# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

Consolidated Appeal No. 13-1894

United States of America,

   Plaintiff / Appellee,

vs.

| | |
|---|---|
| Dominic Henley, | Appeal No. 13-1894 |
| James C. Smith, | Appeal No. 13-1935 |
| Jerry Elkins, | Appeal No. 13-1941 |
| Marshall Fry, | Appeal No. 13-1967 |
| Anthony Robinson and | Appeal No. 13-1969 |
| Jerry Peteet, | Appeal No. 13-1971 |

   Defendants / Appellants.

Appeal from the United States District Court for the Eastern District of Missouri
Cause No. 4:11-CR-246 CDP
Honorable Catherine D. Perry, Chief Judge
United States District Court

## APPELLANTS' JOINT BRIEF

| | |
|---|---|
| Donnell Smith, #44510 | Christopher A. Pickett, #51059 |
| Donnell Smith and Associates, LLC | Greensfelder, Hemker, & Gale, PC |
| 4625 Lindell Boulevard, Suite 500 | 10 S. Broadway, 20th Floor |
| St. Louis, Missouri 63108 | St. Louis, Missouri 63102 |
| (314) 361-2500 telephone | (314) 516-2654 telephone |
| (314) 361-2525 facsimile | (314) 851-0982 facsimile |
| donnell.smith@smithlawpractice.com | cap@greensfelder.com |
| Attorney for Defendant/Appellant | Attorney for Defendant/Appellant |
|  Dominic Henley |  James C. Smith |

Ronald E. Jenkins, #23850
Jenkins & Kling, P.C.
150 N. Meramec Avenue, Suite 400
St. Louis, Missouri 63105
(314) 721-2525
(314) 721-5525
rjenkins@jenkinskling.com
Attorney for Defendant/Appellant
    Jerry Elkins

John M. Lynch, #56604
The Law Offices of John M. Lynch, LLC
222 S. Meramec Avenue, Suite 300
Clayton, Missouri 63105
(314) 726-9999 telephone
(314) 726-9199 facsimile
jlynch@lynchlawonline.com
Attorney for Defendant/Appellant
    Marshall Fry

Douglas P. Roller, #50262
Roller Law Office, LLC
10702 Manchester Road, Suite 207
St. Louis, Missouri 63122
(314) 645-7228 telephone
(314) 685-8014 facsimile
dprcrimlaw@aol.com
Attorney for Defendant/Appellant
    Anthony Robinson

David Woods, #28779
Attorney at Law
427 West Terra Lane, Suite A
O'Fallon, Missouri 63366
(636) 448-1748 telephone
reachingdavid@yahoo.com
Attorney for Defendant/Appellant
    Jerry Peteet

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

Appellants Dominic Henley, James Smith, Jerry Elkins, Marshall Fry, Anthony Robinson and Jerry Peteet (hereinafter "Appellants") pleaded not guilty to the Superseding Indictment (Docket No. 744)[1] filed June 21, 2012. This Indictment charged 11 defendants with 17 Counts including a RICO conspiracy, ITAR attempted murder, ITAR murder, ITAR murder conspiracy, tampering and other charges.

Following a 27 day trial and eight days of jury deliberations, Appellants were found guilty of the following charges:

1. Henley – Counts 1 (Racketeering Conspiracy) and 13 (Conspiracy to Commit Murder). Appellant Henley was acquitted of Counts 4 (Murder in Aid of Racketeering) and 5 (Discharge of Firearm);

2. Smith – Count 1;

3. Elkins – Counts 1 and 13;

4. Fry – Counts 1 and 13. Appellant Fry was acquitted of Count 9 (Murder in Aid of Racketeering);

5. Robinson – Counts 1, 10 (Murder ITAR), 11 (Attempt to Commit Murder), 14 (Murder ITAR) and 16 (Tampering). Appellant Robinson was acquitted of Count 15 (ITAR Attemped Murder); and

6. Peteet – Counts 1 and 2 (ITAR Attempted Murder). Appellant Peteet was acquitted of Count 3 (Tampering).

---

[1] All docket references refer to the District Court Docket Sheet.

i

Chief Judge Catherine D. Perry sentenced Appellants to the following prison terms:

1. Henley (204 months);
2. Smith (120 months);
3. Elkins (210 months);
4. Fry (188 months);
5. Robinson (Life); and
6. Peteet (276 months).

Appellants respectfully request 20 minutes of oral argument as to claims raised in Appellants' *Joint Brief* because they address significant RICO enterprise and predicate act issues, Title III wiretap jurisdiction issues of first impression in this Circuit, as well as evidence and instruction issues common to all Appellants. Additionally, Appellants request five minutes for each of the six Appellant's separate appeals for a total of 30 minutes additional time. Thus, a total time of 50 minutes for all arguments is requested.

Appellate Case: 13-1894    Page: 4    Date Filed: 11/07/2013 Entry ID: 4093815

# TABLE OF CONTENTS

Page No.

Summary of the Case ......................................................................... i

Table of Contents ............................................................................. iii

Table of Authorities ......................................................................... v

Jurisdictional Statement ................................................................... xi

Statement of the Issues ..................................................................... xiii

Statement of the Case........................................................................ 1

Statement of Facts ............................................................................ 3

Summary of the Argument................................................................. 18

Argument........................................................................................... 19

    I.     THE DISTRICT COURT ERRED BY DENYING
          APPELLANTS' MOTIONS FOR JUDGMENT OF
          ACQUITTAL WHEN INSUFFICIENT EVIDENCE
          WAS PRESENTED THAT THE PREDICATE ACTS
          ALLEGED IN THE INDICTMENT CONSTITUTED A
          "PATTERN OF RACKETEERING ACTIVITY" AS
          DEFINED BY 18 U.S.C. § 1961(5). ........................................ 19

    II.    THE DISTRICT COURT ERRED BY DENYING
          APPELLANTS' MOTIONS FOR JUDGMENT OF
          ACQUITTAL WHEN INSUFFICIENT EVIDENCE
          WAS PRESENTED THAT THE WHEELS OF SOUL
          CONSTITUTED AN "ENTERPRISE" AS DEFINED
          BY 18 U.S.C. § 1961(5). .......................................... 29

Appellate Case: 13-1894   Page: 5   Date Filed: 11/07/2013 Entry ID: 4093815

III.    THE DISTRICT COURT ERRED IN DENYING
        APPELLANTS' MOTIONS TO SUPPRESS
        ELECTRONIC SURVEILLANCE WHEN THE
        DISTRICT COURT FOR THE EASTERN DISTRICT
        OF MISSOURI DID NOT HAVE JURISDICTION TO
        AUTHORIZE THE INTERCEPTION OF
        COMMUNICATIONS OVER A CELL PHONE
        LOCATED IN ILLINOIS. ......................................................... 38

IV.     THE DISTRICT COURT ERRED IN ADMITTING
        CONSENSUAL AND COURT-AUTHORIZED TAPE
        RECORDINGS WHICH WERE NOT
        AUTHENTICATED NOR A PROPER FOUNDATION
        LAID ESTABLISHING THE INTEGRITY OF THE
        TAPE RECORDINGS. ............................................................. 44

V.      THE DISTRICT COURT ABUSED ITS DISCRETION
        BY DENYING APPELLANTS' REQUEST FOR A
        SPECIAL INTERROGATORY REFLECTING WHICH
        PREDICATE ACTS THE JURY UNANIMOUSLY
        FOUND AS TO EACH DEFENDANT. ................................... 67

Conclusion ....................................................................................... 73

Certificate of Compliance ................................................................ 75

Certificate of Service ...................................................................... 76

Addendum .............................................................. Separately Filed

iv

Appellate Case: 13-1894    Page: 6    Date Filed: 11/07/2013 Entry ID: 4093815

# TABLE OF AUTHORITIES

Cases:                                                                    Page No.

*Alabama v. Bozeman*, 533 U.S. 146 (2001) ................................................... 40

*Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986
(8th Cir. 1989) ...................................................................... xiii, 21, 36

*Berger v. New York*, 388 U.S. 41 (1967) ................................................. 44, 66

*Cleveland v. United States*, 531 U.S. 12 (2000) ..................................... xiii, 40

*Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765 (8th Cir. 1992) .... xiii, 21, 26, 27

*Durns v. United States,* 562 F.2d 542 (8th Cir. 1977), *cert. denied,*
434 U.S. 959 (1977) ............................................................................ 46

*First Nat'l Bank & Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1304 (8th Cir.
1991) ................................................................................................... 21

*Gray v. United States*, 174 F.2d 919 (8th Cir. 1949) ................................... 69

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) ................. xiii, 20, 21, 22

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1988) ............................................................................ 40

*McAlinney v. Marion Merrell Dow, Inc.*, 992 F.2d 839 (8th Cir. 1993) ....... 63

*United Healthcare Corp. v. American Trade Ins. Co., Ltd.,*
88 F.3d 563 (8th Cir. 1996) ........................................................ xiii, 36

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011) ........................... xiv, 70

*United States v. Biggins*, 551 F.2d 64 (5th Cir. 1977) ............... 45, 54, 55, 60

*United States v. Bledsoe*, 674 F.2d 647 (8th Cir. 1982),
*cert. denied*, 459 U.S. 1040 (1982) ............................................xiii, 33, 34, 35

v

Appellate Case: 13-1894    Page: 7    Date Filed: 11/07/2013 Entry ID: 4093815

*United States v. Branch,* 970 F.2d 1368 (4th Cir. 1992) .............................. 46

*United States v. Burke*, 517 F.2d 377 (2d Cir. 1975) ..................................... 42

*United States v. Calderin-Rodrigquez,* 244 F.3d 977 (8th Cir. 2001) .......... 63

*United States v. Clark,* 986 F.2d 65 (4th Cir. 1993) ............................... 46, 47

*United States v. Delgado*, 401 F.3d 290 (5th Cir. 2005) ............................ 27

*United States v. Denman*, 100 F. 3d 399 (5th Cir. 1996) ....................... 40, 41

*United States v. Donovan*, 429 U.S. 413 (1977) .............................. xiii, 40, 66

*United States v. Eufrasio*, 935 F.2d 553 (3d Cir. 1991) ............................. 21

*United States v. Font-Ramirez,* 944 F.2d 42 (1st Cir. 1991),
*cert. denied,* 502 U.S. 1065 (1992) ................................................ 63

*United States v. Fregoso*, 60 F.3d 1314 (8th Cir. 1995) ........................ 19, 29

*United States v. Fuentes*, 563 F.2d 527 (2d Cir. 1977),
*cert. denied*, 434 U.S. 959 (1977) ................................................... 45

*United States v. Gerber*, 994 F.2d 1556 (11th Cir. 1993) ........................... 42

*United States v. Huff,* 959 F.2d 731 (8th Cir. 1992),
*cert. denied,* 506 U.S. 855 (1992) ................................................ 63

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) .................... xiii, 22

*United States v. Jackson*, 345 F.3d 638 (8th Cir. 2003) ............................. 38

*United States v. Jannotti*, 729 F.2d 213 (3d Cir. 1984),
*cert. denied*, 469 U.S. 880 (1984) .......................................... 22, 23

*United States v. Jones*, 132 S. Ct. 945 (2012) ................................ xiii, 42, 43

*United States v. Kragness*, 830 F.2d 842 (8th Cir. 1987) ...................... 68, 70

Appellate Case: 13-1894    Page: 8    Date Filed: 11/07/2013 Entry ID: 4093815

*United States v. Lamoreaux*, 422 F.3d 750 (8th Cir. 2005) .......................... 67

*United States v. Le,* 272 F.3d 530 (8th Cir. 2001) ......................................... 63

*United States v. Luong*, 471 F.3d 1107 (9th Cir. 2006) ................................. 41

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ... xiv, 64, 65

*United States v. Massino,* 784 F.2d 153 (2d Cir. 1986) ................................ 64

*United States v. McCowan*, 706 F.2d 863 (8th Cir. 1983) ............................ 61

*United States v. McGrath,* 622 F.2d 36 (2d Cir. 1980) ................................. 64

*United States v. McLaurin*, 557 F.2d 1064 (5th Cir. 1977),
*cert. denied*, 434 U.S. 1020 (1978) ................................................................ 35

*United States v. McMillan,* 508 F.2d 101 (8th Cir. 1974),
*cert. denied,* 421 U.S. 916 (1975) ............................................... xiv, 46, 55, 56

*United States v. Minicone*, 960 F.2d 1099 (2d Cir. 1992) ............................ 22

*United States v. Nerone*, 563 F.2d 836 (7th Cir. 1977) ................................ 23

*United States v. North*, 728 F.3d 429 (5th Cir. 2013) *withdrawn,*
No. 11-60763, 2013 WL 5761902 (5th Cir. Oct. 24, 2013) ................... 41, 42

*United States v. Ogando* 968 F.2d 146 (2d Cir. 1992) ........................... 69, 70

*United States v. Oslund*, 453 F.3d 1048 (8th Cir. 2006) ........................ 44, 47

*United States v. Pierce*, 479 F.3d 546 (8th Cir. 2007) .................................. 69

*United States v. Poeta,* 455 F.2d 117 (2d Cir.), *cert. denied,*
406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) .................................... 64

*United States v. Provenzano*, 688 F.2d 194 (3d Cir. 1982),
*cert. denied*, 459 U.S. 1071 (1982) ............................................................... 22

*United States v. Reed*, 147 F.3d 1178 (9th Cir. 1998) .................................. 69

Appellate Case: 13-1894     Page: 9     Date Filed: 11/07/2013 Entry ID: 4093815

*United States v. Rios,* 495 U.S. 257, 264 (1990) ............................................ 65

*United States v. Roach,* 28 F.3d 729 (8th Cir. 1994) ..................................... 46

*United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992),
*cert. denied*, 506 U.S. 847 (1992) ...................................................... 40, 41, 64

*United States v. Roman*, 870 F.2d 65 (2d Cir. 1989) .................................... 70

*United States v. Ruggiero*, 726 F.2d 913 (2d Cir. 1984) .............................. 70

*United States v. Ryan*, 9 F.3d 660 (8th Cir. 1993), *vacated in part
on other grounds but aff'd as to the special verdict form,*
41 F.3d 361 (8th Cir. 1994) (en banc) ..................................................... xiv, 69

*United States v. Smith*, 32 F.3d 1291 (8th Cir. 1994) ............................. 19, 29

*United States v. Starks*, 515 F.2d 112 (3d Cir. 1975) ................ xiv, 44, 54, 60

*United States v. Stegmeier*, 701 F.3d 574 (8th Cir. 2012) ..................... xiv, 69

*United States v. Tavarez*, 40 F.3d 1136 (10th Cir. 1994) ....................... 40, 41

*United States v. Turkette*, 452 U.S. 576 (1981) ......................... xiii, 32, 33, 34

*United States v. Vazquez,* 605 F.2d 1269 (2d Cir. 1979),
*cert. denied,* 444 U.S. 981 (1979) ................................................................ 64

*United States v. Webster*, 84 F.3d 1056 (8th Cir. 1996) ......................... 46, 63

*United States v. Westmoreland*, 312 F.3d 302 (7th Cir. 2002),
*cert. denied*, 538 U.S. 1042 (2003) ............................................................. 45

*United States v. Wilson*, 237 F.3d 827 (7th Cir. 2001) ................................. 41

*United States v. Williams*, 902 F.2d 675 (8th Cir. 1990) .............................. 69

Appellate Case: 13-1894     Page: 10     Date Filed: 11/07/2013 Entry ID: 4093815

Statutes:

18 U.S.C. § 924(j) ........................................................................................ xi

18 U.S.C. § 1512 .......................................................................................... xi

18 U.S.C. § 1861 et seq. ......................................................................... 32, 33

18 U.S.C. § 1959 .......................................................................................... xi

18 U.S.C. § 1961(4) ..................................................................................... 36

18 U.S.C. § 1961(5) ......................................................................... xiii, 19, 29

18 U.S.C. § 1962 ......................................................................................... 36

18 U.S.C. § 1962(d) ........................................... xi, 16, 19, 33, 37, 67

18 U.S.C. § 2517(1) ...................................................................................... 60

18 U.S.C. § 2517(2) ...................................................................................... 60

18 U.S.C. § 2517(3) ...................................................................................... 60

18 U.S.C. § 2518(4)(b) .......................................................................... xiii, 39

18 U.S.C. § 2518(8)(a) ....................................................... xiv, 60, 61, 64, 65

18 U.S.C. § 3231 ......................................................................................... xi

18 U.S.C. § 3575(e) ...................................................................................... 22

28 U.S.C. § 753(b) ........................................................................................ 62

28 U.S.C. § 1291 ......................................................................................... xi

Appellate Case: 13-1894    Page: 11    Date Filed: 11/07/2013 Entry ID: 4093815

Other Authority:

Fed. R. Civ. P. 30(f) ........................................................................... 62

Fed. R. Civ. P. 44 ............................................................................... 62

Fed. R. Civ. P. 80(c) ........................................................................... 62

Fed. R. Crim. P. 27............................................................................. 62

Fed. R. Evid. 901(10)..................................................................... 61, 62

11 Oxford English Dictionary 357 (2d. ed. 1989) ........................................ 20

S. Rep. No. 90-1097, *reprinted in* 1968 U.S.C.C.A.N. 2193-2194......... 60, 61

S. Rep. No. 91-617 (1969) ............................................................ 20, 32, 33

Kate H. Nepveu, Note, *Beyond "Guilty" or "Not Guilty":*
*Giving Special Verdicts in Criminal Jury Trials,*
21 Yale L. & Pol'y Rev. 263, 272 (2003) ............................................ 71, 72

Appellate Case: 13-1894    Page: 12    Date Filed: 11/07/2013 Entry ID: 4093815

# JURISDICTIONAL STATEMENT

This case is a consolidated appeal from the jury verdicts and the sentences entered by the Honorable Catherine D. Perry, Chief United States District Judge for the Eastern District of Missouri. Appellants were charged with violations of 18 U.S.C. §§ 1962(d), 1959, 1512, and 924(j). Jurisdiction in the trial court was based upon 18 U.S.C. § 3231 as the proceeding stemmed from offenses against the laws of the United States.

Appellants were found guilty of the following Counts in the Superseding Indictment on December 7, 2012:

1. Count 1 (All Appellants);
2. Count 2 (Peteet);
3. Count 10 (Robinson);
4. Count 11 (Robinson);
5. Count 13 (Henley, Elkins and Fry);
6. Count 14 (Robinson); and
7. Count 16 (Robinson).

Appellants were sentenced on:

1. Henley (April 15, 2013);
2. Smith (April 12, 2013);
3. Elkins (April 16 ,2013);
4. Fry (April 15, 2013);
5. Robinson (April 23, 2013); and
6. Peteet (April 23, 2013).

All Appellants filed timely notices of appeal in the District Court. (Docket Nos. 1475, 1498, 1496, 1517 and 1520 (redocketed), 1528 and 1523). This Court's jurisdiction is based upon 28 U.S.C. § 1291 which provides the United States

Appellate Case: 13-1894   Page: 13   Date Filed: 11/07/2013 Entry ID: 4093815

Court of Appeals with jurisdiction in appeals from all final decisions of a District

Court.

Appellate Case: 13-1894     Page: 14     Date Filed: 11/07/2013 Entry ID: 4093815

# STATEMENT OF THE ISSUES

I.    Whether the District Court erred by denying Appellants' Motions for Judgment of Acquittal when insufficient evidence was presented that the predicate acts alleged in the Indictment constituted a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5).

> *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)
> *United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989)
> *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986 (8th Cir. 1989)
> *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765 (8th Cir. 1992)

II.    Whether the District Court erred by denying Appellants' Motions for Judgment of Acquittal when insufficient evidence was presented that the Wheels of Soul constituted an "enterprise" as defined by 18 U.S.C. § 1961(5).

> *United States v. Turkette*, 452 U.S. 576 (1981)
> *United States v. Bledsoe*, 674 F.2d 647 (8th Cir. 1982)
> *United Healthcare Corp. v. American Trade Ins. Co., Ltd.*, 88 F.3d 563 (8th Cir. 1996)

III.    Whether the District Court erred in denying Appellants' Motions to Suppress Electronic Surveillance when the District Court for the Eastern District of Missouri did not have jurisdiction to authorize the interception of communications over a cell phone located in Illinois.

> *United States v. Jones*, 132 S. Ct. 945 (2012)
> *Cleveland v. United States*, 531 U.S. 12 (2000)
> *United States v. Donovan*, 429 U.S. 413 (1977)
> 18 U.S.C. § 2518(4)(b)

Appellate Case: 13-1894    Page: 15    Date Filed: 11/07/2013 Entry ID: 4093815

IV.    Whether the District Court erred in admitting consensual and court-authorized tape recordings when they were not authenticated nor a proper foundation of trustworthiness presented establishing their integrity.

> *United States v. McMillan,* 508 F.2d 101 (8th Cir. 1974),
> *cert. denied,* 421 U.S. 916 (1975)
> *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975)
> *United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)
> 18 U.S.C. § 2518(8)(a)

V.    Whether the District Court abused its discretion by denying Appellants' request for a special interrogatory reflecting which predicate acts the jury unanimously found as to each Defendant.

> *United States v. Ryan*, 9 F.3d 660 (8th Cir. 1993), *vacated in part on other grounds but aff'd as to the special verdict form*, 41 F.3d 361 (8th Cir. 1994) (en banc)
> *United States v. Applins*, 637 F.3d 59 (2d Cir. 2011)
> *United States v. Stegmeier*, 701 F.3d 574 (8th Cir. 2012)

Appellate Case: 13-1894    Page: 16    Date Filed: 11/07/2013 Entry ID: 4093815

## STATEMENT OF THE CASE

This is an appeal of a criminal case. On June 9, 2011, the government filed a 17 Count Indictment against 18 defendants. (Docket No. 2). A year later, on June 12, 2012, a 17 Count Superseding Indictment was returned against 11 defendants. (Docket No. 744). Several defendants in the original Indictment entered guilty pleas before the Superseding Indictment was returned.

Prior to trial, Appellants filed Motions to Suppress Electronic Surveillance (e.g. Docket Nos. 419, 435, 452, 518 and 628). Evidentiary hearings were held by U.S. Magistrate Frederick R. Buckles on the electronic surveillance motions on April 15 (Docket Nos. 648 and 1598) and May 24, 2012 (Docket Nos. 1614 and 1615). Judge Buckles issued his Report and Recommendation on September 28, 2012. (Docket No. 1023).

Appellants filed timely objections to Judge Buckles' Report and Recommendation. Judge Catherine D. Perry issued her Order adopting Judge Buckles' Report and Recommendation on October 15, 2012. (Docket No. 1103).

Eight defendants went to trial on the charges in the Superseding Indictment.[2] Trial and jury deliberations before the Honorable Catherine D. Perry lasted 35 days. Seventy witnesses were called by the parties. Appellants were found guilty

---

[2] Curtis Cole was acquitted at the close of the government's case by the Court. Timothy Balle was convicted of some charges and acquitted of others. Balle has not appealed.

1

of certain counts and acquitted of other counts as set forth in the Summary And Request for Oral Argument Section of this brief.

During trial Appellants raised admissibility, foundation and authenticity issues regarding consensual tape recordings and Title III intercepted communications. These issues were properly preserved for appeal.

Moreover, at the close of the government's case and the entire case, all Appellants moved for Judgments of Acquittal on Count 1 (the RICO Count), due to insufficiency of the evidence regarding the "enterprise" and "pattern of racketeering" allegations.

Finally, Appellants tendered proposed jury instructions which were denied by the Court. Several, but not all, Appellants will raise sentencing and other defendant-specific issues in their individual briefs due November 29, 2013.

All Appellants filed timely notices of appeal.

Appellate Case: 13-1894     Page: 18     Date Filed: 11/07/2013 Entry ID: 4093815

## STATEMENT OF FACTS

## A. <u>GENERAL OVERVIEW OF CASE</u>

In 2009, an individual named Matthew Hunter was charged in Reynolds County, Missouri with various serious traffic violations, including evading arrest. (Docket No. 1544 at p. 11). A St. Louis County Police Department detective, Andrea Van Mierlo, was advised that Hunter may wish to cooperate. (Docket No. 1544 at p. 10). At the time, Ms. Van Mierlo was seeking information regarding a St. Louis motorcycle club known as the Sin City Disciples. *Id.* Van Mierlo met with Matthew Hunter and although Hunter was not a member of the Sin City Disciples, he knew several members of that club. Hunter subsequently became an informant for Van Mierlo and the FBI[3] and agreed to wear a concealed body recorder and to have one of his cell phones monitored by the FBI. (Docket No. 1544 at pp. 12, 24, 27).

Shortly after he began cooperating, Hunter joined a sports bike club called the Sin City Titans. The subject of Officer Van Mierlo's investigation, the Sin City Disciples, on the other hand, only rode Harley Davidson motorcycles. (Docket No. 1550 at p. 3). The Sin City Disciples was an "outlaw" motorcycle club. This type of motorcycle club made up its own rules and basically ruled the other motorcycle clubs in the city. (Docket No. 1550 at pp. 33-34).

---

[3] Although Van Mierlo was a St. Louis County Police Department detective, she was also assigned to the FBI as a task force officer. (Docket No. 1544 at p. 9).

Appellate Case: 13-1894   Page: 19   Date Filed: 11/07/2013 Entry ID: 4093815

After Hunter joined the club, the Sin City Titans decided to form their own "outlaw" motorcycle club by creating a St. Louis chapter of a motorcycle club known as the Wheels of Soul. (Docket No. 1544 at p. 126). Defendant Dominic Henley became President of the St. Louis Wheels of Soul. (Docket No. 1550 at p. 36). Co-defendants (but not Appellants herein) Norman Vick, Lawrence Pinkston and Timothy Balle, along with Matthew Hunter, joined the St. Louis chapter of the Wheels of Soul. Matthew Hunter was known as Mad Matt and sometimes used the last name of Mason. (Docket No. 1550 at pp. 41, 44).

Matthew Hunter, under the supervision of Officer Van Mierlo, embarked upon a relentless, full time effort to gather evidence of criminal violations against Mr. Henley and the other members of the Wheels of Soul.[4] From early 2009 through March 2011, Hunter recorded approximately 56 meetings of the St. Louis Chapter of the Wheels of Soul, Regional meetings of the Wheels of Soul and interactions with individual members. During the majority of this time, Mr. Hunter also allowed the FBI to conduct electronic surveillance of one of his two cell phones. (Docket No. 1544 at pp. 26-28). For his efforts, Hunter was paid in excess of $70,000 by the FBI and ATF. (Docket No. 1544 at p. 22; Docket No. 1486 at p. 17). It is Matthew Hunter's secret recordings which formed the backbone of the government's case against the Wheels of Soul. Co-defendants

---

[4] He was so busy trying to make cases that he had to give up his regular job. (Docket No. 1544 at p. 20).

4

turned government witnesses Allan Hunter and Sean Jackson were the key turncoat witnesses for the government at trial.

As noted above, Appellant Dominic Henley was alleged to be the President of the St. Louis Chapter of the Wheels of Soul. The remaining Appellants herein were alleged to have had the following positions in the Wheels of Soul: James Smith, National Vice-President located in Philadelphia; Anthony Robinson, Sergeant at Arms of the Chicago Chapter; Jerry Elkins, Chapter President of Denver Chapter; Marshall Fry, member of Denver Chapter; and Jerry Peteet, President of the Gary, Indiana Chapter. (Docket No. 744 at p. 8).

The investigation, which led to the Indictment herein was headed by a prosecutor in the St. Louis, Missouri United States Attorney's Office and Officer Van Mierlo, a detective with the St. Louis County Police Department with little or no federal experience. As will be seen, the prosecutor and the detective took isolated alleged violations of state law (some of which were investigated originally by local authorities) by individual members of the Wheels of Soul and labeled them as predicate acts in order to manufacture a RICO conspiracy.

## B. <u>SUBSTANTIVE COUNTS UNDERLYING RICO CONSPIRACY</u>

The Government's RICO case is founded on predicate acts which were also

Appellate Case: 13-1894    Page: 21    Date Filed: 11/07/2013 Entry ID: 4093815

charged as substantive counts. The substantive counts of the Indictment at issue herein[5] are as follows:

1) attempt to commit murder in Indiana on May 28, 2009 (Count 2);

2) a shooting on January 2, 2011 at the Hawks' motorcycle club Clubhouse in Chicago, Illinois (Counts 10 and 11);

3) a conspiracy to commit murder on January 29, 2011 in East St. Louis, Illinois (Count 13); and

4) a shooting at the Wheels of Soul Clubhouse in Marion, Ohio on March 6, 2011 (Counts 14 and 16).

The following brief overview of the factual underpinnings of the separate state violations used as predicate acts in the alleged RICO conspiracy (Count 1) is intended to assist in placing in context the arguments set forth in this Joint Brief.

### 1. May 28, 2009 (Count 2)

On May 28, 2009 Jerry Peteet was at the Bennigan's Restaurant in Gary Indiana. (Docket No. 1594 at p. 10). Also present that evening were Mr. Peteet's brother, Kennedy Peteet, Mike Flores a/k/a Fall Guy, Robert Taylor, a/k/a/ Damn Fool and a few members of the Wheels of Soul from Chicago and Indiana. A fight broke out between Flores and Taylor, which was broken up by Bennigan's Security personnel. (Docket No. 1594 at p. 16).

---

[5] Those Appellants charged in Counts 3, 4, 5, 9 and 15 were acquitted of those counts. Counts 6, 7 and 8 did not name any of the Appellants herein. Thus, only the facts pertaining to the counts of conviction are addressed in the joint brief.

6

A number of people then went outside to the parking lot of the restaurant. Robert Taylor walked up to a group where Mr. Kennedy Peteet was standing and, according to Kennedy Peteet, acted like he was going to pull out a gun (Docket No. 1594 at p. 19). Mr. Kennedy Peteet testified that he pulled out his own gun, but Barry Rogers a/k/a "Capone" grabbed the gun out of Kennedy Peteet's hand. (Docket No. 1594 at pp. 19). Mr. Rogers was not a member of Wheels of Soul. (Docket No. 1594 at p. 145).

Mr. Taylor and Mr. Rogers began arguing and cursing at each other. (Docket No. 1594 at p. 22). Jerry Peteet approached the two men and displayed two guns he had on his person and warned Mr. Taylor against exhibiting a firearm. (Docket No. 1594 at p. 21). According to Kennedy Peteet, everyone then began to back up from Mr. Taylor and as that occurred Barry Rogers pointed the gun downward and shot two shots. One hit Taylor in the leg. Taylor fell down, got back up and ran across the street to a waiting vehicle. (Docket No. 1594 at p. 22).

Appellant Jerry Peteet also testified and provided an account of that evening similar to his brother's testimony. (Docket No. 1594 at pp. 145 and 148). Additionally, Jerry Peteet testified that he had been an official member of the Wheels of Soul for only two weeks on the day of the Bennigan's incident. (Docket No. 1594 at p. 137). Jerry Peteet also testified that the Bennigan's incident had nothing to do with the Wheels of Soul. (Docket No. 1594 at pp. 45 and 80).

7

Further, Appellant Jerry Peteet testified that he did not shoot at or attempt to murder Mr. Taylor. (Docket No. 1594 at p. 154).

The government's witness, Robert Taylor, testified that he was a member of the Sin City Disciples in East Chicago, Indiana and had been for approximately three or four years. (Docket No. 1555 at p. 23). He did not leave the Sin City Disciples when Jerry Peteet and others left the Sin City Disciples and joined Wheels of Soul. According to Taylor, Peteet had animosity against Taylor for not joining the Wheels of Soul. (Docket No. 1555 at p. 24-25).

According to Taylor, when he was outside in the parking lot Jerry Peteet walked up behind Taylor and hit him in the side of the head with a gun knocking him to the ground. (Docket No. 1555 at p. 47). Taylor got up and walked to Jerry Peteet to fight with him. At that point, according to Taylor, Peteet put two guns against Taylor's chest and threatened to kill Taylor. Taylor stated he began walking away, watching Peteet as he walked, and then saw Peteet fire shots at him, one of which struck Taylor in the buttocks. Taylor got to his car and drove away. (Docket No. 1555 at p. 50-51).

### 2. January 2, 2011 (Counts 10 and 11)

On January 2, 2011, several Wheels of Soul members, including Anthony Robinson, attended a New Year's Eve party on the South side of Chicago at the clubhouse of another Chicago Motorcycle Club, the Hawks. Also present was

Appellate Case: 13-1894    Page: 24    Date Filed: 11/07/2013 Entry ID: 4093815

Charles Ervin, a member of the Street Soldiers Motorcycle Club based in Indiana. (Docket No. 1581 at 71-72). Robinson and other Wheels of Soul members noted that Ervin was wearing his "colors" (a vest with the name of the motorcycle club and other insignias). Ervin's vest had a "rocker" (lettering) which identified the Street Soldiers as an Illinois Motorcycle Club. (Docket No. 1585 at 94-95). In the motorcycle culture the Street Soldiers were not allowed to wear an Illinois state rocker because they did not have a chapter in Illinois nor were they the dominant club in Illinois. (Docket No. 1585 at 86-88).

Ervin was well aware of this prohibition as a result of at least two meetings with Allan Hunter, the Regional President of the Wheels of Soul and star witness for the government, regarding the Wheels of Soul objection to Street Soldiers wearing the Illinois Rocker. (Docket No. 1585 at 86-88; Docket No. 1581 at 92-93).[6] On January 2, 2011, after observing Ervin's vest at the Hawks' Clubhouse, Robinson, knowing that Allan Hunter had discussed this issue with the Street Soldiers, tried to telephone Allan Hunter but there was no answer. Robinson and other Wheels of Soul members were discussing the matter with Ervin, telling Ervin that he needed to either remove his vest or cut the rocker off, when Hunter called

---

[6] Allan Hunter believed that Ervin was at the Hawks' Clubhouse that evening to kill Allan Hunter because of his opposition to the wearing of the Illinois rocker by the Street Soldiers. (Docket No. 1593 at pp. 66-67). This would explain why, despite the controversy, Ervin wore his vest. This would also explain why Ervin had a weapon that night when he usually did not carry a firearm. (Docket No. 1581 at pp. 99-100).

Appellate Case: 13-1894    Page: 25    Date Filed: 11/07/2013 Entry ID: 4093815

back. (Docket No. 1581 at 78-79). After being told by Robinson what was happening, Hunter told Robinson that he (Hunter) would handle the matter later. (Docket No. 1585 at 94-95). In a second call from Robinson a short time later, Hunter heard arguing in the background and then while Robinson was talking to him, shots rang out and Robinson dropped the phone. (Docket No. 1585 at 96). Hunter testified that someone other than Robinson shot first. (Docket No. 1593 at 65). All three witnesses to the incident, other than Ervin, testified that Ervin drew his gun and fired first. No one saw anyone besides Ervin with a gun before Ervin started firing. (Docket No. 1581 at 97, 162, 175).

The forensic evidence demonstrated that when the shooting started, Robinson moved toward the front door of the clubhouse. When shots were fired at Robinson, however, he returned fire. (Docket No. 1368 at 34-36, 59-60, 98). A Wheels of Soul member and the President of the Hawks were killed in the shoot-out. Co-defendant Curtis Cole was shot eight times but survived and Allan Hunter's brother, Maurice Harper was also wounded but survived.

The incident on January 2, 2011 was a *spontaneous* incident that was not planned, not agreed to by anyone in advance and the continued confrontation with Ervin was against the direct orders of Allan Hunter. No violent action was taken against the Street Soldiers by any member of the Wheels of Soul as a result of the January 2, 2011 shooting. (Docket No. 1593 at 61). The very nature of the

10

incident established that it could not have been an agreed upon predicate act and the evidence was unequivocal that the confrontation with Ervin could not have been undertaken to enhance Robinson's position in the Wheels of Soul because Hunter specifically told Robinson to back off. The District Court characterized what happened in the Hawks' Clubhouse on January 2, 2011 as a "shootout in a bar . . . a crowded bar." (Docket No. 1602 at 21-22).

### 3. January 29, 2011 (Count 13)

On January 29, 2011, the annual "Black New Year's" event occurred at the Masonic Temple in East St. Louis, Illinois. (Docket No. 1601 at p. 130-131). Each year hundreds of bikers from various motorcycle clubs attend the Black New Year's party hosted by two motorcycle clubs, the Buffalo Soldiers and the World of Soul (not affiliated with the Wheels of Soul). (Docket No. 1593 at pp. 131-132).

Government witness Walter Lee testified that Bo (Appellant Marshall Fry) and "Diamond" were present at the Black New Year's party ("BNY"). Lee had come to St. Louis for the party from Milwaukee. These three individuals met "Bishop" (Appellant Dominic Henley) at BNY. According to Lee, a "hit" was to be made on members of the Outcasts motorcycle club in retaliation for the shooting of a Wheels of Soul member in Florida. However, they were also at the event to "party" according to Allan Hunter. (Docket No. 1593 at p. 137). In fact, Dominic

Appellate Case: 13-1894    Page: 27    Date Filed: 11/07/2013 Entry ID: 4093815

Henley was extremely intoxicated. (Docket No. 1601 at p. 142). Henley was so drunk that Fry had to "babysit" him. (Docket No. 1593 at p. 139).

While at BNY, Walter Lee had telephone conversations with Allan Hunter. According to Lee, the conversations were in code. None of the three other Wheels of Soul members at BNY talked to Hunter. Indeed, the only reason Henley was there was because Lee had called him.[7] (Docket No. 1602 at pp. 149-150).

In the late evening or early morning hours that evening, Henley, Fry, Lee and Diamond gathered outside of the Masonic Temple to, according to Lee, wait for members of the Outcasts to leave the building. Lee also testified that the four went to the car to obtain weapons, but after they retrieved two guns, all the members of the Outcasts were gone. The Wheels of Soul members then went their separate ways. (Docket No. 1553 at pp. 261-262). No evidence was introduced at trial that any Outcast members were shot that night or any other time by members of the Wheels of Soul.

In fact, the only "altercation" that night was between Walter Lee and "Pistol Pete" because Pistol Pete (a former member of the Wheels of Soul) was wearing the colors of another motorcycle club. (Docket No. 1601 at p. 147). This did not turn into any sort of "real" altercation because Fry told Lee to leave the situation

---

[7] Henley also testified that he went to the BNY, did not have a weapon, was not aware of any plot to kill members of the Outcasts, did not participate in any such endeavor and never tried to obtain a gun from the trunk of a car or anywhere else. (Docket No. 1602 at pp. 149-150).

Appellate Case: 13-1894   Page: 28   Date Filed: 11/07/2013 Entry ID: 4093815

alone. *Id.* No conversations of Fry or Henley with Allan Hunter were intercepted that night. (Docket No. 1601 at p. 128-130). The only evidence of communication that night with anyone at the BNY was between the two government witnesses, Allan Hunter and Walter Lee.

### 4. March 6, 2011 (Counts 14 and 15)

On March 6, 2011, Robinson attended a party at the Wheels of Soul Clubhouse in Marion, Ohio following a Regional Meeting of the Wheels of Soul. (Docket No. 1585 at 204). Contrary to other Wheels of Souls Clubs, the Marion Chapter allowed "citizens" (non-motorcycle club individuals), including "gangbangers," to attend the party. (Docket No. 1593 at 70). A fight broke out and later a second fight occurred and at least two non-Wheels of Soul individuals ran out the backdoor. (Docket No. 1593 at 71-72). Shortly thereafter, a series of shots were fired and after a very brief period, a second volley of gunfire occurred. *Id.* The evidence by government witnesses clearly showed that at least two or three men were at the front door of the clubhouse firing into the clubhouse. (Docket No. 1378 at 211; Docket No. 1594 at 218). The testimony was unequivocal that Robinson did not fire a weapon until one of the individuals firing into the clubhouse pointed a weapon at Wheels of Soul member "Cueball's" chest. *Id.* Robinson then fired in the direction of the doorway shooters in order to protect himself and Cueball. No one saw any of Robinson's shots hit anyone.

13

Once again, what occurred was a *spontaneous* event not precipitated by Robinson nor agreed upon by anyone prior to the incident. As such, it could not be a predicate act in furtherance of the Count 1 conspiracy. Although the government needed to establish beyond a reasonable doubt that Robinson did not act in self-defense[8], all the relevant evidence, as noted above, showed that Robinson acted in defense of himself and of another.

The only evidence linking Anthony Robinson with the death of Javal Thornton, the March 6, 2011 victim, were two 9mm magazines found in the search of Robinson's residence at the time of his arrest. (Docket No. 1593 at 161-163). Robinson was located, however, through a cell phone tracking device intercepted through the purported authority of the United States District Court in the Eastern Division of Missouri which did not have jurisdiction to enter such an order. (Docket No. 1593 at 156). The introduction of this evidence was thus error.

## C.    INTERELATEDNESS OF SUBSTANTIVE COUNTS

There is none. Government evidence regarding the May 28, 2009 shooting in Gary, Indiana demonstrated clearly that the incident was a spontaneous personal altercation between Appellant Peteet and Robert Taylor. The January 2, 2011 shooting at the Hawks' Clubhouse was a spontaneous event that was against the instructions of the Regional President Allan Hunter. Evidence concerning the

---

[8] Even Allan Hunter testified that the circumstances under which Robinson returned fire was self-defense. (Docket No. 1593 at p. 19).

14

2011 Black New Year showed conclusively that Henley was unarmed and drunk, Fry was unarmed, and the only people talking about an alleged hit were government witnesses Hunter and Walter Lee. The March 6, 2011 shooting in Marion, Ohio was a spontaneous event which the *entirety* of the evidence showed was an unplanned act of self-defense.

Two facts virtually destroy the government's theory that the substantive crimes constituted a pattern of racketeering as part of a monolithic racketeering enterprise. The first fact is that Allan Hunter testified that the incidents on May 28, 2009, January 2, 2011 and March 6, 2011 were all *spontaneous, unplanned* and *unrelated* events. (Docket No. 1593 at pp. 46-47). The second fact is that Appellant James Smith, the alleged National Vice-President, is charged only in Count 1, the RICO conspiracy. If the individual alleged crimes were undertaken as part of a hierarchical command structure, James Smith would also be accountable for the individual crimes. Yet, the government never charged him in *any substantive offense* committed by *any member* of the Wheels of Soul.

Those are the facts.

## D. <u>PROCEDURAL BACKGROUND</u>

Appellants were charged by Indictment filed on June 9, 2011. (Docket No. 2). The Government, more than a year later, on June 21, 2012, filed a Superseding Indictment, alleging seventeen counts. (Docket No. 744). Every appellant was

15

charged in Count 1: Racketeering Conspiracy pursuant to 18 U.S.C. § 1962(d). The other fifteen counts included charges of "attempt to commit murder in aid of racketeering," "murder in aid of racketeering," "conspiracy to commit murder in aid of racketeering," "discharge of a firearm during and in relation to a crime of violence," and "tampering with a victim, witness, or informant."

Prior to trial, Appellants filed Motions to Suppress the Title III Electronic Surveillance in this case. Appellants contended that the District Court for the Eastern District of Missouri did not have jurisdiction to enter an order authorizing the interception of communications over a cell phone always located in Chicago, Illinois, which is in the Northern District of Illinois. Two hearings on these motions were conducted by Judge Frederick R. Buckles.[9]

Judge Buckles' Report recommended, "Because the intercepted conversations were heard and monitored at the 'listening post' in St. Louis, Missouri, within the Eastern District of Missouri, the Court had jurisdiction to issue the orders." (Docket No. 1023 at p. 15).

However, the initial wiretap Order and the two extension orders say absolutely nothing about the Court's jurisdiction being based upon the facility for monitoring the intercepted communications being located in the Eastern District of Missouri rather than predicated upon the interceptions occurring in the Eastern

---

[9] Appellant Fry waived pre-trial motions. It should be noted that Appellant Fry was not intercepted throughout the entirety of the Government's Title III investigation.

16

District of Missouri. It is this Order (not the Application or the Affidavit in Support) that is transmitted to the telephone service provider to initiate the interception. (Docket No. 1614 at pp. 12 and 13).

Appellants filed timely objections to the Magistrate's Report (Docket No. 1103 at p. 1) and the District Court adopted Judge Buckles' analysis on the jurisdiction issue as her own (Docket No. 1103 at p. 2).

On October 15, 2012, trial commenced and verdicts were reached on December 7, 2012. On various dates thereafter, sentencing hearings were held for each Appellant, and the following sentences were imposed:

1. Henley (204 months);
2. Smith (120 months);
3. Elkins (210 months);
4. Fry (188 months);
5. Robinson (Life); and
6. Peteet (276 months).

Each Appellant/Defendant filed a timely Notice of Appeal.

## SUMMARY OF ARGUMENT

This case is a classic example of the government trying to pound a square peg into a round hole. The isolated, sporadic events proven by the government did not have common victims, common participants or an enveloping purpose tying the acts together. Like Allan Hunter's narcotics trafficking, the predicate acts were personal and not dependent on the particular defendant being a member of the Wheels of Soul nor were the acts related to the activities of the Wheels of Soul.

For reasons that remain unclear, the government sought an order to intercept cell phone communications from a cell phone in Illinois through a district court whose statutory authority for the issuance of such an order was limited to the Eastern District of Missouri.

Compounding this total disregard for the jurisdictional limits of the district court, the government displayed an equal disdain for the protections Congress and the courts have developed to ensure the integrity of tape recorded evidence in light of the ease with which a tape may be altered without detection.

Finally, the government opposed a special interrogatory made necessary by the government's overreaching position regarding charged and uncharged predicate acts. As a consequence, the jury's verdict does not conform with the provisions of RICO requiring unanimity as to which two predicate acts each defendant agreed would be committed.

18

# ARGUMENT

I. **THE DISTRICT COURT ERRED BY DENYING APPELLANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL WHEN INSUFFICIENT EVIDENCE WAS PRESENTED THAT THE PREDICATE ACTS ALLEGED IN THE INDICTMENT CONSTITUTED A "PATTERN OF RACKETEERING ACTIVITY" AS DEFINED BY 18 U.S.C. § 1961(5).**

## A. STANDARD OF REVIEW

When evaluating a claim of insufficient evidence, the Eighth Circuit considers "the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that might be drawn from the evidence." *United States v. Fregoso*, 60 F.3d 1314, 1322 (8th Cir. 1995) (quoting *United States v. Smith*, 32 F.3d 1291, 1292 (8th Cir. 1994)).

## B. ARGUMENT

In order for the government to sustain a conviction for violation of 18 U.S.C. § 1962(d), it must show that the activities of the Wheels of Soul were conducted through a pattern of racketeering. The government failed to elicit any, let alone, sufficient evidence of a pattern of racketeering activity.

As discussed in detail, *supra*, the predicate acts alleged by the government were ***unrelated, random, sporadic, spontaneous, isolated*** acts. The incidents were not related to each other, or the Wheels of Soul. Beginning in May 2009, and continuing through March 6, 2011, each of the alleged acts were motivated by

19

personal feuds and other circumstances not related to the activities of the Wheels of Soul.

**1.    The government failed to prove the acts were related.**

"[T]o prove a pattern of racketeering activity ... [the Government] must show that the racketeering predicates are ***related***, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis added).  In *H.J. Inc.*, the Supreme Court noted that "pattern" is an "arrangement or order of things or activity."  *Id.* at 238 (quoting 11 Oxford English Dictionary 357 (2d. ed. 1989)).  The Court continued, "the mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order." *Id.* at 238.

As the Court reviewed the legislative history, it found that it was clear that "a pattern is not formed by 'sporadic activity'."  *Id.* at 239 (citing S. REP. NO. 91-617 at 158 (1969)).  It continued by noting that "[i]nstead 'the term 'pattern' itself requires the showing of a relationship between the predicates' and of 'the threat of continuing activity'."  *Id.* (quoting S. REP. NO. 91-617 at 158).

The Supreme Court found that the pattern requirement under RICO to be essentially the same as defined in Title X:

> Congress defined Title X's pattern requirement solely in terms of the *relationship* of the defendant's criminal acts one to another:  "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar

20

> purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of the relationships between predicates that would suffice.

*H.J. Inc.*, 492 U.S. at 239-240 (citation omitted).

The language of *H.J. Inc.,* makes clear that the Supreme Court defined a pattern as acts that were related and that constituted a threat of continuing activity. In 1989, the Eighth Circuit also addressed the pattern requirement of the Racketeering Statute. In *Atlas Pile Driving Co. v. DiCon Financial Co.*, the Court used a fact based approach to determine the relatedness and threat of continued conduct. *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 994 (8th Cir. 1989). In 1992, this Court held that a pattern exists if "acts are similar in method, purpose, and result." *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 769 (8th Cir. 1992) (citing *First Nat'l Bank & Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1304 (8th Cir. 1991)). The Court set out the test for continuity as the "threat of causing continuous harm in the future exists." *Id*. at 769. This relationship requirement is of utmost importance to ensure individuals are not convicted based upon a "a series of disconnected criminal acts." *United States v. Eufrasio*, 935 F.2d 553, 565 (3d Cir. 1991).

Appellate Case: 13-1894   Page: 37   Date Filed: 11/07/2013 Entry ID: 4093815

The requirements of relatedness and continuity prevent the application of RICO to **isolated** or **sporadic** criminal acts. See *United States v. Indelicato*, 865 F.2d 1370, 1375-76, 1381-82 (2d Cir. 1989) (emphasis added). As noted above, predicate acts must have "the same or similar purposes, results, participants, victims, or methods of commission," to establish relatedness. *H.J., Inc*., 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e) (1988)).

In order to prove relatedness, the government is required to show that not only are the racketeering acts related to one another ("horizontal relatedness"), but also to the enterprise ("vertical relatedness"). To show vertical relatedness, the government must prove that: (1) the offense related to the activities of the enterprise; or (2) the defendant was able to commit the offense *solely because of his position* in the enterprise. See *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992).

The government, then, must show that if a defendant commits racketeering acts while he is part of an enterprise that the person "is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or the predicate offenses are related to the activities of that enterprise." *United States v. Jannotti*, 729 F.2d 213, 226 (3d Cir. 1984) (citing *United States v. Provenzano*, 688 F.2d 194, 200 (3d Cir. 1982) (citation omitted)). In *Jannotti*, there was evidence that the racketeering acts

22

were conducted through a law firm at which the defendants were employed.  In that scenario, membership in the enterprise or law firm was essential in order to pull off the political scheme.  *Id*. at 227.

Contrast *Jannotti* with *United States v. Nerone*, 563 F.2d 836 (7th Cir. 1977), where the defendants were charged with conducting the affairs of Maple Manor, Inc., a trailer park corporation, through a pattern of racketeering activity. The defendants apparently conducted an illegal gambling operation in one of the mobile homes at their trailer park, but the gambling operation had nothing to do with the affairs of the trailer park.  There was no "endeavor to show that gambling revenues were used by or in any way channeled into the corporation or that persons were paid out of gambling revenues to perform services for Maple Manor, Inc." *Id*. at 851.  The government's RICO case failed there "because of a total want of proof of the connection between the racketeering activities and the affairs of Maple Manor, Inc." *Id*. at 852.

> ### a. The acts making up the basis of the Indictment were sporadic and isolated and, therefore, were not related to each other.

Here, the evidence the government presented actually proved the alleged acts as *sporadic* and *isolated* events.  The May 28, 2009 incident spontaneously erupted when Appellant Peteet knowing that Robert Taylor carried a gun,

23

approached Taylor and Appellant's brother, Kennedy Peteet, to tell his brother to leave the parking lot to avoid further confrontration.  (Docket No. 1594 at p. 19).

The January 2, 2011 incident related to a dispute between a Wheels of Soul member and a member of the Street Soldiers, but the event which precipitated the shoot-out was actually instigated by the Street Soldier (Charles Ervin).  Further, Appellant Robinson was instructed by Allan Hunter *not* to engage Charles Ervin. When Robinson did not end the confrontation immediately, resulting in violence erupting, he was not acting on behalf of the Wheels of Soul.  The January 29, 2011 incident also did not relate to the Wheels of Soul.  In fact, Allan Hunter had been told to "chill out" in a previous meeting, and the members were told they were not "at war" with Outcast, the alleged target of the scheme.  In fact, the only two individuals who discussed violence were Allan Hunter and Walter Lee, neither of whom were charged in this count.  Finally, the March 6, 2011 incident was clearly a spontaneous event of self-defense having nothing to do with conducting the affairs of the Wheels of Soul.

Furthermore, the drug distribution undertaken by Allan Hunter was for his personal benefit.  Mr. Hunter testified at trial that he sold the drugs to Matthew Hunter because he wanted to profit.  He testified that he used the proceeds to pay his bills, purchase clothes, and maintain his personal cocaine habit.  (Docket No. 1593 at p. 100).  There was clearly no testimony that any of the Appellants were

Appellate Case: 13-1894    Page: 40    Date Filed: 11/07/2013 Entry ID: 4093815

involved in these transactions or that the Wheels of Soul profited from the proceeds of these transactions.[10]

The above described incidents did not have the same participants, same victims, same goals, or the same purposes. Instead, they were wholly unrelated to each other and to the Wheels of Soul. The one witness in the position to know whether the acts were related is government witness Allan Hunter, who was Regional President. Hunter testified:

> Q. Would you agree with me that the incident on January 2nd was spontaneous?
>
> A. Yes.
>
> Q. And that it was unplanned?
>
> A. Yes.
>
> Q. And would you agree that the incident in March was spontaneous?
>
> A. Yes.
>
> Q. And that it also just happened?
>
> A. Yes.
>
> Q. I think you testified yesterday it just broke out, correct?
>
> A. Yes.

---

[10] In fact, the government stipulated that the Defendants did not participate in the transactions.

Appellate Case: 13-1894    Page: 41    Date Filed: 11/07/2013 Entry ID: 4093815

Q. And would you agree that the other incidents that you have

personal knowledge about -- strike that. The May 29th incident just

happened, of 2009, Gary, Indiana?

A. Did that just happen?

Q. Yeah.

A. Yes.

Q. You did not go with a plan on shooting Robert Taylor?

A. I didn't shoot Robert Taylor.

Q. Fair point. In those incidents, again, they were spontaneous,

correct?

A. Yes.

Q. They were unplanned?

A. Yes.

Q. They were unrelated?

A. Yes.

(Docket No. 1593 at pp. 46-47).

Thus, the evidence clearly shows that the incidents were unplanned,

unrelated, sporadic actions of individuals who happened to be members of the

same motorcycle club. As this Court has held, predicate acts constitute a pattern if

"acts are similar in method, purpose, and result." *Diamonds Plus, Inc.*, 960 F.2d at

26

769 (citation omitted). The acts here are not similar in method, purpose, or result, and therefore, the acts cannot constitute a pattern for purposes of RICO.

### b. The government failed to establish that the acts were related to the enterprise.

The evidence adduced at trial also made clear that membership in the Wheels of Soul did not did not enable any participant to commit any two predicate acts of racketeering. Each of the predicate acts alleged against the defendants could have been committed by anyone. None of the above described acts, even if committed, were made possible *because* of the participant's membership in the Wheels of Soul.

At trial, the Government relied upon testimony of a "war" between the Wheels of Soul and other motorcycle clubs. This reliance, though, was not sufficient because there was no evidence presented that those statements caused any predicate act to occur. In fact, those statements were most often made AFTER the alleged predicate acts, so the statements are not relevant to the analysis. *See* e.g. *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (holding that there was sufficient evidence of RICO conspiracy where an organization met often to discuss its plans for drug trafficking, debt collection, murder and robbery). Furthermore, there was not any evidence establishing the required connection between the predicate acts and the defendant.

Appellate Case: 13-1894    Page: 43    Date Filed: 11/07/2013 Entry ID: 4093815

The evidence in the present case was clear.  The Government failed to establish that the predicate acts were related to each other or to the enterprise. Therefore, the District Court erred when it denied Defendants' Motions for Judgment of Acquittal at the close of the Government's evidence and at the close of the all of the evidence.

Appellate Case: 13-1894     Page: 44     Date Filed: 11/07/2013 Entry ID: 4093815

II.  **THE DISTRICT COURT ERRED BY DENYING APPELLANTS'
MOTIONS FOR JUDGMENT OF ACQUITTAL WHEN
INSUFFICIENT EVIDENCE WAS PRESENTED THAT THE
WHEELS OF SOUL CONSTITUTED AN "ENTERPRISE" AS
DEFINED BY 18 U.S.C. § 1961(5).**

A. <u>STANDARD OF REVIEW</u>

When evaluating a claim of insufficient evidence, the Eighth Circuit

considers "the evidence in the light most favorable to the guilty verdict, giving the

government the benefit of all reasonable inferences that might be drawn from the

evidence." *Fregoso*, 60 F.3d at 1322 (quoting *Smith*, 32 F.3d at 1292).

B. <u>ARGUMENT</u>

1. **The District Court erred when it denied Appellants' Motions
for Judgment of Acquittal because the Government failed to
establish the Wheels of Soul as an "enterprise" defined by 18
U.S.C. § 1961(5).**

a. *Relevant Facts*

Even assuming, without conceding, that the charged predicate acts are found

to be a pattern, the government failed to establish that the Wheels of Soul was a

RICO "enterprise."  The Indictment alleged that the Wheels of Soul was "a

criminal organization that was engaged in" enumerated criminal conduct.  (Docket

No. 744 at p. 12).

The Wheels of Soul, however, is a loosely organized national motorcycle

club with chapters in a majority of the United States.  The club members wear

motorcycle vests, with patches indicating their affiliation with the Wheels of Soul.

29

(Docket No. 1550 at pp. 11-12).  Though the government alleged the Wheels of Soul possessed a clear structure and military like hierarchy, the evidence made clear that this group of individuals did not behave or conduct themselves in a manner consistent with a RICO enterprise.  (Docket No. 1560 at p. 156).

Although James Smith was the National Vice President of the organization (Docket No. 1560 at p. 170), members of the Wheels of Soul did not seek his approval _or_ blessing _before_ undertaking any action on their own behalf or on the purported behalf of their local chapter.  Allan Hunter testified that he did not need Philadelphia (the location of the Mother Chapter where James Smith was located). (Docket No. 1593 at p. 79).  He further testified that he often undertook conduct without advising or consulting with any higher ranking member of the organization.  (Docket No. 1593 at pp. 79 and 80).

In addition to Mr. Hunter's statements that he did not "need" Philadelphia, he also engaged in other illegal acts that were outside of his role as a member of the Wheels of Soul.  Mr. Hunter admitted to selling narcotics for his own benefit. (Docket No. 1607 at p. 109).  This selling of narcotics was not sanctioned by the Wheels of Soul and, in fact, the club did not even know that Mr. Hunter was selling narcotics to Mad Matt Hunter.

Mr. Hunter's testimony was consistent with the evidence that was introduced by the government throughout the trial of this matter.  Walter Lee, the President of

Appellate Case: 13-1894     Page: 46     Date Filed: 11/07/2013 Entry ID: 4093815

the Milwaukee Chapter of the Wheels of Soul, testified that he never paid dues, even though the by-laws and constitution required the payment of club dues. (Docket No. 1601 at p. 217). Mr. Walter Lee also testified that he was never disciplined for his refusal to pay dues. (Docket No. 1601 at p. 217).

James Bradley, the Regional President in California, testified that he did not consult with Mr. Smith or any other ranking member of the organization before he undertook any conduct on his own behalf. (Docket No. 1486 at p. 131). He testified that he did not consider himself to be under the control of Philadelphia. (Docket No. 1486 at p. 131).

There was also significant testimony and evidence regarding the various rules of the organization. The government argued that the presence of the rules evidenced the hierarchical structure of the Wheels of Soul. The evidence, though, revealed a different organization.

Sean Jackson, Matthew Hunter and others, all testified regarding the rules in the St. Louis Chapter of the Wheels of Soul. (Docket No. 1544 at p. 205; Docket No. 1550 at p. 14). They also admitted that those rules were only the rules for St. Louis. (Docket No. 1544 at p. 205; Docket No. 1550 at p. 14). They did not know, nor were they concerned with, any potential rules for the remainder of the organization.

31

There was testimony that the St. Louis Chapter required each member to carry a "kit." (Docket No. 1550 at p. 50). According to the testimony of Norman Vick, Sean Jackson and Matthew Hunter, the "kit" consisted of a pen and paper, flashlight, and a weapon of your choice. (Docket No. 1544 at p. 140; Docket No. 1550 at p. 43; Docket No. 1581 at 63). In St. Louis, that weapon was to be a pistol. Other members of the St. Louis chapter similarly testified that the kit included a "gun" in St. Louis. (Docket No. 1550 at p. 140).

The "gun" requirement did not exist in the other chapters as testified to by members of other chapters of the Wheels of Soul. In fact, some chapters did not have a requirement that the members carry any sort of a weapon.

The evidence made clear that the only consistency throughout the Wheels of Soul was complete inconsistency. The Chapters had different rules, different types of members, no real organizational structure, and no control from the national leadership.

### b. *Legal Analysis*

The primary intent of Congress in enacting The Racketeer Influenced Corrupt Practices Act (RICO) was to prevent organized crime from infiltrating business and other legitimate economic entities. See *United States v. Turkette*, 452 U.S. 576, 591 (1981). The report of the Senate Committee on the Judiciary regarding the Organized Crime Control Act of 1969 notes that 18 U.S.C. § 1861 *et*

32

*seq.* has as one of its primary purposes, the elimination of the infiltration of legitimate organizations operating in interstate commerce by organized crime. S. REP. NO. 91-617 at 76 (1969). The legitimate business organizations have a definite structure and organizational boundaries as part of its operating structure. Thus, in the case of infiltration of legitimate business, the enterprise is readily identifiable. However, the statute also reaches wholly criminal organizations. *Turkette*, 452 U.S. at 578; *United States v. Bledsoe*, 674 F.2d 647, 662 (8th Cir. 1982), *cert. denied*, 459 U.S. 1040 (1982). The Act was *not intended* to encompass a group of criminals who associate with one another. Rather, it was aimed at individuals *who only associate for the purpose of committing crimes;* i.e., the statute was aimed at traditional organized crime. *Bledsoe*, 674 F.2d at 662-63.

Specifically, in *Turkette*, the government charged twelve defendants with violation of 18 U.S.C. § 1962(d). *Turkette*, 452 U.S. at 578-79. The indictment described the enterprise as "a group of individuals associated in fact **for the purpose** of illegally trafficking in narcotics and other dangerous drugs, committing arsons, utilizing the United States mails to defraud insurance companies, bribing and attempting to bribe local police officers, and corruptly influencing and attempting to corruptly influence the outcome of state court proceedings…" *Id.* at 579 (emphasis added).

33

The Court concluded that a RICO enterprise provisions would apply to this type of criminal organization. *Id.* at 580.

However, The Court noted that the government is required to prove <u>both</u> the existence of the "enterprise" and the connected "pattern of racketeering activity." *Turkette*, 452 U.S. at 583. The Court continued,

> "[t]he enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct….[t]he former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."

*Id*.

To prove the existence of an enterprise, the government must offer proof of (1) a common purpose; (2) a formal or informal organization of the participants in which they function as a unit ("some continuity of both structure and personality"); and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. *Bledsoe*, 674 F.2d at 664-665.

The *Bledsoe* Court relied upon *Turkette* when it was required to face the question of what is an "enterprise." The *Bledsoe* Court concluded that the enterprise element requires proof of some structure separate from the racketeering activity and distinct from the organization which is incident to the racketeering. *Id*. at 663. If they were not separate and distinct elements, the Court held, the Act "simply punishes the commission of two of the specified crimes within a 10-year

34

period." *Id.* at 664. The Court then examined the requirements for a finding of enterprise. The Court stated that "[a]lthough commonality of purpose may be the *sine qua non* of a criminal enterprise, in many cases this singular test fails to distinguish enterprises from individuals merely associated together for the commission of sporadic crime." *Bledsoe*, 674 F.2d at 665. The Court also reminded that in addition to having a common or shared purpose, it is fundamental that the enterprise "function as a continuing unit." *Id.* Though the scope of the enterprise can change over time, there must be some continuity of structure and personality. "For example, the operatives in a prostitution ring may change through time, but the various roles which the old and new individuals perform remain the same." *Id.*

Finally, the group must have an "ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity." *Bledsoe*, 674 F.2d at 665. The structure can be "demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes." *Id.* The Court concluded by stating "the command system of the Mafia family is an example of this type of structure as is the hierarchy, planning, and division of profits within a prostitution ring." *Id.* (citing *United States v. McLaurin*, 557 F.2d 1064, 1067-1071 (5th Cir. 1977), *cert. denied* 434 U.S. 1020 (1978)).

Appellate Case: 13-1894   Page: 51   Date Filed: 11/07/2013 Entry ID: 4093815

In 1996, the Eighth Circuit considered the factors to be used when determining whether an organization is an "enterprise." *United Healthcare Corp. v. American Trade Ins. Co.*, *Ltd.*, 88 F.3d 563, 570 (8th Cir. 1996). In *United Healthcare*, the Defendant moved for, but was denied, a Motion for Summary Judgment, on the grounds that Defendant failed to present adequate evidence of each of RICO's required elements. *Id.* at 569.

The Court explained "[u]nder RICO, an 'enterprise' includes any 'individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity'." *Id.* at 570 (citing 18 U.S.C. § 1961(4)). The Court continued by stating the enterprise must be distinct from the alleged pattern of racketeering activity. See *Atlas Pile*, 886 F.2d at 995. In other words, as the United States Supreme Court explained in *Turkette*, an enterprise is not established merely by proof of a series of racketeering acts. Instead, an enterprise must exhibit three characteristics: "(1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *United HealthCare Corp.*, 88 F.3d at 571 (quoting *Atlas Pile*, 886 F.2d at 995).

In this case, it is clear that application of the factors set forth in *Atlas Pile* and *United HealthCare Corp.*, establishes that the Wheels of Soul is not an enterprise as set out in 18 U.S.C. § 1962.

Appellate Case: 13-1894   Page: 52   Date Filed: 11/07/2013 Entry ID: 4093815

## 2. *The Wheels of Soul did not have a common or shared purpose.*

First, the Wheels of Soul did not have a common or shared purpose. The Wheels of Soul were, at most, a loosely organized group of small chapters who affiliated with each other. An example of the nature of the structure of the Wheels of Soul is the formation of the St. Louis chapter. Five guys decided to form a chapter of the Wheels of Soul, sent $200 each to the Philadelphia chapter and received the Wheels of Soul patches and rockers. That was it. For the vast majority of each year, the various chapters and regions did not even interact with each other.

The Wheels of Soul did not distribute narcotics in a wide ranging conspiracy. The Wheels of Soul did not traffic or sell firearms or weapons. Indeed, the evidence established that Allan Hunter was the only one selling narcotics and he kept the profits. Three isolated gun sales by individuals were not done on behalf of the Wheels of Soul but for personal reasons such as money and disposing of evidence. The Wheels of Soul's purpose was simply to ride motorcycles and socialize; not to commit criminal acts.

This Court should find that the government failed to elicit sufficient evidence to sustain a conviction for violation of 18 U.S.C. § 1962(d) because the Wheels of Soul was not an enterprise falling within the provisions of RICO.

37

## III. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' MOTIONS TO SUPPRESS ELECTRONIC SURVEILLANCE WHEN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI DID NOT HAVE JURISDICTION TO AUTHORIZE THE INTERCEPTION OF COMMUNICATIONS OVER A CELL PHONE LOCATED IN ILLINOIS.

### A. STANDARD OF REVIEW

On appeal, this Court's standard of review regarding a District Court's denial of a suppression motion is *de novo*. *United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003).

### B. ARGUMENT

There should be no factual dispute regarding this issue. Target Telephone 1 was never located in the Eastern District of Missouri at any time relevant to the wiretap applications, affidavits or orders. (Docket No. 648 at pp. 79 and 82). Moreover, telephone calls referenced in the wiretap affidavit from Target Telephone 1 (Chicago area code phone) to phone numbers with 314 Missouri area code occurred when the 314 Missouri area code phone was in Illinois (not Missouri). (Docket No. 648 at pp. 82 – 84). The sole legal basis for territorial jurisdiction in the Eastern District of Missouri was that the listening post was located in St. Louis, Missouri. (Docket No. 648 at pp. 92, 93; Docket No. 1023 at p. 15; and Docket No. 1103 at p. 2).

It should also be undisputed that the initial wiretap Order (See Addendum) did not reference jurisdiction being based upon the 'listening post' being located in

38

St. Louis, Missouri.  (See also Docket No. 648 at p. 81).  To the contrary, the wiretap Order states:

> "IT IS ORDERED FURTHER that in the event that **target telephone #1** is transferred outside the territorial jurisdiction of this Court, interception may take place in any other jurisdiction within the United States."

(Addendum at p. 5).

The Court did not say "in the event the listening post was transferred outside the jurisdiction of the Court" nor did the Court reference a "mobile interception device."  Unequivocally, the Court referenced the Target Telephone and the territorial jurisdiction of the Court.  (Docket No. 648 at p. 86).

The wiretap Order then directs the service provider to furnish to the investigative agency all information, facilities and technical assistance necessary pursuant to Section 2518(4) of Title 18 United States Code.  18 U.S.C. § 2518(4)(b) reads:

> (4) Each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter SHALL SPECIFY …
> (b) the nature and location of the communications facilities AS TO WHICH, OR THE PLACE WHERE, authority to intercept is granted …(emphasis added).

The wiretap Order identifies the communication facility [i.e. Target Telephone #1 – (630) 669-1107].  It does not reference the place where authority to intercept is granted (i.e. the wire room in St. Louis, Missouri).

39

"The word 'shall' is ordinarily 'the language of command'." *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) (citation omitted). Moreover, the Supreme Court has also recognized that "the mandatory 'shall' normally creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1988). Certainly, this is also the case when a right under the Fourth Amendment to the Constitution of the United States is at issue.

The Supreme Court has also held that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity" (to the defendant). *Cleveland v. United States*, 531 U.S. 12, 25 (2000).

The Supreme Court has also held and reemphasized that "strict adherence by the Government to the provisions of Title III would…[b]e in keeping with the responsibilities Congress has imposed upon it when authority to engage in wiretapping or electronic surveillance is sought." *United States v. Donovan*, 429 U.S. 413, 439-440 (1977).

This issue is *res nova* in this Circuit. It has been decided in other circuits in favor of the government's position which has been advanced in this case. See *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992); *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th Cir. 1994); *United States v. Denman*, 100 F.3d 399 (5th

Appellate Case: 13-1894     Page: 56     Date Filed: 11/07/2013 Entry ID: 4093815

Cir. 1996); *United States v. Wilson*, 237 F.3d 827, 831 (7th Cir. 2001); *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006); (Docket No. 671 at p. 2).

However, each of these cases can be distinguished from the factual setting in this appeal. *Rodriguez* involved multiple wire interceptions with one of the target telephones in the issuing jurisdiction and the others clearly tied to the first target phone with pen register information in the affidavit. *Tavarez* involved a state wiretap statute with different language. *Wilson* involved the statute authorizing "roving surveillance."

No case has been found that jurisdiction lies in a Court based solely on the "listening post" without some connection between that district, a specified Title 18 crime in that district, and a nexus to the Target Telephone OUTSIDE the district.

Moreover, the tide of these technology/jurisdiction cases has begun to erode. The Fifth Circuit (which authored the *Denman* opinion) recently stated, "We disagree that Congress intended to expand the scope of a district court's authority to issue wiretap warrants in any jurisdiction in the United States when the device to be intercepted is a cell phone. *United States v. North*, 728 F.3d 429 (5th Cir. 2013), *withdrawn*, No. 11-60763, 2013 WL 5761902 (5th Cir. Oct. 24, 2013).

The language in the Order in *North* included the identical language that is present in this case ("In the event that TARGET TELEPHONE 4 is transferred outside the territorial jurisdiction of this Court", etc., etc.). *Id.* at 435. The Fifth

41

Circuit disagreed with the government's position and found "the territorial jurisdiction limitation serves important substantive interests and implicates core concerns of the statute." *Id.* at 437.[11]

Finally, in a related technology matter, the Supreme Court recently and unanimously held that a search warrant was necessary to attach a GPS device to an automobile to track its location even though most Circuit Courts had concluded otherwise. *United States v. Jones*, 132 S. Ct. 945 (2012).

In *Jones*, the government conceded non-compliance with the warrant and argued that it simply was not required.

The concurring opinion of Justice Alito at footnote 11 observes the GPS device was not installed in a timely manner and was not installed in the issuing Court's jurisdiction as required. *Id*. at 964 n.11 (Alito, J, concurring).

Justice Alito further noted:

> "In the courts below the Government did not argue, and has not argued here, that the Fourth Amendment does not impose these precise restrictions and that the violation of these restrictions does not demand the suppression of evidence obtained using the tracking device. See, e.g., *United States v. Gerber*, 994 F.2d 1556, 1559-1560 [11th Cir. 1993]; *United States v. Burke*, 517 F.2d 377, 386-387 [2d Cir. 1975]. Because it was not raised, that question is not before us."

---

[11] The *North* opinion was withdrawn and a substitute opinion revised on October 25, 2013. See *United States v. North*, No. 11-60763, 2013 WL 5761902 (5th Cir. Oct. 24, 2013). Territorial jurisdiction was not reached in the majority opinion, but was addressed in the concurring opinion. *Id*. at *4-*6 (DeMoss, J., specially concurring).

*Id*.

As a result, the District Court erred in failing to suppress the wiretap evidence obtained via a deficient Order authorizing the electronic surveillance.

Appellate Case: 13-1894    Page: 59    Date Filed: 11/07/2013 Entry ID: 4093815

## IV. THE DISTRICT COURT ERRED IN ADMITTING CONSENSUAL AND COURT-AUTHORIZED TAPE RECORDINGS WHICH WERE NOT AUTHENTICATED NOR A PROPER FOUNDATION LAID ESTABLISHING THE INTEGRITY OF THE TAPE RECORDINGS.

### A. STANDARD OF REVIEW

The admission of tape recordings is reviewed for an abuse of discretion. *United States v. Oslund*, 453 F.3d 1048, 1054 (8th Cir. 2006).

### B. ARGUMENT

"Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger v. New York*, 388 U.S. 41, 63 (1967). As a consequence, "[w]hile proof of facts creating a sufficient foundation for the admission of tape recording[s] is a matter to be decided by the trial court, it does not have unbridled discretion to disregard the problems inherent in use of such evidence. Tape recordings are not readily identifiable as the original version." *United States v. Starks*, 515 F.2d 112, 121 (3d Cir. 1975). "[W]e agree with the statement by the Second Circuit that the burden is on the government 'to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings . . . .'" *Id*. (citation omitted).

Juxtaposed to the inherent threat to the Fourth Amendment posed by electronic surveillance, particularly evidence gathered pursuant to Title III's provisions for surreptitious monitoring, is the attitude of the government in this case: "It's the government's position that it really doesn't matter if we found these

44

recordings on the sidewalk, so long as there is a party to the conversation who can testify to their authenticity." (Docket No. 1368 at pp. 259-260). The problem with the government's approach in this case is that Matthew Hunter recorded an untold number of telephone calls and at least 50 meetings over a two year period. (Docket No. 1544 at pp. 21-22). Similarly, during the 90 days that Allan Hunter's cell phone was monitored pursuant to court-authorized Title III electronic surveillance, 36,000 telephone conversations were intercepted. Quite simply, the government's position is supported by neither the law nor the facts of the case.

### 1. *The Consensual Tape Recordings Admitted At Trial Were Not Authenticated By A Chain Of Custody Or Comparison With Originals And The Government Witnesses Could Not Establish The Accuracy Of The Recordings.*

"More so than photographs or other demonstrative evidence, sound recordings are susceptible to alterations that may be impossible to detect." *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977). Thus, the government must prove by *clear and convincing* evidence that a proffered tape recording is a true, accurate and authentic recording of the specified conversation between the participants. *United States v. Westmoreland*, 312 F.3d 302, 311 (7th Cir. 2002); *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977), *cert. denied* 434 U.S. 959 (1978).

Appellate Case: 13-1894    Page: 61    Date Filed: 11/07/2013 Entry ID: 4093815

Several nonexclusive factors should be considered when determining the admissibility of tape-recorded conversations. *United States v. McMillan,* 508 F.2d 101, 104 (8th Cir. 1974), *cert. denied,* 421 U.S. 916 (1975). They include:

> (1) That the recording device was capable of taking the conversation now offered in evidence. (2) That the operator of the device was competent to operate the device. (3) That the recording is authentic and correct. (4) That changes, additions or deletions have not been made in the recording. (5) That the recording has been preserved in a manner that is shown to the court. (6) That the speakers are identified. (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id*.

These factors are useful to determine if a "tape's 'substance and the circumstances under which it was obtained [provide] sufficient proof of its reliability.' " *United States v. Webster,* 84 F.3d 1056, 1064 (8th Cir. 1996) (quoting *United States v. Roach,* 28 F.3d 729, 733 n.4 (8th Cir. 1994)). "These requirements do not, however, exist *in vacuo;* they become meaningful only when viewed in light of the facts of a specific case." *Durns v. United States,* 562 F.2d 542, 547 (8th Cir. 1977) (emphasis added), *cert. denied,* 434 U.S. 959 (1977). The *McMillan* factors are guidelines to be viewed in light of specific circumstances, not a rigid set of tests to be satisfied. See *Webster,* 84 F.3d at 1064 (the *McMillan* factors are general guidelines for a district court to use in evaluating if the Government has met its burden); see also *United States v. Clark,* 986 F.2d 65, 68 (4th Cir. 1993) (quoting *United States v. Branch,* 970 F.2d 1368, 1372 (4th Cir. 1992))

46

(government not required to meet every *McMillan* factor; the "factors, while helpful, merely 'provide guidance to the district court when called upon to make rulings on authentication issues'."); *United States v. Oslund,* 453 F.3d 1048, 1054–55 (8th Cir. 2006). In the present case, *McMillan* factors 3 through 5 provide the framework to examine the government's failure to properly authenticate the consensual tape recordings in this case. Matthew Hunter, in the latter part of 2008, had a pending criminal case in Reynolds County, Missouri. In early 2009, Hunter decided to cooperate with authorities. (Docket No. 1550 at pp. 28-29). Hunter cooperated with the Government from January 2009 until March 2011. (Docket No. 1544 at pp. 21-22). During this time period, Hunter tape recorded or video-taped over 56 in-person meetings. He also allowed the FBI to record all conversations he had over one of his cell phones during the course of the investigation. (Docket No. 1544 at pp. 25-26).

Hunter was furnished with a digital device to tape record in-person meetings. After the meeting, Hunter would give the digital device to Task Force Officer Van Mierlo. Officer Van Mierlo was not present when the conversations were recorded and she was not able to listen to the digital device. The device was then taken to a special unit of the FBI called the ELSUR Unit (Electronic Surveillance Unit). A copy of the recording from the digital device was made by the ELSUR Unit and provided to Ms. Van Mierlo. The original of the digital

47

recording was maintained in the ELSUR Unit and was not used for the trial. The copy received by Officer Van Mierlo from the ElSUR unit was used at trial. (Docket No. 1544 at pp. 25-26; 60-61).

The copy used for trial was never compared to the original nor was any evidence presented as to how the original recording was obtained from the digital recorder or how the copy for Officer Van Mierlo was made. (Docket No. 1544 at pp. 264-272). In advance of trial, the copy received by Officer Van Mierlo was given to administrative personnel of the U.S. Attorney's Office to load selected portions of the conversations on a laptop computer for use at trial. Ms. Van Mierlo did not oversee this process and did not know whether the copy received or the laptop was secured in any fashion. (Docket No. 1601 at pp. 46-47).

In regards to the recordings of calls over Hunter's cell phone, the same procedure was used as in the monitoring of court-authorized electronic surveillance.[12] The original calls are kept on a server and a copy with corresponding transcripts can be exported to a disk. The pertinent portions were then given to the U.S. Attorney's office and handled in the same fashion as the consensual in person recordings. (Docket No. 1601 at pp. 27-28).

Prior to Matthew Hunter taking the stand, the Government called Sean Jackson, a former Wheels of Soul member who had been charged with federal

---

[12] A more detailed explanation of this process is set forth in the next session of this Brief dealing with the admissibility of the Title III intercepts.

Appellate Case: 13-1894      Page: 64      Date Filed: 11/07/2013 Entry ID: 4093815

firearms offenses. Jackson pled guilty pursuant to a plea agreement and agreed to testify. (Docket No. 1544 at pp. 127-128). Portions of meetings of the St. Louis Chapter of the Wheels of Soul occurring on May 16, 2009 (Govt. Ex. 62 and 63) May 27, 2009 (Govt. Ex. 66, 67 and 70) and July 1, 2009 (Govt. Ex. 71), which had been recorded by Matthew Hunter, were played in the presence of Mr. Jackson. (Docket No. 1544 at pp. 136-138, 157-158, 163, 170, and 176-178).

Prior to the playing of each tape, Mr. Jackson was asked if he had reviewed the tape recording and transcript of the portion of the meeting in question and was the tape a true and accurate recordation of the portion of the meeting he heard on the tape. *Id.* Mr. Jackson answered in the affirmative. After the tape was played, Jackson was asked questions regarding what was on the tape.

However, on cross examination, the following exchange with Mr. Jackson occurred:

> Q. All right. And of course, you had meetings with the Assistant United States Attorney and/or Officer Van Mierlo before you took the stand today, correct?
>
> A. One.
>
> Q. One meeting. When were the tapes played to you?
>
> A. The tapes were played, when she was saying tapes, she was saying tapes and transcripts. I had transcripts from my case.
>
> Q. I'm talking about the tapes that we heard in court today.
>
> ***A. Tapes themselves, some of those tapes I didn't hear until***

49

*today.*

*Q. Until today?*

*A. Correct.*

*Q. Well, I thought you testified before the tapes were played, that the tapes were a true and authentic recording of the conversations you had.*

*A. When she stated that, she said tapes and/or transcripts.*

Q. So you assumed transcripts?

A. Excuse me?

*Q. For some of the tapes that were played today, you had merely seen transcripts?*

*A. Some of them, yes.*

*Q. All right, you hadn't actually heard the tapes?*

*A. Not all of them.*

(Docket No. 1544 at pp. 247-248) (emphasis added).

Upon further inquiry, Jackson could not remember what other conversation or even the substance of any other conversation which had occurred on the days that portions of the meetings had been played.  (Docket No. 1544 at p. 249).

Following Mr. Jackson's testimony, defense counsel made a motion to strike these tapes from the record because Jackson had not even heard some of the tapes that he said were true and accurate before they were played nor did he demonstrate sufficient recollection of the meetings to be able to determine whether the tapes he

did hear were true and accurate. (Docket No. 1544 at pp. 264-265). Furthermore, Ms. Van Mierlo had not compared the copy used in court with the original digital recording to determine whether the copy was an exact duplicate of the original. (Docket No. 1544 at p. 268). The Government's only excuse for not having the witness listen to tapes rather than merely review transcripts was because it was more "efficient" to have him review transcripts rather than listen to tapes. (Docket No. 1544 at pp. 271-272).

The court denied the defendants' motion, commenting that she believed that a sufficient foundation would be established before the case was over. (Docket No. 1544 at p. 273). However, the Court also commented on the manner in which the Government presented foundational testimony:

> What I do think is not harmless error, Ms. Wissler, is you leaving the impression with me and with the members of this jury that this witness had listened to these recordings before he heard them in court for the first time. . . .

*Id*.

The next day Matthew Hunter testified. A number of tape recordings were played for Mr. Hunter. This time, the witness was asked, "Were you in anticipation of your testimony at this trial offered the opportunity to review some of the recordings that you made during the course of your cooperation?" After responding in the affirmative, Hunter was then asked, "Were those recordings played for you during your preparation for your testimony?" Once again, Hunter

51

said yes.  He then testified that he was able to recall these conversations.  Then, Hunter was asked, "Now, you've listened to a **number of those recordings**, correct?  Matthew Hunter answered yes.  (Docket No. 1550 at pp. 38-39).

Matthews went on to identify and testify regarding recordings of portions of meetings occurring on July 1, 2009 (Govt. Ex. 72), August 25, 2009 (Govt. Ex. 72, 439), September 9, 2009 (Govt. Ex. 432, 433), September 11, 2009 (Govt. Ex. 434), September 12, 2009 (Govt. Ex. 136, 141, 134, 135, 138, 139, 140, 435), September 13, 2009, (Govt. Ex. 200) and a telephone call occurring sometime between August 18 and 20, 2009 (Govt. Ex. 199).[13]  (Docket No. 1550 at pp. 40, 42-44, 83-84, 88-89, 92, 95, 100, 111-112, 118, 120, 123, 124, 127, 129-130, 133 and 135).  Prior to each Government exhibit, Hunter testified that he had reviewed the tape and to the best of his recollection, the tape accurately reflected the content of the conversation he had on a particular day.  *Id*.

On cross examination, Matthew Hunter was asked, "Did you listen to the actual portions of the tapes, or did you just read transcripts?"  Hunter replied, "I listened to **most of the tapes**."  (Document No. 1628 at p. 146) (emphasis added).  Once again, the Government witness did not listen to all the tapes which he supposedly authenticated.  Once again, the Government did not clarify which tapes he listened to and which he did not.  Further undermining the foundation for the

---

[13] Matthews recorded some calls with a recorder before electronic surveillance was initiated on his cell phone.  (Document No. 1628 at p. 88).

Appellate Case: 13-1894     Page: 68     Date Filed: 11/07/2013 Entry ID: 4093815

reliability and authenticity of the tapes is that Hunter testified that he did not know the dates of the recordings played for him, but rather the Government had to tell him [in their question] the date of each tape. *Id.*

On October 23, 2012 defendants requested and the Court accepted a continuing objection to the tapes which had been played. (Docket No. 1555 at pp. 3-4).

In summary, the evidence presented by the Government regarding foundation and authenticity of the consensual in person and telephone tape recordings was woefully insufficient in the following respects: 1) no evidence was presented as to the manner in which the copy of the in person digital recordings used at trial was made from the digital device by unknown individuals; 2) in both instances, the copy was never compared to the original tape; 3) both Sean Jackson and Matthew Hunter had not even listened to some of the tapes prior to testifying that the tapes accurately depicted the conversation at issue; 4) neither could testify on their own as to when the conversations occurred or what else was said on those occasions in addition to what was on tape; 5) no chain of custody evidence whatsoever was presented regarding the copies which were played; and 6) No affirmative evidence of or testimony establishing that none of the tapes had been tampered with or altered in any way was presented by the Government.

Cases in which similar or even less deficiencies existed have held that the government failed to present sufficient indices of trustworthiness needed to properly authenticate a tape recording. For example, in *United States v. Starks*, 515 F.2d at 123, an FBI agent testified that he placed his initials and the date on a tape cartridge taken from the informant on February 21st and identified his initials on the tape to be played. However, the agent was unable to account for the whereabouts of the tape from the time he gave custody of the tape to another Special Agent on February 22 until the time of trial on June 19th. Nor was he able to state that the magnetic tape inside the cartridge was the same magnetic tape that was taken from the machine used by the informant. The informant/witness testified that he had listened to the offered tape and that it accurately portrayed what occurred on the night in question. *Id.* at 121. The government contended that the informant/witness's testimony was sufficient to authenticate the tape. The court disagreed, noting that the government had the burden of proving by clear and convincing evidence the authenticity and accuracy of a tape recording being offered. *Id.* The appellate court found that the district court erred in shifting the burden to the defendant to prove the tape was not authentic and likewise erred by admitting the tape into evidence. *Id.* at 123.

Similarly, in *United States v. Biggins*, 551 F.2d at 67-68, the court noted, "[a]lthough no one affirmatively suggested that the tape had been altered, the party

54

seeking to introduce such evidence has the burden of going forward." The court further observed that although an agent testified that the copy of the tape played was a duplicate of the original, no testimony was presented that the original was "a faithful recording of the conversation" in question. *Id*. at 67. Significantly, the court also noted that the foundation evidence presented in that case "stands in sharp contrast to the care with which the authenticity of the sound recording was established in *McMillan*." *Id*. (citing *McMillan*, 508 F.2d at 104). "In the *McMillan* case, the agent testified that he replayed the tape of a conversation between defendant and informant in the informant's presence to verify the accuracy of the recording." *Id*. In *Biggins*, the agent who listened to the conversation as it occurred testified that the duplicate was accurate. *Id*. Ultimately, the court ruled that the tape was admissible as a result of two other witnesses who participated in the conversation affirming the accuracy of the recording. *Id*.

In *United States v. McMillan*, 508 F.2d at 104-05, the seminal authority in this circuit regarding the admission of tape recordings, the court described the circumstances under which the court found the government's foundation sufficient for admission as follows:

> It is sometimes necessary that both the informant and the recorder testify in order to meet this burden. It does not follow, however, that the party to the conversation must in each case testify that the recording was authentic and correct and must also identify the speakers. Agent O'Connor testified that he heard the voice of Beverly Johnson at all times when he was making the recording, that that part

55

of the conversation was accurate, and that immediately after the telephone calls were completed the tape was replayed by O'Connor in Johnson's presence to verify that the conversations had in fact been recorded and that the instruments were operating correctly. We think this testimony sufficiently establishes that the recordings were true and accurate.

*Id*.

The foundation and indices of trustworthiness and authenticity presented by the government in the present case fall far short of that necessary to establish the admissibility of consensual tape recordings. The district court therefore erred in admitting the recorded conversations into evidence.

### c. The District Court Erred In Admitting Court-authorized Electronic Surveillance Tape Recordings Without Proper Authentication and Foundation and In Contravention of Title III.

The government obtained a Title III authorization and two extensions thereof to monitor the cell phone communications of Allan Hunter in Chicago, Illinois. The wiretap ran from January 10, 2011 to April 8, 2011. (Docket No. 1601 at pp. 9-10). The FBI used a "Voice Box" system to monitor the intercepted calls. (Docket No. 1601 at pp. 11-12). The inventor and manufacturer of this system, Barry Stewart, testified that Voice Box is a specialized software application using a network of computers to receive audio and call data delivered from the telephone company as part of a court-ordered Title III wiretap, as well as other kinds of audio inputs, including consensual wiretapped phone calls. It records

56

everything, digitally signs it, and allows users to interact with it and manage the content. A Voice Box system was installed at the FBI office in St. Louis. (Docket No. 1486 at p. 25).

Mr. Stewart explained that a wiretap is actually set up by the phone company in accordance with the court order they receive. They program their equipment to deliver audio in real time through telephone lines to the Voice Box for recording. If a monitoring agent has logged on to the Voice Box system, the system will record incoming audio as a digital file, and capture the call data information. (Docket No. 1486 at pp. 25-26). When the call ends, the system automatically calculates what is called an encrypted digital signature, similar to a fingerprint, which stays with the file. The system will then automatically make a copy of that original file on another hard drive in the system for security. It will also automatically archive or write a copy of that file to removable media. One copy would be made to a removable magneto optical disk that cannot be erased and is used as the evidence disk that will be sealed by the court. The system would also make one or more removable disks to be used as working copies that could be retained by the law enforcement agency. (Docket No. 1486 at pp. 27-29). A copy of a conversation on a CD can be authenticated by calculating its digital signature and comparing it to the digital signature of the hard drive copy. However, once a conversation is copied onto *another CD* or DVD, the protection against altering

57

that is on the server does not exist on the copied CD. (Docket No. 1486 at pp. 36-37). In order to insure that a copy was an exact copy of what was on the server, the copy would have to be authenticated by comparison of digital signatures. (Docket No. 1486 at p. 38).

Officer Van Mierlo testified that approximately 36,000 calls were intercepted over Allan Hunter's cell phone during the 90 days of electronic surveillance. (Docket No. 1601 at p. 50). In order to make copies of Allan Hunter's conversations for use in court, Ms. Van Mierlo logged into the Voice Box system, selected the calls she wanted and prepared a transcript on the system. She then exported the call and the transcript at the same time onto CDs. Officer Van Mierlo then delivered the CDs to the U.S. Attorney's office where personnel from the U.S. Attorney's Office imported the calls and transcripts into the computer program that would be used to play the tapes at trial. (Docket No. 1601 at pp. 51-52). Although Van Mierlo testified that, to her knowledge, no one tampered with the CDs once she gave them to the U.S. Attorney's office, no testimony was provided that any means whatsoever were undertaken to insure the integrity of the CDs after delivery to the United States Attorney's Office. (Docket No. 1601 at p. 26).

Ms. Van Mierlo never compared the CDs she created for use at trial with the original digital file on the Voice Box server. She did not take the laptop computer

Appellate Case: 13-1894     Page: 74     Date Filed: 11/07/2013 Entry ID: 4093815

containing the calls to be used at trial into the monitoring room and compare them with what was on the server. (Docket No. 1601 at p. 57, 59). Even more importantly, Ms. Van Mierlo never compared the digital fingerprint on the CDs she created with the digital fingerprint on the server digital file. In fact, Officer Van Mierlo testified that she didn't know what a digital fingerprint is and she did not know how to compare digital fingerprints. Nor did Ms. Van Mierlo ever use the working law enforcement agency copies automatically created by the Voice Box in preparation for trial. Indeed, she said that she had "never seen them." (Docket No. 1601 at pp. 62-64). Thus, no evidence whatsoever was presented that what the jury heard was an *exact* duplicate of what was on the original.

At the conclusion of Mr. Smith's cross examination of Officer Van Mierlo, the district court overruled defendants' objections to the introduction of the consensual and Title III intercepts. In so doing, the Judge noted that although the government did not lay the proper foundation in the beginning, the court felt that they now had done so. The district court also stated that no showing of a likelihood of any difference between the original digital recordings and what was used at trial had been made by the defense. Finally, the Judge overruled any objections regarding the sealing of the tapes. (Docket No. 1601 at pp. 84-85).

In holding that no showing of any likelihood of a difference between the tapes played in court and the original digital recordings had been demonstrated by

Appellate Case: 13-1894     Page: 75     Date Filed: 11/07/2013 Entry ID: 4093815

the defense, the district court, in essence, put the burden on the defense to demonstrate a discrepancy. Putting the burden on the defense was not proper and served to lessen the government's burden of proof. See *Starks*, 515 F.2d at 123; *Biggins*, 551 F.2d at 67.

Furthermore, by virtually dispensing with the requirement that the government establish by clear and convincing evidence that the conversations played to the jury were true and accurate copies of the original recordings, the court vitiated the entire purpose behind the provisions of 18 U.S.C. § 2518(8)(a), which provides in pertinent part as follows:

> **(8) (a). . . .** The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way *as will protect the recording from editing or other alterations.* Immediately upon the expiration *of the period of the order*, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. . . . Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. *The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.* (emphasis added).

Section 2517(3) of Title III governs the introduction of any interceptions pursuant to Title III in "any proceeding held under the authority of the United States." 18 U.S.C. § 2517(3). This of course would include trials. By doing away with any requirement that what is played in court is an exact duplicate of the

60

original, the *entire purpose* of Section 2518(8)(a), to protect recorded conversations from "editing or other alterations" is eviscerated. See S. REP. NO. 90-1097 at 104-105, *reprinted in* 1968 U.S.C.C.A.N. 2193-2194.

Furthermore, no chain of custody whatsoever was established for any of the tapes, consensual or Title III, which were played in court. In the absence of any other evidence of the authenticity and accuracy of the taped conversations *played in court*, chain of custody evidence is necessary. See *United States v. McCowan*, 706 F.2d 863, 865 (8th Cir. 1983).

After the court's ruling, the government attempted to authenticate the Title III tapes by having Allan Hunter testify that what was on each tape was a true and accurate recordation of the conversation he had. Not only is it inherently incredible that Hunter could recollect a handful of 36,000 conversations a year later as being accurate, but Hunter repeatedly said he was not good with dates. (See Docket No. 1585 at pp. 194, 195; Docket No. 1593 at p. 22). Indeed, on cross examination, Hunter could not even state whether an event occurred in 2009, 2010 or 2011. (Docket No. 1593 at p. 23).

Additionally, the government's reliance on Federal Rule of Evidence 901(10) is misplaced. Fed. R. Evid. 901(10) provides for authentication of a piece of evidence as follows:

61

**(10) Methods Provided by a Statute or Rule.** Any method of authentication or identification allowed by a federal statute or a rule prescribed by the Supreme Court.

The Advisory Committee's Notes to this subsection of Rule 901 state:

**Example (10).** The example makes clear that methods of authentication provided by Act of Congress and by the Rules of Civil and Criminal Procedure or by Bankruptcy Rules ***are not intended to be superseded***. Illustrative are the provisions for authentication of official records in Civil Procedure Rule 44 and Criminal Procedure Rule 27, for authentication of records of proceedings by court reporters in 28 U.S.C. § 753(b) and Civil Procedure Rule 80(c), and for authentication of depositions in Civil Procedure Rule 30(f). (emphasis added)

Thus, Federal Rule of Evidence 901, rather than providing a basis for admission of Title III intercepted conversations, specifically provides that the method of authentication must be pursuant to the *provisions of Title III*, the statutory basis for obtaining the conversations.

The district court further erred in admitting the Title III conversations because as testified to by Officer Van Mierlo, the recording system failed on a number of occasions to record audio, even though the machine was still recording. Although Van Mierlo did not place an exact number on the frequency with which the lack of audio occurred, it was significant enough to be recalled by a monitoring agent a year and a half later. Ms. Van Mierlo knew at the time of the actual recordings that there was a problem with the recording system but did nothing to attempt to discern the source of the problem until trial. According to Officer Van

Mierlo, the FBI was *currently* attempting to figure out the problem with the audio gaps. (Docket No. 1601 at pp. 65-67).

Thus, even if no other grounds exist to deny a tape into evidence, a tape may still be excluded if it is deemed untrustworthy because of inaudibility or some other infirmity. *United States v. Font-Ramirez,* 944 F.2d 42, 47 (1st Cir. 1991), *cert. denied,* 502 U.S. 1065 (1992). A partially inaudible recording will be inadmissible where the unintelligible portions are "so substantial, in view of the purpose for which the tape is offered, as to render the recording as a whole untrustworthy...." *United States v. Huff,* 959 F.2d 731, 737 (8th Cir. 1992), *cert. denied,* 506 U.S. 855 (1992); *Webster*, 84 F.3d at 1064; *United States v. Calderin-Rodriguez,* 244 F.3d 977, 987 (8th Cir. 2001); *United States v. Le,* 272 F.3d 530, 532 (8th Cir. 2001).

In the present case, the Title III tapes were offered as substantive evidence, not merely corroboration of Hunter's testimony. Thus, the deficiencies in the tapes were critical to the government's case. Numerous blank spots on a tape recording, especially if other questions exist as to its authenticity, will prevent the tape from being admitted into evidence. *McAlinney v. Marion Merrell Dow, Inc.*, 992 F.2d 839, 842 (8th Cir. 1993).

Finally, Defendants in a Motion in Limine regarding the Title III tapes, raised the issue that the government had not presented evidence establishing that

63

the Title III tapes sealed by the court were still sealed. (Docket No. 1157 at p. 3). In response to this motion, the government adduced testimony through Officer Van Mierlo that the sealed tapes were still in a sealed condition. (Docket No. 1601 at pp. 18-23). However, in presenting this evidence, the government revealed, for the first time, that the original tape recordings had not been sealed in conformance with 18 U.S.C. § 2518(8)(a). That section of Title III requires that original tapes shall be sealed "immediately upon the expiration of the period of the order." *Id*. Officer Van Mierlo, however, testified that tapes from the *entire period* of the electronic surveillance, spanning *three different orders*, were not sealed until April 14, 2011, six days after the expiration of the **last extension order**. (Docket No. 1601 at pp. 18-19).

In *United States v. Maldonado-Rivera*, 922 F.2d 934, 949 (2d Cir. 1990), the court summarized the standard to be applied when the sealing requirements of Section 2518 have been violated:

> We have stated that sealing "within one or two days" will normally be deemed immediate, but that "any delay beyond that certainly calls for explanation." *United States v. Vazquez,* 605 F.2d 1269, 1278 (2d Cir. [1979]), *cert. denied,* 444 U.S. 981…(1979). Thus, we have held that sealing was not immediate within the meaning of § 2518(8)(a) where there were delays of 15 days, *see United States v. Massino,* 784 F.2d 153, 157 (2d Cir. 1986), or 14 days, *see United States v. Rodriguez,* 786 F.2d 472, 476 (2d Cir. 1986), or 13 days, *see United States v. Poeta,* 455 F.2d 117, 122 (2d Cir. [1972]), *cert. denied,* 406 U.S. 948…(1972), or even less, *see, e.g., United States v. McGrath,* 622 F.2d 36, 42–43 (2d Cir. 1980) (three-to-eight days).

64

In *Maldonado*, the attorney supervising the electronic surveillance was under the mistaken impression that the tape recordings did not need to be sealed until a "hiatus" in the electronic surveillance. *Id*. at 950.

If the Title III tapes have not been sealed immediately, they must be suppressed unless the government furnishes an explanation for the delay that is "satisfactory" within the meaning of the statute. *United States v. Rios,* 495 U.S. 257, 264 (1990). In *Rios,* the Supreme Court rejected an argument by the government that the "satisfactory explanation" requirement will be met if the government simply states the reason for the delay and shows that the tapes are authentic. The Court, in response, stated that "the 'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the Government explain not only why a delay occurred but also why it is excusable." *Id*. Additionally, the Supreme Court noted that proof of lack of tampering was not a substitute for a satisfactory explanation for not complying with the provisions of Title III. *Id*.

In the present case, ***no explanation at all was given***, and the government simply glossed over the delay in eliciting sealing testimony from Officer Van Mierlo. Furthermore, as noted previously the government also did not establish absence of tampering. For this reason alone, the district court erred in admitting the Title III tapes.

65

Rather than "strict adherence" to the provisions of Title III, which would be in keeping with the responsibility given to it by Congress,[14] the government in this case took one shortcut after another in regards to both the Title III and consensual recordings. Not only were these shortcuts contrary to statute and case law, but, as the district court observed, the government misled both the Court and the jury in the process. The "threat to liberty" through the use of electronic surveillance envisioned by the Supreme court in *Berger v. New York*, 388 U.S. at 63, became a reality in this case by the government's conduct. As a consequence, defendants' convictions must be reversed.

---

[14] See *Donovan*, 429 U.S. at 439-440.

Appellate Case: 13-1894    Page: 82    Date Filed: 11/07/2013 Entry ID: 4093815

**V. THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING APPELLANTS' REQUEST FOR A SPECIAL INTERROGATORY REFLECTING WHICH PREDICATE ACTS THE JURY UNANIMOUSLY FOUND AS TO EACH DEFENDANT.**

**A.      STANDARD OF REVIEW**

This Court reviews a district court's decision to deny a request for a special verdict form under an abuse of discretion standard.  *United States v. Lamoreaux*, 422 F.3d 750, 756 (8th Cir. 2005).

**B.      ARGUMENT**

The Defendants were charged in a 17 count Superseding Indictment.  Count I charged the Defendants with conspiracy to participate, directly or indirectly, in the affairs of an enterprise (the Wheels of Soul Motorcycle Club) through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  The government alleged that the Appellants committed multiple acts involving narcotics trafficking; tampering with victim, witness, or informant;  murder in second degree in violation of Missouri law; assault in the first degree in violation of Missouri law; robbery in violation of Missouri law, murder in first degree in violation of Illinois law; attempt to commit murder in violation of Illinois law; conspiracy to commit murder in violation of Illinois law; intimidation in violation of Illinois law; arson in violation of Illinois law; murder in violation of Ohio law; attempt to commit murder in violation of Ohio law; kidnapping in violation of Ohio law; attempt to commit murder in violation of Colorado law; and attempt to commit murder in

67

violation of Indiana law. The Indictment maintains that as a part of the conspiracy each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

Due to the Racketeer Influenced and Corrupt Organizations Act (RICO) unanimity requirement on predicate acts as well as the confusion and complexity of this case, the defendants submitted a proposed special interrogatory, requesting the jury to identify the two predicate acts it unanimously found that each defendant agreed would be committed. The special interrogatory would only be answered upon a finding of guilt on Count I. The district court denied the defendants' request. On behalf of all defendants, counsel for defendant Smith made the following record:

> MR. PICKETT: Yes, essentially I guess we would object to Instruction 22, one, because of United States versus Kragness and notwithstanding the language proposed by the Government, the potential issue that the jury might find the defendants guilty based on one specific incident. And then, two, and this goes more to the verdict forms that the Government and the defendants have not been able to come to an agreement to, but two, that it is the defendants' position that unindicted acts cannot be considered predicate acts for purposes of the RICO conspiracy, and that is the reason why we adopt Mr. Robinson's proposed verdict form or the special interrogatory that specifically listed those acts because it was the only way to clarify that the jury was not considering unindicted predicate acts for purposes of a finding of guilt on the RICO conspiracy. Notwithstanding the fact that I do believe the Government is correct generally that it's the category of

68

racketeering activity that is the relevant point, in this case with the additional information of unindicted predicate acts, we believe that the verdict form needs to be more specific and include those specific acts as set forth in Mr. Robinson's proposed verdict form.

(Document No. 1596 at p. 23-104 – 23-105).

Appellants recognize that the use of special verdicts is generally disfavored in criminal cases. *Gray v. United States*, 174 F.2d 919, 923-24 (8th Cir. 1949); *United States v. Williams*, 902 F.2d 675, 678 (8th Cir. 1990); *United States v. Pierce*, 479 F.3d 546, 551 (8th Cir. 2007); *United States v. Stegmeier*, 701 F.3d 574, 581 (8th Cir. 2012).

However, they are appropriate and effective in some circumstances. *United States v. Ryan*, 9 F.3d 660, 670-671 (8th Cir. 1993), *vacated in part on other grounds but aff'd as to the special verdict form*, 41 F.3d 361, 362 (8th Cir. 1994) (en banc). This Court, quoting the Ninth Circuit explained: "Where a special verdict form requires the jury to determine the occurrence of any of a series of acts, each of which is sufficient to constitute the indicted crime, traditional concerns regarding special verdicts are not implicated." *United States v. Stegmeier*, 701 F.3d 574, 581 (8th Cir. 2012) (quoting *United States v. Reed*, 147 F.3d 1178, 1181 (9th Cir. 1998)).

Similarly, the Second Circuit expressed a "preference for special interrogatories in particularly complex criminal cases." *United States v. Ogando*

69

968 F.2d 146, 149 (2d Cir. 1992). "These complexities have prompted us to conclude that, notwithstanding the law's 'traditional distaste for special interrogatories', 'where the offense charged requires proof of a specific number of predicate facts and the nature of the proof at trial warrants it, the trial court would be well advised to submit to the jury interrogatories that would allow an assessment of whether the jury's determination of guilt rested on permissible bases'." *United States v. Applins*, 637 F.3d 59, 82 (2d Cir. 2011) (quoting *United States v. Roman*, 870 F.2d 65, 73 (2d Cir. 1989)); *United States v. Ruggiero*, 726 F.2d 913, 926 (2d Cir. 1984). The Court went further to state, "We take this opportunity to alert bench and bar that in a complex RICO trial such as this one, it can be extremely useful for a trial judge to request the jury to record their specific dispositions of the separate predicate acts charged, in addition to their verdict of guilt or innocence on the RICO charge." *Applins*, 637 F.3d at 82. It is not proper under RICO to charge two predicate acts where one action violates two statutes. *United States v. Kragness*, 830 F.2d 842, 858 (8th Cir. 1987).

In the case at bar, seventy witnesses testified over twenty-seven days. The jury deliberated ***eight days***. The Superseding Indictment was thirty-nine pages, alleging 15 categories of racketeering activities, sixty-six overt acts, and twenty-two conspirators. Clearly, this is a complex RICO case. As such, the traditional "disfavor" for a special verdict form is far outweighed by its benefits. The special

70

interrogatory would have been useful in ensuring that the jury's decision was founded on legal grounds; that there was unanimity on the type of predicate acts for each defendant; that the two types of predicate acts did not arise out of the same action; and that there was no improper spillover from the myriad of other bad acts introduced at trial by the government.

Requiring juries to address a specific question required in the law "ensures that the issue did not get lost in the shuffle during deliberations." Kate H. Nepveu, Note, *Beyond "Guilty" or "Not Guilty": Giving Special Verdicts in Criminal Jury Trials*, 21 Yale L. & Pol'y Rev. 263, 272 (2003). Special verdicts can assist jurors in the fair administration of justice as noted in the above cited law review publication:

> "In complex or confusing cases, special verdicts can help the jury remember the case, keeping any number of things—charges, acts, even defendants—straight. They can also remind the jury not to overlook an important piece of the case, such as an unusual factual requirement or a legal prerequisite like jurisdiction. Second, special verdicts can assist other participants in the system, sometimes more than one at a time. For instance, a special verdict can ensure unanimity on an element of the crime, protecting the defendant; it would also ease appellate review, as do special verdicts on novel theories of law and alternate grounds of conviction…. A special interrogatory asking whether the defendant committed various predicate acts makes the case less confusing for the jury, protects the defendant by ensuring unanimity and lessening prejudicial spillover from various bad acts alleged at trial, may provide the

71

judge with information relevant to sentencing, and clarifies the record for appellate review."

*Id*. at 297-98.

Absent a special interrogatory, one can only speculate as to how and on what grounds the jury reached the general verdict.

This Court should find that the District Court abused its discretion when denying the Appellants' request for a special interrogatory on the types of predicates acts which the jury unanimously agreed as to each defendant.

Appellate Case: 13-1894     Page: 88     Date Filed: 11/07/2013 Entry ID: 4093815

## CONCLUSION

For all the reasons set forth herein, Appellants respectfully submit that this case must be reversed as to all Appellants and the case dismissed because the government failed to establish a RICO conspiracy. In the alternative, Appellants respectfully submit that the case be reversed as to all Appellants and the case remanded to the district court for a new trial.

Respectfully submitted,

Donnell Smith, #44510
Donnell Smith and Associates, LLC
4625 Lindell Boulevard, Suite 500
St. Louis, Missouri 63108
(314) 361-2500 telephone
(314) 361-2525 facsimile
donnell.smith@smithlawpractice.com
Attorney for Defendant/Appellant
    Dominic Henley

Christopher A. Pickett, #51059
Greensfelder, Hemker, & Gale, PC
10 S. Broadway, 20th Floor
St. Louis, Missouri 63102
(314) 516-2654 telephone
(314) 851-0982 facsimile
cap@greensfelder.com
Attorney for Defendant/Appellant
    James C. Smith

Ronald E. Jenkins, #23850
Jenkins & Kling, P.C.
150 N. Meramec Avenue, Suite 400
St. Louis, Missouri 63105
(314) 721-2525
(314) 721-5525
rjenkins@jenkinskling.com
Attorney for Defendant/Appellant
    Jerry Elkins

John M. Lynch, #56604
The Law Offices of John M. Lynch, LLC
222 S. Meramec Avenue, Suite 300
Clayton, Missouri 63105
(314) 726-9999 telephone
(314) 726-9199 facsimile
jlynch@lynchlawonline.com
Attorney for Defendant/Appellant
    Marshall Fry

Douglas P. Roller, #50262
Roller Law Office, LLC
10702 Manchester Road, Suite 207
St. Louis, Missouri 63122
(314) 645-7228 telephone
(314) 685-8014 facsimile
dprcrimlaw@aol.com
Attorney for Defendant/Appellant
    Anthony Robinson

David Woods, #28779
Attorney at Law
427 West Terra Lane, Suite A
O'Fallon, Missouri 63366
(636) 448-1748 telephone
reachingdavid@yahoo.com
Attorney for Defendant/Appellant
    Jerry Peteet

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, table of contents and authorities, certificates of service and compliance, but including footnotes) contains 19,705 words as determined by the word counting feature of Microsoft Word 2010.

Pursuant to Circuit Rule 28A(h), I also hereby certify that electronic files of this Brief and accompanying Addendum have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free.

Respectfully submitted,

JENKINS & KLING, P.C.

By: /s/ Ronald E. Jenkins
    Ronald E. Jenkins, #23850
    150 N. Meramec Avenue, Suite 400
    St. Louis, Missouri 63105
    (314) 721-2525
    (314) 721-5525
    rjenkins@jenkinskling.com
Attorney for Defendant/Appellant Jerry Elkins

Appellate Case: 13-1894    Page: 91    Date Filed: 11/07/2013 Entry ID: 4093815

# CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, and Circuit Rule 25A(a), I hereby certify that on November 6, 2013, I filed a copy of the foregoing, along with the accompanying Addendum, with the Clerk of the Court through the Court's CM/ECF system, which will serve electronic copies on all registered counsel.

I further certify that I will hand deliver ten (10) paper copies of this Brief and the accompanying Addendum to the Clerk of the Court within five (5) days after I have been notified that the electronic version of this Brief has been accepted for filing.

I further certify that I will hand deliver two (2) paper copies of this Brief and the accompanying Addendum to Serena M. Wissler, Assistant United States Attorney, within five (5) days after I have been notified that the electronic version of this Brief has been accepted for filing.

Respectfully submitted,

JENKINS & KLING, P.C.

By: /s/ Ronald E. Jenkins
    Ronald E. Jenkins, #23850
    150 N. Meramec Avenue, Suite 400
    St. Louis, Missouri 63105
    (314) 721-2525
    (314) 721-5525
    rjenkins@jenkinskling.com
Attorney for Defendant/Appellant Jerry Elkins

76