**NOS. 13-1894, 13-1935, 13-1941,**
**13-1967, 13-1969, 13-1971**

***Criminal***
_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

***UNITED STATES OF AMERICA***
*Appellee*

***v.***

***DOMINIC HENLEY, JAMES SMITH, JERRY ELKINS,***
***MARSHALL FRY, ANTHONY ROBINSON, and JERRY PETEET***
*Appellants*
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
_____

BRIEF OF APPELLEE
_____

**RICHARD G. CALLAHAN**
**United States Attorney**

**SIRENA MILLER WISSLER**
**Assistant United States Attorney**
111 S. 10th Street, Room 20.331
St. Louis, Missouri 63102
Attorneys for Appellee

Derek Wiseman (Washington University School of Law 3L)
materially assisted in the preparation of this brief.

# SUMMARY OF THE CASE AND POSITION ON ORAL ARGUMENT

In June 2011, Appellants Dominic Henley, James C. Smith, Jerry Elkins, Marshall Fry, and Anthony Robinson were charged by way of Indictment with Racketeering Conspiracy in violation of Title 18, United States Code, Section 1962(d). Some, but not all, were also charged with Violent Crime in Aid of Racketeering. Appellant Jerry Peteet was added by way of Superseding Indictment in June 2012.

The parties proceeded to trial on October 15, 2012 before Chief United States District Judge Catherine D. Perry. The jury returned verdicts of "guilty" as to the Racketeering Conspiracy and some, but not all of the substantive offenses. On appeal, Appellants raise issues related to the sufficiency of the evidence supporting their convictions, the admission of various recorded and other evidence, the denial of a motion to sever, the instructions and verdict form provided to the jury, and the imposition of a leadership enhancement.

The Government believes that oral argument would materially assist the Court in resolving the legal issues raised by way of this appeal, and asks for an amount of time equal to the time afforded the Appellants in the aggregate.

Appellate Case: 13-1894    Page: 2    Date Filed: 02/06/2014 Entry ID: 4121608

# **TABLE OF CONTENTS**

SUMMARY OF THE CASE AND POSITION ON ORAL ARGUMENT .............i

TABLE OF AUTHORITIES .......................................................................v

STATEMENT OF THE ISSUES.............................................................x

STATEMENT OF THE CASE...............................................................1

SUMMARY OF THE ARGUMENTS ................................................86

ARGUMENTS

I.    THE DISTRICT COURT DID NOT ERR IN DENYING
      APPELLANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL
      BECAUSE THE GOVERNMENT PRESENTED SUFFICIENT
      EVIDENCE FROM WHICH THE JURY COULD
      REASONABLY CONCLUDE BEYOND A REASONABLE
      DOUBT THAT EACH APPELLANT WAS GUILTY OF EACH
      OFFENSE OF CONVICTION...............................................98

      B(i)    The Government presented sufficient evidence as to the
              existence of an "enterprise" as required by 18 U.S.C.
              §1961 ...........................................................100
      B(ii)   The District Court Did Not Err In Denying Appellants'
              Motions For Judgment Of Acquittal Because The
              Government Presented Sufficient Evidence To Support
              The Jury's Unanimous Verdict Finding The Existence Of
              A "Pattern Of Racketeering Activity".......................114
      B(iii)  The District Court Properly Denied J. Smith's Motion For
              Judgment of Acquittal Because the Government Presented
              Sufficient Evidence that J. Smith Agreed to Participate in
              the Affairs of an Enterprise With the Knowledge and
              Intent that a Co-Conspirator Would Commit at Least Two
              Predicate Acts in Furtherance of The Enterprise.........133

Appellate Case: 13-1894    Page: 3    Date Filed: 02/06/2014 Entry ID: 4121608

B(iv)    Sufficient Evidence Supports Henley's, Elkins', and Fry's Convictions As To Count XIII ...................................................139

B(v)    The District Court Did Not Err In Denying Robinson's Motion For Judgment Of Acquittal As To Counts X And XI Because The Government Presented Sufficient Evidence That Robinson Committed Felony Murder And Attempt To Commit Murder ......................................................146

B(vi)    The District Court Did Not Err In Denying Robinson's Motion For Judgment Of Acquittal As To Count XIV, Because The Government Proved By Sufficient Evidence And Beyond A Reasonable Doubt That Robinson Was Not Acting In Self-Defense Or Defense Of A Third Party ..............153

B(vii)    The District Court Did Not Err In Denying Robinson's Motions For Judgment Of Acquittal As To Counts X, XI, And XIV Because The Government Proved By Sufficient Evidence That Robinson Committed Those Offenses In Aid Of Racketeering Activity......................................................158

II.    THE DISTRICT COURT DID NOT CLEARLY ABUSE ITS DISCRETION IN ADMITTING RECORDED EVIDENCE AT TRIAL ...................................................................................166

B(i)    The Judicially Authorized Title III Wiretap Evidence was Properly Admitted Because the Authorizing Judge Had Jurisdiction to Authorize the Interceptions Based Upon the "Listening Post" Rule ..................................................167

B(ii)    The Consensual Recordings Were Properly Admitted Because They Were Properly Authenticated.............................173

B(iii)    The District Court Properly Admitted the Authentic Judicially-Authorized Wiretap Recordings in Accordance with Title 18, United States Code, Section 2518 .....................178

III.    THE DISTRICT COURT DID NOT CLEARLY ABUSE ITS DISCRETION WHEN IT REFUSED TO ADMIT BARRY ROGERS' HEARSAY AFFIDAVIT......................................................188

Appellate Case: 13-1894    Page: 4    Date Filed: 02/06/2014    Entry ID: 4121608

IV.    THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR
WHEN IT REFUSED TO ADMIT BARRY ROGERS'
HEARSAY STATEMENTS ..................................................................203

V.    THE DISTRICT COURT DID NOT ERR IN ADMITTING
EVIDENCE OF A NOVEMBER 1, 2009 MURDER ..........................209

VI.    THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR
WHEN IT DENIED J. SMITH'S MOTION TO SEVER.....................214

VII.    NEITHER THE GOVERNMENT NOR THE COURT
"CONSTRUCTIVELY AMENDED" THE INDICTMENT AS TO
COUNT XI AND THE DISTRICT COURT THEREFORE DID
NOT COMMIT PLAIN ERROR WHEN IT DENIED
ROBINSON'S MOTION FOR JUDGMENT OF ACQUITTAL
AS TO COUNT XI................................................................................219

VIII.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
IN REFUSING TO UTILIZE A SPECIAL VERDICT FORM.............225

IX.    THE DISTRICT COURT DID NOT COMMIT CLEAR ERROR
IN IMPOSING A TWO LEVEL ENHANCEMENT AS TO J.
PETEET PURSUANT TO UNITED STATES SENTENCING
GUIDELINES SECTION 3B1.1(c), BECAUSE J. PETEET WAS
AN ORGANIZER, LEADER, MANAGER, OR SUPERVISOR
IN THE CRIMINAL ACTIVITY ........................................................228

CONCLUSION .....................................................................................234

CERTIFICATE OF COMPLIANCE....................................................235

CERTIFICATE OF SERVICE .............................................................235

Appellate Case: 13-1894    Page: 5    Date Filed: 02/06/2014 Entry ID: 4121608

# TABLE OF AUTHORITIES

## Cases

*Boyle v. United States*, 556 U.S. 938 (2009)....................................................... 102, 109, 110

*Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813 (8th Cir. 2010) ........................................ 206

*Buchanan v. Kentucky*, 483 U.S. 402 (1987) ......................................................... 215

*Cavazos v. Smith*, 132 S. Ct. 2 (2011)............................................................... 99

*Dranow v. United States*, 307 F.2d 545 (8th Cir. 1962) ........................................ 182

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) ...............................passim

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 829 F.2d 648 (8th Cir. 1987), ...................... 116

*Harris v. Chand*, 506 F.3d 1135 (8th Cir. 2007) ........................................... 203

*In re American Honda Motor Co., Inc. Dealerships Relations Litigation Flynn Motors, Inc. et al. v.*
  *American Honda Motor Co, Inc., et al.*, 965 F. Supp. 716 (D. Md. 1977)............................138

*Kaplan v. Mayo Clinic*, 653 F.3d 720 (8th Cir. 2011) .................................... 173, 179

*Layton v. South Dakota*, 918 F.2d 739 (8th Cir. 1990)....................................... 215

*Reed v. Thalacker*, 198 F.3d 1058 (8th Cir. 1999).......................................... 206

*Richardson v. Marsh*, 481 U.S. 200 (1987) .............................................. 215

*Salinas v. United States*, 522 U.S. 52 (1997) ...............................................passim

*Sedima, S.P.R.L. v. Imrex Co*, 473 U.S. 479 (1985) ....................................... 115

*United States v. Abbell*, 413 F.3d 1286 (11th Cir. 2001) ................................. 134

*United States v. Adetiloye*, 716 F.3d 1030 (8th Cir. 2013) ........................... 228, 230

*United States v. Allery*, 139 F.3d 609 (8th Cir. 1998)................................ 140, 143

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011) ................................... 226

*United States v. Baez*, 349 F.3d 90 (2d Cir. 2003) ...................................... 210

*United States v. Baker*, 367 F.3d 790 (8th Cir. 2004)................................... 140

*United States v. Beaulieu*, 893 F.2d 1177 (8th Cir. 1990) ............................. 229

*United States v. Bergin*, 650 F.3d 257 (3d Cir. 2011) ................................. 110

*United States v. Bernardino, No.* 07 Cr. 151 (PKC), 2007 WL 4462176 (S.D.N.Y., Dec. 17, 2007) ..... 171

*United States v. Bobo*, 994 F.2d 524 (8th Cir. 1993)................................ 196, 199

*United States v. Boyle*, No. S108CR523 (CM), 2009 WL 5178525 (S.D.N.Y., Dec. 23, 2009)...............210

*United States v. Bolzer*, 367 F.3d 1032 (8th Cir. 2004)................................ 155, 156

*United States v. Burden*, 600 F.3d 204 (2d Cir. 2010)........................... 122, 128, 129, 131

*United States v. Cain*, 671 F.3d 271 (2d Cir. 2012).................................... 122

*United States v. Calderin-Rodriguez*, 244 F.3d 977 (8th Cir. 2001) ................. 176, 181

*United States v. Chauncey*, 420 F.3d 864 (8th Cir. 2005) ........................... 196

*United States v. Chavez*, 230 F.3d 1089 (8th Cir. 2000).............................. 141

*United States v. Cole*, 525 F.3d 656 (8th Cir. 2008) ................................ 193

*United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992) ....................... 159, 160

*United States v. Coohey*, 11 F.3d 97 (8th Cir. 1993) .............................. 177, 180

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) ............................ 102

*United States v. Crenshaw*, 359 F.3d 977 (8th Cir. 2004) ......................... 151, 152

*United States v. Crippen*, 627 F.3d 1056 (8th Cir. 2010) ......................... 145

Appellate Case: 13-1894     Page: 6     Date Filed: 02/06/2014 Entry ID: 4121608

*United States v. Daidone*, 471 F.3d 371 (2d Cir. 2006)................................................122, 123

*United States v. Darden*, 70 F.3d 1507 (8th Cir. 1995).............................101, 109, 217

*United States v. Davidson*, 122 F.3d 531 (8th Cir. 1997)........................................103, 104

*United States v. De Oliveira*, 623 F.3d 593 (8th Cir. 2010) ....................................229, 230

*United States v. Denman*, 100 F.3d 399 (5th Cir. 1996)........................169, 170, 171, 172

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001) ...........................................................161

*United States v. Erwin*, 793 F.2d 656 (5th Cir. 1986)..........................................210, 211

*United States v. Eufrasio*, 935 F.2d 553 (3d Cir. 1991) .........................................................211

*United States v. Farmer*, 583 F.3d 131 (2d Cir. 2009) ...........................................................161

*United States v. Fernandez*, 526 Fed. Appx. 270 (4th Cir. 2013)....................119, 120

*United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994) ................................................................163

*United States v. Finestone*, 816 F.2d 583 (11th Cir. 1987)................................210, 211

*United States v. Frank*, 354 F.3d 910 (8th Cir. 2004).........................................214, 217

*United States v. Frausto*, 636 F.3d 992 (8th Cir. 2011)......................................................229

*United States v. Gavin*, 583 F.3d 542 (8th Cir. 2009).........................................................219

*United States v. Ghant*, 339 F.3d 660 (8th Cir. 2003) .......................................................216

*United States v. Giampa*, 904 F. Supp. 235 (D. N.J.. 1995) ..............................................171

*United States v. Gonzales*, 921 F.2d 1530 (11th Cir. 1991)..............................134, 210

*United States v. Gooch*, 665 F.3d 1318 (D.C. Cir. 2012) ..................................................163

*United States v. Goodwin*, 719 F.3d 857 (8th Cir. 2013)....................................................100

*United States v. Griffin*, 660 F.2d 996 (4th Cir. 1981) .......................................................102

*United States v. Halk*, 634 F.3d 482 (8th Cir. 2011)..................................................passim

*United States v. Harris*, 695 F.3d 1125 (10th Cir. 2012)....................................107, 108

*United States v. Heilman*, 377 Fed. Appx. 157 (3d Cir. 2010) .........................163, 165

*United States v. Hernandez*, 13 F.3d 248 (7th Cir. 1994) ..................................................151

*United States v. Hilliard*, 490 F.3d 635 (8th Cir. 2007)......................................................139

*United States v. Hinojosa*, 728 F.3d 787 (8th Cir. 2013) .....................................................99

*United States v. Hively*, 437 F.3d 752 (8th Cir. 2006) ............................129, 130, 131, 132

*United States v. Hutchinson*, 573 F.3d 1011 (10th Cir. 2009) ..........................................227

*United States v. Jackson*, 610 F.3d 1038 (8th Cir. 2010)....................................142, 143

*United States v. Jackson*, 639 F.3d 479 (8th Cir. 2011)......................................................229

*United States v. Jefferson*, 432 Fed. Appx. 387-88 (5th Cir. 2011)................................222

*United States v. Jefferson*, 652 F.3d 927 (8th Cir. 2011).....................................................99

*United States v. Jefferson*, 725 F.3d 829 (8th Cir. 2013) ....................145, 212, 220

*United States v. Jirak*, 728 F.3d 806 (8th Cir. 2013) ...........................................................99

*United States v. Johnson*, 474 F.3d 1044 (8th Cir. 2001) ..................................................140

*United States v. Johnson*, 688 F.3d 494 (8th Cir. 2012) ......................................................99

*United States v. Johnson*, 767 F.2d 1259 (8th Cir. 1985) ..................................166, 178

*United States v. Johnson*, No. 08-5911, 2010 WL 3736881 (6th Cir., Sept. 17, 2010)............................171

*United States v. Jones*, 132 S. Ct. 945 (2012)..........................................................................172

*United States v. Kazarian, No.* 10 Cr. 895, 2012 WL 1810214 (S.D.N.Y., May 18, 2012) ....................171

*United States v. Keltner*, 147 F.3d 662 (8th Cir. 1998) ........................................130, 131

*United States v. Kenyon*, 397 F.3d 1071 ...............................................................................203

*United States v. Keys*, 721 F.3d 512 (8th Cir. 2013)..............................................................99

vi

*United States v. Kindle*, 925 F.2d 272 (8th Cir. 1991)...............................................215
*United States v. Kragness*, 830 F.2d 842 (8th Cir. 1987) .........................110, 111, 112
*United States v. Lane*, 474 U.S. 438 (1986)..............................................................215
*United States v. Leisure*, 844 F.2d 1347 (8th Cir. 1988) ...........................................103
*United States v. Lester*, 283 Fed. Appx. 421 (8th Cir. 2008)......................................157
*United States v. Lewis*, 557 F.3d 601 (8th Cir. 2009) ........................................215, 216
*United States v. Luong*, 471 F.3d 1107 (9th Cir. 2006) ............................................171
*United States v. Manning*, 738 F.3d 937 (8th Cir. 2013) ...........................................181
*United States v. Mariano*, 729 F.3d 874 (8th Cir. 2013) ....................................220, 222
*United States v. Mason*, 479 Fed. Appx. 397 (2d Cir. 2012)......................................145
*United States v. Mathison*, 157 F.3d 541 (8th Cir. 1998) ..........................................214
*United States v. Maxwell*, 25 F.3d 1389 (8th Cir. 1994).....................................184, 185
*United States v. McCowan*, 706 F.2d 863 (8th Cir. 1983) ...................................177, 180
*United States v. McKay*, 431 F.3d 1085 (8th Cir. 2005)..............................................99
*United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974)...........................................174
*United States v. Moe*, 536 F.3d 825 (8th Cir. 2008) .................................................151
*United States v. Mohamed*, 600 F.3d 1000 (8th Cir. 2010) .......................................144
*United States v. Morales*, 445 F.3d 1081, 1084 (8th Cir. 2006) .................................132
*United States v. Morales*, 655 F.3d 608 (7th Cir. 2011) ...........................................217
*United States v. Mueller*, 661 F.3d 338 (8th Cir. 2011)......................................214, 216
*United States v. Nagi*, No. 11-1170, 2013 WL 5433464 (6th Cir., Sept. 13, 2013) ................121, 127, 130
*United States v. Nguyen*, 255 F.3d 1335 (11th Cir. 2001) ..................................133, 136
*United States v. North*, 728 F.3d 429 (5th Cir. 2013) ..............................................172
*United States v. North*, No. 11-60763, 2013 WL 5761902 (5th Cir., Oct. 24, 2013) ...............................172
*United States v. Ogando*, 968 F.2d 146 (2d Cir. 1992) ............................................226
*United States v. Ortiz-Rodriguez*, 461 Fed. Appx. 525 (8th Cir. 2012)........................229
*United States v. Oslund*, 453 F.3d 1048 (8th Cir. 2006) .....................................174, 180
*United States v. Panas*, 738 F.2d 278 (8th Cir. 1984) .......................................177, 178
*United States v. Payne*, 119 F.3d 637 (8th Cir. 1997) .............................................230
*United States v. Payne*, 591 F.3d 46 (2d Cir. 2010)..........................................105, 106
*United States v. Pecina*, 956 F.2d 186 (8th Cir. 1992) ......................................166, 216
*United States v. Pedroni*, 958 F.2d 262 (9th Cir. 1992) ...........................................185
*United States v. Perez*, 663 F.3d 387 (8th Cir. 2011) ...............................99, 140, 145
*United States v. Pherigo*, 327 F.3d 690 (8th Cir. 2003)............................................214
*United States v. Pierce*, 479 F.3d 546 (8th Cir. 2007)..............................................225
*United States v. Piwowar*, 492 F.3d 953 (8th Cir. 2007) ..........................................139
*United States v. Pizano*, 421 F.3d 707 (8th Cir. 2003) .............................................230
*United States v. Polanco*, 145 F.3d 536 (2d Cir. 1998) ............................................122
*United States v. Pou*, 953 F.2d 363 (8th Cir. 1992)..................................................215
*United States v. Rasmussen*, 790 F.2d 55 (8th Cir. 1986)..........................................194
*United States v. Ray*, 250 F.3d 596 (8th Cir. 2001) .................................................181
*United States v. Reddest*, 512 F.3d 1067 (8th Cir. 2008)..........................................139
*United States v. Redzic*, 627 F.3d 683 (8th Cir. 2010)..............................................222
*United States v. Risken*, 788 F.2d 1361 (8th Cir. 1986).......................................175, 178

*United States v. Roach*, 28 F.3d 729 (8th Cir. 1994) ...................................... 166, 176, 177, 178

*United States v. Robertson*, 736 F.3d 1317 (11th Cir. 2013) .................................. 163

*United States. v. Rodriguez*, No. 08 CR 1311 (RPP),
    2009 WL 2569116 (S.D.N.Y., Aug. 20, 2009) ........................................... 171

*United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992) ........................... 168, 169, 171

*United States v. Rodriguez-Ramos*, 663 F.3d 356 (8th Cir. 2011) ......................... 230

*United States v. Sabubu*, 891 F.2d 1308 (7th Cir. 1989) .................................. 226

*United States v. Sanchez-Garcia*, 685 F.3d 745 (8th Cir. 2012) .......................... 214

*United States v. Savage*, 863 F.2d 595 (8th Cir. 1988) .................................... 193

*United States v. Savoy*, 883 F. Supp. 2d 101 (D. D.C. 2012) .............................. 171

*United States v. Seibel*, 712 F.3d 1229 (8th Cir. 2013) .................................. 203

*United States v. Shenburg*, 89 F.3d 1461 (11th Cir. 1996) ............................... 227

*United States v. Shryrock*, 342 F.3d 948 (9th Cir. 2003) ............................ 191, 192

*United States v. Smith*, 413 F.3d 1253 (10th Cir. 2005) .................................. 227

*United States v. Smith*, 938 F.2d 69 (7th Cir. 1991) ..................................... 226

*United States v. Starks*, 515 F.2d 112 (3d Cir. 1975) .................................... 180

*United States v. Starrett*, 55 F.3d 1525 (11th Cir. 1995) ................................ 134

*United States v. Stegmeier*, 701 F.3d 574 (8th Cir. 2012) ........................... 222, 225

*United States v. Stephenson*, 924 F.2d 753 (8th Cir. 1991) .............................. 215

*United States v. Stymiest*, 581 F.3d 759 (8th Cir. 2009) ................................ 153

*United States v. Tate*, 633 F.3d 624 (8th Cir. 2011) .................................... 100

*United States v. Tavarez*, 40 F.3d 1136 (10th Cir. 1994) ................................ 169

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ...................................... 212

*United States v. Turkette*, 452 U.S. 576 (1981) .................................... 101, 102

*United States v. Two Shields*, 497 F.3d 789 (8th Cir. 2007) ...................... 188, 189, 193

*United States v. Webster*, 442 F.3d 1065 (8th Cir. 2006) ................................ 222

*United States v. Wells*, 646 F.3d 1097 (8th Cir. 2011) .................................... 98

*United States v. White*, 675 F.3d 1106 (8th Cir. 2012) .................................. 100

*United States v. Whitten*, 610 F.3d 168 (2d Cir. 2010) .............................. 159, 161

*United States v. Wilcox*, 487 F.3d 1163 (8th Cir. 2007) ................................. 206

*United States v. Wilson*, 237 F.3d 827 (7th Cir. 2001) .................................. 170

*United States v. Yarrington*, 634 F.3d 440 (8th Cir. 2011) ......................... 205, 207

*United States v. Yockel*, 320 F.3d 818 (8th Cir. 2003) .................................. 140

*Weeks v. Angelone*, 528 U.S. 225 (2000) ............................................ 123, 132

*Williamson v. United States*, 512 U.S. 594 (1994) ...................................... 189

*Zafiro v. United States*, 506 U.S. 534 (1993) .......................................... 215

## Statutes

Title 18, United States Code, Section 1959(a)........................................... 158

Title 18, United States Code, Section 1959(a)(1) ....................................... 147

Title 18, United States Code, Section 1961............................................ 100, 116

Title 18, United States Code, Section 1961(4)........................................ 86, 101

Title 18, United States Code, Section 1961(5)..................................... 86, 115, 117

Title 18, United States Code, Section 1962(c)........................................ 100, 114

Title 18, United States Code, Section 1961(d).................................... 133, 138, 139

Appellate Case: 13-1894    Page: 9    Date Filed: 02/06/2014 Entry ID: 4121608

Title 18, United States Code, Section 2518 ..................................................... 167, 178, 184, 186

Title 18, United States Code, Section 2518(3)................................................................ 168, 169

Title 18, United States Code, Section 2518(8)(a) .......................................... 179, 181, 182

Title 18, United States Code, Section 2518(10).......................................................... 166, 169

Title 18, United States Code, Section 2518(10)(1) ............................................................ 183

Title 18, United States Code, Section 2518(10)(a) ........................................................... 183

Title 18, United States Code, Section 3575 ...................................................................... 121

## Rules

Fed. R. Evid. 103(a)(1)(A).................................................................................................. 182

Fed. R. Evid. 103(a)(1)(B).................................................................................................. 182

Fed. R. Evid. 403 ................................................................................................................. 94

Fed. R. Evid. 609(a)(1) ...................................................................................................... 196

Fed. R. Evid. 804(a) ........................................................................................................... 189

Fed. R. Evid. 804(b)(3) .................................................................................. 189, 191, 193, 207

Fed. R. Evid. 804(b)(3)(A) ................................................................................................. 190

Fed. R. Evid. 901(a) ........................................................................................................... 173

Fed. R. Crim. P. 12(b)(3)(C) .............................................................................................. 183

U.S.S.G. Section 3B1.1 ...................................................................................................... 229

U.S.S.G. Section 3B1.1(a) .......................................................................................... 228, 229

U.S.S.G. Section 3B1.1(c) ................................................................................... 228, 229, 232

Appellate Case: 13-1894    Page: 10    Date Filed: 02/06/2014 Entry ID: 4121608

## STATEMENT OF THE ISSUES

**I.**  **THE DISTRICT COURT DID NOT ERR IN DENYING APPELLANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT PRESENTED SUFFICIENT EVIDENCE FROM WHICH THE JURY COULD REASONABLY CONCLUDE BEYOND A REASONABLE DOUBT THAT EACH APPELLANT WAS GUILTY OF EACH OFFENSE OF CONVICTION**

*United States v. Wells*, 646 F.3d 1097 (8th Cir. 2011)
*United States v. Leisure*, 844 F.2d 1347 (8th Cir. 1988)
*Salinas v. United States*, 522 U.S. 51 (1997)

**II.**  **THE DISTRICT COURT DID NOT CLEARLY ABUSE ITS DISCRETION IN ADMITTING RECORDED EVIDENCE AT TRIAL**

*United States v. Rodriguez*, 968 F.3d 130 (2d Cir. 1992)
*United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974)
*United States v. Coohey*, 11 F.3d 91 (8th Cir. 1993)

**III.**  **THE DISTRICT COURT DID NOT CLEARLY ABUSE ITS DISCRETION WHEN IT REFUSED TO ADMIT BARRY ROGERS' HEARSAY AFFIDAVIT**

*Williamson v. United States*, 512 U.S. 594 (1994)
*United States v. Halk*, 634 F.3d 482 (8th Cir. 2011)

**IV.**  **THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR WHEN IT REFUSED TO ADMIT BARRY ROGERS' HEARSAY STATEMENTS**

*United States v. Wilcox,* 487 F.3d 1163 (8th Cir. 2007)

**V. THE DISTRICT COURT DID NOT ERR IN ADMITTING EVIDENCE OF A NOVEMBER 1, 2009 MURDER**

*United States v. Finestone*, 816 F.2d 583, 586 (11th Cir. 1987)
*United States v. Gonzales*, 921 F.2d 1530, 1546 (11th Cir. 1991)

**VI. THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR WHEN IT DENIED J. SMITH'S MOTION TO SEVER**

*United States v. Lewis*, 557 F.3d 601 (8th Cir. 2009)
*United States v. Frank*, 354 F.3d 910, 920 (8th Cir. 2004)

**VII. NEITHER THE GOVERNMENT NOR THE COURT "CONSTRUCTIVELY AMENDED" THE INDICTMENT AS TO COUNT XI AND THE DISTRICT COURT THEREFORE DID NOT COMMIT PLAIN ERROR WHEN IT DENIED ROBINSON'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO COUNT XI**

*United States v. Mariano*, 729 F.3d 874 (8th Cir. 2013)

**VIII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO UTILIZE A SPECIAL VERDICT FORM**

*United States v. Pierce*, 479 F.3d 546 (8th Cir. 2007)
*United States v. Stegmeier*, 701 F.3d 574 (8th Cir. 2012)
*United States v. Sabubu*, 891 F.2d 1308 (7th Cir. 1989)

**IX. THE DISTRICT COURT DID NOT COMMIT CLEAR ERROR IN IMPOSING A TWO LEVEL ENHANCEMENT AS TO J. PETEET PURSUANT TO UNITED STATES SENTENCING GUIDELINES SECTION 3B1.1(c), BECAUSE J. PETEET WAS AN ORGANIZER, LEADER, MANAGER, OR SUPERVISOR IN THE CRIMINAL ACTIVITY**

*United States v. Frausto*, 636 F.3d 992 (8th Cir. 2011)

Appellate Case: 13-1894    Page: 12    Date Filed: 02/06/2014 Entry ID: 4121608

## STATEMENT OF THE CASE

## HISTORY AND OVERVIEW

Near the end of 2008, St. Louis County Police Officer and Federal Bureau of Investigation Task Force Officer Andria Van Mierlo (hereinafter, "TFO Van Mierlo") was introduced to a man named Matthew Hunter (hereinafter, "M. Hunter").[1]  (Tr. Vol. II, p. 9)   She met M. Hunter through his defense attorney, who advised TFO Van Mierlo that M. Hunter had information regarding a motorcycle club called the Sin City Desciples [sic].  (Tr. Vol. II, p. 9; Tr. Vol. III, p. 29)  Although M. Hunter was not a member of the Sin City Desciples [sic] in 2009, he was acquainted with some individuals who were members.  (Tr. Vol. III, p. 29)  At the time TFO Van Mierlo met M. Hunter, he had a pending criminal case in Crawford County, Missouri.  (Tr. Vol. II, p. 9)  The case arose from a situation in which M. Hunter, while riding a motorcycle, had fled from law enforcement. (Tr. Vol. II, pp. 9-10).   TFO Van Mierlo did not promise M. Hunter that his criminal case would be dismissed if he agreed to act as an informant, nor did she agree to make any particular sentencing recommendation on his behalf.  (Tr. Vol. II, p. 16; Tr. Vol. III, p. 32).  TFO Van Mierlo never intervened in the Crawford County Case against M. Hunter.  (Tr. Vol. II, p. 16).

---

[1] Andria Van Mierlo was employed as a St. Louis County (Missouri) Police Officer but was detached to the FBI's "5 squad," also known as the "gang unit."  (Tr. Vol. II, p. 9)

Appellate Case: 13-1894     Page: 13     Date Filed: 02/06/2014 Entry ID: 4121608

After interviewing M. Hunter and learning that he could provide information to the FBI regarding members of the Sin City Desciples [sic], TFO Van Mierlo enrolled M. Hunter as an informant. (Tr. Vol. II, p. 10). At the time he was enrolled as an informant, M. Hunter signed an "otherwise illegal activity" admonishment, which explained that he was forbidden to engage in illegal conduct, except under the direction of the FBI. (Tr. Vol. II, pp. 12-13; Tr. Vol. III, p. 31; Govt. Exh. 192). The "otherwise illegal activity" admonishment was reviewed with M. Hunter periodically during the entire course of his efforts as an informant. (Tr. Vol. II, p. 13; Govt. Exh. 192).

The FBI paid M. Hunter to act as an informant. (Tr. Vol. II, p. 17; Tr. Vol. III, pp. 31-32). He was paid for his time, and he was reimbursed for expenses he incurred during his service. (Tr. Vol. II, p. 17). Among other things, he was reimbursed for vehicle maintenance, hotels stays, and food. (Tr. Vol. II, p. 17). In addition, M. Hunter was paid to attend various functions, some of which occurred outside the State of Missouri. (Tr. Vol. II, pp. 18-19). Eventually, M. Hunter's activity as informant became so time-consuming that he was unable to maintain a job. (Tr. Vol. II, p. 20). As a result, the FBI began to pay him a monthly stipend. (Tr. Vol. II, p. 20). Over a period of roughly 26 months, the FBI paid M. Hunter approximately $39,000 for his services. (Tr. Vol. II, p. 22) In addition, he was

2

reimbursed for actual out-of-pocket expenses in the approximate amount of $20,000.[2] (Tr. Vol. II, p. 20).

At various times throughout his service as an informant, M. Hunter was equipped with concealed recording devices, by way of which he surreptitiously recorded interactions with other individuals. (Tr. Vol. II, pp. 23-24). M. Hunter consented to the use of the concealed recording devices. (Tr. Vol. II, p. 25). The recording devices were digital devices that M. Hunter relinquished to TFO Van Mierlo after the recordings had been made. (Tr. Vol. II, p. 25). Thereafter, FBI personnel would download the digital recordings onto CDs, which were maintained in the custody of the FBI. (Tr. Vol. II, p. 26). M. Hunter also consented to the monitoring of his telephone conversations during the course of the investigation. (Tr. Vol. II, pp. 27-28). The consensual monitoring of M. Hunter's telephone calls utilized the same technology and equipment that is utilized in a conventional, judicially authorized Title III wiretap. (Tr. Vol. II, p. 27).

M. Hunter also eventually made a series of controlled purchases of drugs and/or firearms during his service as an informant. (Tr. Vol. II, pp. 28-30). Each of the controlled purchases was audio and/or video recorded. (Tr. Vol. II, p. 31). After the recordings were made, M. Hunter relinquished the recording device to TFO Van Mierlo, who caused the recordings to be maintained in the custody of the

---

[2] M. Hunter was also eventually paid by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, a fact about which the jury was informed.

3

FBI, where they remained. (Tr. Vol. II, p. 31). Prior to trial, TFO Van Mierlo personally reviewed all of the recordings made by M. Hunter. (Tr. Vol. II, p. 32). She also participated in creating transcripts of some of those recordings, for purposes of trial. (Tr. Vol. II, p. 32).

As the investigation progressed, TFO Van Mierlo applied for, and received, judicial authorization for a wiretap on a telephone utilized by Allan Hunter, a/k/a "Dog" (hereinafter, "A. Hunter"). (Tr. Vol. II, pp. 35-37). [3]

M. Hunter ultimately joined the Sin City Titans motorcycle club in St. Louis at the behest of TFO Van Mierlo. (Tr. Vol. II, p. 79; Tr. Vol. III, p. 30). He utilized the moniker "Madd Matt," although some people also referred to him as "Max." (Tr. Vol. III, p. 41; Tr. Vol. XVIII, p. 160). The Sin City Titans were distinct from the Sin City Desciples [sic] only in the sense that the Titans rode "street bikes," whereas the Desciples [sic] rode Harley Davidson motorcycles. (Tr. Vol. III, p. 30). The Sin City Titans were essentially an "extension" of the Sin City Desciples. (Tr. Vol. XX, p. 113). Other members of the Sin City organization in St. Louis included Sean Jackson, a/k/a "Smoke," (hereinafter, "Jackson"); Appellant Dominic Henley, a/k/a "Bishop," (hereinafter, "Henley"); Lawrence Pinkston, a/k/a "Pac," (hereinafter, "Pinkston"), and Norman Vick, a/k/a "Justice," (hereinafter, "Vick,") (Tr. Vol. II, pp. 120-21, 124-26). The Sin City Desciples

---

[3] The details of this Title III wiretap will be discussed more fully herein.

Appellate Case: 13-1894    Page: 16    Date Filed: 02/06/2014 Entry ID: 4121608

[sic], of which Jackson, Henley, Pinkston, and Vick were members, was an "outlaw club;" the Sin City Titans were not.  (Tr. Vol. II, p. 121; Tr. Vol. III, pp. 33-34).

In early 2009, Jackson, Henley, Pinkston, Vick, and M. Hunter left the Sin City organization and joined the Wheels of Soul (hereinafter, "WOS").  (Tr. Vol. II, p. 121; Tr. Vol. III, p. 33; Tr. Vol. XX, p. 114).  They formed a new chapter of the WOS in St. Louis.  (Tr. Vol. II, pp. 122, 126; Tr. Vol. XX, p. 114).   The national headquarters, or "Mother Chapter," of the WOS is located in Philadelphia, Pennsylvania.  (Tr. Vol. VI, pp. 156, 233, 249; Tr. Vol. IX, p. 93; Tr. Vol. XVI, p. 103).

At the time the St. Louis Chapter of the WOS was formed, Henley was the President of the Chapter. (Tr. Vol. II, p. 126; Tr. Vol. III, p. 36; Tr. Vol. VI, p. 156, 248; Tr. Vol. XX, p. 115; Govt. Exh. 72).[4]   Pinkston served as the Vice President. (Tr. Vol. II, p. 127; Tr. Vol. VI, p. 156; Tr. Vol. XX, p. 115).  Vick was the Secretary.  (Tr. Vol. II, p. 127; Tr. Vol. VI, p. 156; Tr. Vol. XX, p. 156).   Jackson assumed the role of Sergeant at Arms, also known as the Enforcer.  (Tr. Vol. II, p. 122; Tr. Vol. VI, p. 156; Tr. Vol. XX, p. 115).  The Sergeant at Arms was responsible for protecting the Chapter President, keeping order, and ensuring the

_____

[4] Appellants jointly claim that "Henley was *alleged* to be the President of the St. Louis Chapter of the Wheels of Soul."  (Appellants' Joint Brief, p. 5) (emphasis added).  Not only was Henley "alleged" to be the President, he freely admitted that he was, in fact, the President.  (Tr. Vol. XX, p. 115).

Appellate Case: 13-1894     Page: 17     Date Filed: 02/06/2014 Entry ID: 4121608

safety of members.  (Tr. Vol. II, pp. 122-23).  The duties of the Sergeant at Arms and all the Chapter officers are more thoroughly described in the WOS Constitution.  (Govt. Exh. 40).  Every WOS Chapter had these same officer positions.  (Tr. Vol. IX, pp. 95-96; Govt. Exh. 40).

The members of the newly formed St. Louis Chapter of the WOS joined the WOS knowing that it was an "outlaw club."  (Tr. Vol. III, p. 33).  The WOS is an "outlaw club."  (Tr. Vol. III, p. 34; Tr. Vol. VI, 257-58; Tr. Vol. VI, p. 246; Tr. Vol. IX, p. 79; Govt. Exh. 67).  An "outlaw club" is one whose members "live beyond the law." (Govt. Exh. 67; Tr. Vol. II, p. 122).  They "don't back down from nobody," and they "play for keeps."  (Govt. Exh. 67).  "Outlaw clubs" are distinct from "motorcycle clubs," or "MCs," the members of which follow the law.  (Tr. Vol. VI, p. 247).  An "outlaw club" controls all the MCs in a given geographic area.[5]  (Tr. Vol. III, p. 34).  Members of "outlaw clubs" and "MCs" alike wear "colors," which essentially consisted of vests sporting patches identifying the club.  (Govt. Exh. 67; Tr. Vol. II, pp. 136-37; Govt. Exh. 2; Govt. Exh. 6).  No member of the WOS was permitted to wear "colors," or any patch, unless the right to do so

---

[5] Henley admitted, albeit reluctantly, that other clubs wishing to spread into areas in which the WOS maintained a presence would be permitted to do so only if they purchased a WOS "support patch."  Henley admitted that he told the St. Louis members, "[t]hey ain't spreading nowhere without buying our $50 patch.  We might decide to make it $75.  Everybody in the club.  They ain't spreading nowhere where Wheels at [sic]."  (Tr. Vol. XX, p. 160).  Henley further stated, "[w]hen they get there, they've got to pay that price for the patch."  (Tr. Vol. XX, p. 160).

Appellate Case: 13-1894     Page: 18     Date Filed: 02/06/2014 Entry ID: 4121608

had been conferred by the Mother Chapter. (Govt. Exh. 62; Tr. Vol. XX, p. 156). "Outlaw clubs" wear a special patch called a "bottom rocker." (Tr. Vol. IX, p. 89; Govt. Exh. 6). Only "outlaw clubs" are permitted to wear the "bottom rocker," which designates the club's state. (Tr. Vol. IX, pp. 88-89). If another club wished to wear a "bottom rocker" bearing that state, that club would need to request and receive permission from the state's "outlaw club." (Tr. Vol. IX, p. 90). If such permission was not received, or was denied, the offending club would be required to remove the "state rocker" from their "colors." (Tr. Vol. IX, p. 90). Wearing a "bottom rocker" without the permission of the presiding "outlaw club" is considered a sign of disrespect, and disputes over "bottom rockers" frequently resulted in violence. (Tr. Vol. IX, p. 90).

The WOS is not only an "outlaw club," it is a "one percenter club." (Tr. Vol. III, p. 33; Tr. Vol. VI, p. 247; Tr. Vol. IX, p. 79). A "one percenter club" is "the top of the food chain when it comes to outlaw clubs." (Tr. Vol. IX, p. 79, 223). The club's distinction as a "one percenter club" is most obviously manifested in the wearing (by some members) of a diamond-shaped patch containing the designation "1%." (Tr. Vol. IX, p. 79; Govt. Exh. 1).

7

The WOS had a "chain of command."  (Tr. Vol. IX, p. 107; Govt. Exh. 230).

The St. Louis Chapter of the WOS was part of the Midwest Region.[6] (Govt. Exh.

219, Appellee's Appendix (hereinafter, "Appx."), pp. 2-4).   Also included in the

Midwest Region were Chapters from Illinois, Minnesota, Kentucky, Ohio,

Michigan, Indiana, and Wisconsin.  (Tr. Vol. IX, p. 144; Govt. Exh. 219, Appx.

pp. 2-3).  In 2009, Myron Farris, a/k/a "Ghost" (hereinafter, "Farris") was the

president of the Midwest Region.  (Tr. Vol. IX, p. 70-71, p. 95; Tr. Vol. XVI, p.

99, 143).  Farris was murdered in his Chicago garage on July 17, 2010.  (Tr. Vol.

IX, p. 70, 73).   After Farris's murder, A. Hunter assumed the position of Midwest

Region President.[7]  (Tr. Vol. IX, pp. 105-06; Tr. Vol. XVI, p. 108).  The Regional

President reported directly to the National leadership.  (Tr. Vol. IX, p. 107).

---

[6] Although the WOS was comprised of different chapters that were grouped into
Regions, these entities were not separate components, but rather, part of a larger
whole.  A. Hunter was asked about the relationship between the Chicago chapter
and the Mother Chapter, with defense counsel stating, "[t]hey are their own
separate thing, doing their own thing?"  (Tr. Vol. XIX, p. 80).  In response, A.
Hunter corrected him, stating "[t]hat's not true.  You can't be separate if you're
Wheels of Soul.  That's like saying Philadelphia is only Philadelphia and Chicago
is only Chicago.  It doesn't make sense."  (Tr. Vol. XIX, p. 80).   A. Hunter also
testified that "[t]here was no such thing as individuals when you belong to a club,"
later refusing to change that statement, saying "once again, you belong to a club,
you're all together.  I'm not going to change that."  (Tr. Vol. XIV, pp. 54-55).
[7] A. Hunter will be discussed more fully herein.  Like Henley, Pinkston, Vick, and
Jackson, A. Hunter had previously been a member of the Sin City Desciples [sic],
although he was a member of the Chicago chapter.  (Tr. Vol. IX, p. 77, 81, 82).
Also like these men, A. Hunter joined the WOS in 2009 along with approximately
21 other members from the Chicago chapter of Sin City and several members from
East Chicago and Detroit.  (Tr. Vol. IX, p. 82).  A. Hunter and M. Hunter are not
blood-related.

Appellate Case: 13-1894     Page: 20     Date Filed: 02/06/2014 Entry ID: 4121608

Failure to follow the "chain of command" could result in a fine or beating.[8]  (Tr. Vol. IX, p. 107).

The National leadership positions were established by and described in the WOS Constitution.  (Govt. Exh. 40).  More specifically, the Constitution established that:

> THE ELECTED OFFICERS OF THIS CLUB SHALL BE:  PRESIDENT, VICE PRESIDENT, SECRETARY, TREASURER, BUSINESS MANAGER, SERGEANT AT ARMS, AND OTHER OFFICES PENDING PRESIDENTIAL DESIGNATION.  THE TERM OF ALL OFFICERS WILL EXTEND FOR ON [SIC] (1) YEAR.

(Govt. Exh. 40).  The Constitution also contained a "mission statement" of sorts, explaining, "[i]t shall be the object of this organization to inform, to ride motorcycles, and to advance the interest of the members."  (Govt. Exh. 40).  The WOS also had, as one of its goals, expanding its presence into geographic areas in which they did not have existing presence.  (Tr. Vol. IX, p. 106; Tr. Vol. XX, p. 170).  Each chapter of the WOS held regular meetings at the local level, with Regional and National meetings occurring less frequently.  (Tr. Vol. IX, p. 94).  WOS members were expected to pay dues, not only to the local chapter, but also to the National organization.  (Tr. Vol. IX, pp. 96-97; Tr. Vol. XX, p. 159).  If dues

---

[8] One witness testified that "you just got to get permission to do certain things . . . you just don't go attacking without confirmation. . . Everything's got to be sanctioned. . . Cleared.  Permission. . . [From] [w]hoever's in charge."  (Tr. Vol. XVI, p. 131).

Appellate Case: 13-1894    Page: 21    Date Filed: 02/06/2014 Entry ID: 4121608

were not submitted to the Mother Chapter in timely fashion, the National Treasurer would impose a fine against the offending chapter. (Tr. Vol. IX, p. 98). Individual members could also be disciplined for transgressions, including insubordination, lateness, or absence. (Tr. Vol. II, p. 172; Tr. Vol. IX, p. 99, 101; Tr. Vol. XX, p. 165). Insubordination included failure to comply with a directive. (Tr. Vol. IX, p. 100). Other infractions were punishable by beatings. (Tr. Vol. IX, p. 107-08; Tr. Vol. XVIII, pp. 201-02).

Some WOS chapters, including the Mother Chapter, had clubhouses. (Tr. Vol. IX, pp. 102-03; p. 161-62; Tr. Vol. XVIII, p. 199). The WOS held social events to raise money for the organization, some of which was remitted to the Mother Chapter. (Tr. Vol. XX, p. 159). In addition, the WOS collected money from its membership to pay the legal fees of fellow members who were incarcerated or had been charged with crimes. (Govt. Exh. 136, Appx. p. 1). Such expenses were characterized as being "the responsibility of the nation/region."[9] (Govt. Exh. 136, Appx., p. 1). At one time, Henley specifically asked his fellow members for money, stating:

> Bishop, St. Louis President. Along with our brother
> Slim, we have another brother by the name of Tim that is
> still in jail at this moment in time. I don't know what his
> fees consist of at this moment in time, but, uh, said to
> keep you up on that. Tim, along with Slim, along with

---

[9] Members of the WOS commonly referred to themselves collectively as "the Wheels of Soul nation," or simply, "the nation." (Tr. Vol. III, p. 102)

Appellate Case: 13-1894    Page: 22    Date Filed: 02/06/2014 Entry ID: 4121608

> myself, all have legality [sic] issues pertaining to the
> club.  All between the club.[10]

(Govt. Exh. 136, Appx. p. 1; Tr. Vol. XX, p. 212).

Appellant James C. Smith, a/k/a "Animal" (hereinafter, "J. Smith") was, at all times relevant to the instant case, National Vice-President of the WOS.  (Tr. Vol. VI, p. 170, pp. 258-59; Tr. Vol. IX, pp. 87-88; Govt. Exh. 230).  J. Smith presided over National, and sometimes, Regional meetings of the WOS.  (Tr. Vol. IX, p. 215; Govt. Exh. 219, Appx., pp. 2-4).  One such meeting occurred in Chicago in November 2009.  (Tr. Vol. IX, p. 215,  217; Govt. Exh. 219, 220, 228, 229, 230).  During that November 2009 national meeting, J. Smith admonished the membership about the importance of secrecy, warning:

> We don't put our s**t on the street.  We do not put our
> s**t on the street.  If there's anything pertaining to
> Wheels of Soul business, if you're not talking to
> someone that has that Wheel and Wing, you don't talk
> Wheels of Soul business. . . . Wheels of Soul business is
> not spoken outside Wheels of Soul membership.[11]

(Govt. Exh. 219, Appx., p. 4).

J. Smith also stressed the importance of loyalty and solidarity, explaining:

---

[10] The St. Louis Chapter put $150 "on the books" of fellow WOS member Timothy Balle (hereinafter, "Balle"), a co-defendant, but not an Appellant herein.  Balle was incarcerated at the time.  (Tr. Vol. III, p. 134; Tr. Vol. IV, pp. 90-93; Govt. Exh. 435).  The money was taken from the St. Louis Chapter's bank account at the direction of Henley.  (Tr. Vol. IV, pp. 90-93).

[11] The center patch on the Wheels of Soul "colors" is a depiction of a wheel with a wing emanating from it. Members commonly referred to it as the "wheel and wing." (Govt. Exh. 2, 4, 6, 446P; Tr. Vol. IX, p. 91).

Appellate Case: 13-1894     Page: 23     Date Filed: 02/06/2014 Entry ID: 4121608

> [t]alk is cheap. I tell you right now. If you got a f***ing problem out there, I got a problem out there. . . We will bleed for you, we will die for you, but I can tell you point blank, straight the f**k up. There's no point in sugar coating nothing. If I'm out there and I got a motherf***ing situation and you leave me, you better hope to God that I don't survive, because the first motherf***er I'm looking for is that mother***er that left me.
>
> Don't leave a brother in a f***ing situation. You either survive with him, or you go down with him.

(Govt. Exh. 220, Appx., p. 5). If a WOS member were to run afoul of this warning, there would be repercussions, to include beatings. (Tr. Vol. IX, p. 223).

J. Smith further instructed his fellow members as to their dealings with other motorcycle clubs, specifically advising that "if you out there and you see somebody and they don't have the Wheel and Wing, you can consider that's your enemy. Until proven different, you can consider that's your enemy." (Govt. Exh. 228, Appx., p. 6). When explaining how to interact with members of other clubs, J. Smith instructed the members of the WOS to:

> stand up for yourself. Alright? Every motherf***er that come into here, believe me, I don't want nobody coming in here and I gotta make you a man. You be a mother***ing man when you come in this bitch! . . . Alright? Now, how you do that? How you do that is when the situation arise, you stand the f**k up, because if you don't, the next motherf***ing time, the motherf***er gonna punk you out even worse.

12

(Govt. Exh. 229, Appx., p. 7). J. Smith spoke in particular about one rival motorcycle club, advising WOS members in November 2009 that he had "a sit down with Cast," and that "Cast down there in Atlanta, running their mouth." He told his fellow members that he "can say something that's in the works, but [he] won't" and that "ain't nobody losing sleep over Outcast."[12] (Govt. Exh. 229, Appx., pp. 7-8).

## PATTERN OF RACKETEERING ACTIVITY

The Government presented evidence at trial of a number of acts of violence, which collectively constituted a "pattern of racketeering activity." Those acts included, but were not necessarily limited to the following:

## MAY 28, 2009

On May 28, 2009, Sin City Desciples [sic] member Robert Taylor (hereinafter, "Taylor") went to Bennigan's restaurant in Gary, Indiana. (Tr. Vol. V, p. 27). He went there to pick up some takeout food that he had ordered by telephone. (Tr. Vol. V, p. 27). He did not intend to stay at Bennigan's for any prolonged period of time. (Tr. Vol. V, p. 29) Rather, he intended only to pick up

---

[12] J. Smith often spoke in vagaries, particularly over the telephone. He cautioned his fellow WOS (while gesturing to a cell phone) that "this motherf***er right here, this is your worst motherf***ing enemy. This here is your worst enemy." In response, another member shouted, "FBI. . . ATF, and some more." (Govt. Exh. 230, Appx., p. 9). J. Smith warned the other members to speak in code on the telephone, saying, "[i]f you can't talk in code, then you better find, ahh, new talk." (Govt. Exh. 230, Appx. p. 9).

Appellate Case: 13-1894    Page: 25    Date Filed: 02/06/2014 Entry ID: 4121608

his order and leave.  (Tr. Vol. V, p. 29).  Taylor drove to Bennigan's in his mother's red Pontiac Grand Prix passenger car.  (Tr. Vol. V., pp. 28-29).  He was accompanied by his friend and fellow Sin City Desciple [sic] Michael Smith (hereinafter, "M. Smith").  (Tr. Vol. V, p. 28).

Taylor belonged to the Sin City Desciples [sic] in East Chicago, Indiana. (Tr. Vol. V, p. 23).  During the time he was a member of the Sin City Desciples [sic], Appellant Jerry Peteet (hereinafter, "J. Peteet") was also a member of the same chapter.  (Tr. Vol. V, p. 23; Tr. Vol. XXI, p. 131).  J. Peteet was a licensed, practicing attorney in the states of Indiana and Illinois, specializing in criminal defense work.  (Tr. Vol. XXI, p. 127-29).  J. Peteet gave the Taylor the nickname "Damn Fool."  (Tr. Vol. V, p. 24).

In early 2009, J. Peteet and other members of the East Chicago chapter of the Sin City Desciples [sic] left that organization.  (Tr. Vol. 5, p. 24, 171; Tr. Vol. XXI, pp. 9-10, 131-32).  They left the Sin City Desciples [sic] to join the WOS. (Tr. Vol. V, pp. 24-25; Tr. Vol. XXI, pp. 9-10, 132).  After J. Peteet joined the WOS, he began to use the moniker "Angel" and continued to utilize that name thereafter.  (Tr. Vol. II, p. 155; Tr. Vol. IX, p. 113; Tr. Vol. XXI, p. 14, 139).  J. Peteet received a "1%" diamond patch when he joined the WOS.  (Tr. Vol. XXI, p. 138, 179; Govt. Exh. 109).  J. Peteet was also the President of the Indiana Chapter. (Tr. Vol. XX, p. 244; Tr. Vol. XXI, p. 119; Govt. Exh. 109).   For his part, Taylor

14

was also invited to join the WOS. (Tr. Vol. V, p. 25). However, he declined the invitation and remained with the Sin City Desciples [sic]. (Tr. Vol. V, p. 25). As a result, J. Peteet harbored animosity toward Taylor.[13] (Tr. Vol. V, p. 26).

When Taylor arrived at Bennigan's on May 28, 2009, he went into the restaurant alone. (Tr. Vol. V, pp. 29-30). M. Smith waited in the car, because he was on probation and did not want to go to a bar. (Tr. Vol. V, p. 30). In addition, M. Smith was on crutches at that time, having been shot in an unrelated incident. (Tr. Vol. V, p. 30, 174). While M. Smith waited in the car outside, Taylor went into Bennigan's and approached the bar. (Tr. Vol. V, p. 33). He went to the bar because that was the location where he could pick up his takeout order. (Tr. Vol. V, pp. 33-34). His food was not yet ready, so Taylor sat down at the bar and bought a beer. (Tr. Vol. V, p. 34). He engaged in conversation with a friend, and then struck up a conversation with a woman he knew as "Cookie." (Tr. Vol. V, pp. 34-35). Taylor and "Cookie" sat at a table and talked. (Tr. Vol. V, p. 36).

As Taylor spoke to "Cookie," he heard motorcycles pulling up outside. (Tr. Vol. V, p. 37). Thereafter, a number of members of the WOS came inside Bennigan's. (Tr. Vol. V, p. 37). They were wearing "colors" identifying them as

---

[13] During a May 16, 2009 meeting of the St. Louis Chapter of the WOS, Henley advised his fellow members that "Jerry, who used to be the lawyer for the club, a national position in Sin City, is now the president of Gary. What he's gonna, what he's attempting to do is, he's trying to take everything from Sin City." (Govt. Exh. 63, Appx., p. 169).

15

WOS.  (Tr. Vol. V, p. 38; Tr. Vol. XXI, p. 184).  Among the WOS present that

night were J. Peteet and a number of members from Chicago.  (Tr. Vol. XXI, pp.

181-83).  Farris – then the Regional President – was in attendance, as were A.

Hunter and several others.  (Tr. Vol. IX, pp. 111-12; Tr. Vol. XXI, p. 182).  WOS

Chicago members "Tone," Curtis Johns, a/k/a "CJ," "Road Runner," and "Baby

Boy" attended, along with Randall McNeil, a/k/a "Rock-a-Doc," Michael Flores,

a/k/a "Fall Guy," (hereinafter, "Flores"),  Kennedy Peteet, a/k/a "Lucky,"

(hereinafter, "K. Peteet"), Arthur Griffin, a/k/a "Wayne," and Barry Rogers, a/k/a

"Capone," (hereinafter, "B. Rogers") from the Gary area.[14]  (Tr. Vol. IX, p. 112-

13; Tr. Vol. XX, pp. 237-38; Tr. Vol. XXI, pp. 109-10, 180-82).  Neither Walter

Lee, a/k/a "Li'l Dude" (hereinafter, "Lee") nor a WOS member named "Low

Rider" were present.  (Tr. Vol. XXI, pp. 182-83).

     When J. Peteet and the other members of the WOS entered Bennigan's,

"Capone" [B. Rogers] approached Taylor and shook his hand.  (Tr. Vol. V, p. 28).

Thereafter, Flores approached as well, and Taylor asked Flores about some money

Flores owed him.  (Tr. Vol. V, p. 38).  In response, Flores stated, "get the f**k

away" and told Taylor that he (Flores) was "with the Wheels now."  (Tr. Vol. V,

---

[14] J. Peteet, acting as an attorney, represented Randall McNeil, Michael Flores, and
Arthur Griffin at various times during their acquaintance.  (Tr. Vol. XX, p. 235,
246-49; Tr. Vol. XXI, p. 122, 181).  K. Peteet, who at times during trial was
referred to by defense counsel as "Kenneth Peteet" but who testified that his given
name is "Kennedy,"  is J. Peteet's biological brother.  (Tr. Vol. IX, p. 120; Tr. Vol.
XXI, p. 8, 126).

pp. 39-40). Flores then pushed Taylor, and Taylor pushed back. (Tr. Vol. V, p. 40). At that time, J. Peteet, K. Peteet, and other members of the WOS approached. (Tr. Vol. V, p. 40). J. Peteet pushed his way through the crowd and told Taylor, "we'll kill you right here." (Tr. Vol. V, pp. 41-42). Taylor then left Bennigan's. (Tr. Vol. V, p. 42). As he did, he noticed that B. Rogers and K. Peteet were following behind him. (Tr. Vol. V, p. 43).

When Taylor got to the parking lot, he realized that M. Smith had moved the car and it was no longer in the place where Taylor had parked it. (Tr. Vol. V, pp. 42-43). B. Rogers and K. Peteet were attempting to engage Taylor in conversation. (Tr. Vol. V, p. 44). Taylor agreed to speak to B. Rogers and K. Peteet, and walked toward them in Bennigan's parking lot. (Tr. Vol. V, pp. 44-45). The conversation between B. Rogers and Taylor was cordial. (Tr. Vol. V, p. 45). However, K. Peteet was more aggressive in nature. (Tr. Vol. V. pp. 45-46). As Taylor spoke to B. Rogers and K. Peteet, he deliberately stayed in an area he knew to be covered by surveillance cameras, because he was concerned that something might happen to him. (Tr. Vol. V, p. 47).

During Taylor's conversation with B. Rogers and K. Peteet, J. Peteet approached. (Tr. Vol. V, p. 47). A verbal altercation ensued between J. Peteet and Taylor. (Tr. Vol. IX, p. 123). During that verbal altercation, J. Peteet pistol-whipped Taylor, striking him on the left side of the head near his eye. (Tr. Vol. V,

17

p. 47, p. 177; Tr. Vol. IX, p. 123). Taylor suffered an injury to the left side of his head as a result, and he fell down. (Tr. Vol. V, p. 48; Tr. Vol. IX, p. 124; Govt. Exh. 88). When Taylor got up from the ground, J. Peteet pointed two guns at Taylor's chest and stated, "I will kill you right here." (Tr. Vol. V, p. 48-50). Taylor began to turn to walk toward his car, which M. Smith had begun to move toward Taylor. (Tr. Vol. V, p. 51). As Taylor turned, he continued to watch J. Peteet. (Tr. Vol. V, p. 52). J. Peteet fired two gunshots at Taylor. (Tr. Vol. V, p. 52, pp. 127-28, 178; Tr. Vol. IX, p. 127) Taylor was struck in the buttocks. (Tr. Vol. V, p. 52; Govt. Exh. 89). Taylor was unarmed during the entire incident. (Tr. Vol. V, p. 50, 182; Tr. Vol. IX, p. 125). After Taylor was shot, he made his way to his vehicle, driven by M. Smith, and went to the hospital. (Tr. Vol. V, pp. 53-54).

On May 28, 2009, the Gary (Indiana) Police Department received a 911 call reporting that a shooting had just occurred in the parking lot of Bennigan's restaurant. (Govt. Exh. 453). In that call, the caller reported that "Jerry Peteet" had just shot "Robert Taylor." (Govt. Exh. 453). The caller was subsequently identified as Taylor himself. (Tr. Vol. V, pp. 54-55).

J. Peteet admitted at trial that he had pointed two guns at Taylor. (Tr. Vol. XXI, pp. 147-48, 188). J. Peteet also admitted that he did not see Taylor with a gun on May 28, 2009, and that Taylor was wearing sweatpants that evening. (Tr. Vol. XXI, p. 189).

18

Charles Calvin (hereinafter, "Calvin") was employed as a security guard at Bennigan's and was working on May 28, 2009. (Tr. Vol. IV, p. 269; Tr. Vol. V, pp. 118-19). Calvin was assigned to watch the parking lot, because of the "bike night" the restaurant was hosting that evening. (Tr. Vol. V, p. 119; Tr. Vol. IX, p. 111). Calvin's attention was initially drawn to one particular individual standing in the corner of the lot. (Tr. Vol. V, p. 121). The man was engaged in an argument with two other people. (Tr. Vol. V, p. 122). Calvin heard one man yell, "b***h, I'll kill you!" in a loud voice. (Tr. Vol. V, p. 122). The man had a gun in his hand, and immediately after he shouted "b***h, I'll kill you," he pulled the trigger. (Tr. Vol. V, pp. 122-24). Calvin saw the muzzle flash from the gun. (Tr. Vol. V, p. 124).

Calvin was interviewed on May 28, 2009 at the Gary Police station. (Tr. Vol. V, pp. 129-30). He was shown a photographic lineup containing six photographs, one of which depicted J. Peteet. (Tr. Vol. V, p. 130; Govt. Exh. 92). After viewing the photographic lineup, Calvin circled the photograph of J. Peteet, indicating that J. Peteet was the person he had seen shoot Taylor in the parking lot of Bennigan's that evening. (Tr. Vol. V, pp. 131-32; Govt. Exh. 92).

M. Smith was also interviewed on the night of the shooting. (Tr. Vol. V, p. 184). He met with detectives at the hospital, where he had gone with Taylor. (Tr. Vol. V, p. 184). At that time, M. Smith advised detectives that J. Peteet had shot

Appellate Case: 13-1894    Page: 31    Date Filed: 02/06/2014 Entry ID: 4121608

Taylor. (Tr. Vol. V, p. 184). He was subsequently shown a single photograph of J. Peteet for confirmation, which M. Smith positively identified as a photograph of Taylor's shooter. (Tr. Vol. V, p. 185-86; Govt. Exh. 91).

In the aftermath of the May 28, 2009 shooting, WOS St. Louis Chapter President Henley advised his members that there had been an incident in Gary. (Tr. Vol. III, p. 59). More specifically, Henley told them that "Jerry," who was a lawyer, had shot someone. (Tr. Vol. III, p. 59; Tr. Vol. VI, p. 157, pp. 254-55). After the shooting in Gary, there were "issues" between the WOS and Sin City in Gary and St. Louis. (Tr. Vol. III, pp. 58-59). As a result, Henley advised his fellow members that the WOS were going to begin stealing, "on sight," the "colors" of Sin City members. (Tr. Vol. II, p. 183). Henley also advised at least one WOS member that the WOS were supposed to be "at war" with Sin City because of the shooting in Gary. (Tr. Vol. VI, p. 255).

**August 10, 2009**

On August 10, 2009, the St. Louis Chapter of the WOS held a meeting. (Tr. Vol. XX, p. 181). Henley, as President, presided over that meeting. (Tr. Vol. XX, p. 181). During the meeting, Henley discussed the local "bikers coalition," announcing that the WOS needed to have more influence over that coalition.[15] (Tr.

---

[15] In summer 2009, Henley attended a meeting of the "bikers' coalition" in St. Louis. At that meeting, Henley proclaimed to the other clubs in attendance that the

20

Vol. XX, pp. 181-82). In discussing the WOS's relationships with other clubs, Henley instructed his fellow members, "[i]f somebody steps out of line, there will be no conversation. If we tell somebody to do something, we have to back it up, whatever we're ordering them to do." (Tr. Vol. XX, p. 183).

During that same August 10, 2009 meeting, Henley spoke about a conversation he had had with a man named Roy, who was, at that time, the President of the St. Louis chapter of Sin City. (Tr. Vol. XX, p. 183). Henley and Roy had discussed the fact that another club was wearing "MC" on their vests and that they should be forced to remove it. (Tr. Vol. XX, p. 183). Henley also reminded his members that no black men – other than WOS – should be wearing a "1%" diamond patch. (Tr. Vol. XX, p. 184). Finally, Henley told the other WOS members that every now and then, they needed to "put their hands on someone." (Tr. Vol. XX, p. 184).

After the August 10, 2009 WOS meeting in St. Louis, most of the members of that chapter went to a local bar called "The Avenue."[16] (Tr. Vol. III, pp. 60-61; Tr. Vol. VI, p. 260; Tr. Vol. XX, pp. 121-22, 185). Henley, Pinkston, M. Hunter,

---

WOS were "in charge of the set," asserting that the WOS was the dominant "outlaw club" in the city. (Tr. Vol. VI, p. 158).

[16] The name of this establishment had changed several times, and was therefore referred to variously as "The Avenue" and "Fleetwood and Sons." (Tr. Vol. VI, p. 10). For purposes of this brief, it shall be referred to as "The Avenue."

Appellate Case: 13-1894   Page: 33   Date Filed: 02/06/2014 Entry ID: 4121608

and Balle all attended the event at "The Avenue."[17]  (Tr. Vol. VI, p. 261; Tr. Vol. XX, p. 122).  They were wearing their WOS "colors." (Tr. Vol. VI, p. 12, 262-63). Balle was a "prospect," or a probationary member of the WOS at that time.  (Tr. Vol. VI, p. 261; Tr. Vol. XX, p. 188).  As a "prospect," a prospective member is required to do anything a full member tells him to do.[18]  (Tr. Vol. VI, p. 261).

Also attending the event at "The Avenue" that night were at least two members of the STL Riders, Joshua Polk (hereinafter, "J. Polk")  and his wife, Constance Polk (hereinafter, "C. Polk").   (Tr. Vol. III, p. 62;  Tr. Vol. VI, pp. 9-12; Tr. Vol. XX, pp. 125-27).  J. Polk and C. Polk were the founding members of the STL Riders.  (Tr. Vol. VI, p. 4).  Like the WOS, the STL Riders wore "colors" bearing a logo specific to that club.  (Tr. Vol. VI, p. 5; Govt. Exh. 127, 127A-D).

When J. Polk and C. Polk entered "The Avenue," they noticed several members of the WOS wearing WOS "colors."  (Tr. Vol. VI, p. 11).  Henley had also noted the arrival of J. Polk and C. Polk.  (Tr. Vol. XX, pp. 126-27).  Henley then approached the other members of the WOS in attendance and instructed them to take the "colors" from the STL Riders.  (Tr. Vol. III, p. 63; Tr. Vol. VI, p. 263).

---

[17] Another St. Louis member known as "Corrupt" also attended.  (Tr. Vol. VI, p. 261).  "Corrupt" was not charged as part of the instant case.

[18] During the execution of a search warrant at the Philadelphia, Pennsylvania residence of J. Smith, National Vice-President of the WOS, the FBI located and seized a document entitled "Duties of a Prospect."  (Govt. Exh. 36; Tr. Vol. I, p. 165; 179-80).  Among the duties listed on that document is:  "8.  All prospects must obey all full color members regardless of what chapter they are from."

In response, Pinkston, M. Hunter, Balle, and others began moving toward J. Polk and C. Polk. (Tr. Vol. VI, p. 264).

J. Polk and C. Polk began to walk outside. (Tr. Vol. VI, p. 11). As they did, Henley approached them. (Tr. Vol. VI, p. 12, 15). Henley approached J. Polk and advised him that the WOS was taking over the motorcycle "set." (Tr. Vol. VI, p. 12, 15). When J. Polk asked Henley why the WOS was doing this, Henley reiterated that the WOS was taking over. (Tr. Vol. VI, p. 13). J. Polk gathered his wife and the two attempted to retreat into "The Avenue." (Tr. Vol. VI, p. 13, 64). However, as they did so, they were approached near the door by several other WOS members, including Balle, M. Hunter and Pinkston. (Tr. Vol. VI, p. 13, 64, 100 ; Tr. Vol. VI, p. 264). Henley then demanded that C. Polk "give [him] the colors." (Tr. Vol. VI, p. 267). The WOS attempted to physically remove C. Polk's vest from her. (Tr. Vol. VI, p. 101, 267). At that point, Balle pulled out a .38 caliber revolver and pointed it at C. Polk, whose husband was attempting to shield her. (Tr. Vol. III, p. 65; Tr. Vol. VI, pp. 13-14, 16, 102-03, 267). As he did so, Balle stated, "[y]ou heard what he said, give him the colors." (Tr. Vol. VI, p. 269). J. Polk and C. Polk immediately surrendered their "colors" to the WOS. (Tr. Vol. III, p. 67; Tr. Vol. VI, pp. 13-14, 269).

J. Polk and C. Polk reported the incident to the St. Louis Metropolitan Police Department that night. (Tr. Vol. VI, p. 16). When they did so, they provided a

Appellate Case: 13-1894    Page: 35    Date Filed: 02/06/2014 Entry ID: 4121608

license plate number for a Harley Davidson motorcycle that was believed to have been driven by one of the suspects.  (Tr. Vol. VI, p. 107; Tr. Vol. XX, pp. 104-05). The license plate they provided was "AVCGK."  (Tr. Vol. XX, p. 105).  When the responding officer attempted to retrieve registration information for that license plate number, it came back "not on file."  (Tr. Vol. XX, p. 106).  At that time, Henley owned a Harley Davidson motorcycle bearing license plate "AV6GK." (Govt. Exh. 133).

Within days of reporting the August 10, 2009 incident, both J. Polk and C. Polk responded to the St. Louis Metropolitan Police Department to view photographic lineups containing photographs of Henley and Balle.  (Tr. Vol. VI, pp. 18-21).  Both J. Polk and C. Polk identified both Henley and Balle from separate photographic lineups.  (Tr. Vol. VI, pp. 18-21; Govt. Exh. 128B, 129B; Tr. Vol. VI, pp. 107-12; Govt. Exh. 128A, 129A).  Thereafter, both J. Polk and C. Polk (separately) observed separate in-person lineups in which Henley and Balle were participants.  (Tr. Vol. VI, pp. 21-25, pp. 114-18; Govt. Exh. 130A, B; Govt. Exh. 131A, B).  Again, both J. Polk and C. Polk identified Henley and Balle.  (Tr. Vol. VI, pp. 21-25, pp. 114-18; Govt. Exh. 130A, B; Govt. Exh. 131A, B).

M. Hunter immediately reported the incident at "The Avenue" to TFO Van Mierlo.  (Tr. Vol. III, pp. 66-67).  M. Hunter had possession of one of the two sets of "colors" that had been forcibly taken from J. Polk and C. Polk.  (Tr. Vol. III, p.

24

67).  TFO Van Mierlo gave M. Hunter instructions as to what he should do with the "colors."  (Tr. Vol. III, p. 68).

In the aftermath of the August 10, 2009 incident, Henley contacted Vick and advised Vick that the "colors" they had taken needed to "disappear."  (Tr. Vol. VI, p. 161).  Henley further stated that they needed to get rid of the "colors" so they could not be used as evidence against the WOS.  (Tr. Vol. VI, p. 161, 163).  In response, Vick contacted M. Hunter by telephone.  (Tr. Vol. III, p. 68; Tr. Vol. VI, p. 161; Govt. Exh. 167).  Vick instructed M. Hunter to bring those "colors" to Vick at his house.  (Tr. Vol. III, p. 68;  Tr. Vol. VI, p. 161; Govt. Exh. 167).  Later in the same day, Vick burned the "colors" in his fireplace.  (Tr. Vol. III, p. 69; Tr. Vol. VI, p. 163-64; Govt. Exh. 168).

## November 1, 2009

On November 1, 2009, a group of WOS members in the Chicago, Illinois area attended a party on Chicago Avenue.  (Tr. Vol. IX, p. 155-56).  The party was hosted by a "social club," the members of which wore vests signifying their membership but did not ride motorcycles.  (Tr. Vol. IX, pp. 155-56).  A. Hunter was among those who attended.  (Tr. Vol. IX, p. 155-56).  He arrived at the party in a gray Audi that was registered to a female acquaintance.  (Tr. Vol. IX, p. 156).  Accompanying A. Hunter were Anthony Robinson, a/k/a "Blade" (hereinafter, "Robinson") and Johns.  (Tr. Vol. IX, p. 157).  All three were wearing WOS

Appellate Case: 13-1894     Page: 37     Date Filed: 02/06/2014 Entry ID: 4121608

"colors." (Tr. Vol. IX, p. 158-59). When A. Hunter, Robinson, and Johns arrived, Farris was already there. (Tr. Vol. IX, p. 159). Also in attendance were WOS members "Cyclopse [sic]," "Photo," and "Black." (Tr. Vol. IX, p. 159). A man known as "Dot" was there along with the WOS, although he was not an actual member of the group.[19] (Tr. Vol. IX, p. 159).

During the course of the evening, "Dot" was involved in an altercation with a member of the Brothers Keepers club. (Tr. Vol. IX, p. 160). "Dot" was armed with a knife. (Tr. Vol. IX, p. 161). Immediately after the altercation ended, the WOS left the party and went to the WOS Westside Clubhouse located at 16th and Keeler streets in Chicago. (Tr. Vol. IX, pp. 161-62). Once they got there, Farris indicated that he wanted to go to his garage. (Tr. Vol. IX, p. 162). Thereafter, he left the clubhouse and was gone for 15 to 20 minutes. (Tr. Vol. IX, p. 162). When he returned, he had a black, pistol-grip shotgun. (Tr. Vol. IX, p. 162).

After Farris returned with the shotgun, he handed it to Robinson. (Tr. Vol. IX, p. 162). Farris also indicated that he had learned where the Brother's Keepers had gone. (Tr. Vol. IX, p. 162). The group then left the clubhouse in four different vehicles, en route to the location where the Brother's Keepers were believed to be. (Tr. Vol. IX, p. 163). Farris drove his Dodge Durango, "Dot" drove a Dodge Charger, a WOS member named "Black" drove a Suburban, and A.

---

[19] "Dot" was considered a "W.O.S.," a special designation meant for associates of the group who did not ride motorcycles. (Tr. Vol. IX, p. 159).

Appellate Case: 13-1894    Page: 38    Date Filed: 02/06/2014 Entry ID: 4121608

Hunter drove the gray Audi.[20] (Tr. Vol. IX, p. 163). A. Hunter was accompanied in the Audi by Robinson and Johns. (Tr. Vol. IX, p. 163). Robinson sat in the back seat on the passenger side of the vehicle. (Tr. Vol. IX, p. 163). He carried the shotgun with him. (Tr. Vol. IX, p. 164).

The group of four vehicles traveled to 4211 West Division Street in Chicago. (Tr. Vol. IX, p. 164; Govt. Exh. 204). There was a nightclub-like establishment located at that address. (Tr. Vol. IX, p. 164). A. Hunter parked the gray Audi at the curb on the same side of the street as the club. (Tr. Vol. IX, p. 165). Farris parked his Dodge Durango across the street. (Tr. Vol. IX, p. 165). At some point as they sat there, Johns exited A. Hunter's vehicle.[21] (Tr. Vol. IX, p. 166).

---

[20] "Black" is a member of the WOS who was subsequently identified by members of the investigative team, but whose real identity is not pertinent to this appeal.

[21] During trial, counsel for defendant Robinson alleged that A. Hunter had not testified that Johns had exited the vehicle until his re-direct examination. Counsel for defendant Robinson further alleged that counsel for the Government had instructed A. Hunter to change his testimony in that regard. (Tr. Vol. XI, p. 33). On cross examination, counsel for defendant Robinson challenged A. Hunter, stating, "[y]esterday on direct you told the jury that CJ [Johns] was in the front seat of the car, your car." A. Hunter answered "yes." Counsel then asked, "[t]oday didn't you say that he wasn't in the car?" A. Hunter then clarified, "[n]o, she asked me, she said at the time of the shooting was he in the car. At the time of the shooting, he was not. He had gotten out of the car and gotten into another car." (Tr. Vol. XI, p. 35). However, on direct examination, *A. Hunter had clearly testified that Johns had gotten out of the car prior to the shooting.* (Tr. Vol. IX, p. 166). When counsel for Robinson challenged A. Hunter, stating "you changed some of your testimony from today, didn't you," A. Hunter replied, "[n]ot to my knowledge. I don't agree with that." (Tr. Vol. XI, p. 37). Counsel then alleged, "[y]ou changed your testimony about CJ and you changed your testimony about…," prompting an objection from the Government. (Tr. Vol. XI, p. 37). At

27

As he sat in his parked car on Division Street with Robinson in the back seat holding a shotgun, A. Hunter believed that Robinson would not shoot anyone. (Tr. Vol. IX, p. 67). However, A. Hunter soon observed a person arrive in the area wearing a Brother's Keepers vest, at which time Robinson advised A. Hunter to pull the car away. (Tr. Vol. IX, pp. 167-68). A. Hunter did so, and as he did, Robinson rolled down the window of the Audi and fired one shot from the shotgun. A. Hunter continued driving, making a right-hand turn onto the next cross street and heading toward the WOS clubhouse. (Tr. Vol. IX, p. 169). During the drive, Robinson told A. Hunter that the guy that was standing outside the club had been hit. (Tr. Vol. IX, pp. 169-70).[22]

Following the shooting, A. Hunter drove the gray Audi to the WOS Westside clubhouse. (Tr. Vol. IX, p. 170). The shotgun was still in the vehicle when he arrived there. (Tr. Vol. IX, p. 170). The shotgun was given to Farris, who handed it to "Black." (Tr. Vol. IX, p. 170). Farris had arrived at roughly the same time as A. Hunter. (Tr. Vol. IX, p. 170). Johns arrived with Farris in Farris's

sidebar, counsel for the Government reminded the District Court that A. Hunter "testified yesterday that CJ got out of the car before the shooting." (Tr. Vol. XI, p. 37). Despite counsel for Robinson's protestations to the contrary, the record irrefutably reveals that A. Hunter had, in fact, testified on direct examination that "CJ" (Johns) had gotten out of his car prior to the shooting.

[22] The victim of that shooting was Thomas Tatum. (Tr. Vol. IX, pp. 13-14). Thomas Tatum had been employed as a correctional officer. (Tr. Vol. IX, p. 64). Dr. Valerie Arangelovich, who conducted the autopsy on Thomas Tatum, testified that he died as the result of a gunshot wound to the back. (Tr. Vol. IX, p. 57). She further testified that the manner of his death was homicide. (Tr. Vol. IX, p. 58).

Appellate Case: 13-1894    Page: 40    Date Filed: 02/06/2014 Entry ID: 4121608

vehicle.[23]  (Tr. Vol. IX, p. 170). A. Hunter never saw that black pistol-grip shotgun again.  (Tr. Vol. IX, p. 171).

In March 2010, Robinson was incarcerated in the Cook County Jail in Chicago. (Tr. Vol. IX, p. 64, 171).  Chicago Police Department Officer Del Pearson visited with Robinson in the Cook County Jail in an attempt to interview him.  (Tr. Vol. IX, p. 64).  He did so for the specific purpose of attempting to gather intelligence from Robinson about the then-unsolved murder that had occurred on November 1, 2009. (Tr. Vol. IX, pp. 64-65).  After Officer Pearson's visit, Robinson made a series of telephone calls from the Cook County Jail to A. Hunter and others.  (Tr. Vol. IX, p. 171; Govt. Exh. 211, 212, 213, 215, 216, Appx., pp. 11-16, 17-27, 28-39, 40-55, 56-69, respectively).  It is the policy of the Cook County Jail to record every outgoing call placed by an inmate.  (Tr. Vol. XII, p. 124).  Each call includes a verbal warning that the call is subject to monitoring and recording.  (Tr. Vol. XII, pp. 124-25).  The warning is repeated intermittently throughout the call.  (Tr. Vol. XII, p. 125).

On March 16, 2010, Robinson placed a telephone call from the Cook County Jail at 9:02 pm.  (Tr. Vol. XII, p. 128; Govt. Exh. 211, Appx., pp. 11-16).  The call was answered by a female who did not identify herself.  (Govt. Exh. 211, Appx., p.

---

[23] A. Hunter's testimony that "CJ" (Johns) arrived at the clubhouse in Farris's vehicle further emphasizes his previous testimony that same day that Johns had gotten out of the gray Audi prior to the shooting.

Appellate Case: 13-1894   Page: 41   Date Filed: 02/06/2014 Entry ID: 4121608

11).  During the call, the female advised Robinson, "I talked to Dog [A. Hunter] Sunday."  (Govt. Exh. 211, Appx., p. 12).  She further stated, "[h]e got everything taken care of. . . He said he got your lawyer, they will be there.  I don't think it's Jerry [J. Peteet], I think it's somebody else."  (Govt. Exh. 211, Appx., p. 12).

On March 23, 2010, Robinson made an outgoing phone call from the Cook County Jail at 5:44 pm.  The call was answered by a female who Robinson referred to as "Rain."  (Govt. Exh. 212, Appx., p. 17).  Robinson advised "Rain," "don't give me no bulls**t.  The motherf***ing feds came in here and questioned me, with my pictures and everything. [24]  They done told me what, what CJ [Johns] locked up for and everything."  (Govt. Exh. 212, Appx., pp. 17-18).   When "Rain" attempted to interject, Robinson shouted, "I ain't got enough time for that right now."  (Govt. Exh. 212, Appx., p. 18)  Robinson then instructed "Rain," "[c]all Dog [A. Hunter] and tell Dog whatever he got to get, that can tie us to anything, get the f**k rid of it."  (Govt. Exh. 212, Appx., p. 18).  He later told "Rain," "[t]hey want Dog and Ghost [sic] [ ] head on a platter.  And if they don't get the f**k rid of every f***ing thing, man, they gonna try come get us."  (Govt. Exh. 212, Appx., p. 22).   Before he hung up, Robinson told "Rain" to "[k]eep calling him back.  Tell him it's a life or death emergency."  (Govt. Exh. 212, Appx., p. 26).

---

[24] It seems as though Robinson had mistaken Officer Pearson for a federal agent.

30

On March 24, 2010, Robinson placed a number of outgoing phone calls from the Cook County Jail.  (Tr. Vol. XII, p. 129; Govt. Exh. 213, Appx., pp. 28-39).  The first occurred at 10:50 am.  (Tr. Vol. XII, p. 129; Govt. Exh. 213, Appx., p. 28).  The call was placed to "Rain," who answered.  "Rain" advised Robinson, "I talked to Dog.  I talked to 'D' and told him everything you said about the feds comin' to talk to you and the names they named."[25]  (Govt. Exh. 213, Appx., p. 29).  At Robinson's behest, "Rain" then attempted to include "Dog" in the conversation by initiating a three-way telephone call between herself, Robinson, and "Dog."  (Govt. Exh. 213, Appx., pp. 29-30).  The attempt failed, because the call went to "Dog's" voicemail.  (Govt. Exh. 213, Appx., p. 30).  However, Robinson did leave a message, stating, "[m]an, check this out, you, you know what I'm saying? Pick up the phone ASAP."  (Govt. Exh. 213, Appx., p. 30).  Later in the same call, "Rain" made a second attempt to contact "Dog" via three-way call, but once again the call went straight to voicemail.  (Govt. Exh. 213, Appx., p. 35).  Again, Robinson left an urgent message asking "Dog" to answer the phone.  (Govt. Exh. 213, Appx., p. 36).

Robinson placed a second outgoing telephone call on March 24, 2010, this one occurring at 7:20 pm.  (Tr. Vol. XII, p. 219; Govt. Exh. 215, Appx., pp. 40-

---

[25] The "Dog" to whom she was referring was A. Hunter, who admitted to having received a number of telephone calls from Robinson during his incarceration in the Cook County Jail. (Tr. Vol. IX, p. 172).

Appellate Case: 13-1894     Page: 43     Date Filed: 02/06/2014 Entry ID: 4121608

55).  Once again the recipient of the call was "Rain."  (Govt. Exh. 215, Appx., p. 40).   During this call, "Rain" successfully connected A. Hunter to the call.  (Govt. Exh. 215, Appx., p. 41).  Robinson advised A. Hunter that "the feds came," and warned A. Hunter, "[n]***er, they say they want you, and motherf***in' G on a platter."  (Govt. Exh. 215, Appx., p. 42).  A. Hunter asked, "'but they still ain't say what they can charge no- you, me, or nobody else with  though, right?"  (Govt. Exh. 215, Appx., p. 45).  Robinson responded, "[t]hey ain't, they, they told me, but, you know what I'm sayin'?  They, they, they told me – listen, I can't say it over this phone."  (Govt. Exh. 215, Appx., p. 45).  A. Hunter then asked, "[a]h, s**t.  What it, what it start with, though?"[26]  (Govt. Exh. 215, Appx., p. 46).  Robinson replied, "Halloween."[27]  (Govt. Exh. 215, Appx., p. 46).   According to A. Hunter, during this conversation, he and Robinson were referring to the shooting on Division.  (Tr. Vol. IX, pp. 184-185).

On May 24, 2010, Robinson placed yet another call from the Cook County Jail at 7:37 pm.  (Tr. Vol. IX, p. 129; Govt. Exh. 216, Appx., pp. 56-71).  The call was once again placed to "Rain," who added A. Hunter to the conversation via three-way call.  (Govt. Exh. 216, Appx., p. 57).  During this call, Robinson spoke

---

[26] In many, if not all, of the recorded calls from the Cook County Jail, Robinson and A. Hunter referred to their associates only by the first letter of their names, as opposed to their full names.

[27] The Chicago Police Department received the call regarding Thomas Tatum's murder on November 1, 2009 at approximately 4:30 am.  (Tr. Vol. IX, p. 7).   The night immediately preceding was Halloween.  (Tr. Vol. IX, p. 7).

Appellate Case: 13-1894     Page: 44     Date Filed: 02/06/2014 Entry ID: 4121608

further about the meeting he had had with investigators. (Govt. Exh. 216, Appx., p. 57). He advised A. Hunter, "they talkin' about the conversation we had about how, you know what I'm sayin', about us bein' blood brothers, you know what I'm sayin', for life." (Govt. Exh. 216, Appx., p. 58). A. Hunter and Robinson referred to each other as "blood brothers." (Tr. Vol. IX, p. 190). They began doing so after the November 1, 2009 shooting in which Thomas Tatum was killed. (Tr. Vol. IX, p. 190).

**January 2, 2011**

Charles Ervin (hereinafter, "Ervin") was a member of the Street Soldiers motorcycle club in the Chicago, Illinois area. (Tr. Vol. XIII, p. 125). The Street Soldiers, like the WOS, was an "outlaw club." (Tr. Vol. XIII, p. 125; Tr. Vol. XVIII, p. 85). Like the WOS, the Street Soldiers wore vests bearing patches identifying them as members. (Tr. Vol. XIII, p. 127; Govt. Exh. 307). Ervin was familiar with the WOS, having made the acquaintance of two of their members – "Cyclopse [sic]," and "Dog" [A. Hunter]. (Tr. Vol. XIII, pp. 127-28).

In September or October of 2010, Ervin encountered A. Hunter at the Hawks motorcycle club in Chicago. (Tr. Vol. XIII, p. 128; Tr. Vol. XVIII, p. 85). A. Hunter noticed that Ervin's Street Soldiers vest bore a "bottom rocker" reading "Illinois." (Tr. Vol. XVIII, p. 86; Govt. Exh. 307). A. Hunter felt that the Street Soldiers should not be wearing the Illinois "bottom rocker," because he had not

33

given them permission to do so.  (Tr. Vol. XIII, p. 130; Tr. Vol. XVIII, pp. 86-87).

There was no physical altercation between A. Hunter and Ervin, although A.

Hunter did tell Ervin to remove his vest.  (Tr. Vol. XIII, p. 129).  A. Hunter also

told Ervin to have his President contact him to set up a meeting.  (Tr. Vol. XIII, p.

130; Tr. Vol. XVIII, p. 87).  Ervin and A. Hunter ended up having a drink together

that evening.  (Tr. Vol. XIII, pp. 129-30; Tr. Vol. XVIII, p. 87).

A week or two later, the President of the Street Soldiers contacted A. Hunter

by telephone.  (Tr. Vol. XIII, p. 130; Tr. Vol. XVIII, p. 88).  Subsequent to that

phone call, a group of Street Soldiers, including Ervin, went to the WOS Westside

clubhouse for a meeting.  (Tr. Vol. XIII, p. 130; Tr. Vol. XVIII, p. 88).  A. Hunter

met with the leadership of the Street Soldiers, and they specifically discussed the

issue of the Street Soldiers moving into Chicago.[28]  (Tr. Vol. XVIII, p. 89).  They

did not reach a resolution that evening, and A. Hunter did not demand that the

Street Soldiers stop wearing their "colors" in Chicago.  (Tr. Vol. XVIII, p. 89).

Instead, A. Hunter advised the Street Soldiers leadership that he would get back to

them.  (Tr. Vol. XVIII, p. 89).  He never did.  (Tr. Vol. XVIII, p. 89).

---

[28] Although A. Hunter recalled that Ervin was a party to this conversation, Ervin stated that he had been excluded but was told later by his leadership what had occurred.  (Tr. Vol. XVIII, p. 89; Tr. Vol. XIII, pp. 131-32).  After that night, Ervin had no concern about wearing his Street Soldiers vest around the city of Chicago, and he continued to do so.  (Tr. Vol. XIII, p. 133).

Appellate Case: 13-1894    Page: 46    Date Filed: 02/06/2014 Entry ID: 4121608

On January 2, 2011, Ervin attended a party at the Hawks' clubhouse in Chicago. (Tr. Vol. XIII, p. 134). Ervin was accompanied by his friend, Carl Davis (hereinafter, "Davis"), and a woman he was dating. (Tr. Vol. XII, pp. 69-71; Tr. Vol. XIII, p. 134). Ervin wore his Street Soldiers vest to the event at the Hawks' clubhouse. (Tr. Vol. XII, pp. 70-71; Tr. Vol. XVIII, p. 134). Although Davis attempted to dissuade Ervin from wearing the vest, Ervin wore it because he could think of no reason he should not. (Tr. Vol. XII, p. 71; Tr. Vol. XIII, pp. 135-36).

Despite the fact that he was a previously convicted felon, Ervin was armed with a handgun on January 2, 2011 when he went to the Hawks' clubhouse. (Tr. Vol. XIII, p. 156). He was armed for no particular reason, save for the fact that it was a habit. (Tr. Vol. XIII, p. 136). Ervin carried the handgun in his waistband. (Tr. Vol. XIII, p. 136). Davis, however, was unaware that Ervin was armed. (Tr. Vol. XII, p. 99).

When Ervin and Davis arrived at the Hawks' clubhouse, they greeted some acquaintances and then went to the bar. (Tr. Vol. XII, p. 73; Tr. Vol. XIII, p. 136). Ervin noted the presence of 10 to 15 members of the WOS, and even shook the hands of some. (Tr. Vol. XIII, p. 137). At least some of the WOS were wearing their "colors." (Tr. Vol. XII, p. 77). As Ervin and Davis sat at the bar, the members of the WOS occupied a number of tables near the front of the clubhouse. (Tr. Vol. XIII, p. 141; Govt. Exh. 525). Ervin sat with his back to the bar, turned

35

facing outward into the club. (Tr. Vol. XIII, p. 139). Ervin and Davis noticed the group of WOS watching them, and Ervin pointed that out to Davis. (Tr. Vol. XII, p. 75). At one point, Davis saw one of the WOS members talking on a telephone. (Tr. Vol. XII, p. 75).

Robinson was among the group of WOS at the Hawks' clubhouse on January 2, 2011. (Tr. Vol. XII, p. 143; Tr. Vol. XVIII, p. 94). Robinson had placed one or more telephone calls to A. Hunter that evening, but A. Hunter had missed the calls and did not answer. (Tr. Vol. XVIII, p. 93). When A. Hunter returned Robinson's phone calls, Robinson advised that there was a Street Soldier at the Hawks' clubhouse, and that the Street Soldier was wearing an Illinois "bottom rocker." (Tr. Vol. XVIII, p. 94). Robinson asked A. Hunter if he had authorized the Street Soldiers to wear the Illinois "bottom rocker." (Tr. Vol. XVIII, p. 94). A. Hunter replied that he had not yet come to an agreement with the Street Soldiers. (Tr. Vol. XVIII, p. 94). Robinson asked A. Hunter what he wanted Robinson to do about the Street Soldier, and A. Hunter responded that he would take care of the matter later. (Tr. Vol. XVIII, p. 95).

As Robinson spoke to A. Hunter on the telephone, Ervin and Davis remained seated at the bar. (Tr. Vol. XII, p. 77; Tr. Vol. XIII, p. 142). Davis left to use the restroom, and when he returned, he noticed that the group of WOS had grown in size. (Tr. Vol. XII, p. 77). As Davis returned to the bar, the WOS

36

surrounded him and Ervin.  (Tr. Vol. XII, p. 77; Tr. Vol.  XIII, pp. 142-43).  One in the group drew Ervin's attention particularly.  (Tr. Vol. XIII; p. 143).  That person was Robinson.  (Tr. Vol. XIII, p. 143).

As the WOS approached Ervin, Robinson told him to take off his "colors." (Tr. Vol. XII, p. 78; Tr. Vol. XIII, p. 144).   Robinson had a gun in his hand.  (Tr. Vol. XIII, p. 144).  Robinson demanded, "[m]otherf***er, what we tell you about that vest?  Man, take that motherf***ing vest off!"  (Tr. Vol. XIII, p. 145).  Ervin initially responded by saying, "[m]an, you all drunk.  I ain't on that, you know?" (Tr. Vol. XIII, p. 145).  Robinson again insisted, "[t]ake the vest off."  (Tr. Vol. XIII, p. 145).  Ervin refused to relinquish his vest.  (Tr. Vol. XII, p. 78; Tr. Vol. XIII, p. 145).

As Ervin volleyed back and forth with Robinson and the other WOS, Davis noticed that one in the group of WOS had a knife.  (Tr. Vol. XII, p. 79).  It appeared to be a switchblade knife.  (Tr. Vol. XII, p. 79).  The person with the knife, a member of the WOS, also demanded that Ervin take off his "colors."  (Tr. Vol. XII, p. 80).   As this incident was unfolding, two members of the Hawks motorcycle club attempted to intervene.  (Tr. Vol. XII, p. 80; Tr. Vol. XII, p. 146). One was the Hawks President, Emmitt Suddoth, a/k/a "World" (hereinafter, "Suddoth").  (Tr. Vol. XII, p. 80; Tr. Vol. XIII, pp. 27-28, 146).  Another was a Hawks member known as "Wild Child."  (Tr. Vol. XII, p. 146).

Appellate Case: 13-1894     Page: 49     Date Filed: 02/06/2014 Entry ID: 4121608

As Suddoth and "Wild Child" attempted to diffuse the situation, a second member of the WOS, described as a short, dark-skinned man with dreadlocks, approached with a gun. (Tr. Vol. XII, p. 148). This second man pointed his gun at Ervin. (Tr. Vol. XII, pp. 147-48). Davis, whose attention was focused on the man with the knife, saw that man lunge toward Ervin. (Tr. Vol. XII, p. 83). Believing that he was about to be shot, Ervin drew his own gun and shot at the short, dark-skinned man who was pointing the gun at him. (Tr. Vol. XIII, p. 149). Thereafter, Ervin ran toward the back of the clubhouse. (Tr. Vol. XIII, p. 149). As he ran, people were shooting at him from the front of the clubhouse. (Tr. Vol. XII, pp. 83-84; Tr. Vol. XIII, p. 150) Ervin was unable to escape through the back door because it was locked. (Tr. Vol. XIII, p. 150). He stayed crouched near the back door until the shooting stopped, at which point he ran toward the front of the clubhouse and out the front door. (Tr. Vol. XIII, p. 151). He threw his gun into a vacant lot and was shortly thereafter arrested by police. (Tr. Vol. XIII, pp. 152-53). Ervin had been carrying a .45 caliber Glock handgun on January 2, 2011. (Tr. Vol. XIII, p. 153; Govt. Exh. 273A). It was recovered from the vacant lot by Chicago Police on that same night. (Tr. Vol. XIII, pp. 24-25; Govt. Exh. 273A).

Unbeknownst to Ervin, Robinson had telephoned A. Hunter a second time on January 2, 2011. (Tr. Vol. XVIII, p. 95). During the second call, Robinson advised A. Hunter that he and "a Street Soldier" had exchanged words. (Tr. Vol.

Appellate Case: 13-1894    Page: 50    Date Filed: 02/06/2014 Entry ID: 4121608

XVIII, p. 95).  As Robinson and A. Hunter spoke by phone, A. Hunter heard

gunshots through the phone.  (Tr. Vol. XVIII, pp. 95-96).  The call then dropped

and the line went dead.  (Tr. Vol. XVIII, p. 96).  When A. Hunter attempted to call

back, he got no answer. (Tr. Vol. XVIII, p. 96).

After receiving no answer to his calls to Robinson, A. Hunter attempted to

call his brother, Maurice Harper, a/k/a "Smooth," (hereinafter, "Harper") who was

with Robinson that night.  (Tr. Vol. XVIII, pp. 96-97).  Harper was a WOS

prospect on January 2, 2011.  (Tr. Vol. XVIII, p. 97).  Harper did not answer his

phone when A. Hunter attempted to call him after the shooting at the Hawks'

clubhouse.  (Tr. Vol. XVIII, p. 98).  However, a WOS member named "Pharaoh"

(also known as "44") did answer Harper's phone.  (Tr. Vol. XVIII, pp. 97-98).  A.

Hunter also spoke to Robinson again that night.  (Tr. Vol. XVIII, p. 101).  At the

time, Robinson, Harper, and "Pharaoh" were all in the car together.  (Tr. Vol.

XVIII, p. 101).

Robinson advised A. Hunter that his brother had been shot.  (Tr. Vol. XVIII,

p. 101).  As A. Hunter was speaking to Robinson on the phone, A. Hunter was on

his way to the Hawks' clubhouse.  (Tr. Vol. XVIII, p. 102).  He arrived there

within minutes, as police were still arriving on scene.  (Tr. Vol. XVIII, p. 102).  A.

Hunter saw Ervin coming out of the alley.  (Tr. Vol. XVIII, p. 102).  Chicago

Police approached Ervin, and A. Hunter watched as Ervin was arrested.  (Tr. Vol.

39

XVIII, p. 102). A. Hunter recognized Ervin as the same Street Soldier with whom he had had a drink at the Hawks' clubhouse before. (Tr. Vol. XVIII, p. 104).

Sometime shortly after he arrived at the Hawks' clubhouse after the shooting, A. Hunter managed to get inside the clubhouse. (Tr. Vol. XVIII, p. 104). While there, he saw a man lying face down on the floor. (Tr. Vol. XVIII, p. 104). He initially thought it was "Cyclopse" [sic] but later discovered that it was Bryant Glass, a/k/a "Faith" (hereinafter, "Glass").[29] (Tr. Vol. XVIII, p. 27, 104). Glass was dead. (Tr. Vol. XIII, p. 27). A. Hunter also saw Suddoth laying on the floor of the clubhouse, near the pool table. (Tr. Vol. XVIII, p. 109). Suddoth was also pronounced dead later that night. (Tr. Vol. XVIII, p. 27; Tr. Vol. XIII, p. 27, 70). After A. Hunter left the Hawks' clubhouse, he responded to the hospital where his brother was being treated for a gunshot wound. (Tr. Vol. XVIII, p. 109-10). While he was at the hospital, A. Hunter placed a telephone call to J. Smith and advised J. Smith of the shooting, specifically telling J. Smith that his brother had been shot and at least one WOS member had been killed. (Tr. Vol. XVIII, pp. 109-11).

When the Chicago Police Department investigated the shooting at the Hawks' clubhouse, they recovered a number of shell casings, including a cluster of

_____

[29] The Chicago Police Department recovered two knives from the floor of the clubhouse, one of which was a silver folding knife located very near Glass's body. (Tr. Vol. XIII, p. 17; Govt. Exh. 269, 285, 287). Glass was wearing a leather knife sheath on his belt at the time of his death. (Tr. Vol. XIII, p. 11; Govt. Exh. 269).

Appellate Case: 13-1894    Page: 52    Date Filed: 02/06/2014 Entry ID: 4121608

.40 caliber shell casings near the front door.  (Tr. Vol. XIII, p. 14).  All of the

recovered .40 caliber shell casings were fired from the same gun.  (Tr. Vol. XVI, p.

55).   Investigators also recovered several bullets of unknown caliber that had been

fired.  (Tr. Vol. XIII, pp. 16-19)  All of those .40 caliber projectiles were fired

from the same gun.  (Tr. Vol. XVI, p. 58).  Near the back door of the clubhouse,

investigators recovered a number of .45 caliber shell casings.  (Tr. Vol. XIII, pp.

18-22).   All of the .45 caliber shell casings were fired from the same gun.  (Tr.

Vol. XIII, p. 34; Tr. Vol. XVI, p. 52).    More specifically, they were all fired from

Ervin's gun.  (Tr. Vol. XVI, pp. 52-53).

Dr. Mitra Kalelkar, of the Cook County Medical Examiner's Office,

conducted post-mortem examinations upon the bodies of Glass and Suddoth.  (Tr.

Vol. XIII, p. 70, pp. 75-76).   Dr. Kalelkar determined that Suddoth had suffered a

gunshot wound to the upper left back.  (Tr. Vol. XIII, p. 72).  The wound was a

"perforating wound," which meant that it traveled completely through Suddoth's

body.  (Tr. Vol. XIII, p. 72).  As a result, no projectile was recovered from

Suddoth's body.  (Tr. Vol. XIII, p. 72).  Dr. Kalelkar concluded that Suddoth had

died as a result of a single gunshot wound, and classified his death as a homicide.

(Tr. Vol. XIII, p. 75).

Glass had suffered two separate gunshot wounds.  (Tr. Vol. XIII, p. 77). The

first entered his right cheek and traveled to his neck, fracturing a cervical vertebrae

41

and lacerating his spinal cord. (Tr. Vol. XIII, p. 77). Dr. Kalelkar recovered a projectile corresponding to that gunshot wound. (Tr. Vol. XIII, p. 77; Govt. Exh. 305A). It was later determined that the projectile recovered from Glass's neck was fired by a .40 caliber Smith and Wesson handgun that Robinson sold to M. Hunter on January 8, 2011, six days after Glass and Suddoth were killed. (Tr. Vol. XIII, p. 77; Tr. Vol. XVI, p. 83). The second gunshot wound entered Glass's right upper back, traveled superficially until it exited again, and re-entered his body at his upper right arm. (Tr. Vol. XIII, pp. 77-78). Dr. Kalelkar also recovered a projectile from this second gunshot wound.[30] (Tr. Vol. XIII, p. 78). Dr. Kalelkar determined that Glass had died as a result of multiple gunshot wounds, and that the manner of his death was homicide. (Tr. Vol. XIII, p. 85).

In the days following the fatal shooting at the Hawks' clubhouse, M. Hunter had telephone contact with Robinson. (Tr. Vol. XIII, p. 239). During one conversation, Robinson advised M. Hunter that he (Robinson) had something for sale. (Tr. Vol. XIII, p. 239). More specifically, Robinson advised that he had a gun for sale. (Tr. Vol. XIII, p. 239). Beginning on January 5, 2011, M. Hunter had a series of recorded telephone conversations with Robinson, during which Robinson offered to sell M. Hunter a gun for $400. (Tr. Vol. XIII, p. 240; Govt.

---

[30] Glass also suffered a gunshot wound to the right leg. (Tr. Vol. XIII, p. 84). There was no projectile recovered corresponding to that wound, inasmuch as the projectile had traveled completely through Glass's body. (Tr. Vol. XIII, p. 84).

Appellate Case: 13-1894   Page: 54   Date Filed: 02/06/2014 Entry ID: 4121608

Exh. 316, 317). The transaction was to take place in Chicago, to which M. Hunter

planned to travel to attend Glass's funeral. (Tr. Vol. XIII, p. 240).

**January 8, 2011**

On January 8, 2011, acting at the direction and under the supervision of the

Special Agent Kevin Schuster of the Bureau of Alcohol, Tobacco, Firearms, and

Explosives (ATF) in Chicago, M. Hunter met with Robinson outside the WOS

Westside clubhouse in Chicago. (Tr. Vol. XIII, p. 245). The vehicle in which M.

Hunter was traveling was equipped with audio and video recording equipment.

(Tr. Vol. XIII, p. 246). As surveillance agents watched from nearby, M. Hunter

placed a call to Robinson, who was inside the clubhouse. (Tr. Vol. XIII, pp. 246-

247). Robinson called M. Hunter and advised that he was coming out of the

clubhouse. (Tr. Vol. XIII, p. 249).

When M. Hunter learned that Robinson was exiting the clubhouse, M.

Hunter "popped" his trunk, opening it from inside his vehicle. (Tr. Vol. XIV, p.

13). He opened the trunk because he had told Robinson to put the gun in his trunk.

(Tr. Vol. XIV, p. 13; Govt. Exh. 318). Robinson came out of the clubhouse,

placed an item inside M. Hunter's trunk, and closed the trunk.[31] (Tr. Vol. XIV, p.

---

[31] Pursuant to standard ATF protocols, M. Hunter and his vehicle had been searched
for contraband and weapons prior to the transaction. (Tr. Vol. XV, pp. 41-42).
The search yielded neither. (Tr. Vol. XV, p. 42).

43

15).  Robinson then got into the passenger side of M. Hunter's vehicle.[32]  (Tr. Vol.

XIV, p. 15; Govt. Exh. 319).   As Robinson sat in M. Hunter's car, M. Hunter

asked Robinson whether he could keep the gun.  (Tr. Vol. XIV, p. 18; Govt. Exh.

319).  He did so in order to ensure that it had not been used in a crime.  (Tr. Vol.

XIV, p. 18).  In response, Robinson advised M. Hunter that if he wanted to keep

the gun, he needed to "change the guts," meaning replace the barrel of the gun.

(Tr. Vol. XIV, p. 19; Govt. Exh. 319).   M. Hunter gave Robinson $100 on the

night of the transaction, promising to pay the remaining balance at a later date.[33]

(Tr. Vol. XIV, pp. 24-25).

   After Robinson left the vehicle, M. Hunter met with ATF agents, who

opened his trunk and discovered a Crown Royal bag containing a .40 caliber Smith

and Wesson firearm and two magazines.  (Tr. Vol. XIV, pp. 19-20; Tr. Vol. XV, p.

50; Govt. Exh. 320, 321A, 321B).   The agents also recovered a number of .40

caliber "hollow point" bullets from inside one of the magazines.  (Tr. Vol. XV, pp.

54-55; Govt. Exh. 322B, 323B).  The firearm and magazines were subsequently

provided to the Illinois State Police Crime Laboratory for analysis and comparison.

(Tr. Vol. XVI, pp. 73-75).   The Smith and Wesson was test-fired and discovered

---

[32] Robinson was identified and photographed by surveillance agents.  (Tr. Vol. XV,
p. 47; Govt. Exh. 527).
[33] After Robinson gave M. Hunter his real name for purposes of a Western Union
wire transfer, M. Hunter wired the remaining $300 to Robinson in Chicago.  (Tr.
Vol. XIV, p. 27-28).

Appellate Case: 13-1894     Page: 56     Date Filed: 02/06/2014 Entry ID: 4121608

to be functioning as designed.  (Tr. Vol. XVI, p. 75).  The test-fired cartridge casings were then compared to the .40 caliber cartridge casings recovered from the Hawks' clubhouse on January 2, 2011.  (Tr. Vol. XVI, pp. 77-79).  The firearms and toolmarks examiner determined that the .40 caliber handgun that Robinson sold to M. Hunter on January 8, 2011 had fired all the .40 caliber cartridge casings recovered from the Hawks' clubhouse on January 2, 2011.  (Tr. Vol. XVI, p. 80).

The examiner similarly compared the .40 caliber spent projectiles recovered from the Hawks' clubhouse to the test-fired projectiles from the firearm purchased on January 8, 2011 from Robinson.  (Tr. Vol. XVI, pp. 80-81).  He concluded that the .40 caliber Smith and Wesson firearm that Robinson sold to M. Hunter on January 8, 2011 had fired all the .40 caliber projectiles recovered from the Hawks' clubhouse on January 2, 2011.  (Tr. Vol. XVII, p. 82).   The examiner specifically concluded that Government's Exhibit 321, the .40 caliber Smith and Wesson handgun that M. Hunter purchased from Robinson on January 8, 2011, had fired Government's Exhibit 305A, the projectile that was recovered from Glass's neck at the time of his autopsy.  (Tr. Vol. XIII, p. 77; Tr. Vol. XVI, p. 83).

45

**January 10, 2011**

On January 10, 2011, United States District Judge Henry E. Autrey issued an Order Authorizing Interception of Wire and Electronic Communication for cellular telephone bearing telephone number (630) 669-1107. (Govt. Exh. 98). This telephone was known to be utilized by A. Hunter. (Govt. Exh. 98). On February 9, 2011, United States District Judge Audrey G. Fleissig issued an Order Authorizing Continued Interception of Wire and Electronic Communications over the same telephone. (Govt. Exh. 99). On March 10, 2011, United States District Judge E. Richard Webber issued a Second Order Authorizing Continued Interception of Wire and Electronic Communications, once again for the same device. (Govt. Exh. 100). In compliance with the second extension order, the interceptions ceased on Friday, April 8, 2011 at 11:59 pm. (Tr. Vol. XVII, p. 18). The next business day was Monday, April 11, 2011. (Tr. Vol. XVII, p. 18). United States District Judge Jean C. Hamilton was contacted on that day, and she ordered the wiretap to be sealed before her on Thursday, April 14, 2011. (Tr. Vol. XVII, p. 19; Govt. Exh. 526).

**January 17, 2011**

In the aftermath of the January 2, 2011 shooting in Chicago, the WOS convened at the Mother Chapter in Philadelphia for a national meeting. (Tr. Vol. XVI, p. 103). J. Smith presided over the national meeting, at which every member

46

of the WOS was expected to be in attendance. (Tr. Vol. XVI, pp. 103-05). J.

Smith also presided over a special "Presidents' Meeting," at which only Chapter

Presidents were welcome. (Tr. Vol. XVI, p. 105). During that "Presidents'

Meeting," J. Smith advised the Chapter Presidents that there was conflict between

the WOS and the Street Soldiers motorcycle club, and also between the WOS and

the Outcast motorcycle club. (Tr. Vol. XVI, pp. 106-07). More particularly, J.

Smith informed the WOS Presidents that it was "a full-on war with both clubs."

(Tr. Vol. XVI, p. 107). According to J. Smith, the feud stemmed from the recent

killing of a WOS member by the Street Soldiers, and a shooting in which a

member of Outcast had killed a member of the WOS. (Tr. Vol. XVI, p. 107).

More specifically, the conflict with the Street Soldiers arose from the incident on

January 2, 2011. (Tr. Vol. XVI, p. 106). Lee, who was the President of the

Wisconsin Chapter of the WOS, and who testified at trial, attended the January

2011 Presidents Meeting and heard J. Smith's directives. (Tr. Vol. XVI, pp. 100-

01; p. 105). Lee characterized J. Smith's instructions as, "it's war. You're –

you're trying to kill somebody. Somebody's got to die. It's war." (Tr. Vol. XVI,

p. 107).

　　　　During the weekend of the national meeting in Philadelphia, A. Hunter

spoke to a number of his fellow members about the January 2, 2011 shooting that

had left his brother wounded and Glass deceased. (Tr. Vol. XVIII, pp. 137-38). At

the conclusion of the January 2011 national meeting, A. Hunter asked Lee to transport a bag from Philadelphia to the WOS Westside Clubhouse in Chicago. (Tr. Vol. XVI, p. 108-09, 111; Tr. Vol. XVIII, pp. 138-39). Lee was accompanied by Robinson. (Tr. Vol. XVI, p. 112, 136). Inside the bag were a number of firearms and a bulletproof vest. (Tr. Vol. XVI, p. 109; Tr. Vol. XVIII, pp. 138-39). Lee placed the bag in his truck and transported it to Chicago, where he left the guns at the WOS Westside clubhouse.[34] (Tr. Vol. XVI, p. 111).

## January 28, 2011

On the weekend of January 28, 2011, Appellant Jerry Elkins, a/k/a "Shakka" (hereinafter, "Elkins") visited A. Hunter in Chicago. (Tr. Vol. XVIII, p. 154). The two met at the WOS Westside clubhouse. (Tr. Vol. XVIII, p. 154). There, they got high on cocaine, which A. Hunter had acquired from a co-conspirator in anticipation of Elkins' visit. (Tr. Vol. XVIII, pp. 151-53, 155). At some point in the evening, Elkins left the clubhouse to find an ATM to get cash so he and A. Hunter could acquire more cocaine. (Tr. Vol. XVIII, p. 155). Meanwhile, agents monitoring the judicially authorized wiretap on A. Hunter's telephone had

---

[34] A. Hunter subsequently removed the guns from the clubhouse and on January 27, 2011, he sold two of those guns – an AK-47 style assault rifle and a shotgun – to M. Hunter in a controlled purchased conducted at the behest and under the supervision of SA Schuster of the Chicago ATF. (Tr. Vol. XIII, pp. 141-46; Tr. Vol. XIV, pp. 41-46; Tr. Vol. XV, pp. 58-70; Govt. Exh. 262A, 262B, 263).

Appellate Case: 13-1894     Page: 60     Date Filed: 02/06/2014 Entry ID: 4121608

established surveillance in the vicinity of the WOS Westside clubhouse. (Tr. Vol. XV, p. 70, 73).

Surveillance agents, who had received intelligence information regarding a vehicle with Colorado license plates, located a black Cadillac Escalade outside the clubhouse. (Tr. Vol. XV, p. 73). The vehicle had Colorado license plates. (Tr. Vol. XV, p 74). When the vehicle left the area, the agents followed, and ultimately made contact with the driver of the Cadillac Escalade. (Tr. Vol. XV, p. 72, 76). Agents identified Elkins as the driver. (Tr. Vol. XV, p. 76).

After Elkins stepped out of the vehicle, the agents requested his identification and insurance information.[35] (Tr. Vol. XV, p. 77). When Elkins asked why he had been stopped, the agents, engaged in a ruse, advised Elkins that his vehicle matched the description of a vehicle that had been used in a series of armed robberies. (Tr. Vol. XV, p. 79). They engaged in the ruse so as not to reveal the ongoing wiretap investigation. (Tr. Vol. XV, p. 79). During this encounter, Elkins identified himself as a former police officer. (Tr. Vol. XV, p. 79).

---

[35] Although the agents involved in this incident were ATF agents, they represented to Elkins that they were Chicago Police Department officers. (Tr. Vol. XV, p. 89). Two of the individuals who participated in this enforcement action were Task Force Officers who were employed by the Chicago Police Department as police officers, but who were, at the time, detached to ATF. (Tr. Vol. XV, p. 77; Transcript of Hearing on Motion to Suppress, January 25, 2012, pp. 4-5).

49

Elkins was asked whether there were any weapons in his vehicle. (Tr. Vol. XV, p. 80). He replied that there were not. (Tr. Vol. XV, p. 80). When asked for consent to search the vehicle, Elkins granted his consent. (Tr. Vol. XV, p. 80). The vehicle was subsequently searched. (Tr. Vol. XV, p. 81). During the search, agents located $260 in cash and a loaded .40 caliber semi-automatic handgun. (Tr. Vol. XV, p. 81; Govt. Exh. 362, 358). Elkins' vehicle also contained a black leather vest bearing WOS patches on the back, including a Colorado "bottom rocker." (Tr. Vol. XV, p. 84).

Upon discovery of the firearm, Elkins was placed in handcuffs. (Tr. Vol. XV, p. 86). The agents then spoke with him briefly about the gun. (Tr. Vol. XV, p. 86). Elkins explained that he did not think the agents would actually search his vehicle, and that was why he did not tell them the truth about the gun. (Tr. Vol. XV, p. 86). At that point, Elkins was placed in the rear of an unmarked law enforcement vehicle. (Tr. Vol. XV, p. 86). He was thereafter advised of his rights. (Tr. Vol. XV, pp. 86-87).

Elkins was informed that the agents had located the gun and the $260 in cash in the vehicle. (Tr. Vol. XV, p. 87). They then asked Elkins what he thought they should do. (Tr. Vol. XV, p. 87). Elkins responded by saying that he did not need any of his things back. (Tr. Vol. XV, p. 87). He clarified by stating, "[w]ell, I don't need the gun, and you can have the money." (Tr. Vol. XV, p. 87). Elkins

50

later elaborated, telling the agents that he had been a narcotics officer, and that he had been in their position many times. (Tr. Vol. XV, p. 88). The agent responded by telling Elkins, "[s]o basically I understand what you're saying, we're going to take this [the gun] and you're going to go." (Tr. Vol. XV, p. 88). Elkins stated, "[w]e all got to eat. I can go back to the ATM, it's not a problem." (Tr. Vol. XV, p. 88). Elkins was subsequently released from custody, and the agents kept the firearm and the $260 in cash, logging both items as evidence. (Tr. Vol. XV, p. 89; Govt. Exh. 362, 358).

## January 29, 2011

During the time that Elkins was in Chicago with A. Hunter over the weekend of January 28, 2011, the two had a discussion about a party that was occurring in St. Louis. (Tr. Vol. XVIII, p. 157). Specifically, Elkins told A. Hunter that he (Elkins) was sending a couple of people because he (Elkins) had heard there were going to be a number of members of Outcast at the party. (Tr. Vol. XVIII, p. 157). Elkins advised A. Hunter that "his people" were on their way to St. Louis to "take care of business." (Tr. Vol. XVIII, p. 157). Elkins specifically identified "his people" as "Diamond" and "Bo." (Tr. Vol. XVIII, p. 158). According to A. Hunter, "take care of business" meant that "Diamond and "Bo" were supposed to shoot Outcast members on sight. (Tr. Vol. XVIII, p. 158).

51

In advising A. Hunter of this plan, Elkins recalled that there was a "war" between the WOS and Outcast. (Tr. Vol. XVIII, p. 158).

After their initial, in-person conversation about the party in St. Louis, A. Hunter and Elkins spoke by telephone. (Tr. Vol. XVIII, p. 159). Because these calls were made during the period of judicially authorized interception, the calls were monitored and recorded by law enforcement. (Tr. Vol. XVIII, p. 159; Govt. Exh. 98, 99, 100). During one such call, made on January 29, 2011, Elkins advised that his "people" "wanna touch bases and connect with" A. Hunter, "to make things happen." (Govt. Exh. 353, Appx., pp. 70-71). A. Hunter responded, "[a]lright, I'ma call Max right now."[36] (Tr. Vol. XVIII, p. 160; Govt. Exh. 353, Appx., p. 71). The "Max" to whom A. Hunter was referring was M. Hunter. (Tr. Vol. XVIII, p. 160). M. Hunter was in St. Louis on January 29, 2011. (Tr. Vol. XIV, p. 46).

That A. Hunter chose M. Hunter for the "mission" on January 29, 2011 was not a coincidence; rather, M. Hunter was chosen because A. Hunter had sold M. Hunter the AK-47 and the shotgun two days earlier during an ATF-controlled purchase in Chicago. (Tr. Vol. XVIII, p. 165). Because he believed M. Hunter to be in possession of those weapons, A. Hunter was attempting to connect M. Hunter

---

[36] In a subsequent call, Elkins asked A. Hunter, "[s]o, uh, Max is the one I need to get tied in with the, uh, with my folks that's on my way up there?" (Govt. Exh. 356, Appx., p. 72). A. Hunter responded, "[y]eah. I text [sic] him. Told him to call me back ASAP." (Govt. Exh. 356, Appx., p. 72).

Appellate Case: 13-1894    Page: 64    Date Filed: 02/06/2014 Entry ID: 4121608

to "Diamond" and "Bo." (Tr. Vol. XVIII, p. 165). A. Hunter had told Elkins that the guns were in St. Louis. (Tr. Vol. XVIII, p. 166).

As A. Hunter continued to attempt to reach M. Hunter in St. Louis, A. Hunter also intermittently spoke to Elkins by phone. (Tr. Vol. XVIII, p. 167). Elkins continued to explain, "my folks, uh, definitely wanna get in touch with, you know, your dude." (Govt. Exh. 357, Appx., p. 74). Elkins made a point to ask, "he, uh, he uh, definitely got that, uh, K from Philly?" (Govt. Exh. 357, Appx., p. 74). A. Hunter assured, "[y]eah." (Govt. Exh. 357, Appx., p. 74).

At approximately 8:30 p.m. on January 29, 2011, M. Hunter received a telephone call from Elkins. (Tr. Vol. XIV, p. 49). The telephone call was recorded with M. Hunter's consent. (Tr. Vol. XIV, p. 49). During the call, Elkins asked, "did you get anywhere on that, uh, on that little mission?" (Tr. Vol. XIV, p. 50; Govt. Exh. 371, Appx., p. 76). When M. Hunter feigned confusion, Elkins clarified, "I been talking to Dog [A. Hunter]. I'm up in here in Chicago right now. I been [sic] talking to Dog." (Govt. Exh. 371, Appx., p. 76). Elkins again referenced the "mission," stating, "we talking [sic] about the same thing." (Govt. Exh. 371, Appx. 76). Although M. Hunter was at home in bed at the time of this call, he told Elkins that he was out of town "on another mission," more specifically, "a money mission." (Tr. Vol. XIV, p. 50; Govt. Exh. 371, Appx. 76-77). Elkins asked, "so you ain't, you ain't on that other deal then?" (Govt. Exh.

53

371, Appx., p. 77). M. Hunter responded, "[n]o, no, no, no. Nope." (Govt. Exh. 371, Appx., p. 77). Elkins then stated, "[o]h, f**k." (Govt. Exh. 371, Appx., p. 77). He later advised M. Hunter, "listen, yeah, 'cause I got some people up – call Dog [A. Hunter]. Dog been waiting on your call too. . . 'cause I got, I got some – yeah – I got some people on their way up there to meet up with you." (Govt. Exh. 371, Appx., p. 77).

M. Hunter knew of the "mission" to which Elkins was referring, because when M. Hunter had been in Chicago, A. Hunter had advised M. Hunter that there were "problems" with Outcast. (Tr. Vol. XIV, p. 51). According to M. Hunter, there was a "Black New Years in St. Louis, and they wanted me to go up there to the Black New Years in East St. Louis with a gun that I bought from Dog [A. Hunter] to give them some assistance."[37] (Tr. Vol. XIV, pp. 51-52). This directive had come from A. Hunter and Elkins. (Tr. Vol. XIV, p. 52).

Shortly after M. Hunter spoke to Elkins on January 29, 2011, M. Hunter spoke to A. Hunter in a recorded phone call. (Tr. Vol. XIV, p. 52). During the call, A. Hunter admonished M. Hunter, "[y]ou are the hardest motherf***er in the world to get in touch with." (Govt. Exh. 372, Appx., p. 79). M. Hunter protested, telling A. Hunter:

_____

[37] East St. Louis, Illinois is located directly across the Mississippi River from St. Louis, Missouri.

54

No!  You know what I'm doing.  What, I called, I asked
you.  Well, I just talked to Shakka [Elkins], so he filled
me in a little bit.  Uh, I asked, I asked a bunch of people
– Kool Papa, uh, and a couple other people.  Little Dude
the only one say [sic] he coming down here.  But he said,
he didn't tell me, he said he [sic] coming down here to, to
see his people, that's all.  That's all he told me, and.."

(Govt. Exh. 372, Appx., p. 79).  A. Hunter interrupted, stating, "[w]ell, well, look,

I'ma need you to call Diamond and them.  They already in town."  (Govt. Exh.

372, Appx. 79).  At that point, M. Hunter lied, stating, "I'm hours away, that's why

I can't."  (Govt. Exh. 372, Appx., p. 79; Tr. Vol. XIV, p. 53).  In response, A.

Hunter said "[w]ell, I  - I gotta call Bishop [Henley] then.  I don't really want to."

(Govt. Exh. 372, Appx., pp. 79-80).

In point of fact, A. Hunter did speak to Henley on January 29, 2011.  (Tr.

Vol. XVIII, p. 160).  When he did, A. Hunter asked Henley, "[y]ou, uh, got

Shakka's [Elkins'] number?"  (Govt. Exh. 354, Appx., p. 81).  Henley responded,

"[n]o," after which A. Hunter advised, "[a]lright, I'm gonna text it to you.  Uh,

give him a call for me real quick, and he's gonna, uh…"  (Govt. Exh. 354, Appx.,

p. 81).  Henley then asked, "[i]s he here?"  (Govt. Exh. 354, Appx., p. 81).  In

response, A. Hunter indicated, "[u]h, somebody will be there."  (Govt. Exh. 354,

Appellate Case: 13-1894    Page: 67    Date Filed: 02/06/2014 Entry ID: 4121608

Appx., p. 81). A. Hunter did, in fact, send Henley a text message with Elkins' phone number on January 29, 2011.[38] (Tr. Vol. XVIII, p. 161).

When M. Hunter advised A. Hunter that he was out of town and thus, unavailable to participate in the "mission," A. Hunter called Elkins spoke by phone. (Tr. Vol. XVIII, pp. 167-68). Elkins advised A. Hunter, "[h]e told me he was out of town. He wasn't even – I was like, 'you've gotta be bullsh***in' me, man.'" (Govt. Exh. 363, Appx., p. 82). Elkins then complained, "[m]an, I got some folks on the way up there. This, this is some bulls**t." (Govt. Exh. 363, Appx., p. 82). A. Hunter advised Elkins, "[t]hey there [sic]. I just talked, I just talked to them. They there [sic]." (Govt. Exh. 363, Appx., p. 82). A. Hunter further explained, "[t]hey are there. He, I just hung up the phone with him before I called Max [M. Hunter]." (Govt. Exh. 363, Appx., p. 82). Elkins expressed disappointment, stating, "[n]o s**t. Ain't this a b**ch?" and then "[a]in't this a

_____

[38] Minutes after A. Hunter's phone call to Henley, A. Hunter called Elkins, who answered the phone by stating, "[y]o, Wheels." (Govt. Exh. 355, Appx., p. 85). A. Hunter reported, "Bishop's [Henley's] finna [sic] call you now." (Govt. Exh. 355, Appx., p. 85; Tr. Vol. XVIII, p. 162). Elkins then advised A. Hunter that he was going to take a nap, to which A . Hunter responded, "we got that thing cooking for later on anyway." (Govt. Exh. 355, Appx., p. 85). Elkins then replied, "[y]eah, 'cause it's clickin'." (Govt. Exh. 355, Appx., p. 85).

Appellate Case: 13-1894     Page: 68     Date Filed: 02/06/2014 Entry ID: 4121608

b**ch?  'Cause see, they could use that doggone tool."  (Govt. Exh. 363, Appx.,

pp. 82-83).  In using the word "tool," Elkins was referring to the AK-47.  (Tr. Vol.

XVIII, p. 169).  A. Hunter then asked, "[d]o they, uhm, do they got any women

with them?"  (Govt. Exh. 363, Appx., p. 83).  A. Hunter was not referring to actual

women; rather, he was referring to guns.  (Tr. Vol. XVIII, p. 169).  In response,

Elkins stated, "little small ones."  (Govt. Exh. 363, Appx., p. 83).  He later stated

"they got a little small bitch, and uh, that's why, you know, it was gonna work out

good.  'Cause, you know, uh, Max [M. Hunter]  had that Amazon with him, so…

f**k."  (Govt. Exh. 363, Appx., p. 83).  The word "Amazon" was a reference to the

AK-47.  (Tr. Vol. XVIII, p. 169).

    In a further attempt to acquire the AK-47, A. Hunter contacted M. Hunter

again and asked whether M. Hunter could return to St. Louis.  (Tr. Vol. XVIII, pp.

169-70).  M. Hunter declined.  (Tr. Vol. XVIII, p. 170).  Thereafter, A. Hunter

called Elkins and advised that he was "getting a million and one excuses."  (Govt.

Exh. 364, Appx., p. 86).  Elkins asked, "[s]o he ain't – bottom line, he's not willing

to go back."  (Govt. Exh. 364, Appx., p. 86).  When A. Hunter responded,

"[r]ight," Elkins stated, "[w]ow.  'Kay, alright, well, you know, my folks was

prepared what – even without him.  You know what I'm sayin'?  They didn't even

know nothing about that.  You know?  So it's all good.  Uh, shoulda, uh, shoulda

God d**n still be a 'go.'"  (Govt. Exh. 364, Appx., p. 86).  A. Hunter added,

Appellate Case: 13-1894     Page: 69     Date Filed: 02/06/2014 Entry ID: 4121608

"that's what I say. F**k it. That, you know? Let's still, let's still have a party. I mean, it ain't gonna be the party that we wanted." (Govt. Exh. 364, Appx., p. 86). When he used the expression "have a party," A. Hunter meant locating some of the Outcast members. (Tr. Vol. XVIII, p. 170). He then told Elkins, "even if one motherf***er get drunk . . . if one motherf***er get drunk, at least a ball is rolling." (Govt. Exh. 364, Appx., p. 88). In using the phrase "get drunk," A. Hunter meant "even if one person get shot." (Tr. Vol. XVIII, pp. 170-71).

After learning that M. Hunter would not return to St. Louis, A. Hunter received a call from Lee, who was in St. Louis for the Black New Year's party. (Tr. Vol. XVI, p. 113, 116). Lee had earlier spoken to M. Hunter, who had advised Lee to call A. Hunter. (Govt. Exh. 365, Appx., p. 90). Upon hearing that Lee was in St. Louis, A. Hunter instructed him, "[h]ey, hey, yeah, yeah, yeah! Stay right by the phone." (Govt. Exh. 365, Appx., p. 90). Less than a minute later, A. Hunter called Elkins, advising him, "[h]ey, Li'l Dude [Lee] is there." (Tr. Vol. XVIII, p. 172; Govt. Exh. 366, Appx., p. 91). A. Hunter suggested, "[t]hey need to go on and get up with Li'l Dude." (Govt. Exh. 366, Appx., p. 91). In response, Elkins asked, "[i]s uh, is Li'l Dude – is he prepared?" (Govt. Exh. 366, Appx., p. 91). Shortly thereafter, during this same call, A. Hunter joined Lee into the conversation by way of a three-way call. (Tr. Vol. XVI, p. 117; Govt. Exh. 366, Appx., p. 93). Elkins asked Lee, "[h]ave you seen, uhh, any of them, uhh, peoples

58

[sic] up there?  OC?" (Govt. Exh. 366, Appx., p. 94).  A. Hunter and Lee both recognized "OC" to be a reference to Outcast.  (Tr. Vol. XVI, p. 118; Tr. Vol. XVIII, p. 173).  Lee responded, "[n]ot yet. . .  but I understand they [sic] here." (Govt. Exh. 366, Appx., p. 94).  Later in the conversation, Elkins asked Lee, "I take it you are prepared?" (Govt. Exh. 366, Appx., p. 96).  Lee understood Elkins to be questioning him about whether Lee had a gun with him.  (Tr. Vol. XVI, p. 118).  In response, Lee represented that he had a gun, although he did not.  (Tr. Vol. XVI, p. 121; Govt. Exh. 366, Appx., p. 96).  Lee lied, claiming that he had a gun, in order to "save face with the club" so they would "think [he was] as tough as" the other WOS.  (Tr. Vol. XVI, p. 121).  According to Lee, pretending that he was armed would "keep [him] in their good graciousness [sic]."  (Tr. Vol. XVI, p. 121).

As the evening of January 29, 2011 unfolded, A. Hunter continued to have telephone contact with Elkins and others.  (Govt. Exh. 367, 368, Appx., pp. 98-99, 100, respectively).  During one such conversation, A. Hunter spoke to Rasheed Jamal Brandon, a/k/a "Diamond," (hereinafter, "Brandon"), a co-conspirator and co-defendant (though not an Appellant herein).  (Tr. Vol. XVIII, p. 175; Govt. Exh. 368, Appx., p. 100).  A. Hunter advised Brandon, 'you know Li'l, Li'l Dude [Lee] is there, right?" (Govt. Exh. 368, Appx., p. 100).  Brandon responded, "I just got off the phone with Li'l Dude too." (Govt. Exh. 368, Appx., p. 100).  Later in

59

the same call, A. Hunter stated, "tell Bishop [Henley] he need some of that new –
some, some, uh, some, some, some of that new car smell to go in the car."  (Govt.
Exh. 368, Appx., p. 100).  The reference to "new car smell" was a reference to
drugs.  (Tr. Vol. XVIII, p. 175).

At some point in the evening, Lee advised A. Hunter that Henley was
intoxicated.  (Tr. Vol. XVIII, p. 176).   Upon learning that Henley was intoxicated,
A. Hunter contacted him by telephone to advise him to leave the Black New Year's
party.  (Tr. Vol. XVIII, p. 176; Govt. Exh. 369, Appx., pp. 101-02).  In addition, A.
Hunter was concerned because he was aware that Henley already had a court case
pending.  (Tr. Vol. XVIII, p. 177).   In light of these two factors, A. Hunter called
Henley to instruct him to stay away from Black New Years.  (Tr. Vol. XVIII, pp.
176-77).  Henley, however, insisted, "[n]***a down here by his self [sic], n***a.
That's unacceptable."  (Tr. Vol. XVIII, pp. 176-177; Govt. Exh. 369, Appx., p.
101).  A. Hunter cautioned Henley, "duck in and out though.  You know what I'm
sayin', man?  You need to, uh, you don't need to be around, pimp."  (Govt. Exh.
369, Appx., p. 102).  In response, Henley advised that he understood, stating, "I
talked to Shakka [Elkins]."  (Govt. Exh. 369, Appx., p. 102).

Lee, Brandon, and Appellant Marshall Fry, a/k/a "Bo" (hereinafter, "Fry"),
all members of the WOS, attended the Black New Year's party in East St. Louis,
Illinois.  (Tr. Vol. XVI, pp. 119-20, 137-38; Tr. Vol. XVIII, pp. 177-78).  When

Lee arrived there, he first met up with Henley, who had arrived separately.  (Tr. Vol. XVI, p. 122).  Henley advised Lee that this scenario was a "hit" on Outcast, specifically employing the word "hit" in his description.  (Tr. Vol. XVI, p. 122).  Lee and Henley sat together in the party venue, watching the Outcast members, who were assembled in a group.  (T. Vol. XVI, p. 123).  Brandon and Fry had not yet arrived, but arrived shortly before the party was scheduled to end.  (Tr. Vol. VI, p. 124).  Henley was intoxicated.  (Tr. Vol. XVI, p. 125).  Because Lee was watching Henley, Fry was watching the Outcast members, waiting for them to leave.  (Tr. Vol. XVI, p. 125).

Lee, Brandon, Fry, and Henley did not plan to confront the Outcast members inside the Black New Year's party.  (Tr. Vol. XVI, p. 125).  Rather, they intended to carry out the "mission" as the Outcast members were leaving.  (Tr. Vol. XVI, p. 126).  To that end, as Fry watched the Outcast members leave, he sent a text message to Lee, advising that they were on their way out.  (Tr. Vol. XVI, p. 126).  Lee knew that this text message meant that he needed to get ready to "carry out the mission."  (Tr. Vol. XVI, p. 126).  Although Lee had not planned to come to the party to participate in a hit, he felt nonetheless obligated for fear that if he did not participate, "at the next meeting, [he'd] get [his] a** stomped."  (Tr. Vol. XVI, p. 127).

Appellate Case: 13-1894    Page: 73    Date Filed: 02/06/2014 Entry ID: 4121608

After Lee received Fry's text message notifying him that Outcast members were leaving, Lee and Henley left the building. (Tr. Vol. XVI, p. 128). Once outside, they encountered a former WOS member who was wearing "colors" belonging to another club. (Tr. Vol. XVI, p. 128, 130). Lee contacted A. Hunter to advise him of the transgression. (Tr. Vol. XVI, p. 128; Govt. Exh. 370, Appx., p. 103). Lee seized the opportunity to address the issue of the traitorous former member, hoping to divert the attention away from the Outcast and thus, prevent Brandon, Fry, and Henley from carrying out the "mission." (Tr. Vol. XVI, p. 130). When Lee advised A. Hunter that the former member was wearing "colors" belonging to another club, A. Hunter instructed Lee, "[t]ake that s**t off of him." (Govt. Exh. 370, Appx., p. 103; Tr. Vol. XVIII, p. 179). Lee confronted the former member, but Fry told him to "leave it alone" because the group had "other business." (Tr. Vol. XVI, p. 132).

Lee, Fry, Brandon, and Henley went to the truck in which Fry and Brandon had arrived at the party. (Tr. Vol. XVI, p. 132). Fry and Brandon retrieved guns from the truck. (Tr. Vol. XVI, p. 133). However, they subsequently learned that Outcast had "disappeared." (Tr. Vol. 133). Henley urged the others to give him a gun, stating "[g]ive me a gun. I'll do it."[39] (Tr. Vol. XVI, p. 132). Despite his

---

[39] On January 22, 2011, Henley and A. Hunter spoke by telephone. (Govt. Exh. 342, Appx., pp. 123-24). During that call, Henley and A. Hunter spoke about Outcast, with Henley stating, "[t]hey had a little meeting with, with City and the

Appellate Case: 13-1894     Page: 74     Date Filed: 02/06/2014 Entry ID: 4121608

insistence, no one would provide Henley with a weapon, because the Outcast members were nowhere to be found.  (Tr. Vol. XVI, p. 134).

After the "mission" was aborted, Lee spoke to Elkins and A. Hunter in a three-way telephone call.  (Tr. Vol. XVI, pp. 134-35; Govt. Exh. 375, Appx., pp. 104-22).  Elkins advised A. Hunter, "Dude is, is giving me some information.  My folks had already called me earlier before I even talked to Li'l Dude and uh, my peoples [sic] kinda pissed off right now."  (Govt. Exh. 375, Appx., p. 104).  He further explained that his "people" were upset "because of Bishop [Henley]." (Govt. Exh. 375, Appx., p. 104; Tr. Vol. XVIII, p. 180).  Lee then corroborated, "he just wasn't on his square last night.  He was intoxicated."  (Govt. Exh. 375, Appx., p. 105).  A. Hunter responded, "[i]f he was off his square, motherf***er had every right to put him on his square."  (Govt. Exh. 375, Appx., p. 105).  Lee protested, "[h]e – motherf***er come in there and he called me and told me to stay with him all night, so I was babysitting him until Bo and them showed up.  Yeah, I know it's – how do you put a drunk motherf***er on their square, other than taking him home or some shit?"  (Govt. Exh. 375, Appx., p. 105).  A. Hunter

---

OC's right?  Everybody – check it out, I know n***a, I know.  Everybody want [sic] peace.  The motherf***ers called me, I'm like, 'n***a I don't' sit – I ain't talking to no OCs.  I don't give a f**k what they got to talk about.  We on a no talk – we on a no talk basis."  (Govt. Exh. 342, Appx., p. 123).  He later stated, "them OC's?  F**k them n***as."  (Govt. Exh. 342, Appx., p. 123).  Finally, Henley told A. Hunter, "I ain't talking to no OCs.  I ain't got s**t to talk to them about." (Govt. Exh. 342, Appx., p. 124).

Appellate Case: 13-1894    Page: 75    Date Filed: 02/06/2014 Entry ID: 4121608

countered, "[b]eat his motherf****ing a**."  (Govt. Exh. 375, Appx., p. 105).

When Lee reminded, "I ain't on that level," Elkins stated, "[w]ell you, you

couldn't have, you couldn't have done it so much, but, uh, Bo [Fry] and Diamond

coulda [sic]."  (Govt. Exh. 375, Appx., p. 105).  A. Hunter agreed, "[y]eah, Bo and

Diamond coulda [sic]."  (Govt. Exh. 375, Appx., p. 105).  During the remainder of

the lengthy conversation, Lee carefully explained how the planned operation

against Outcast had failed, recounting the roles played by Fry, Brandon, and

Henley.  (Govt. Exh. 375, Appx., pp. 106-11).  Ultimately, after hearing the story,

A. Hunter concluded, "Bishop [Henley] f***ed it up for us."  (Govt. Exh. 375,

Appx., p. 112).  Elkins agreed.  (Govt. Exh. 375, Appx., p. 112).

Throughout the call, Lee expressed frustration that the "mission" had not

been accomplished.  (Govt. Exh. 375, Appx., pp. 104-22).  In fact, Lee told Elkins

and A. Hunter, "I was sittin in there to snuff me a motherf***er out and if they'da

[sic] showed up, that's exactly what the f**k was fittin' [sic] t happen, but they

didn't."  (Govt. Exh. 375, Appx., p. 115). Among other things, Lee told Elkins and

A. Hunter, "[b]y his [Henley's] being so God damned reckless last night, that

kinda f***ed up that opportunity.  If, if Diamond, if Diamond and Bo [Fry]would

have just came on in and we'd a hooked up, everything would have been

everything."  (Govt. Exh. 375, Appx., p. 115).  Lee stated, "[t]hey [Outcast] don't

know who the f**k we is [sic] and motherf***er woulda just been leaving the God

64

d****ed club. 'Bam, bam, and we out!'" (Govt. Exh. 375, Appx., pp. 115-16). At no point in the conversation did Elkins or A. Hunter express shock or disapproval. (Govt. Exh. 375, Appx., pp. 104-22).

On February 9, 2011 – some eleven days after the Black New Year's party in East St. Louis, A. Hunter contacted J. Smith by telephone. (Tr. Vol. XVIII, p. 181; Govt. Exh. 376, Appx., pp. 125-28). A. Hunter asked, "did, uh, Love tell you what happened?" (Govt. Exh. 376, Appx., p. 125). He explained, "I saw him face to face, so, uh, I couldn't, I couldn't say it on the phone. So I make [sic] sure I told him and let you guys know."[40] (Govt. Exh. 376, Appx., p. 125). A. Hunter told J. Smith that the information pertained to something "down there in St. Louis." (Govt. Exh. 376, Appx., p. 126). J. Smith indicated that "Love" had not told him anything. (Govt. Exh. 376, Appx., p. 126). A. Hunter then urged J. Smith to talk to "Love," stating, "that way he can tell you guys, 'cause I can't say it on the phone." (Govt. Exh. 376, Appx., p. 127). A. Hunter told J. Smith, "I mean, me and Shakka [Elkins] had everything perfect." (Govt. Exh. 376, Appx., p. 126).

On February 15, 2011, A. Hunter once again spoke to J. Smith by phone. (Tr. Vol. XVIII, pp. 185-86; Govt. Exh. 377, Appx., pp. 129-30). J. Smith indicated that he had met with "Love." (Govt. Exh. 377, Appx., p. 129). A.

---

[40]"Love" is a Mother Chapter member with whom A. Hunter had an in-person conversation regarding the events of January 29, 2011. (Tr. Vol. XVIII, pp. 181-82). A. Hunter had specifically asked "Love" to convey the information to J. Smith. (Tr. Vol. XVIII, p. 181).

65

Hunter advised J. Smith, "I'm gonna deal with that next week, as far as the motherf***er that f***ed it up." (Govt. Exh. 377, Appx., p. 129). A. Hunter also stated, "now you see why I couldn't call you first." (Govt. Exh. 377, Appx., p. 129). A. Hunter explained to J. Smith, "[T]hat was just what, what, what I felt like we really needed. You know, uh, uh, just a hell of a, huh, uh a hell of a hand to play. That'd been a hell of a play." (Govt. Exh. 377, Appx., p. 129). He further stated, "[m]e and Shakka [Elkins] did everything on our end. We was[sic] cool." (Govt. Exh. 377, Appx., p. 129). A. Hunter then assured J. Smith,

> it's back to the drawing board now. I don't know when another opportunity is gonna present itself that good, but you, I can't, you know, we, we can't give up on pushin' the envelope, either. . . I'm still tryin' to, you know, dig up, as you can tell, some uh, some power moves. And, you know, I've been, as you , as you, as you heard, you know, workin' with Shakka [Elkins] on, on, on a few things, so.

(Govt. Exh. 377, Appx., pp. 129-30). In response, J. Smith stated, "Alright bro, sounds good." (Govt. Exh. 377, Appx., p. 130).

J. Smith never instructed A. Hunter not to pursue any action against Outcast, nor did he reprimand A. Hunter as a result of the January 29, 2011 incident. (Tr. Vol. XVIII, p. 186).

## March 6, 2011

On the weekend of March 6, 2011, the Midwest Region of the WOS convened in Marion, Ohio for a regional meeting. (Tr. Vol. XIV, p. 57; Tr. Vol.

XVIII, p. 198).  Among those who attended were M. Hunter and A. Hunter.  (Tr.

Vol. XIV, p. 57; Tr. Vol. XVIII, p. 198).

At the time of the Marion, Ohio meeting A. Hunter was the Regional

President of the WOS.  (Tr. Vol. XVIII, p. 197).  He traveled from his home near

Chicago to Marion, Ohio in a rented vehicle.  (Tr. Vol. XVII, p. 198).  He was

accompanied by his brother, Robinson, and a Chicago WOS member called "Little

Buck."  (Tr. Vol. XVIII, p. 198).  When the group arrived in Marion, Ohio, they

went to the WOS clubhouse there.  (Tr. Vol. XVIII, p. 199; Govt. Exh. 383B).

After the other members arrived, the regional meeting began.  (Tr. Vol. XVIII, p.

200).  As Regional President, A. Hunter presided over the meeting.  (Tr. Vol.

XVIII, p. 201).   He planned to stay overnight in Marion and return home the next

day.  (Tr. Vol. XVIII, p. 199).

M. Hunter also traveled to Marion, Ohio for the regional meeting.[41]  (Tr.

Vol. XIV, p. 57).  Like A. Hunter, M. Hunter drove to Ohio in a car.  (Tr. Vol.

XIV, p. 58).   M. Hunter left from St. Louis and drove first to Chicago, where he

hoped to meet up with WOS members from that city.  (Tr. Vol. XIV, p. 58).

However, when he arrived in Chicago, M. Hunter learned that most of the Chicago

members had already left for Ohio.  (Tr. Vol. XIV, p. 58).  M. Hunter picked up a

WOS member called "Say-So," who had been left behind, and the two drove to

---

[41] M. Hunter was, at that time, still acting as an informant, and attended the WOS
meeting in Marion, Ohio at the behest of the FBI and ATF.

Appellate Case: 13-1894     Page: 79     Date Filed: 02/06/2014 Entry ID: 4121608

Ohio together, arriving on the same day as the regional meeting.  (Tr. Vol. XIV, p. 58).  Like A. Hunter, M. Hunter planned to stay overnight in Ohio and return home the following day.  (Tr. Vol. XIV, p. 58).

During the course of the regional meeting in Marion, A. Hunter directed the other WOS members to administer a beating to fellow member "Goldie."  (Tr. Vol. XIV, p. 64; Tr. Vol. XVIII, pp. 201-02).  "Goldie" was beaten as punishment because he failed to come to the aid of another member who had gotten into a fight in a bar.  (Tr. Vol. XIV, p. 64; Tr. Vol. XVIII, p. 202).  After "Goldie" was beaten at the direction of A. Hunter, the members who had beaten him shook "Goldie's" hand and kissed his cheek, effectively signaling an end to the discipline.  (Tr. Vol. XVIII, p. 202).  Robinson was among those WOS members who participated in beating "Goldie."  (Tr. Vol. XVIII, p. 203).  As a result of the beating, "Goldie" suffered injuries, including an injury to his jaw.  (Tr. Vol. XVIII, p. 203).

After the meeting had concluded, A. Hunter went to his hotel, accompanied by his brother (Harper), Robinson, and "Pharaoh."  (Tr. Vol. XVIII, p. 204).  Later that evening, they assembled back at the WOS clubhouse for a party.  (Tr. Vol. XVIII, p. 205).  When A. Hunter arrived for the party, the only people in the clubhouse were other WOS members, all of whom were wearing their "colors," including A. Hunter.  (Tr. Vol. XVIII, p. 205).

Appellate Case: 13-1894     Page: 80     Date Filed: 02/06/2014 Entry ID: 4121608

Because the WOS members felt it to be the safest location for their Regional President, A. Hunter spent most of the party in the rear of the clubhouse. (Tr. Vol. XVIII, p. 207). He was accompanied by several women, his brother (Harper), and "Say So." (Tr. Vol. XVIII, p. 209). At some point during the evening, a partygoer approached A. Hunter's group too closely, and was instructed to walk around. (Tr. Vol. XVIII, p. 209). A. Hunter did not recognize this individual, and believed him to be a local Marion resident.[42] (Tr. Vol. XVIII, p. 210). As he approached, "Say So" stopped the man and prevented him from walking behind A. Hunter. (Tr. Vol. XVIII, p. 210). Shortly thereafter, A. Hunter noticed that the same man was involved in an altercation with some members of the WOS's Columbus (OH) Chapter, during which the man was beaten. (Tr. Vol. XVIII, p. 210).

After this initial beating, a second altercation ensued. (Tr. Vol. XVIII, p. 211). This second fight was much larger and involved a number of people. (Tr. Vol. XVIII, p. 211). During this large fight, M. Hunter was one of the WOS members responsible for preventing other "civilians" from entering the fray. (Tr. Vol. XIV, p. 68). As he attempted to do that, M. Hunter was struck on the back of the head. (Tr. Vol. XIV, p. 71). He responded by striking back with a retractable baton (also called an "asp"), which he carried without the knowledge or permission

---

[42] In addition to WOS members, "civilians," or non-motorcycle riders, were invited to the party. (Tr. Vol. XVI, p. 66).

Appellate Case: 13-1894    Page: 81    Date Filed: 02/06/2014 Entry ID: 4121608

of TFO Van Mierlo or SA Schuster. (Tr. Vol. XIV, pp. 71-72). Numerous WOS members participated in this large-scale fistfight. (Tr. Vol. XVIII, p. 211).

Devin Jones (hereinafter, "D. Jones"), who resided in Marion, Ohio, attended the WOS party on Mach 6, 2011.[43] (Tr. Vol. XVIII, pp. 57-58). During the party, D. Jones was beaten by several members of the WOS. (Tr. Vol. XVIII, p. 64). D. Jones was able to escape, but not before he suffered a crushed eye socket, resulting in his eye protruding from his skull. (Tr. Vol. XVIII, p. 68). He also suffered three broken ribs on his right side, two broken ribs on his left side, and a broken bone in his back. (Tr. Vol. XVIII, p. 69). As D. Jones fled from the WOS clubhouse, he heard approximately five gunshots, which sounded like they were coming from the front of the building from which he had just emerged. (Tr. Vol. XVIII, p. 66). D. Jones could not tell whether the gunshots were coming from inside the clubhouse, or outside. (Tr. Vol. XVIII, p. 73).

A. Hunter also heard the gunshots, and like D. Jones, A. Hunter was unable to determine where the first shots originated. (Tr. Vol. XVIII, p. 212). A. Hunter immediately hit the floor. (Tr. Vol. XVIII, p. 212). When A. Hunter looked around for his brother (Harper), A. Hunter heard further gunshots and then noticed that a WOS member named "Cuz" was shooting and Robinson was shooting. (Tr.

---

[43] Devin Jones shares a name with Detective Devinn Jones of the Chicago Police Department, who also testified at trial in the instant case. Despite the coincidence of their names, the two men are unrelated and do not know each other.

70

Vol. XVIII, p. 213). Robinson was standing toward the front of the clubhouse when A. Hunter saw him shooting. (Tr. Vol. XVIII, p. 214).

M. Hunter was standing directly beside Robinson while Robinson was shooting. (Tr. Vol. XIV, pp. 74-75). According to M. Hunter, Robinson was standing "arm's length" away and was shooting out the front door of the clubhouse. (Tr. Vol. XIV, p. 75). Robinson was shooting at people that were outside the door. (Tr. Vol. XIV, p. 75). M. Hunter also heard other gunshots being fired from near the rear of the clubhouse. (Tr. Vol. XIV, p. 75). After the shooting stopped, M. Hunter attempted to flee through the front door of the clubhouse, only to encounter a person in the foyer who M. Hunter believed was dead. (Tr. Vol. XIV, pp. 75-76). M. Hunter turned around and ultimately exited the clubhouse out the rear door. (Tr. Vol. XVI, p. 77). M. Hunter left Marion and immediately contacted TFO Van Mierlo and ATF Special Agent Kevin Schuster and reported what he had seen. (Tr. Vol. XIV, p. 78). M. Hunter drove to Chicago, where he dropped off "Say So" and met with SA Schuster.[44] (Tr. Vol. XIV, pp. 78-79). Thereafter, M. Hunter was removed from service as an informant. (Tr. Vol. XVI, p. 80).

---

[44] Upon his return to St. Louis, M. Hunter met with TFO Van Mierlo, who debriefed him fully as to what had occurred in Marion. M. Hunter produced a diagram, admitted as Government's Exhibit 424, on which he made circles depicting the location of himself and Robinson at the time the shots were fired. The diagram depicted Robinson as standing in the front of the building, next to the front door. (Tr. Vol. XIV, p. 85; Govt. Exh. 424).

Appellate Case: 13-1894   Page: 83   Date Filed: 02/06/2014 Entry ID: 4121608

After the shooting had stopped inside the Marion clubhouse, A. Hunter left through the back door and got into a vehicle. (Tr. Vol. XVIII, p. 214). A number of other people got into the car with him, including "Little Buck," "Pharoah" (also known as "44")" and Robinson. (Tr. Vol. XVIII, p. 214). The group drove to a nearby church, at which time Robinson got out of the vehicle and hid a gun. (Tr. Vol. XVIII, p. 215). He got back into the car seconds later and the group returned to the clubhouse. (Tr. Vol. XVIII, p. 215). By that time, Marion Police Department officers had begun responding to the scene, and they stopped A. Hunter as he approached the front of the clubhouse on foot. (Tr. Vol. XVIII, p. 217). As he walked around the corner toward the front door of the clubhouse, A. Hunter saw a person he did not recognize lying on the sidewalk. (Tr. Vol. XVIII, p. 217). When questioned by police, A. Hunter advised (falsely) that he did not know anything about the shooting. (Tr. Vol. XVIII, p. 218). He gave the police his identification and returned to the car. (Tr. Vol. XVIII, p. 218).

When A. Hunter got back into the car, he and the others left the area en route to the hotel. (Tr. Vol. XVIII, p. 225). However, on the way to the hotel, they stopped at the church where Robinson had hidden the gun. (Tr. Vol. XVIII, p. 225). Robinson exited the vehicle and retrieved the gun from where he had previously concealed it. (Tr. Vol. XVIII, p. 225). Thereafter, at the hotel, A. Hunter saw Robinson wiping the same gun with a towel. (Tr. Vol. XVIII, p. 220).

Appellate Case: 13-1894    Page: 84    Date Filed: 02/06/2014 Entry ID: 4121608

As he did so, Robinson, A. Hunter, "Low Rider" and others discussed getting rid of the guns. (Tr. Vol. XVIII, p. 220). Robinson attempted to conceal his gun inside a Mexican pizza box, but when it did not fit, he placed it instead inside a Taco Bell bag. (Tr. Vol. XVIII, p. 220). Thereafter, "Pharaoh" (also known as "44") and others possibly including Robinson, took the Taco Bell bag from the hotel room and later returned without it. (Tr. Vol. XVIII, p. 221). "Pharaoh" later reported that he had thrown the gun into a sewer. (Tr. Vol. XVIII, p. 221).

Robinson, A. Hunter, and the others left Marion the following day. (Tr. Vol. XVIII, pp. 221-22). A. Hunter contacted J. Smith by telephone to advise him that there had been "trouble" in Marion. (Tr. Vol. XVIII, p. 225; Govt. Exh. 428, Appx., pp. 131-33). During the phone call, A. Hunter advised J. Smith that he would provide further details in person. (Tr. Vol. XVIII, p. 225; Govt. Exh. 428, Appx., p. 132). J. Smith never advised A. Hunter to contact authorities, nor did he ever instruct A. Hunter to reprimand Robinson in any way. (Tr. Vol. XVIII, p. 223).

Marion Police investigated the shooting at the WOS clubhouse on March 6, 2011. (Tr. Vol. XVI, pp. 178-80). The first responding officers approached the scene and immediately noted a large number of people running and attempting to flee. (Tr. Vol. XVI, p. 181). They also noted a person lying on the sidewalk near the clubhouse, face down. (Tr. Vol. XVI, p. 182). He was deceased. (Tr. Vol.

Appellate Case: 13-1894    Page: 85    Date Filed: 02/06/2014 Entry ID: 4121608

XVI, p. 184).  The deceased was subsequently identified as Javell Thornton

(hereinafter, "Thornton").  (Tr. Vol. XVI, p. 187).  There was no gun or any type

of weapon located in the vicinity of Thornton's body.  (Tr. Vol. 17, p. 204).  There

was a second person lying in the entrance to the clubhouse.  (Tr. Vol. XVI, p. 182).

This second person was alive, although grievously wounded.  (Tr. Vol. XVI, p.

185).

　　　Crime scene investigators secured the scene and processed it for evidence.

(Tr. Vol. XVI, p. 195).  Among the items they located were three 9-millimeter

cartridge casings.  (Tr. Vol. XVI, pp. 210-13; Govt. Exh. 401B, 402B, 403B).

These casings were recovered from the small vestibule at the front of the

clubhouse, and the interior of the clubhouse near the front door.  (Tr. Vol. XVIII,

p. 210; Govt. Exh. 401B, 402B, 403B).   In addition, investigators located a single

.40 caliber cartridge casing from the middle of the main room of the clubhouse.

(Tr. Vol. XVII, p. 224; Govt. Exh. 405B).  Although there were a number of .380

caliber cartridge casings and live rounds found on the sidewalk outside the

clubhouse, the investigators did not observe any physical evidence that led them to

believe that anyone was shooting from outside of the clubhouse to the inside of the

clubhouse. (Tr. Vol. XVI, p. 244).

　　　Dr. Jan Gorniak, the Franklin County (Ohio) Coroner, conducted the autopsy

on Thornton's body.  (Tr. Vol. XVII, p. 161, 163-64).  During the external

Appellate Case: 13-1894   Page: 86   Date Filed: 02/06/2014 Entry ID: 4121608

examination, Dr. Gorniak observed a gunshot wound to Thornton's back. (Tr. Vol. XVII, p. 165).   This wound was an entrance wound.  (Tr. Vol. XVII, p. 167). There was, however, no corresponding exit wound.  (Tr. Vol. XVII, p. 168).  On the front of Thornton's body, there was a red discoloration and a palpable object underneath the skin of Thornton's chest.  (Tr. Vol. XVII, p. 169).  During the internal examination, Dr. Gorniak discovered this object to be a projectile.  (Tr. Vol. XVII, p. 170).   She removed the projectile and described it as a "mildly deformed, full-jacketed, hollow-point, medium-caliber bullet" before providing it to a representative of the Marion Police Department, who attended the autopsy. (Tr. Vol. XVII, p. 171, 209).  According to Dr. Gorniak, the pathway of the bullet through Thornton's body was consistent with a person who was running at the time he was struck.  (Tr. Vol. XVII, p. 173).  Dr. Gorniak determined that Thornton died as result of the single gunshot wound to his back.  (Tr. Vol. XVII, p. 174).

On March 23, 2011, road crew workers in Marion County, Ohio were inspecting and clearing storm drains.  (Tr. Vol. XVI, p. 168).  As they examined one such storm drain, one worker discovered a gun.  (Tr. Vol. XVI, p. 169).  After realizing the gun was real, and not a toy, the worker examined it further and discovered it to be a 9-millimeter Smith and Wesson, still containing its magazine. (Tr. Vol. XVI, pp. 171-72; Govt. Exh. 408A).  The worker immediately contacted his supervisor, who called the Sheriff's Department.  (Tr. Vol. XVI, p. 173-74).

75

The Sheriff's Department subsequently contacted the Marion Police Department. Major Bill Collins of the Marion Police Department responded and took custody of the 9- millimeter Smith and Wesson and the magazine, which had been removed from the firearm. (Tr. Vol. XVII, pp. 199-200; Govt. Exh. 408A, 412). The firearm bore serial number THB4479 (Tr. Vol. XVIII, p. 28; Tr. Vol. XIV, p. 167; Govt. Exh. 408A). Major Collins discovered that the magazine had a total capacity of 12, and that there were 9 rounds remaining therein. (Tr. Vol. XVII, p. 201). He also noted that the magazine bore a label on the end that read "MAG 1." (Tr. Vol. XVII, p. 201; Govt. Exh. 412). The magazine also bore an etched marking on the side, consisting of the characters "THB4479." (Tr. Vol. XIX, p. 167; Govt. Exh. 412).

The 9 millimeter Smith and Wesson firearm discovered in the storm drain was subsequently submitted to the State of Ohio's Bureau of Criminal Identification and Investigation and examined by a firearms and toolmarks examiner. (Tr. Vol. XVIII, p. 17, 28). The weapon was test fired, and the test fires were compared to evidence seized from the WOS clubhouse in Marion, Ohio on March 6, 2011. (Tr. Vol. XVIII, pp. 28-29). Specifically, the examiner compared the test fired cartridge casing to the 9-millimeter cartridge casings recovered from the WOS clubhouse. (Tr. Vol. XVIII, p. 30). The examination confirmed that all three 9-millimeter cartridge casings recovered from the WOS clubhouse on March

76

6, 2011 were fired from the 9-millimeter Smith and Wesson recovered from the storm drain on March 23, 2011. (Tr. Vol. XVIII, p. 30).

The firearms and toolmark examiner also compared the test fired projectile from the 9-millimeter Smith and Wesson to a 9-millimeter projectile that had been recovered from WOS clubhouse. (Tr. Vol. XVIII, p. 31). The forensic comparison revealed that the 9-millimeter Smith and Wesson had fired that projectile. (Tr. Vol. XVIII, p. 31). Similarly, the examiner conducted a forensic comparison between the test fired projectile and the projectile recovered from Thornton's chest at the time of the autopsy. (Tr. Vol. XVIII, p. 33). This forensic comparison revealed that the 9-millimeter Smith and Wesson recovered from the storm drain had indeed fired the 9-millimeter bullet that killed Thornton. (Tr. Vol. XVIII, p. 33).

## July 12, 2011

On July 12, 2011, Robinson and numerous other co-defendants and/or Appellants herein were arrested at various locations throughout the United States, pursuant to arrest warrants issued by the United States District Court for the Eastern District of Missouri. (DCD 249). Robinson was arrested at the Chicago home of his grandparents, where he appeared and the door along with his grandparents, and was taken into custody. (Tr. Vol. XIX, pp. 156-57). Robinson consented to a search of his room in the residence. (Tr. Vol. XIX, p. 158).

Appellate Case: 13-1894    Page: 89    Date Filed: 02/06/2014 Entry ID: 4121608

Robinson directed agents to two firearm magazines located in the closet of his room. (Tr. Vol. XIX, pp. 158-59). The agents located the magazines, photographed them, and seized them. (Tr. Vol. XIX, pp. 159-61; Govt. Exh. 452A, 452B). One of the magazines, admitted as Government's Exhibit 452A, bore a label on the end reading "MAG2." (Tr. Vol. XIX, p. 162; Govt. Exh. 452A). The same magazine also bore an etched marking on the side reading "THB4479," the serial number of the firearm recovered from the storm drain in Marion, Ohio on March 23, 2011. (Tr. Vol. XIX, pp. 162-63; p. 167; Govt. Exh. 452A, 408A).

The second magazine recovered from the closet in Robinson's room was admitted as Government's Exhibit 452B. (Tr. Vol. XIX, p. 161). Like Government's Exhibit 452A, Exhibit 452B bore two markings. (Tr. Vol. XIX, p. 163). The first of these markings was a label affixed to the end of the magazine, reading "MAG3." (Tr. Vol. XIX, p. 163; Govt. Exh. 452B). The second was an etched marking on the side of the magazine, reading "THB-4479." (Tr. Vol. XIX, p. 163; Govt. Exh. 452B.).

Agents also located Robinson's WOS "colors" in his room. (Tr. Vol. XIX, p. 164; Govt. Exh. 447). Lastly, they recovered a 9-millimeter Intertech semi-automatic pistol. (Tr. Vol. XIX, p. 165; Govt. Exh. 448).

Appellate Case: 13-1894    Page: 90    Date Filed: 02/06/2014 Entry ID: 4121608

## APPELLANTS' CASES-IN-CHIEF

For their part, only two of the Appellants presented any evidence at trial. Henley called only one witness – himself. (Tr. Vol. XX, pp. 109-227). He admitted to being a member of the WOS, and the President of its St. Louis Chapter. (Tr. Vol. XX, pp. 114-15). Henley also admitted to having a "1%er" diamond patch. (Tr. Vol. XX, p. 118).

Henley acknowledged that on August 10, 2009, he and other members of the St. Louis Chapter of the WOS attended a social function at "The Avenue" in St. Louis. (Tr. Vol. XX, pp. 121-31). Although Henley admitted to having instructed his fellow WOS to "get the vests" from STL Riders members J. Polk and C. Polk, he denied that he had instructed anyone to commit a robbery or use a weapon. (Tr. Vol. XX, p. 130).

Henley also admitted to having attended the Black New Year's party in East St. Louis, Illinois on January 29, 2011. (Tr. Vol. XX, p. 148). He acknowledged that he met Lee at the party. (Tr. Vol. XX, pp. 148-49). He denied, however, that he had any knowledge of any conspiracy or plan to commit a murder that night. (Tr. Vol. XX, pp. 148-49).

Henley acknowledged that it was indeed his voice on the recordings attributed to him by the Government, and although he characterized their content as "abrasive," he also claimed them to be "exaggerated." (Tr. Vol. XX, p. 150).

Appellate Case: 13-1894    Page: 91    Date Filed: 02/06/2014 Entry ID: 4121608

J. Peteet also testified on his own behalf.  In addition, J. Peteet called multiple witnesses, including his brother.  Both J. Peteet and K. Peteet admitted that they had attended the "bike night" at Bennigan's in Gary, Indiana on May 28, 2009.  (Tr. Vol. XXI, p. 11, 141).  Both J. Peteet and K. Peteet admitted that J. Peteet confronted Taylor in the parking lot of the Bennigan's, and both admitted that J. Peteet pointed two guns at Taylor. (Tr. Vol. XXI, p. 21, 147-48).  However, both J. Peteet and K. Peteet claimed that another man, and not J. Peteet, that shot Taylor.  (Tr. Vol. XXI, p. 22, 151).  J. Peteet testified that he did not actually see the shooting, but claimed that another man took responsibility for it.  (Tr. Vol. XXI, p. 151).

Both J. Peteet and K. Peteet admitted that the gun that was used to shoot Taylor belonged to K. Peteet.  (Tr. Vol. XXI, p. 25, 213-14).  J. Peteet admitted that he was well aware that K. Peteet had possession of that gun between May 28, 2009 and June 2012.  (Tr. Vol. XXI, pp. 213-14).  J. Peteet also admitted that, despite being a licensed and practicing attorney, and an officer of the court, he fled the scene of the Bennigan's shooting on May 28, 2009.  (Tr. Vol. XXI, p. 192). Although J. Peteet claimed to have reported his account of the incident to a Sergeant Whaley (hereinafter, "Whaley") of the Gary Police Department the following day, Whaley was not assigned to investigate the shooting (Tr. Vol. XXI, pp. 193-94), nor was he assigned to the Gary Police Department's detective bureau

Appellate Case: 13-1894     Page: 92     Date Filed: 02/06/2014 Entry ID: 4121608

on May 28, 2009.  (Tr. Vol. XXII, p. 10).   Instead, Whaley was assigned to the front desk.  (Tr. Vol. XXII, p. 10).  Despite personally participating in the depositions of three different detectives who were assigned to the May 28, 2009 shooting, J. Peteet never asked any of those detectives whether they had received any information from Whaley. (Tr. Vol. XXI, p. 212).   Whaley was fired from the Gary Police Department in September 2009 after he was convicted of "several felonies" for having embezzled $100,000 from a 90 year old woman.  (Tr. Vol. XXI, pp. 212-13; Tr. Vol. XXII, pp. 12-13).  J. Peteet represented Whaley as his attorney in that criminal matter.  (Tr. Vol. XXII, p. 13).

## PROCEDURAL HISTORY

Henley, J. Smith, Elkins, Fry, and Robinson were indicted by a duly empaneled Grand Jury sitting in the Eastern District of Missouri on June 9, 2011. The Indictment was suppressed until July 12, 2011, at which time J. Smith, Henley, and Robinson were arrested.  (DCD 177, 43, 249, respectively). Elkins surrendered himself within a matter of days, and Fry was arrested by United States Marshals in Colorado after having been declared a fugitive.  J. Peteet was charged by way of Superseding Indictment on June 21, 2012 (DCD 745), and was arrested on the following day.  (DCD 776).

Pursuant to a scheduling order established by United States Magistrate Judge Frederick R. Buckles (Ret.), Henley, J. Smith, Elkins, Fry, and Robinson filed pre-

81

trial motions on a variety of issues. Germane to this appeal, Henley, J. Smith, Elkins, and Robinson each filed a motion to suppress the contents of any electronic surveillance, including but not necessarily limited to a judicially authorized wiretap. (DCD 435, 419, 452, 518, respectively). On October 15, 2012, Chief United States District Judge Catherine D. Perry issued an Order denying Appellants' motions to suppress the contents of any electronic surveillance. (DCD 1103).

J. Smith also filed a motion to sever his case from the remaining defendants. (DCD 445). The District Court denied J. Smith's motion to sever on October 15, 2012. (DCD 1104). J. Smith did not renew his motion to sever during trial or thereafter.

On September 11, 2012, the Government filed a motion in limine seeking an Order excluding from evidence an affidavit, purportedly signed by Barry Rogers (hereinafter, "B. Rogers"). The Government anticipated – correctly – that J. Peteet would seek to admit this affidavit (hereinafter, "the Rogers Affidavit, Appx., pp. 173-74) in lieu of B. Rogers' live testimony at trial. The District Court granted the Government's motion in limine with regard to the Rogers Affidavit on October 9, 2012. (DCD 1087).

On October 8, 2012, Robinson filed a motion in limine seeking an Order excluding from trial evidence of a November 1, 2009 murder in Chicago, Illinois in

Appellate Case: 13-1894    Page: 94    Date Filed: 02/06/2014 Entry ID: 4121608

which an off-duty correctional officer was shot in the back and killed. (DCD 1085). Robinson argued that because this November 1, 2009 murder was not listed in the Superseding Indictment as an "overt act" in furtherance of the racketeering conspiracy, the Government should be precluded from admitting evidence of this incident at trial. On October 9, 2012, the District Court denied Robinson's motion in limine with regard to the November 1, 2009 murder. (DCD 1087).

Having failed to reach a negotiated settlement, Henley, J. Smith, Elkins, Fry, Robinson, and J. Peteet (hereinafter, collectively, "Appellants") proceeded to trial before Chief United States District Judge Catherine D. Perry in the Eastern District of Missouri beginning on October 15, 2012. The Government called no fewer than 60 witnesses over the course of some six weeks. At the conclusion of the Government's case in chief, Appellants individually moved for judgment of acquittal. J. Smith so moved on November 15, 2012 (DCD 1184), as did Henley (DCD 1185), Elkins (DCD 1188), Fry (DCD 1189), Robinson (DCD 1187), and J. Peteet (DCD 1190). The District Court denied Appellants' motions for judgment of acquittal at the conclusion of the Government's case on the same date. (DCD 1191). All Appellants renewed their motions for judgment of acquittal at the close of all of the evidence, and such motions were again denied. (DCD 1199).

The jury deliberated for nearly eight days before reaching unanimous verdicts finding the Appellants guilty of some, but not all, of the offenses with

Appellate Case: 13-1894    Page: 95    Date Filed: 02/06/2014 Entry ID: 4121608

which they were charged (DCD 1229, 1230, 1232, 1233, 1234, 1235).  More

specifically, Appellants were convicted of the following:

**Henley** --   Racketeering Conspiracy; Violent Crime in Aid of Racketeering–
            Conspiracy to Commit Murder

**J. Smith** --   Racketeering Conspiracy

**Elkins** --   Racketeering Conspiracy; Violent Crime in Aid of Racketeering –
            Conspiracy to Commit Murder

**Fry** --   Racketeering Conspiracy; Violent Crime in Aid of Racketeering –
            Conspiracy to Commit Murder

**Robinson** -- Racketeering Conspiracy; Violent Crime in Aid of Racketeering –
            Murder; Violent Crime in Aid of Racketeering – Murder

**J. Peteet** -- Racketeering Conspiracy; Violent Crime in Aid of Racketeering –
            Attempt to Commit Murder

On December 13, 2012, Henley filed a post-verdict motion for judgment of

acquittal.  (DCD 1249).  J. Smith and Robinson filed similar post-verdict motions

for judgment of acquittal on December 21, 2012. (DCD 1255, DCD 1256,

respectively).  The District Court denied the post-verdict motions for judgment of

acquittal on March 6, 2013. (DCD 1362).

Prior to his sentencing, J. Peteet filed objections to the Pre-Sentence Report

prepared by the United States Probation Office.  (DCD 1342).  The District Court

addressed J. Peteet's objections to the Pre-Sentence Report at the time of his

sentencing.  Germane to this appeal, the District Court overruled J. Peteet's

objection to the imposition of an enhancement under the United States Sentencing

Appellate Case: 13-1894   Page: 96   Date Filed: 02/06/2014 Entry ID: 4121608

Guidelines for his having occupied a position as an "organizer or leader, manager or supervisor."  (DCD 1506).

Appellants received the following sentences:

**Henley** --        204 months

**J. Smith** --        120 months

**Elkins** --        210 months

**Fry** --        188 months

**Robinson** --        life without the possibility of parole

**J. Peteet** --        276 months

Following their sentencings, all Appellants timely filed Notice of Appeal.

This Court consolidated Appellants' appeals, granting them permission to file one "Joint Brief" in which they addressed common legal issues, and permission for each to also file an "Individual Brief" containing issues unique to each Appellant.  The Government hereby responds to Appellants' Joint Brief, as well as each man's "Individual Brief."

Appellate Case: 13-1894     Page: 97     Date Filed: 02/06/2014 Entry ID: 4121608

# SUMMARY OF THE ARGUMENTS

**The District Court did not err in denying Appellants' motions for judgment of acquittal as to any count for which they – either collectively or individually – were convicted.**

All Appellants were convicted of Count I – Racketeering Conspiracy, in violation of Title 18, United States Code, Section 1962(d). As to each Appellant, the Government proved beyond a reasonable doubt and by sufficient evidence that the Appellant members of the Wheels of Soul Outlaw Motorcycle Club (hereinafter, "WOS") constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), and that each Appellant was associated with that enterprise. Similarly, the Government proved beyond a reasonable doubt and by sufficient evidence that each Appellant conspired with others to conduct the affairs of the charged enterprise through a "pattern of racketeering activity" as defined in Title 18, United States Code, Section 1961(5). Because Appellants were not charged with a violation of the "substantive RICO" statute, the Government was not required to prove that any Appellant himself committed or agreed to commit two predicate acts of racketeering. Rather, the Government was obligated only to prove, and it did prove, that each Appellant agreed that a co-conspirator would commit at least two such acts. The Government proved by sufficient evidence that the predicate acts were related to each other, both horizontally and vertically, and that they posed a continuing threat of criminal activity. Lastly, the Government

86

proved by sufficient evidence that each Appellant possessed the requisite

knowledge as to the activities of his co-conspirators, from which the jury could

properly have inferred that each Appellant intended to conduct the affairs of the

enterprise through a pattern of racketeering activity. The District Court did not,

therefore, err in denying any Appellant's motion for judgment of acquittal as to

Count I.

### The District Court did not err in denying the motions for judgment of acquittal filed by Appellants Henley, Elkins, or Fry as to Count XIII, Violent Crime in Aid of Racketeering - Conspiracy to Commit Murder.

The Government proved by sufficient evidence that on January 29, 2011,

Henley, Elkins, and Fry agreed with each other and with other persons to commit

the murders of unidentified members of the Outcast motorcycle club, with whom

the WOS was feuding. Two different co-conspirators testified that Elkins had

orchestrated a plan whereby he dispatched two fellow WOS members, including

Fry, from Denver to East St. Louis, Illinois, for the purpose of killing members of

the Outcast club. Once in East St. Louis, the co-conspirators testified, Fry was

joined by Henley, who had traveled from nearby St. Louis, Missouri to assist. As

Elkins directed the activities by telephone, Fry, Henley and the others identified

the target members of Outcast and planned to intercept them as they left a social

event. Fry and a co-conspirator retrieved guns from the vehicle in which they had

traveled to East St. Louis, only to learn that the Outcast members had slipped away

undetected.  They were, therefore, unable to carry out the planned murders.

Despite Appellants' characterization of the Government's evidence as to Count

XIII, it was not based solely on the uncorroborated testimony of one co-

conspirator, but rather, on the testimony of two co-conspirators and on numerous

recorded telephone conversations in which Elkins and others discussed the plan

and the eventual aborting of it.  Moreover, even assuming, *arguendo*, that the

Government's evidence had consisted solely upon the uncorroborated testimony of

a co-conspirator, the credibility of such testimony is determined solely by the jury

as the finder of fact.  The jury's credibility determination may not be undermined

by the District Court, which therefore did not err in denying Henley, Elkins, and

Fry's motions for judgment of acquittal as to Count XIII.

> **The District Court did not err in denying Robinson's motion for judgment of acquittal as to Counts X and XI, because the Government proved beyond a reasonable doubt and by sufficient evidence that Robinson committed the offenses of felony murder in aid of racketeering and attempted murder in aid of racketeering on January 2, 2011.**

Multiple witnesses testified that on January 2, 2011, a number of members

of the WOS, including Robinson, surrounded a member of a rival motorcycle club

in Chicago, Illinois, demanding that he remove the "colors" that identified his club.

Robinson, armed with a handgun, made multiple, profane demands for the "colors"

before the wearer, fearing for his life, produced his own gun and shot at the

88

advancing WOS members. Two persons were killed in the resulting exchange of gunfire. Six days after the shooting, Robinson sold a .40 caliber Smith and Wesson handgun to a person who, unbeknownst to Robinson, was acting as a confidential informant for the Government. During the transaction, Robinson advised the informant that if he were going to keep the firearm, he would need to change out the barrel of the gun. Robinson later admitted to a fellow WOS member that he believed he had shot one of the victims.

To the extent that Robinson argues, for the first time on appeal, that the jury was improperly instructed as to the elements of Count XI – Violent Crime in Aid of Racketeering, Attempt to Commit Murder, his argument is without merit. First, Robinson failed properly to preserve this argument for appeal, inasmuch as he specifically approved of the District Court's instructions as to Count XI. Moreover, the jury charge, when examined as a whole, properly and adequately instructed the jury as to each of the requisite elements of each offense, including Count XI. The District Court did not commit plain error in instructing the jury as to the elements of Count XI, nor did it err in denying Robinson's motion for judgment of acquittal as to Counts X and XI.

Appellate Case: 13-1894     Page: 101     Date Filed: 02/06/2014 Entry ID: 4121608

**The District Court did not err in denying Robinson's motion for judgment of acquittal as to Count XIV – Violent Crime in Aid of Racketeering, Murder, occurring on March 6, 2011.**

The Government proved beyond a reasonable doubt and by sufficient evidence that Robinson was not acting in self-defense at the time he shot an unarmed victim in the back, killing him almost instantly. The jury was permitted to hear evidence in the form of a hearsay statement made by a co-conspirator, who allegedly reported that someone had pointed a gun at his chest. However, that hearsay statement was wholly uncorroborated, as other eyewitnesses who testified to the same incident failed to report having seen any such thing. While Robinson urged the District Court, and urges this Court, to conclude that he shot the unarmed victim in response to seeing a gun pointed at a fellow WOS, there was no such testimony. The jury, which heard the evidence, clearly could have reached the conclusion that Robinson acted in self-defense. Obviously, it did not. In order to reject the jury's verdict, the District Court would have been required to make inferences from the evidence to benefit Robinson, which it may not do. Rather, both the District Court and this Court must view the evidence in the light most favorable to the jury's verdict and nullify that verdict only if no reasonable jury could possibly have concluded that Robinson was not acting in self-defense. The circumstances of the shooting and Robinson's behavior thereafter quite clearly suggest that Robinson was the aggressor in the incident that gave rise to the death

90

of the victim, and that he then engaged in the concealment and/or destruction of evidence in order to evade responsibility. The jury was entitled to consider these facts in determining that Robinson was not acting in self-defense when he killed the victim, and the District Court did not err in refusing to disturb the jury's verdict.

> **The District Court did not err in denying Robinson's motions for judgment of acquittal as to any count alleging Violent Crime in Aid of Racketeering, because the Government proved beyond a reasonable doubt and by sufficient evidence that Robinson committed these offenses, in whole or in part, for the purpose of "maintaining or increasing position in an enterprise."**

The Government was not required to prove that "maintaining or increasing position" was Robinson's sole or even principle motive. Rather, it was required only to prove that "maintaining or increasing position" was among Robinson's motives. Moreover, the Government did not engage in improper closing argument when it advised the jury that it could find Robinson "guilty" of Violent Crime in Aid of Racketeering if it found that Robinson felt obligated, by virtue of his membership in the WOS, to commit the charged offense. The Government's argument in this regard was factually and legally accurate, and had been specifically authorized by the District Court. The jury was properly instructed as to the requisite elements of Violent Crime in Aid of Racketeering, including the Government's obligation to prove that Robinson was motivated at least in part by

Appellate Case: 13-1894    Page: 103    Date Filed: 02/06/2014 Entry ID: 4121608

his desire to maintain or increase his position in the enterprise. The District Court did not err when it concluded that a reasonable jury could have concluded beyond a reasonable doubt that the Government had satisfied that element of each Violent Crime in Aid of Racketeering offense charged.

### The District Court did not clearly err when it admitted recorded evidence at trial.

The Government's recorded evidence, including the judicially authorized wiretap calls, consensually recorded telephone calls, and consensually recorded in-person conversations, were acquired lawfully and were properly authenticated. As to the judicially authorized wiretap, the authorizing United States District Judge enjoyed jurisdiction to issue the Order because, although the cellular telephone at issue was located outside the Eastern District of Missouri, the wiretap calls were intercepted and monitored within the District. Moreover, the calls were properly authenticated by both the case agent and, as to each call, one of the parties to the conversation. Although Appellants claim on appeal that the Government failed to comply with the "sealing requirement," which obligates the Government to seal the contents of any judicially authorized wiretap immediately after the expiration of the Order, the issue is not properly preserved for appeal, inasmuch as Appellants failed to raise the issue in the District Court. Moreover, the Government did, in fact, comply with the "sealing requirement," sealing the wiretap before United

Appellate Case: 13-1894    Page: 104    Date Filed: 02/06/2014 Entry ID: 4121608

States District Judge Jean C. Hamilton on a date of her choosing four business days

after the expiration of the Order.

### The District Court did not abuse its discretion when it refused to admit the affidavit of Barry Rogers, proffered by Appellant J. Peteet.

Putative witness B. Rogers provided an affidavit in which he claimed claims

to have committed the shooting with which J. Peteet was charged in Count II of the

Superseding Indictment. According to B. Rogers, he shot the victim in defense of

himself and unnamed third persons. To that extent, the affidavit does not

constitute a "statement against interest" such that it would qualify under that

exception the general hearsay rules. Moreover, the circumstances under which the

affidavit was drafted, signed, and presented to the Court, strongly suggest that the

affidavit is wholly untrustworthy. Therefore, the District Court did not abuse its

discretion in refusing to admit the affidavit in lieu of the live testimony of B.

Rogers.

### The District Court did not plainly err when it refused to allow B. Rogers' wife to testify about certain hearsay statements he allegedly made to her.

This Court should review the District Court's ruling in that regard only for

"plain error," because after the District Court refused to admit the hearsay

statements, J. Peteet failed to make an offer of proof as to the evidence he sought

to admit. Moreover, J. Peteet failed to establish any foundation for his suggestion

Appellate Case: 13-1894    Page: 105    Date Filed: 02/06/2014 Entry ID: 4121608

that the evidence would have qualified as either a "statement against interest" or an "excited utterance." Therefore, the District Court was well within its discretion and did not commit plain error when it refused to admit the hearsay statements of B. Rogers.

### The District Court did not abuse its discretion when it permitted the Government to admit evidence of a November 1, 2009 murder in Chicago, Illinois, despite the fact that the murder was not specifically listed as an "overt act" in the Superseding Indictment.

Inasmuch as the Superseding Indictment charged a Racketeering Conspiracy, evidence of the November 1, 2009 murder was relevant and admissible to prove the existence of the charged enterprise, and the Appellants' agreement to conduct the affairs of that enterprise through a pattern of racketeering activity. This evidence was not substantially more prejudicial than probative, rendering it admissible even when viewed through the lens of Fed. R. Evid. 403. The District Court therefore did not abuse its discretion in admitting evidence of the November 1, 2009 murder.

### The District Court did not commit plain error when it denied J. Smith's motion to sever his case from his co-conspirators.'

This Court should review the District Court's denial of J. Smith's motion for plain error only, because although J. Smith moved to sever his case prior to trial, he failed to renew his motion at the close of the Government's case, and /or at

94

the conclusion of all the evidence. This Court has expressed a preference for joint trials where defendants are charged with jointly engaging in criminal conduct. This preference abides, notwithstanding differences in the quality or quantity of evidence, and irrespective of whether a particular defendant may enjoy a better chance of acquittal at a separate trial. In the instant case, the jury's verdict clearly reveals that the jury carefully considered the evidence separately as to each defendant and as to each count. The fact that the jury returned "not guilty" verdicts as to some counts strongly suggest that it retained the ability to compartmentalize the evidence as to each defendant and as to each offense. J. Smith, who bears the burden to establish that clear prejudice resulted from the District Court's denial of his motion to sever, has failed to do so. Therefore, this Court should affirm the District Court's denial of J. Smith's motion to sever.

> **Robinson did not allege, at trial or at any time thereafter until the filing of his Individual Brief, that either the Court or the Government "constructively amended" the Superseding Indictment as to Count XI – Violent Crime in Aid of Racketeering, Attempt to Commit Murder.**

The jury was properly instructed as to the requisite elements of Count XI, including the Government's obligation to prove that Robinson committed a "substantial step" toward the commission of the offense of murder. Robinson did not object to the instructions as given by the District Court, and the Government did not engage in improper argument. This Court should conclude that neither the

95

Government nor the District Court "constructively amended" the Superseding

Indictment as to Count XI, and should affirm Robinson's conviction.

> **The District Court did not abuse its discretion in refusing to utilize a special verdict form, in which it would have required the jury to specify which predicate acts it found to have been committed or agreed to by each Appellant.**

Special verdict forms are disfavored in criminal cases, and countless Courts

of Appeals have affirmed the refusal to utilize such forms, even in complex cases

such as the instant case. The Government was not required to prove that any

Appellant committed or agreed to the commission of any specific predicate act,

only the types of predicate acts. The jury was so instructed, and it is presumed to

have followed that instruction. The District Court enjoys broad discretion in

determining whether to utilize a special verdict form. Appellants fail to cite even a

single example in which a Court of Appeals has reversed a District Court's refusal

to utilize such a form. This Court, as the others have, should conclude that the

District Court in the instant case was well within its broad discretion to decline to

use a special verdict form, and should affirm Appellants' convictions as to Count I.

> **The District Court did not commit clear error in imposing a two level enhancement as to J. Peteet at the time of sentencing.**

The District Court properly concluded, as had the United States Probation

Office, that J. Peteet occupied a position as an "organizer, leader, manager or

Appellate Case: 13-1894     Page: 108     Date Filed: 02/06/2014 Entry ID: 4121608

supervisor" of the criminal activity.  As a result, the enhancement was appropriate and its imposition did not amount to plain error.  This Court should affirm J. Peteet's sentence.

<center>**ARGUMENT**</center>

I.   **THE DISTRICT COURT DID NOT ERR IN DENYING APPELLANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT PRESENTED SUFFICIENT EVIDENCE FROM WHICH THE JURY COULD REASONABLY CONCLUDE BEYOND A REASONABLE DOUBT THAT EACH APPELLANT WAS GUILTY OF EACH OFFENSE OF CONVICTION**

In the face of unanimous jury verdicts finding them guilty beyond a reasonable doubt, Appellants challenge the sufficiency of the evidence supporting their convictions, alleging that the District Court erred in denying their motions for judgment of acquittal as to Count I – Racketeering Conspiracy, and as to various substantive counts.  (Appellants' Joint Brief, Issue I and Issue II; Individual Brief of  James C. Smith, Issue I; Brief of Appellants Fry and Elkins, Issue II; Appellant Dominic Henley Individual Brief, Issue I and Issue II; Individual Brief of Defendant-Appellant Anthony Robinson, Issue I, Issue III, and Issue IV; Appellant's Brief (J. Peteet), Issue I and Issue II).

A.   **Standard of Review**

"The standard of review governing sufficiency-of-the-evidence challenges is extremely deferential to the underlying guilty verdict and raises a high bar for a defendant to overcome." *United States v. Wells*, 646 F.3d 1097, 1102 (8th Cir. 2011). While sufficiency-of-the-evidence challenges are reviewed *de novo*, this Court has held that it will reverse a unanimous jury verdict "only if no reasonable

<center>98</center>

jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Hinojosa*, 728 F.3d 787, 789 (8th Cir. 2013); *United States v. Keys*, 721 F.3d 512, 519 (8th Cir. 2013). When reviewing a sufficiency-of-the-evidence challenge, this Court "must view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." *United States v. Perez*, 663 F.3d 387, 391 (8th Cir. 2011).

It is imperative to recall that "[w]itness testimony . . . does not need to be corroborated" when reviewing the sufficiency of the evidence. *Id.,* (quoting *United States v. Jefferson*, 652 F.3d 927, 930 (8th Cir. 2011)).  Furthermore, because "[t]he jury has the responsibility of resolving conflicts or contradictions in testimony," this Court has explained that it will "resolve any credibility issues in favor of the verdict." *United States v. Johnson*, 688 F.3d 494, 502 (8th Cir. 2012), *see also Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (noting that "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial"); *United States v. Jirak*, 728 F.3d 806, 812 (8th Cir. 2013) (holding that, when reviewing sufficiency-of-the-evidence challenges, the Court does not weigh the credibility of evidence). For this reason, "[a]ttacks on the sufficiency of the evidence that call upon this [C]ourt to scrutinize the credibility of witnesses are generally not an appropriate ground for reversal." *United States v. McKay,* 431 F.3d 1085, 1094 (8th Cir. 2005); *Jefferson,* 652 F.3d

at 930 (holding that "a jury's credibility determinations are virtually unreviewable on appeal").

As these holdings clearly demonstrate, this Court has noted that it does "not lightly overturn a jury's guilty verdict." *United States v. Goodwin*, 719 F.3d 857, 860 (8th Cir. 2013); *United States v. Tate*, 633 F.3d 624, 628 (8th Cir. 2011). Indeed, this Court "decline[s]s to substitute [its] own judgment for that of the jury." *United States v. White*, 675 F.3d 1106, 1109 (8th Cir. 2012). In view of these holdings, this Court should be loath to disturb the jury's verdicts in the case at bar.

## B. Argument

### i. The Government presented sufficient evidence as to the existence of an "enterprise" as required by 18 U.S.C. §1961[45]

Appellants Henley, Smith, Elkins, Fry, Robinson, and Peteet (hereinafter, collectively "Appellants") first assert that the District Court erred in denying their motions for judgment of acquittal as to Count I, alleging that the Government failed to present sufficient evidence as to the existence of an "enterprise" as required by Title 18, United States Code, Sections 1962(c) and (d). Section 1962(c) defines the offense with which Appellants were charged with conspiring to commit. Specifically, Section 1962(c) provides,

> [I]t shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign commerce,

---

[45] Appellants' Joint Brief, Issue II, pp. 29-37.

> to conduct or participate in, directly or indirectly, the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Its companion section, Section 1962(d), criminalizes any conspiracy to commit the offense proscribed in Section 1962(c). Appellants were convicted by the jury of a Section 1962(d) racketeering conspiracy.

Title 18, United States Code, Section 1961(4) provides the definition of "enterprise" for purposes of Section 1962(c) and (d). An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).

> To prove the existence of an enterprise, the government must offer proof of (1) a common purpose; (2) a formal or informal organization of the participants in which they function as a unit ('some continuity of both structure and personality'); and (3) 'an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity.'

*United States v. Darden*, 70 F.3d 1507, 1520 (8th Cir. 1995). "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). "Neither the language nor structure of RICO limits its application to legitimate 'enterprises.'" *Id.* at 587. To the contrary, "[t]he language of the statute, [ ] – the most reliable evidence of its intent – reveals that

101

Congress opted for a far broader definition of the word 'enterprise.'" *Id.* at 593.

"The very concept of an association in fact is expansive. The RICO statute

provides that the terms are to be 'liberally construed to effectuate its remedial

purposes.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009). An association-in-

fact enterprise "'is proved by evidence of an ongoing organization, formal or

informal, and by evidence that the various associates function as a continuing

unit.'" *Id.* at 945. Moreover, "[c]ommon sense suggests that the existence of an

association –in –fact is oftentimes more readily proven by 'what it *does*, rather

than by abstract analysis of its structure.'" *United States v. Coonan*, 938 F.2d

1553, 1559 (2d Cir. 1991). In some instances, the existence of the "enterprise"

may be proven by the very same evidence that established a "pattern of

racketeering activity." *Boyle*, 556 U.S. at 947.

### a. The Appellant members of the WOS shared a "common purpose"

In order to establish the existence of an "enterprise" as defined in Section

1961(4), the Government must first prove that the members of the organization at

issue had a "common purpose." *Turkette*, 452 U.S. at 583. Such

> proof may of course be direct but, as the Turkette Court
> pointed out, it may also be circumstantial, as by evidence
> that the group of individuals functions as a continuing
> unit in an informal or formal organization engaged in a
> course of conduct directed toward the accomplishment of
> the common purpose alleged.

*United States v. Griffin*, 660 F.2d 996, 1000 (4th Cir. 1981).

In *United States v. Leisure*, 844 F.2d 1347 (8th Cir. 1988), this Court addressed an issue nearly identical to one in the instant case. Namely, "[a]ppellants maintain that the evidence at trial was insufficient to support the jury's finding of an 'enterprise.'" *Id.* at 1363. After reiterating the general requirements of a racketeering "enterprise," (requirements that have since been more acutely honed), this Court concluded that "[t]he Leisure group acted out of a common purpose to dominate local labor unions, profit economically from this domination, and murder the opponents of their efforts to the extent necessary." *Id.* This Court thereafter announced, "this is not a case of 'a sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes.'" *Id.* at 1364.

The same could certainly be said of the WOS. The evidence at trial clearly demonstrated that the Appellants were not strangers whose paths coincidentally crossed, or who merely intermittently banded together to commit crimes. Rather, these were members of a single, unified "nation," to which they pledged their loyalty. They were members of the WOS "enterprise" before the predicate acts were committed, they were members of the WOS "enterprise" at the time the predicate acts occurred, and they remained members of the WOS "enterprise" after the predicate acts had been accomplished.

In *United States v. Davidson*, 122 F.3d 531 (8th Cir. 1997), this Court was called upon to consider the sufficiency of the Government's evidence with regard

Appellate Case: 13-1894     Page: 115     Date Filed: 02/06/2014 Entry ID: 4121608

to the "enterprise" element of a racketeering conspiracy. There, as here, the appellant "argue[d] that the government proved only 'sporadic criminal predicate acts,' not the requisite common purpose." *Id.* at 534. This Court disagreed, writing,

> Davidson ran a small but prolific crime ring. Initially, stepson Tim Scarbrough and Roger Rollet were the foot soldiers, stealing cars and trucks and burglarizing homes. Davidson 'chopped' the stolen cars in his shop and fenced the other stolen goods. But Davidson was more than an outlet for stolen goods. He instructed Scarbrough and Rollet to burn cars and houses, both for insurance proceeds and intimidation. He financed their drug activities and provided other support for his criminal associates. When Scarbrough went to prison, Tony Webster filled in, stealing cars, supplying Davidson with drugs for distribution, and serving as his enforcer, while Davidson paid $5,000 to murder Cooperwood for setting Scarbrough up with an undercover police officer.

> The length of these associations, the number and variety of crimes the group jointly committed, and Davidson's financial support of his underlings demonstrate an ongoing association with a common purpose to reap the economic rewards flowing from the crimes, rather than a series of ad hoc relationships.

*Id.* at 534-35. In the instant case, the WOS, like the organization at issue in *Davidson*, clearly acted as a group with a common purpose. Their repeated violent acts of retaliation, retribution, and intimidation fly directly in the face of Appellants' claims that the predicate acts were not related to any common purpose. The Government's evidence at trial irrefutably demonstrated that many, if not all,

104

of the targeted acts of violence against members of other motorcycle clubs came *after* National President J. Smith had presided over national meetings at which he issued calls to arms and incited his fellow members to violence. These acts were committed with full support of the WOS as an entity and were not merely the product of individual animosities.

Similarly, in *United States v. Payne*, 591 F.3d 46 (2d Cir. 2010), the United States Court of Appeals for the Second Circuit examined the sufficiency of the Government's evidence following the conviction at trial of a number of members of a group (including Payne, Thomas, and Hatcher) engaged in narcotics trafficking and acts of violence in the Brooklyn, New York area. On appeal, the appellants argued, among other things, that the Government had presented insufficient evidence that the group constituted an "enterprise" as required by Section 1962(c). In its analysis, the Second Circuit disagreed, finding,

> [a]lthough Payne contends that the evidence at trial merely showed a group of 'neighborhood friends' who 'may have given each other sporadic assistance,' that characterization plainly does not view the evidence in the light most favorable to the government. . . there was testimony by Thomas and Hatcher that there were more than a dozen individuals distributing narcotics in the East New York section of Brooklyn; although there was no highly structured organization, Thomas and Hatcher testified that these individuals were members of a 'family' or 'street family' who 'made money together,' *i.e.* they would 'sell drugs together,' 'protect [ ] each other,' and take 'care of each other' by providing funds for family members who were 'broke' or in jail. The

105

> family was protective of its territory, allowing family
> members to sell drugs at family spots, coordinating
> family members' selling hours if they used the same spot
> and otherwise avoiding conflicts with one another,
> excluding nonmembers of the family from those spots,
> and using violence against rivals who attempted to
> possess or repossess family spots.

*Id.* at 60. Not only did the Second Circuit reject the appellant's argument in *Payne*, it wrote that his "contention that the evidence was insufficient to permit inferences that the RICO enterprise alleged in the indictment existed, and that he participated in it, *borders on the frivolous." Id*. at 61(emphasis added).

Here, as in *Payne*, the Appellant members of the WOS were much more than a group of "friends" who gave "each other sporadic assistance." When examined in the light most favorable to the Government, the evidence at trial clearly demonstrated that the WOS was a motorcycle club, independent of their violent acts. Appellants maintained fierce loyalties, not only to the WOS but to each other as a result of their membership. The record is replete with instances in which the WOS were reminded – and affirmed – that membership came not only with rewards, but with responsibilities. The members of the WOS were expected to defend that organization and its members even to death, with National President J. Smith specifically warning, "[I]f I'm out there and I got a motherf***ing situation and you leave me, you better hope to God that I don't survive, because the first motherf***er I'm looking for is that motherf***er that left me." (Govt. Exh. 220,

106

Appx., p. 5). Members, like "Goldie," who failed to heed this warning were mercilessly beaten by their own "brothers."[46] (Tr. Vol. XIV, p. 64; Tr. Vol. XVIII, p. 202). The WOS were expected – under penalty of physical violence – to advance the interests of the WOS at all costs.

In *United States v. Harris*, 695 F.3d 1125 (10th Cir. 2012), the Tenth Circuit Court of Appeals also considered the "enterprise" element of a racketeering conspiracy. There, the court clarified that,

> if the Government established that the [organization in question] shared '[a] purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose,' then the Government would have proved the existence of an 'enterprise' within the meaning of 18 U.S.C. §1962(d).

---

[46] In a particularly chilling incident, co-conspirator Pinkston was punched in the face during a WOS regional meeting in St. Louis following an August 15, 2009 shooting in which Henley shot and killed a member of the Sin City Titans. Henley was acquitted at trial of a substantive VCAR count arising out of this shooting, evidently on the grounds of self-defense. In the aftermath of that shooting, Pinkston was "put in the circle" by his fellow WOS in a disciplinary proceeding designed to force Pinkston to explain why he had failed to shoot his gun during the August 15, 2009 incident. According to multiple witnesses, there was sheet plastic spread beneath Pinkston's feet during this disciplinary proceeding, because the original plan was that Pinkston was to be stabbed for his transgression. Farris called off the planned stabbing shortly before it was to occur. Pinkston was, however, stripped of his "colors" and ejected from the WOS for failing to come to Henley's aid. (Tr. Vol. III, pp. 103-07; Tr. Vol. VII, pp. 24-29; Tr. Vol. IX, pp. 151-54).

Appellate Case: 13-1894    Page: 119    Date Filed: 02/06/2014 Entry ID: 4121608

*Id.* at 1136.  In affirming the guilty verdict, the Tenth Circuit held "that the

evidence . . . established that the [organization in question] meets the test for an

association-in-fact enterprise."  *Id.*  Specifically as it pertained to

> 'purpose,' the evidence at trial showed that [appellants],
> members of different sets, jointly operated the houses
> from which various set members sold drugs, and that
> they provided drugs to those lower in the chain to sell.
> There was also testimony that the different [ ] sets would
> work together by 'making money, having meetings,
> things of that nature,' including committing robbery,
> selling drugs, and prostitution.

*Id.*

In the instant case, although some Appellants belonged to different chapters

of the WOS, the chapters clearly functioned together as part of one larger, self-

described "nation," the ideals to which all of the Appellants adhered.  They

attended functions together, they held Regional and National meetings together,

and when any member committed a crime on behalf of the "nation," its members

rallied around him, refusing to cooperate with law enforcement (as in the case of

the May 28, 2009 shooting in Gary, IN); concealing evidence (as in the case of the

Gary, IN shooting, the Chicago, IL murders on November 1, 2009 and January 2,

2011, and the Marion, OH murder); and raising money for incarcerated "brothers"

(as in the case of "Slim" and Balle).  When a WOS member committed a criminal

offense and another refused to assist, he was stripped of his patches, beaten, and/or

expelled from the WOS (as in the case of Pinkston and "Goldie" in Marion, OH).

Appellate Case: 13-1894     Page: 120     Date Filed: 02/06/2014 Entry ID: 4121608

Here, as in *Payne*, Appellants' argument that the Government presented

insufficient evidence at to the existence of an "enterprise" borders on the frivolous.

    **b.  The Government presented sufficient evidence tending to establish that the WOS organization had a formal structure and its participants functioned as a unit**

       Assuming, *arguendo*, that the Government presented sufficient evidence as

to the WOS's "common purpose," the Court must next determine whether the

Government proved, by sufficient evidence, the second of the three requirements

of an "enterprise." This second component requires the Government to

demonstrate that the WOS had "a formal or informal organization of the

participants in which they function as a unit ('some continuity of both structure and

personality')." *Darden*, 70 F.3d at 1520; *Boyle*, 556 U.S. at 945. However,

> [a]n association-in-fact enterprise . . . need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods – by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned,

Appellate Case: 13-1894    Page: 121    Date Filed: 02/06/2014    Entry ID: 4121608

> unsophisticated, and brutal means may fall squarely
> within the statute's reach.

*United States v. Bergrin*, 650 F.3d 257, 266 (3d Cir. 2011) (citing *Boyle*, 129 S. Ct. at 2245-46). "Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis." *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir. 1987).

In the instant case, despite Appellant's acknowledgement that this Court is obligated to view the evidence in the light most favorable to the jury's verdict and affirm the denial of their motions for judgment of acquittal unless no rational trier of fact could have found them guilty beyond a reasonable doubt, they continue to flatly deny the existence of an organizational pattern and system of authority within the WOS. The Government simply invites this Court's attention to the Statement of the Case, which contains a citation to the trial record for each and every factual assertion contained therein. This Statement of the Case, in the Government's view, demonstrates quite clearly that the Government did prove the existence of a hierarchical structure in the WOS. Multiple witnesses testified that the WOS had a "chain of command," testimony which is borne out by the WOS Constitution, admitted as an exhibit at trial. (Govt. Exh. 40). The jury heard recorded evidence, directly from the Appellants' own mouths, in which the Appellants demanded that the rank-and-file members follow the chain-of

110

command, protect their "officers," and never back down from an "enemy." The very fact that there were clearly-defined officers (President, Vice President, Sergeant-at-Arms), and both regional and national leadership teams demonstrates the formal structure of the WOS.

The Government was not required to prove the existence of a formal "chain of command," let alone that every member followed that "chain of command" on every occasion. The trial record contains numerous examples of instances in which a WOS member contacted a higher ranking member *prior to* committing a crime (as in the case of the January 2, 2011 murders in Chicago and the January 29, 2011 conspiracy to commit murder in East St. Louis, IL), and other instances in which a member contacted a higher ranking member *after* a crime had been committed on behalf of the WOS (as in the case of the January 2, 2011 murders in Chicago, the January 29, 2011 conspiracy in East St. Louis, and the March 6, 2011 murder in Marion, OH). So, despite the fact that the Government was not required to prove a formal hierarchy or "chain of command," it did so and did so by sufficient evidence.

"The continuity-of-personnel element involves a closely related inquiry, in which '[t]he determinative factor is whether the associational ties of those charged with a RICO violation amount to an organizational pattern or system of authority.'" *Kragness*, 830 F.3d at 856 (internal citation omitted). However, the

111

fact that "some changes in structure and personnel occur does not mean that there is no mechanism for continuing direction of group affairs." *Id.* Where, as here, "the activities of the group exhibit a pattern of roles and a continuing system of authority; [and] the essential identity of the enterprise endure[s]," continuity of structure and personnel exists to adequately support the jury's finding as to the existence of an "enterprise." *Id.* at 857.

In the instant case, each of the Appellants was a member of the WOS during the period of time proscribed by the Indictment. While some had been members of the WOS for years, most of the Appellants joined in early 2009 and almost immediately thereafter, the crimes alleged as predicate acts began. Each Appellant maintained his membership in the WOS during the period of time encompassed by the predicate acts, as evidenced by their own admissions and by the discovery of WOS vests and other identifying paraphernalia in their possession at the time of their arrests.[47] Although several members of the WOS died during the course of the investigation (most notably, Farris) and others either left the club voluntarily (Vick) or were expelled (Pinkston), these minor changes in personnel are insignificant to the analysis, inasmuch as they had no impact on the "mechanism for continuing direction of group affairs." To the contrary, following Farris's murder, A. Hunter seamlessly ascended to the rank of Regional President and the

---

[47] WOS "colors" were seized from J. Smith, Henley, Robinson, and J. Peteet. (Govt. Exh. 6, 446P, 447, 109, respectively).

Appellate Case: 13-1894     Page: 124     Date Filed: 02/06/2014 Entry ID: 4121608

WOS moved on, seemingly barely noticing Farris's absence. His death had no impact whatsoever on the conduct of the organization's activities because the "organizational pattern or system of authority" utilized by the WOS made its leadership essentially fungible cogs. It mattered not to the organization that A. Hunter, as opposed to Farris, led the Midwest Region, because the organization functioned as a continuing unit – precisely the requirement in establishing "continuity of structure and personnel."

The evidence at trial more than sufficiently established that the WOS exhibited "continuity of structure and personnel" such that it meets the second of the three requirements of an "enterprise." Appellants' contention to the contrary is belied by the evidence, particularly when viewed, as this Court must, in the light most favorable to the verdict.

    **c. Appellants do not allege that the Government presented insufficient evidence as to the existence of 'an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity.**

Although Appellants correctly note that the Government was required at trial to prove the existence of an "an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity," (Appellants' Joint Brief, p. 35), they do not allege that the Government failed to present sufficient evidence as to this component of an "enterprise." Here, the Government conclusively demonstrated the ascertainable structure of this motorcycle club at trial. In

113

addition, the evidence demonstrated that this structure was far beyond that which was inherent in the conduct the charged criminal activity. Certainly, Appellants could have engaged in these types of violent offenses without benefit of regular meetings, bylaws, dues, or a chain-of-command with formalized officer positions. Rather, those characteristics were features of the "enterprise," and not simply of a collection of individuals. This Court should therefore conclude that the Government did, in fact, present sufficient evidence as to the "ascertainable structure" requirement.

### ii. The District Court Did Not Err In Denying Appellants' Motions For Judgment Of Acquittal Because The Government Presented Sufficient Evidence To Support The Jury's Unanimous Verdict Finding The Existence Of A "Pattern Of Racketeering Activity"[48]

Appellants next assert that the District Court erred in denying their motions for judgment of acquittal as to Count I, alleging that the Government failed to present sufficient evidence as to the existence of a "pattern of racketeering activity" as required by Title 18, United States Code, Sections 1962(c) and (d). Section 1962(c) defines the offense with which Appellants were charged with conspiring to commit. Specifically, Section 1962(c) provides,

> [I]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate in, directly or indirectly, the

---

[48] Appellants' Joint Brief, Issue I, pp. 19-28.

114

conduct of such enterprise's affairs through a pattern of
racketeering activity or collection of unlawful debt.

Its companion section, Section 1962(d), criminalizes any conspiracy to commit the

offense proscribed in Section 1962(c).  Appellants were convicted by the jury of a

Section 1962(d) racketeering conspiracy.

Title 18, United States Code, Section 1961(5) is the beginning point for any

analysis of any issue a "pattern of racketeering activity."   That section defines

"pattern of racketeering activity" thusly:

"pattern of racketeering activity" requires at least two
acts of racketeering activity, one of which occurred after
the effective date of this chapter and the last of which
occurred within ten years (excluding any period of
imprisonment) after the commission of a prior act of
racketeering activity.

18 U.S.C. §1961(5).  Appellants herein do not allege that the Government failed to

establish the requisite two acts of racketeering activity, or that one of those two

acts occurred within the period proscribed by the statute.[49]  However, the inquiry

does not end there.

The United States Supreme Court has held that "there is something to a

RICO pattern *beyond* simply the number of predicate acts involved."  *H.J. Inc. v.*

*Northwestern Bell Tel. Co.*, 492 U.S. 229, 235 (1989).  Four years prior to the

Court's decision in *H.J. Inc.,* the Court had announced in *Sedima, S.P.R.L. v. Imrex*

---

[49] Appellants Henley and J. Peteet argue individually that the Government did not
prove by sufficient evidence that they personally committed two racketeering acts.

Appellate Case: 13-1894    Page: 127    Date Filed: 02/06/2014 Entry ID: 4121608

*Co*, 473 U.S. 479 (1985), that the RICO pattern element required more than merely proving the existence of two predicate racketeering acts. Thereafter, and in reliance on *Sedima*, this Court held that multiple acts of racketeering activity could not constitute a "pattern" as contemplated by Section 1961 if each of those acts were part of a single scheme or criminal episode. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 829 F.2d 648, 650 (8th Cir. 1987), *rev'd*, 492 U.S. 229 (1989). On petition for certiorari, the Supreme Court unanimously rejected this Court's view, holding that the "multiple schemes" requirement imposed by this Court was without support in the statute or the legislative history of RICO. *H.J. Inc.*, 492 U.S. at 240-41. Instead, the Supreme Court explained, "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239. (emphasis in original).

> **a. The Government proved by sufficient evidence the occurrence of at least two acts of racketeering during the period proscribed by the statute[50]**

In establishing the existence of a "pattern of racketeering activity," the Government's first obligation is to prove the occurrence of at least two acts of racketeering activity (as defined by 18 U.S.C. §1961), one of which occurred after

---

[50] Appellant Dominic Henley Individual Brief, Issue I; Appellant's Brief (J. Peteet), Issue II.

Appellate Case: 13-1894     Page: 128     Date Filed: 02/06/2014 Entry ID: 4121608

the effective date of the statute, and the other of which occurred no more than ten years after the commission of a prior act.  18 U.S.C. §1961(5).  Henley and J. Peteet, for their part, suggest that their convictions must be reversed because each man was convicted of only one substantive offense (conspiracy to commit murder and attempt to commit murder, respectively), and that, as a result, their convictions on the racketeering conspiracy charge are fatally flawed. [51]  Both Henley and J. Peteet are in error.

A conviction for racketeering conspiracy may properly rest upon conduct that falls short of the commission of two predicate acts,  so long as one of the co-conspirators committed two or more predicate acts of racketeering, and Henley and J. Peteet knew about and agreed to facilitate the scheme.  As a preliminary matter, it is crucial to note that Henley and J. Peteet were charged with a violation of Section 1962(d) – racketeering conspiracy, as distinct from a violation of Section 1962(c) – substantive racketeering.  In *Salinas v. United States*, 522 U.S. 52, 61 (1997), the United States Supreme Court addressed the interplay between substantive RICO violations and RICO conspiracy.  Salinas, who was convicted of RICO conspiracy, appealed, arguing that "[t]here could be no conspiracy offense . . . unless he himself committed or agreed to commit the two predicate acts requisite

---

[51] Appellant Dominic Henley Individual Brief, p. 21; Appellant's Brief (J. Peteet), pp. 18-22.

Appellate Case: 13-1894     Page: 129     Date Filed: 02/06/2014 Entry ID: 4121608

for a substantive RICO offense under §1962(c)." *Id.* Recognizing a split in the

circuits as to this issue, the Supreme Court granted certiorari to resolve it.

After reciting the text of Section 1962(d), the Supreme Court noted in

*Salinas* that:

> [t]here is no requirement of some overt act or specific act
> in the statute before us, unlike the general conspiracy
> provision applicable to federal crimes, which requires
> that at least one of the conspirators have committed an
> "act to effect the object of the conspiracy." §371. The
> RICO conspiracy provision, then, is even more
> comprehensive than the general conspiracy offense in
> §371.

*Id.* at 63. The Court also cautioned that

> [t]he RICO conspiracy statute, §1962(d), broadened
> conspiracy coverage by omitting the requirement of an
> overt act; it did not, at the same time, work the radical
> change of requiring the Government to prove each
> conspirator agreed that he would be the one to commit
> two predicate acts.

*Id.* at 64. Finally, in resolving the split among circuits, the Supreme Court

explained,

> [a] conspirator must intend to further an endeavor which,
> if completed, would satisfy all of the elements of a
> substantive criminal offense, but it suffices that he adopt
> the goal of furthering or facilitating the criminal
> endeavor. He may do so in a number of ways short of
> agreeing to undertake all of the acts necessary for the
> crime's completion. One can be a conspirator by
> agreeing to facilitate only some of the acts leading to the
> substantive offense. It is elementary that a conspiracy
> may exist and be punished whether or not the substantive

118

> crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.
>
> It makes no difference that the substantive offense under §1962(c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.

*Id.* at 65. Ultimately, the Supreme Court affirmed Salinas's conviction because, although Salinas did not himself commit or agree to commit two predicate racketeering acts, "[t]he evidence showed that [a co-defendant] committed at least two acts of racketeering activity . . . and that Salinas knew about and agreed to facilitate the scheme. This is sufficient to support a conviction under §1962(d)." *Id.* at 66. As a result of the Supreme Court's holding in *Salinas*, the fact that Henley and J. Peteet were each found to have committed only one substantive offense is utterly irrelevant. There was more than sufficient evidence to demonstrate that a co-defendant committed two or more predicate acts, and that both Henley and J. Peteet knew about and intended to facilitate the scheme. Each man's conviction could – and should – stand solely on the basis of the jury's finding of guilt on the conspiracy charge.

To the extent that Henley and/or J. Peteet argue that the Government's evidence in the instant case proves "mere association" and nothing more, they are once again in error. In *United States v. Fernandez*, 526 Fed. Appx. 270 (4th Cir.

119

2013), the United States Court of Appeals examined similar circumstances in which a number of members of the MS-13 street gang were convicted of racketeering conspiracy. There, appellants argued that their racketeering convictions were based solely upon their attendance at MS-13 meetings, which, according to the appellants, "is improper evidence of 'mere association,' and, therefore, is not sufficient to establish an agreement to commit a predicate act." *Id.* at 276-77. The Fourth Circuit disagreed:

> [t]his argument fails inasmuch as the evidence established far more than mere association. As noted above, the evidence was that at these meetings, members of MS-13 would discuss their plans to commit various acts of racketeering including murder, distribution of illegal drugs, and extortion.

*Id.* at 277. In the instant case, as in *Fernandez*, the record is replete with evidence establishing that both Henley and J. Peteet had involvement in the WOS that went far beyond attendance at meetings and "mere association." Both men were, by their own admission, Chapter Presidents. As such, they acted on behalf of the organization, issued directives, and represented the WOS in its dealings with other clubs. Here, as in *Fernandez*, "the evidence established that many Appellants were leaders, as opposed to mere associates" of the WOS enterprise. *Id.* There was more than sufficient evidence to show that Henley and J. Peteet knew about and agreed to facilitate the purposes of the WOS enterprise. As a result, their convictions should be affirmed.

Appellate Case: 13-1894     Page: 132     Date Filed: 02/06/2014 Entry ID: 4121608

### b.  The relatedness requirement

After announcing the "continuity plus" requirement, the Supreme Court then

endeavored to identify and define its two component parts.   The first of these is

the "relatedness" requirement.  Relying on the definition of "pattern of criminal

conduct" contained in 18 U.S.C. §3575, the *H.J. Inc.* Court concluded that,

> [C]riminal conduct forms a pattern if it embraces
> criminal acts that have the same or similar purposes,
> results, participants, victims, or methods of commission,
> or otherwise are interrelated by distinguishing
> characteristics and are not isolated events.  We have no
> reason to suppose that Congress had in mind for RICO's
> pattern of racketeering component any more constrained
> a notion of the notion of the relationships between
> predicates that would suffice.

*H.J. Inc.*, 492 U.S. at 240.  In so doing, the Supreme Court established the standard

for demonstrating the "relatedness" of predicate acts sufficient to form a "pattern

of racketeering activity."  It is important to note that "'[p]redicate acts do not

necessarily need to be directly interrelated,' but 'they must be connected to the

affairs and operations of the criminal enterprise.'"  *United States v. Nagi*, No. 11-

1170, 2013 WL 5433464 (6th Cir., Sept. 13, 2013) at *8 (internal quotations

omitted).

As the Appellants correctly note, the concept of "relatedness" also has two

components, "horizontal relatedness" and "vertical relatedness."  "Horizontal

relatedness" requires the Government to prove that the predicate acts are related to

121

one another, whereas "vertical relatedness" imposes a similar burden upon the

Government to demonstrate the predicate acts' nexus to the enterprise. *United*

*States v. Cain*, 671 F.3d 271, 284-85 (2d Cir. 2012). "'The requirements of

horizontal relatedness can be established by linking each predicate act to the

enterprise, although the same or similar proof may also establish vertical

relatedness.'" *Id*. at 285. (internal citation omitted).

The United States Court of Appeals for the Second Circuit has carefully

illuminated the concepts of "horizontal relatedness" and "vertical relatedness." In

*United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010), that Court wrote,

> Horizontal relatedness requires that the racketeering
> predicate acts be related to each other. However, that
> relationship need not be direct; an indirect relationship
> created by the relationship of each act to the enterprise
> will suffice. *United States v. Polanco,* 145 F.3d 536, 541
> (2d Cir. 1998). ("A predicate act is related to a different
> predicate act if each predicate act is related to the
> enterprise."). Vertical relatedness means that the acts are
> related to the enterprise. It requires that the defendant
> was enabled to commit the offense solely because of his
> position in the enterprise or his involvement in or control
> over the enterprise's affairs, or because the offense
> related to the activities of the enterprise. *United States v.*
> *Daidone*, 471 F.3d 371, 375 (2d Cir. 2006). (per
> curiam). Although the government must provide
> sufficient evidence of each kind of relatedness*, "both the*
> *vertical and horizontal relationships are generally*
> *satisfied by linking each predicate act to the enterprise.*
> *This is because predicate crimes will share common*
> *goals ... and common victims ... and will draw their*
> *participants from the same pool of associates (those who*
> *are members and associates of the enterprise)*."

*Id.* at 376. (emphasis added).

In the instant case, the jury was properly instructed as to the Government's obligation to prove the "relatedness" of the predicate racketeering acts. Appellants do not contend otherwise. Using language virtually identical to the language employed by the Supreme Court in *H.J. Inc.*, the District Court instructed the jury that "the Government must prove beyond a reasonable doubt that . . . (2) the racketeering acts had the same or similar purpose, results, participants, victims, or methods of commission, or are interrelated by distinguishing characteristics and are not isolated events." (DCD 1206, p. 28). This instruction constitutes a correct statement of the law, and it is presumed that the jury followed that instruction. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

As the Government argued in its closing, the predicate acts as outlined at trial and as summarized in the Statement of the Case contained herein clearly meet the "relatedness" requirement. Certainly these acts shared a similar purpose – to assert the dominance of the WOS and to punish those who committed real or perceived transgressions against the club or its members.

On May 28, 2009, J. Peteet shot and wounded Taylor, a member of Sin City who had been invited to join the WOS but who had refused, during a dispute in which a number of other WOS members were involved. According to Taylor, J.

Peteet had expressed ill-will toward him for having refused to join the WOS along with the others who left Sin City.

On August 10, 2009, Henley and numerous other members of the WOS committed an armed robbery against two members of the STL Riders who had the misfortune to wear "colors" that the WOS had not authorized them to wear. This incident occurred shortly after Henley had attended a meeting of the "bikers' coalition" and announced that the WOS was taking over the "bike set" in St. Louis.

In a remarkably similar incident on January 2, 2011, Robinson attempted to force Ervin at gunpoint to remove his "Street Soldiers" "colors" in a dispute over whether the "Street Soldiers" had been authorized by A. Hunter to wear an Illinois "bottom rocker."

On November 1, 2009, Robinson shot and killed off-duty Corrections Officer Tatum after one of Tatum's fellow "Brothers Keepers" had been involved in a dispute with a WOS associate. Testimony at trial revealed that Farris had provided Robinson with the shotgun used in the murder, and that Farris disposed of the weapon thereafter.

Then, on March 6, 2011, the misstep of an unwitting party-goer resulted in a melee in which at least one person was brutally beaten until his eye nearly fell from its socket in an incident that ended in gunfire and the death of an unarmed man, Thornton. Each of these incidents was a deliberate and calculated effort to

124

reinforce the notion that the WOS was the dominant "outlaw club" in the cities in which they maintained an existence.

Many of the predicate acts involved the taking of the "colors" of members of rival clubs. In some instances, the results were limited to stolen property (as in the case of the August 10, 2009 robbery in St. Louis). Other times, attempts to steal property were thwarted. In one such instance, on January 2, 2011, Robinson demanded Ervin's "Street Soldier's" vest, only to learn that Ervin was armed and unwilling to relinquish his "colors." On January 29, 2011, Lee contacted A. Hunter to advise that a former WOS member had been seen wearing the "colors" of another club, which prompted A. Hunter to instruct Lee to remove the member's "colors." Lee failed to do so, inasmuch as he was preoccupied by his participation in a conspiracy to commit murder.

Just as the predicate acts in the instant case shared similar purposes and results, so too did they share common participants. Evidence at trial demonstrated that a number of the Appellants had personally participated in multiple predicate acts, including Henley, Elkins, and Robinson. J. Smith was personally aware of a number of predicate acts, and incited others with his violent rhetoric and calls to arms during WOS meetings.

Lastly, the predicate acts in the instant case certainly involved similar victims. When examined in the light most favorable to the jury's verdict, and as

125

supported by countless citations to the record in the Statement of the Case contained herein, the similarity of the victims becomes immediately evident. Victims Taylor, J. Polk, C. Polk, Ervin, and Tatum were all members of other motorcycle clubs or social organizations that identified themselves by the wearing of "colors." The record in the instant case is replete with instances in which various witnesses discussed the importance of "colors" to the motorcycle culture, and to the "rules" for the wearing of such "colors." The testimony at trial further revealed that the WOS – an "outlaw club" - had anointed themselves as the group responsible for determining which other clubs would be permitted to exist or wear "colors" or "bottom rockers" in the cities the WOS controlled. When the other clubs failed to heed the WOS's directives, property was stolen and lives were lost.

Taylor, a member of the Sin City Desciples [sic] who had been invited to leave that organization to join the WOS but who had refused, was shot after arguing with WOS members in the parking lot of Bennigan's restaurant in Gary, Indiana. J. Peteet, who was identified by multiple eyewitnesses as the shooter, was the President of the Indiana Chapter of the WOS. J. Polk and C. Polk were the founding members of the STL Riders in St. Louis. Henley demanded that they remove their STL Riders "colors" during a social event at a bar. When the Polks refused, they were again ordered to relinquish their "colors," this time at gunpoint.

Appellate Case: 13-1894     Page: 138     Date Filed: 02/06/2014 Entry ID: 4121608

Ervin, a member of the "Street Soldiers" went to a party on January 2, 2011, wearing his "colors," which included an Illinois "bottom rocker." That "bottom rocker" had been the subject of discussion between the WOS and the "Street Soldiers," but the issue had not been resolved and Ervin believed he was free to continue to wear his "colors" in Chicago. Apparently, Robinson believed otherwise, and he attempted to force Robinson to relinquish his "colors" – at gunpoint – only to learn that Ervin himself was armed, resulting in a shootout and two lost lives.

As for Thornton, he was unique in the sense that he was not a member of a club at all. Sadly, Thornton was "collateral damage" in the WOS's campaign. He was victimized by the WOS's efforts to enforce their campaign to maintain their dominance in cities in which they maintained a presence.

In *Nagi*, the Sixth Circuit was called upon to address a case in which defendant Nagi was convicted of multiple criminal charges, including substantive RICO, RICO conspiracy, and violent crime in aid of racketeering. *Nagi*, 2013 WL 5433464 at *8. Nagi and his co-defendants were members of a motorcycle club called the Highwaymen Motorcycle Club ("HMC"). *Id.* at *1. The HMC bore many similarities to the WOS.

> The Highwaymen Motorcycle Club is a multi-state organization with its national headquarters located in Detroit, Michigan. In its prime, HMC included approximately ten chapters, mostly in and around Detroit.

127

> Each chapter, with its own officers and internal
> leadership structure, operated within the hierarchy of the
> organization as a whole. Members earned their HMC
> "colors" after going through a probationary period and
> could earn lightning rods a symbol worn on the HMC
> vest by committing various types of criminal activity in
> the interest of the Club.

*Id.* In addition, like the WOS, the HMC was involved in a variety of criminal

activity, including "a history of violent acts. Many of the group's violent acts were

done to further the Club's criminal enterprise and to protect the authority and

reputation of the HMC amongst rival gangs." *Id.* Following their convictions,

Nagi and others argued, among other things, that their offenses were unrelated to

each other and to the enterprise. The Sixth Circuit summarily disagreed, writing,

"[T]he jury was well within reason to conclude that the HMC's acts of violence

were based on the group's rivalries and loyalties, as well as protecting the

reputation of the group itself." *Id.* at *8.

Similarly, in *Burden*, the Court held that "sufficient evidence exists to

support a finding that each of the four trial defendants was engaged in a pattern of

racketeering. We reach this conclusion even though the violent acts in this case are

the type of conduct that the defendants could have committed absent a connection

to the enterprise." *Burden*, 600 F.3d at 217. More particularly, the Court

concluded that "the jury could reasonably have inferred that the charged acts of

violence were related to the enterprise because they were conducted to protect the

128

Burden Organization's members and garner them respect in the drug community." *Id.* at 218-19. The Government submits that the evidence in the instant case is equally clear and that the jury reasonably concluded that the predicate acts were horizontally and vertically related to each other.

Despite Appellants' claims to the contrary, there was more than sufficient evidence from which the jury could have properly concluded that the predicate acts in the instant case were both horizontally and vertically related to each other. The similarities in purpose, results, participants, and victims clearly established that each of these predicate acts was connected to the affairs of the enterprise and, as a result, the District Court did not err in denying Appellants' motion for judgment of acquittal on the ground that the Government failed to prove beyond a reasonable doubt the existence of a "pattern of racketeering activity."

### c. The continuity requirement

Even assuming, *arguendo*, that the proven predicate acts were "related," the inquiry does not end. Closely akin to the requirement that the predicate acts be related to each other is the notion that in order to establish that the predicate acts constitute a "pattern of racketeering activity," the acts must present a threat of continued activity. *H.J. Inc.,* 492 U.S. at 239; *United States v. Hively*, 437 F.3d 752, 761 (8th Cir. 2006). "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its

Appellate Case: 13-1894    Page: 141    Date Filed: 02/06/2014 Entry ID: 4121608

nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. "Whether the predicate acts proved establish a threat of continued racketeering activity depends on the specific facts of each case." *Id.* at 242. "Continuity can be shown by related acts continuing over a period of time lasting at least one year (closed ended continuity), or by acts which by their very nature threaten repetition (open ended continuity)." *Hively*, 437 F.3d at 761.

Although the Supreme Court in *H.J. Inc.* declined to speculate or predict the quantum or quality of evidence that would theoretically suffice for purpose of compliance with the "continuity" requirement, it did offer suggestions. The Court instructed, for example, that "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* The Court then noted that "[t]he development of these concepts await future cases." *Id.* at 243.

As it happens, many of the RICO cases decided in the wake of *H.J. Inc.* do provide helpful guidance in interpreting and applying the concept of "continuity." For example, the Sixth Circuit in *Nagi, supra*, determined almost summarily that "[a]mple evidence suggests that the predicate acts can be attributed to the defendants, operating as part of a long-term association which existed for criminal purposes." *Nagi*, 2013 WL 5433464 at *8. In *United States v. Keltner*, 147 F.3d 662, 669 (8th Cir. 1998), this Court held that the Government had offered

Appellate Case: 13-1894     Page: 142     Date Filed: 02/06/2014 Entry ID: 4121608

"sufficient evidence to support the jury's finding that defendants engaged in a pattern of racketeering activity" and the jury could properly conclude that "the ten predicate acts of which the jury convicted the defendants were related" and "involved the distinct threat of long-term racketeering activity." *Id.* at 669.

Similarly, in *Hively*, this Court concluded that "[a] reasonable jury could therefore have found that a distinct threat of long-term racketeering activity remained" where defendant Hively had, for a period of five years, improperly accepted federal and state grant money in two separate schemes to receive improper funds to which he was not entitled. *Hively*, 437 F.3d at 752, 761 (internal quotations omitted). And, in *Burden*, the Court concluded that because "[t]he government established a link between the Burden Organization's narcotics activity and violence for the purpose of protecting and furthering its narcotics business, that provides sufficient proof of the threat of continuing racketeering activity." *Burden*, 600 F.3d at 219.

In the instant case, the substantive predicate acts for which the Appellants were collectively convicted encompassed a period of time ranging from May 28, 2009 to March 6, 2011. Quite obviously, this period of time is well in excess of the one year period typically associated with "closed ended continuity" as defined in *Hively* and other cases. Moreover, here, as in *Hively*, "[e]ven if the predicate acts had not extended over a period of at least one year, there was also a sufficient

Appellate Case: 13-1894    Page: 143    Date Filed: 02/06/2014 Entry ID: 4121608

threat of repetition in connection to the scheme to show open ended continuity." *Hively*, 437 F.3d at 762.

The jury in the instant case was properly instructed as to the Government's duty to prove, beyond a reasonable doubt, that the proven predicate acts "amounted to or otherwise constitute a threat of continued activity." (DCD 1206, p. 28). It is presumed that the jury gave meaning to that instruction and followed it accordingly. *Weeks*, 528 U.S. at 234. The jury's verdict finding the Appellants guilty beyond a reasonable doubt evidences their collective judgment that the proven predicate acts did, in fact, amount to or otherwise constitute a threat of continued criminal activity. This Court must honor that verdict unless "no reasonable jury could have found the defendant[s] guilty beyond a reasonable doubt." *United States v. Morales*, 445 F.3d 1081, 1084 (8th Cir. 2006). The Government respectfully submits that the evidence adduced at trial clearly and unequivocally demonstrated beyond a reasonable doubt that the proven predicate acts satisfied the "continuity plus" requirement. This Court should honor the jury's verdicts and should affirm the District Court's denial of Appellant's motion for judgment of acquittal on the issue of the "pattern of racketeering activity" element.

Appellate Case: 13-1894    Page: 144    Date Filed: 02/06/2014 Entry ID: 4121608

### iii. __The District Court Properly Denied J. Smith's Motion For Judgment of Acquittal Because the Government Presented Sufficient Evidence that J. Smith Agreed to Participate in the Affairs of an Enterprise With the Knowledge and Intent that a Co-Conspirator Would Commit at Least Two Predicate Acts in Furtherance of The Enterprise[52]__

In an argument reminiscent of the one advanced by Henley and J. Peteet, J. Smith alleges that the District Court erred in denying his motion for judgment of acquittal as to Count I (the only count with which J. Smith was charged), claiming that the Government failed to prove by sufficient evidence that J. Smith possessed the requisite knowledge and intent. According to J. Smith, his conviction must be reversed because no reasonable jury could have concluded beyond a reasonable doubt that he was aware that any member of the conspiracy would commit two predicate acts of racketeering. However, it is crucial to recall that there are two alternative ways for the Government to establish a conspiratorial agreement to violate RICO under Title 18, United States Code, Section 1961(d). *See United States v. Nguyen*, 255 F.3d 1335, 1341 (11th Cir. 2001). First, the Government can prove that the defendant personally committed two predicate acts in furtherance of the enterprise. *Id.* Alternatively, the Government can prove that the defendant agreed to participate in an enterprise "with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance

---

[52] Individual Brief of Appellant James C. Smith, Issue I.

Appellate Case: 13-1894     Page: 145     Date Filed: 02/06/2014 Entry ID: 4121608

of the enterprise." *Id. See also Salinas*, 522 U.S. at 61 (holding that the government need not prove that the defendant "himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under §1962(c)"); *United States v. Abbell*, 413 F.3d 1286, 1299 (11th Cir. 2001) ("If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts."). This second method of establishing a conspiratorial agreement is commonly referred to as the "*Salinas* alternative." *See Salinas*, 522 U.S. at 61.

Under the "*Salinas* alternative," "[t]he focus is on the agreement to participate in the affairs of the enterprise through the pattern of racketeering activity, not on the agreement to commit the individual predicate acts." *United States v. Starrett*, 55 F.3d 1525, 1543-44 (11th Cir. 1995). The Government can prove such an agreement with "circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Id.* (quoting *United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991)).

It is important to note that J. Smith was not charged with conspiring to commit any *specific* predicate acts. Therefore, the Government was not obligated to prove that J. Smith had advance knowledge of any *specific* predicate act, nor that he agreed to the commission of any *specific* predicate act. Rather, the

Appellate Case: 13-1894     Page: 146     Date Filed: 02/06/2014 Entry ID: 4121608

Government was only required to prove that J. Smith agreed to the overall objective of the conspiracy, and that he must have known that others were conspiring with him through a pattern of racketeering activity. *See Salinas*, 522 U.S. at 61. This distinction is crucial.

The Government has never suggested that J. Smith personally committed two predicate acts of racketeering activity. However, while J. Smith may not have committed two such predicate acts himself, there is abundant evidence proving that he knew other conspirators were carrying out the violent objectives of the enterprise. Evidence at trial proved beyond a reasonable doubt that not only was J. Smith the national Vice President of the WOS, he presided over numerous national meetings at which dozens, if not hundreds, of other members were in attendance. (Tr. Vol. IX, p. 215; Govt. Exh. 219). During trial, the jury heard the testimony of former members of the WOS, who testified that J. Smith was advised of numerous acts of violence committed by members of that organization. For example, A. Hunter testified that he personally advised J. Smith of multiple such acts. A. Hunter further testified that J. Smith never expressed concern or outrage over such acts when notified that they had occurred. J. Smith did not so much as question A. Hunter about these acts of violence, let alone take any corrective action. A. Hunter testified that no member of the WOS had ever been expelled from the organization for committing an act of violence, nor did J. Smith ever report any of these acts to

135

any law enforcement agency. (Tr. Vol. XVIII, *Passim*).  As the national Vice President of an organization predicated on violence, and remaining in that role as multiple violent acts were being committed, J. Smith undoubtedly knew that "other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise." *Nguyen*, 255 F.3d at 1341.

As if the testimony of A. Hunter were not enough to establish a conspiratorial agreement to violate RICO, further evidence established that J. Smith gave at least tacit approval to specific acts of violence. Indeed, A. Hunter testified that after the January 2, 2011 shooting in which his own brother was shot at the Hawks' clubhouse, he called J. Smith and insinuated that he was going to retaliate against the shooters. (Tr. Vol. XVIII, p. 108-10). From this evidence, the jury could certainly have concluded that J. Smith was aware that A. Hunter was planning to commit retaliatory acts of violence. The fact that A. Hunter testified that he had no intention of actually attempting to murder anyone is of no import whatsoever. The simple fact remains that the jury could have properly inferred that J. Smith had acquiesced or agreed to the commission of acts of violence on the part of his co-conspirators.

Shortly after the January 2, 2011 shooting, J. Smith acquiesced to further violence in the name of his enterprise. Presiding over a National meeting of the WOS in Philadelphia, J. Smith discussed other clubs with whom the WOS were

Appellate Case: 13-1894      Page: 148      Date Filed: 02/06/2014 Entry ID: 4121608

feuding. As the meeting wound to a close, members of the "Mother chapter" provided weapons, including a shotgun and an AK-47 assault rifle, to A. Hunter and the Westside Chicago chapter. According to A. Hunter, these guns were provided for the purpose of retaliating against the Street Soldiers, who were believed to be responsible for the January 2, 2011 shooting. (Tr. Vol. XVIII, p. 138-42). Although there was no direct evidence that J. Smith personally provided those weapons, the jury could properly have inferred based upon his position in the organization that he had authorized others to do so.

The Government also presented evidence at trial that several members of the WOS engaged in a conspiracy to commit murder on January 29, 2011. The jury found Henley, Elkins, and Fry guilty beyond a reasonable doubt of Violent Crime in Aid of Racketeering—Conspiracy to Commit Murder for their conduct in connection with that incident. Although J. Smith was not charged with the substantive VCAR offense, evidence at trial established that he was advised of the plan after it had been aborted. Following this conspiracy to commit murder, A. Hunter testified that he told J. Smith that he was going to continue to explore opportunities for similar acts of violence. A. Hunter testified that J. Smith made no attempt to dissuade him from taking similar action in the future. Taken in the light most favorable to the jury's verdict, the jury could well have concluded from this

137

evidence that J. Smith was aware that A. Hunter intended to plan and commit further acts of violence.

Based on J. Smith's agreement to lead an organization predicated on violence and his approval of specific acts of violence, the Government presented more than sufficient evidence to prove the conspiratorial agreement element of Title 18, United States Code, Section 1961(d).

Arguing that the district court improperly dismissed his Motion for Acquittal, J. Smith relies on a civil case out of the District Court of Maryland that is nearly forty years old. *See In re American Honda Motor Co., Inc. Dealerships Relations Litigation Flynn Motors, Inc. et al. v. American Honda Motor Co, Inc., et al.*, 965 F. Supp. 716 (D. Md. 1977). Even ignoring that *American Honda* holds no precedential weight, this case is clearly distinguishable from the case at bar. In *American Honda*, the plaintiffs "made no allegations . . . that [the defendant] agreed that the other defendants would engage in RICO violations," and the court held that no agreement could be inferred because "the predicate acts had been completed before" the defendant entered the conspiracy. *Id.* But these facts are wholly distinct from the facts in this case. The Government here presented evidence that J. Smith entered the WOS enterprise before the predicate acts had been completed, and that he acquiesced to violence during his leadership of the enterprise. Based on these facts, the jury was presented with more than enough

Appellate Case: 13-1894    Page: 150    Date Filed: 02/06/2014 Entry ID: 4121608

evidence to find that J. Smith entered into a conspiratorial agreement to violate RICO under Title 18, United States Code, Section 1961(d). His conviction as to Count I should therefore be affirmed.

### iv. Sufficient Evidence Supports Henley's, Elkins', and Fry's Convictions As To Count XIII[53]

Appellant Henley argues that the District Court erred in denying his motion for judgment of acquittal – made after the jury returned its guilty – as to Count XIII. Similarly, Elkins and Fry assert that their convictions as to Count XIII must be reversed, arguing that the convictions are supported by insufficient evidence.

> For purposes of this appeal, [this Court] discern[s] no meaningful distinction between the *de novo* standard used to review the sufficiency of the evidence to support a guilty verdict and the *de novo* standard used to review the district court's ruling on a defendant's motion for judgment of acquittal. In both inquiries, we review the same evidence, view the evidence in the light most favorable to the Government, and ask the same legal question: whether the evidence is sufficient to permit a reasonable jury to conclude that the defendant is guilty beyond a reasonable doubt. *Compare United States v. Hilliard,* 490 F.3d 635, 640 (8th Cir. 2007) (judgment of acquittal), with *United States v. Piwowar,* 492 F.3d 953, 955 (8th Cir. 2007) (sufficiency of the evidence).

*United States v. Reddest*, 512 F.3d 1067, 1070 (8th Cir. 2008).

Henley (and only Henley) alleges that the District Court erred in denying his motion for judgment of acquittal, suggesting that "the only evidence proffered that

---

[53] Brief of Appellants Fry and Elkins, Issue I; Appellant Dominic Henley Individual Brief, Issue I.

139

supports a finding of guilty was the unreasonable and incredible testimony of Walter Lee." (Appellant Dominic Henley Individual Brief, p. 19). However, here, as in the District Court, Henley neglects to acknowledge that this Court has consistently cautioned, "[a] district court has very limited latitude in ruling upon a motion for judgment of acquittal." *United States v. Baker*, 367 F.3d 790, 797 (8th Cir. 2004). Moreover, "[i]n exercising this limited latitude, it 'cannot weigh the evidence or assess the credibility of witnesses.'" *United States v. Allery*, 139 F.3d 609, 610-11 (8th Cir. 1998) (internal citations omitted). *See also, United States v. Yockel*, 320 F.3d 818, 824 (8th Cir. 2003) ("'In ruling on a motion for judgment of acquittal, the role of the district court is not to weigh evidence or consider the credibility of witnesses, but rather to determine whether the government has presented evidence on each element sufficient to support a jury verdict.'") (internal citation omitted); *United States v. Johnson*, 474 F.3d 1044, 1048 (8th Cir. 2007) ("A district court must consider a motion for judgment of acquittal with 'very limited latitude' and must neither assess the witnesses' credibility or weigh the evidence.")(Internal citation omitted in original). This Court has further instructed that "'[w]itness testimony ... does not need to be corroborated.'" *Perez*, 663 F.3d at 391. (internal citation omitted).

For his part, Fry similarly alleges that the "entirety of the Government's case in Count XIII rested on mere presence at a popular M/C celebration, and the



Appellate Case: 13-1894 Page: 152 Date Filed: 02/06/2014 Entry ID: 4121608

vacillating commentary of Walter Lee." (Brief of Appellants Fry and Elkins, p. 32). Elkins acknowledges that the Government admitted evidence against him by way of Title III wiretap calls, although he characterizes those calls as "indistinct" and claims that they "could not be substantiated by any credible evidence." (Brief of Appellants Fry and Elkins, p. 36). However, both Fry and Elkins virtually ignore the testimony of A. Hunter, who testified that he and Elkins had discussed the Black New Year's party, and Elkins' plan with regard to Outcast, while A. Hunter and Elkins partied in Chicago on January 28, 2011. More specifically, A. Hunter testified that Elkins had informed him of the Black New Year's party; that Outcast would be there; and that Elkins was sending "Diamond" and "Bo" [Fry] from Denver to "take care of business." (Tr. Vol. XVIII, pp. 157-58). According to A. Hunter, Elkins' plan to "take care of business" meant that "Diamond and Bo" were supposed to shoot members of Outcast "on sight." In making the explanation to A. Hunter, Elkins demonstrated his involvement in the "war" between Outcast and the WOS. (Tr. Vol. XVIII, p. 158).

Time and time again, this Court has reiterated that "[q]uestions of credibility are the province of the jury." *United States v. Chavez*, 230 F.3d 1089, 1091 (8th Cir. 2000). In considering a motion for judgment of acquittal, a "district court ha[s] neither the duty or the authority to grant [defendant's] motion based on witness credibility." *Id.* "The jury is responsible for assessing the credibility of

141

witnesses and resolving conflicts in testimony, and its conclusions on these issues are virtually unreviewable on appeal." *United States v. Jackson*, 610 F.3d 1038, 1042 (8th Cir. 2010) (internal quotations omitted).

Henley's argument on appeal, as it was in the District Court, is insufficient virtually on its face. Elkins' and Fry's arguments suffer from the same fatal disability. Henley concedes that Lee testified that Henley told him about the murder plot upon Henley's arrival at the event ("Black New Years"). Indeed, Lee did so testify. (Tr. Vol. XVI, p. 122). Defendant Henley further acknowledges that Lee testified that after the party, "Henley begged for a gun so that he could 'carry out the mission.'" Once again, Lee did so testify. (Tr. Vol. XVI, p. 132). Similarly, Elkins and Fry reluctantly concede that Lee testified about the planned shootings at the Black New Year's party, specifically testifying that Elkins orchestrated the plan and Fry stood ready to execute it.[54] This Court is obliged to

---

[54]Fry asserts that he "attended the Black New Year's party unarmed on January 29, 2011." (Brief of Appellants Fry and Elkins, p. 34). In so doing, he cites to Trial Transcript Volume XVIII at page 294. However, a review of that page of the record reveals that it is utterly silent as to whether or not Fry was armed that evening. Indeed, the only evidence as to that issue came from Lee, who testified that after Fry had texted him that Outcast members were leaving the party, Fry and "Diamond" went to a truck in the parking lot and retrieved guns. (Tr. Vol. XVI, p. 132-133). To state the obvious, Fry did not testify at trial. Therefore, the only evidence presented to the jury as to whether or not Fry was armed came in the form of Lee's testimony. Fry's self-serving claim that he was "unarmed" is wholly unsupported by the record.

Appellate Case: 13-1894    Page: 154    Date Filed: 02/06/2014 Entry ID: 4121608

accept the testimony of co-defendant Walter Lee without passing upon its credibility. *Allery*, 139 F.3d at 610-11; *Jackson*, 610 F.3d at 1042.

To the extent that Henley, Elkins, and Fry argue that Lee's testimony was inherently implausible because it conflicted with other evidence, the jury was well aware of any inconsistencies at the time it reached its verdict. Moreover, although Henley suggests that, based upon the testimony of A. Hunter and the recordings played at trial, Lee must have been untruthful when he testified that he was aware of the plot to kill members of Outcast, Henley fails to frame the evidence in the light most favorable to the jury's verdict. For example, Henley neglects to acknowledge that mere days before the January 29, 2011 incident, he spoke with A. Hunter by telephone in a conversation in which Henley expressed his hatred of Outcast. (FN 38, *supra).* Moreover, Henley fails to acknowledge that, while A. Hunter testified that he had not told Henley any specifics of the January 29, 2011 plan, Henley also spoke to Elkins by phone that same night, in an unrecorded conversation to which only Henley and Elkins were presumably parties. A. Hunter had texted Henley a telephone number for Elkins during the course of that evening.

Both the jury and the District Court were entitled to infer from that evidence that Henley had learned specifics of the plan from Elkins. When viewed in light of this additional evidence, which Henley ignores, Lee's testimony that Henley was aware of the plot was entirely reasonable, consistent, and credible. This Court

143

should not disturb the jury's verdict and should conclude that the District Court did

not err when it denied Henley's motion for judgment of acquittal as to Count

XIII.[55]

<hr />

[55] To one extent or another, Henley, Fry, and Elkins all suggest that in connection with Count XIII, the Government failed to present sufficient evidence as to the commission of an "overt act" in furtherance of the Conspiracy to Commit Murder. For his part, Henley makes this assertion only in the heading of Issue II in his Individual Brief. However, Henley makes no further reference to the "overt act" requirement. He makes no argument whatsoever in relation to that element of the offense. To characterize Henley's treatment of this issue is undeveloped at best. For their part, Fry and Elkins frame their argument in the form of a rhetorical question, with Fry urging that "the Government failed to present evidence of an integral part of its conspiracy theory as it related to Fry – when did he join the conspiracy, and what overt act did he engage in?" (Brief of Appellants Fry and Elkins, p. 34). Elkins' argument is phrased in virtually identical language. (Brief of Appellants Fry and Elkins, p. 36).

     Without conceding the validity of any argument related to the "overt act" requirement, the Government first notes that it was not required to prove either half of Fry's rhetorical question. The Government was not required to prove *when* Fry or Elkins joined the conspiracy – merely that they joined it at some time while it was still in effect. Secondly, the Government was not required to prove that the "overt act" was committed by any specific individual. "A conspiracy is committed when two or more persons conspire to commit any offense against the laws of the United States, and only requires that one or more of the co-conspirators commit an overt act to further the purposes of the conspiracy." *United States v. Mohamed*, 600 F.3d 1000, 1007 (8th Cir. 2010). The Government is not obligated to prove that the overt act was committed by the specific defendant charged. Rather, "[t]he requisite overt act is satisfied by a single overt act committed by one coconspirator." *Id.* It matters not whether the "overt act" in the instant case was committed by Fry or Elkins, or any of the other co-conspirators, so long as one of the conspirators committed such an act. The evidence was clear that Fry and "Diamond" had driven from Denver, Colorado to East St. Louis, Illinois to carry out the "mission" to kill members of Outcast. They then went to the location at which they knew their targets would be present. Fry, "Diamond," and Lee entered the party venue and identified their targets. When the targets left the party, Fry and "Diamond" retrieved guns from a nearby vehicle to carry out the plan. During the

<div align="center">144</div>

Unsurprisingly, Henley, Elkins, and Fry fail to recite or analyze any of the Title III wiretap calls corroborating Lee's testimony. Of course, the jury was entitled to convict all three men based solely on Lee's testimony, even if it were uncorroborated. *Perez*, 663 F.3d at 391. *See also United States v. Jefferson*, 725 F.3d 829, 834 (8th Cir. 2013) ("We have repeatedly upheld jury verdicts based solely on the testimony of co-conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony.") However, when *all* the evidence, including the many wiretap calls, is viewed in the light most favorable to the jury's verdicts, resolving any credibility issues in favor of the verdict, and accepting all reasonable inferences that support the verdict, this Court must conclude that the evidence was more than sufficient to support the jury's verdicts of guilty as to Henley, Elkins, and Fry as to Count XIII. To do otherwise would be to impermissibly usurp the role of the jury as factfinder and arbiter of witness credibility.

---

entire course of the evening, various co-conspirators were discussing the plans by phone. Any one of these occurrences qualifies as an "overt act." *See United States v. Crippen*, 627 F.3d 1056, 1065 (8th Cir. 2010) ("telephone conversations 'in which plans and arrangements are made in furtherance of the conspiracy are overt acts'") (internal citation omitted); *see also United States v. Mason*, 479 Fed. Appx. 397, 399 (2d Cir. 2012) (telephone call in to victim of wire fraud scheme constituted an "overt act" in furtherance of scheme).

145

**v.** **The District Court Did Not Err In Denying Robinson's Motion For Judgment Of Acquittal As To Counts X And XI Because The Government Presented Sufficient Evidence That Robinson Committed Felony Murder And Attempt To Commit Murder**[56]

Appellant Robinson (and only Robinson) alleges that the District Court erred in denying his motions for judgment of acquittal as to Count X and Count XI of the Superseding Indictment, claiming that the Government failed to present sufficient evidence that Robinson was attempting to rob Ervin on January 2, 2011 during their confrontation at the Hawks' clubhouse in Chicago. Although Robinson acknowledges that in assessing this issue on appeal, this Court must view the evidence in the light most favorable to the Government, virtually his entire argument is premised upon one comment made by Ervin during his testimony on cross-examination. Specifically, Robinson contends that because Ervin testified that he had not heard that anyone was going to take his Street Soldiers vest from him, the Government failed to prove the requisite elements of armed robbery. (Individual Brief of Defendant-Appellant Anthony Robinson, p. 7). Robinson is in error.

As a preliminary matter, Robinson was charged with what is commonly referred to as "felony murder." More specifically, the Superseding Indictment charged in Count X that:

---

[56] Individual Brief of Defendant-Appellant Anthony Robinson, Issue I.

146

Appellate Case: 13-1894     Page: 158     Date Filed: 02/06/2014 Entry ID: 4121608

On or about January 2, 2011, in the Northern District of Illinois, the Defendants,

**ANTHONY ROBINSON, a/k/a "Blade," and
CURTIS COLE, a/k/a "Tomahawk,"**

for the purpose of maintaining and increasing position in "WOS," an enterprise engaged in racketeering activity, did kill an individual whose identity is known to the Grand Jury, without lawful justification, when, in performing the acts which caused the death, defendants were attempting and committing a forcible felony other than second degree murder, in violation of Chapter 720, Act 4, Section 9-1(a)(3) of the Illinois Compiled Statutes, as amended,

All in violation of Title 18, United States Code, Section 1959(a)(1).

(DCD 745, pp. 32-33). In connection with that offense, the jury was properly

instructed, in pertinent part, that:

The crime of felony murder in violation of Illinois law, in aid of racketeering activity, as charged in Count Ten of the indictment against defendant Anthony Robinson, has three elements, which are:

*One*, on or about January 2, 2011, in Illinois, defendant Anthony Robinson killed another person;

*Two*, in performing the acts which caused the death, the defendant was committing another forcible felony, namely attempted robbery; and

*Three*, the defendant did so for the purpose of maintaining or increasing his position in an enterprise engaged in racketeering activity.

147

The crime of attempted armed robbery has two elements, which are:

*One*, the defendant attempted to take property from the person or presence of another by the use of force or by threatening the imminent use of force; and

*Two*, the defendant carried on or about his person, or was otherwise armed with, a firearm.

(DCD 1206, p. 50). Robinson did not object to this instruction at trial, and does not do so now. (Tr. Vol. XXIII, pp. 74-76).

Despite Robinson's characterization of the evidence at trial, there was more than sufficient evidence from which the jury could have concluded beyond a reasonable doubt that Robinson and others were attempting to rob Ervin of his Street Soldiers vest and/or Illinois "bottom rocker" on January 2, 2011. Both Ervin and Davis testified at trial that a group of WOS members approached Ervin at the bar in the Hawks' clubhouse, demanding Ervin's Street Soldiers "colors." (Tr. Vol. XII, p. 78; Tr. Vol. XIII, p. 144). Davis saw that one of these WOS members was armed with a knife, while Ervin positively identified Robinson as the man who approached him with a gun drawn, demanding his vest. (Tr. Vol. XII, p. 144). For her part, witness Tonya Mayes (hereinafter, "Mayes") largely corroborated this account. She testified that she attended the party at the Hawks' clubhouse, and that during the party, she overheard an argument about a "rocker." (Tr. Vol. XII, p. 152). When she looked toward the argument, Mayes saw "about

148

four or five" people surrounding a man sitting at the bar. (Tr. Vol. XII, p. 153). According to Mayes, "a few" in this group were wearing WOS vests. (Tr. Vol. XII, p. 153). Mayes described the WOS members as "going back and forth" with the man seated at the bar, specifically testifying that there was discussion between them about a "rocker." (Tr. Vol. XII, p. 154). As Mayes watched, Suddoth attempted to intervene, telling the WOS to "take it outside." (Tr. Vol. XII, p. 154). However, the WOS did not leave. (Tr. Vol. XII, p. 155). Thereafter, Mayes saw the man seated at the bar pull out a gun, which prompted her to run. (Tr. Vol. XII, p. 155). As she ran, she heard gunfire. (Tr. Vol. XII, p. 156). Mayes did not see who was shooting, although she heard the sound of two different guns being fired. (Tr. Vol. XII, p. 156, 164).

Witness Andrea Smith (hereinafter, "A. Smith") also attended the party at the Hawks' clubhouse on January 2, 2011. (Tr. Vol. XII, p. 165). She also observed an altercation there. (Tr. Vol. XII, p. 168). A. Smith testified that she was seated at the bar, and saw one individual nearby who was approached by several other individuals. (Tr. Vol. XII, pp. 167-68). She later observed that the group who approached the individual were wearing WOS insignias. (Tr. Vol. XII, pp. 168-69). After the WOS approached the individual, A. Smith heard "loud talking," which she characterized as "an argument," although she could not hear the specific words being said. (Tr. Vol. XII, pp. 169-70). During this argument,

149

Hawks member "Wild Child" attempted to intervene, as did Suddoth. (Tr. Vol. XII, pp. 170-71). After Suddoth walked away, the argument "got worse." (Tr. Vol. XII, p. 172). According to A. Smith, the WOS "surrounded" the man at the bar, and "that's when he got up with the gun." (Tr. Vol. XII, p. 172). A. Smith's testimony was absolutely clear that "when [the WOS] surrounded him," the "guy who was sitting at the bar" "jumped out [sic] the seat and brought out a weapon." (Tr. Vol. XII, p. 172). He "pulled it out and pointed it." At that time, A. Smith was looking at the man at the bar, and not at the WOS members. (Tr. Vol. XII, p. 176). She "started to run." (Tr. Vol. XII, pp. 172-73). As she did, she heard gunshots, and not all the gunshots sounded the same. (Tr. Vol. XII, p. 173). A. Smith heard at least two different kinds of gunshot sounds. (Tr. Vol. XII, p. 173).

When viewed in the light most favorable to the jury's verdict, and affording all reasonable inferences to which it is entitled, it seems patently clear that, despite Robinson's argument to the contrary, neither Mayes' nor A. Smiths' testimony undermines confidence in the jury's verdict. Rather, both Mayes and A. Smith corroborated the testimony of Davis and Ervin to a large extent. Mayes' testimony is particularly noteworthy, given that she specifically recalled having overheard an argument about a "rocker," which is precisely the item that had inflamed Robinson's anger.

150

Robinson is correct in noting that a jury's verdict should be disturbed "only if no reasonable jury could have found the accused guilty beyond a reasonable doubt." *United States v. Moe*, 536 F.3d 825, 833 (8th Cir. 2008). Further, appellate review of witness credibility is prohibited absent extraordinary circumstances. "The test for rejecting evidence as incredible is extraordinarily stringent and is often said to bar reliance only on testimony asserting facts that are physically impossible." *United States v. Crenshaw*, 359 F.3d 977, 988 (8th Cir. 2004), citing *United States v. Hernandez*, 13 F.3d 248, 252-53 (7th Cir. 1994).

Robinson wholly fails to demonstrate that the testimony of Ervin and Davis falls into this narrow category of testimony contemplated by *Crenshaw*. Contrary to his assertion, the testimony of Mayes and A. Smith did not assert facts that were physically impossible, nor did their testimony materially contradict that of Ervin and Davis. To be sure, Mayes and A. Smith did not give testimony identical to the testimony of Davis and Ervin. Such a result is to be expected given the circumstances in which they found themselves. Both Mayes and A. Smith testified that they saw Ervin pull a gun *after* he was confronted by various members of the WOS, with whom Ervin was arguing over his Street Soldiers vest and/or his Illinois "rocker." This testimony does not contradict the testimony of Ervin or Davis. To the contrary, it corroborates the fact that Robinson and others were attempting to rob Ervin. That neither Mayes not A. Smith saw anyone else with a

151

weapon is not surprising given the life-threatening events unfolding on that evening. A. Smith testified that she was looking at Ervin, and not at the WOS members, at the time of confrontation at the bar. Both women testified that when they saw Ervin's gun, they fled and were not watching when the gunshots were fired. Insofar as there were any inconsistencies in the testimony, those inconsistencies were "on collateral matters," or were otherwise "amenable to explanation," and perhaps most importantly, "they were exposed to the jury." *Id.* at 991. Furthermore, even if the jury believed Ervin's testimony to be given in exchange for consideration in his pending State case, such testimony "is not rendered insubstantial because of the witness's self-interest."[57] *Id.* at 988.

The jury's guilty verdicts as to Counts X and XI were supported by sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that Robinson was engaged in the commission of an attempted robbery on January 2, 2011 and that in the course of that robbery, Glass was fatally

---

[57] To the extent that Robinson suggests some impropriety or sinister wrongdoing on the part of the Government in seeking the Superseding Indictment, his argument is as baseless as it is bizarre. It seems that Robinson would have this Court assume that the Government must have engaged in misconduct, because it changed the manner in which Count X was charged in the Superseding Indictment. (Individual Brief of Defendant-Appellant Anthony Robinson, pp. 11-13). He offers no support for this proposition, and there is none. To be clear, the Government interviewed Ervin on March 15, 2012 (Tr. Vol. XXI, p. 226). The Superseding Indictment was returned on June 21, 2012. That the Government amended the charge in Count X was the result of the additional evidence provided by Ervin (as corroborated by Davis, Mayes, and A. Smith) and nothing more. Robinson's allegations to the contrary are frivolous.

wounded.  Similarly, the jury could reasonably have concluded beyond a reasonable doubt that during the course of that incident, Robinson attempted to kill Ervin.  Therefore, the District Court did not err in denying Robinson's motions for judgment of acquittal as to those counts, and this Court should affirm.

**vi.**      **The District Court Did Not Err In Denying Robinson's Motion For Judgment Of Acquittal As To Count XIV, Because The Government Proved By Sufficient Evidence And Beyond A Reasonable Doubt That Robinson Was Not Acting In Self-Defense Or Defense Of A Third Party[58]**

Robinson (and only Robinson) alleges that the District Court erred in denying his motion for judgment of acquittal as to Count XIV, Violent Crime in Aid of Racketeering – Murder, for an offense committed on March 6, 2011 in Marion, Ohio.  In connection with that offense, the Government bore the burden to prove beyond a reasonable doubt that he was *not* acting in self-defense when he killed Thornton by shooting him in the back.  *United States v. Stymiest*, 581 F.3d 759, 766 (8th Cir. 2009).  Robinson contends that the Government failed to disprove his self-defense claim beyond a reasonable doubt, despite the fact that the jury was properly instructed as to the availability of self-defense and its impact upon a potential verdict.

Jury Instruction 44, read to the jury prior to its deliberations, informed the jury that,

---

[58] Individual Brief of Defendant-Appellant Anthony Robinson, Issue III.

Appellate Case: 13-1894    Page: 165    Date Filed: 02/06/2014    Entry ID: 4121608

One of the issues as to Counts Fourteen and Fifteen in this case is whether the use of force by Anthony Robinson on March 6, 2011 was lawful.

If a person reasonably believes that force is necessary to protect himself and/or another person from what he reasonably believes to be unlawful physical harm about to be inflicted by another and uses such force, then he acted in self-defense or defense of another.

However, self-defense or defense of another which involves using force likely to cause death or great bodily harm is justified only if the person reasonably believes that such force is necessary to protect himself and/or the third person from what he reasonably believes to be a substantial risk of death or great bodily harm.

This instruction was given over the Government's objection. (Tr. Vol. XXIII, pp. 83-89). In overruling the Government's objection, the District Court noted, "the jury could conclude there is no self-defense, there is no doubt about that, the jury could conclude that." (Tr. Vol. XXIII, p. 87). Indeed, the jury did so conclude.

The crux of his argument that the Government failed to disprove beyond a reasonable doubt that he acted in self-defense on March 6, 2011 stems from Robinson's assertion that "the testimony was likewise unequivocal that Anthony did not fire a weapon until one of the individuals firing into the club house pointed a weapon at WOS member "Cueball's" chest. Robinson then fired in the direction of the doorway shooters in order to protect himself and Cueball." (Individual Brief of Defendant-Appellant Anthony Robinson, p. 22). However, this interpretation of

154

the facts as they were presented at trial "would require [this Court] to give *him* the benefit of all reasonable inferences that may be drawn from the evidence.  This [it] clearly cannot do."  *United States v. Bolzer*, 367 F.3d 1032, 1036 (8th Cir. 2004) (emphasis in original).

Despite Robinson's representation to the contrary, not a single witness testified that Robinson fired gunshots in response to being shot at, or to seeing anyone point a gun at anyone else.  The only evidence in support of Robinson's self-defense claim was a hearsay statement – admitted over the Government's objection – in which co-conspirator Thomas Bailey, a/k/a "Q Ball" allegedly told A. Hunter that someone had pointed a gun at his chest.  A. Hunter testified that after the shooting in the WOS clubhouse in Marion, a group of members congregated in a nearby hotel.  (Tr. Vol. XXI, p. 217).  Among those members present was "Q Ball."[59]  After reiterating that he had not actually seen the shooting, A. Hunter was permitted to testify that Q Ball claimed that a "guy came through the front door and pointed a gun at him, and then pointed a gun at his chest."  (Tr. Vol. XXI, p. 218).  Further, A. Hunter was permitted to testify that Q Ball then "said Blade shot him."  (Tr. Vol. XXI, p. 218).  Crucially, A. Hunter testified that he "did not personally see anyone point a gun at Cue Ball [sic] that night."  (Tr. Vol. XXI, p. 222).  The *only* evidence presented to the jury with regard to any

---

[59] Trial transcripts refer to this member as "Cue Ball."  However, in the Indictment, he was listed as "Q Ball."

Appellate Case: 13-1894     Page: 167     Date Filed: 02/06/2014 Entry ID: 4121608

person pointing a gun at Q Ball came in the form of Q Ball's hearsay statement, made during a meeting of co-conspirators in which they were making preparations to conceal evidence of the crime in which they had just been involved.[60] The jury was free to consider the hearsay nature of Q Ball's alleged statement, its self-serving nature, the circumstances under which it was made, and all of the other evidence presented before determining whether Robinson acted in self-defense or defense of a third party. Moreover, the jury was entitled to consider the totality of the evidence against Robinson, including the evidence that in the immediate aftermath of the shooting in Marion, Robinson hid the gun behind a church only to retrieve it later, wipe it clean of fingerprints, and then participate in throwing it into a storm drain. *See Bolzer*, 367 F.3d at 1037 (jury could infer that defendant had wiped fingerprints from gun in order to conceal his guilt).

---

[60] Robinson also urges the Court to reverse his conviction based upon the testimony of M. Hunter, who told the Grand Jury that during the incident in Marion, he saw "about three" people in the vestibule of the clubhouse, and that they were "shooting." However, there was no testimony elicited as to *when* M. Hunter saw those individuals shooting. (Tr. Vol. XVI, p. 209). It is entirely possible that someone returned fire from that vestibule *after* Robinson had mortally wounded Thornton, who was unarmed and shot in the back. Any suggestion to the contrary would amount to an improper inference to benefit Robinson. In addition, it is interesting to note that M. Hunter did not testify to seeing anyone point a gun at Q Ball, despite the fact that M. Hunter was standing "just about arm's length" away from Robinson at the time Robinson was shooting out the clubhouse door. (Tr. Vol. XVI, p. 75). The jury was entitled to consider the absence of such testimony in reaching its verdict.

The province of the jury extends to determining whether a defendant acted in self-defense. *See, United States v. Lester*, 283 Fed. Appx. 421, 423 (8th Cir. 2008). In reviewing the jury's verdict in that regard, this Court does

> not weigh the evidence or assess the credibility of witnesses. Instead, the jury has sole responsibility for resolving conflicts or contradictions in testimony, and [this Court] must resolve credibility issues in favor of the verdict.

*Id.* at 423. (internal citations and quotations omitted).

When viewed in the light most favorable to the Government and the jury's verdict, and granting all reasonable inferences that could be derived therefrom, as indeed this Court must do, it seems clear that the District Court did not err in denying Robinson's motion for judgment of acquittal as to Count XIV, inasmuch as the Government proved by sufficient evidence and beyond a reasonable doubt that Robinson was not acting in self-defense or defense of a third party when he shot the unarmed Thornton in the back, killing him. This Court should affirm Robinson's conviction as to Count XIV, Violent Crime in Aid of Racketeering – Attempt to Commit Murder.

157

**vii.** **<u>The District Court Did Not Err In Denying Robinson's Motions For Judgment Of Acquittal As To Counts X, XI, And XIV Because The Government Proved By Sufficient Evidence That Robinson Committed Those Offenses In Aid Of Racketeering Activity</u>[61]**

Robinson alleges on appeal that the District Court erred in denying his motion for judgment of acquittal as to three Violent Crime in Aid of Racketeering (VCAR) counts, namely, Counts X, XI, and XIV. These counts charged Robinson with Violent Crime in Aid of Racketeering – Murder; Violent Crime in Aid of Racketeering - Attempt to Commit Murder; and Violent Crime in Aid of Racketeering – Murder, respectively. These counts arose from offenses committed on January 2, 2011 (Counts X and XI) and March 6, 2011.

Title 18, United States Code, Section 1959(a) provides, in pertinent part, that:

> [w]hoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, *or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise* engaged in racketeering activity, murders, kidnaps, maims, assaults with a deadly weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States is guilty of Violent Crime in Aid of Racketeering Activity.

---

[61] Individual Brief of Defendant-Appellant Anthony Robinson, Issue IV.

Appellate Case: 13-1894     Page: 170     Date Filed: 02/06/2014 Entry ID: 4121608

18 U.S.C. §1959(a)(emphasis added). Robinson alleges that his convictions as to Counts X, XI, and XIV must be reversed because the Government failed to prove by sufficient evidence that he committed those offenses "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."

In order to prove that Robinson acted "for the purpose of ... maintaining or increasing position," the Government bore the burden of proving not only that Robinson committed the was obligated to show [1] "that [Robinson] had a position in the enterprise," and [2] "that his general purpose" in committing the charged "was to maintain or increase his position in the enterprise." *United States v. Whitten*, 610 F.3d 168, 1780179 (2d Cir. 2010) (citing *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir. 1992)). However, "[m]aintaining or increasing position in the [racketeering] enterprise [need not have been] defendant's sole or principal motive." *Id.*

Interestingly, Robinson cites to *Concepcion,* calling it the "seminal case" in interpreting the VCAR statute. (Individual Brief of Defendant-Appellant Anthony Robinson, p. 23). Robinson also acknowledges that *Concepcion* provides that "[t]he motive [element is] satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by

Appellate Case: 13-1894    Page: 171    Date Filed: 02/06/2014 Entry ID: 4121608

reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.*

Robinson's concession in this regard is curious and rather contradictory, given his suggestion that the Government engaged in misconduct during closing argument when it stated that the jury could find any defendant guilty of a VCAR offense if the Government had proven "the defendants felt that they were beholden to commit those acts, or that they were obligated to commit those acts or expected to commit those acts by reason of their involvement in the enterprise." (Tr. Vol. XXIV, p. 116). Robinson moved for a mistrial, arguing that the Government had improperly "argued exactly what you cut out of the instruction, and that it's that they did what was expected of them to do because of their membership, rather than what you have in Instruction 29." (Tr. Vol. XXIV, p. 118). In so doing, Robinson argued, the Government had impermissibly lowered its burden of proof with regard to the "maintain or increase position" element of VCAR. Yet, remarkably, Robinson now cites to this Court a case which stands firmly for the proposition the Government argued.

More shockingly, Robinson continues to suggest that the Government engaged in misconduct, arguing that the Government's closing argument was "improper," that it "diminished the government's burden of proof by misstating the law," and by suggesting that the Government had "intentionally ignored the district

160

court's ruling and argued a position [it] knew was contrary to the law."  (Individual Brief of Defendant-Appellant Anthony Robinson, pp. 27-28).  Robinson's contention that the Government engaged in misconduct during closing argument is completely without merit.

As Robinson correctly notes, the Government proposed a jury instruction regarding the motive element of the VCAR counts.  The Government's proposed instruction, which it derived from caselaw, read:

> To prove that a defendant committed a violent crime 'for the purpose of maintaining or increasing position in an enterprise engaged in racketeering activity," the government is not required to prove that the defendant's sole or principal motive was maintaining or increasing his position, so long as it proves that maintaining or increasing his position was among his purposes.  The question is not whether the defendant's position was in fact increased, but whether one purpose in committing the violent crime was to benefit his position.  *The motive requirement is satisfied if the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed it in furtherance of that membership.*

(DCD 1196, p. 2)(emphasis added).  The Government proposed this instruction in reliance on *Whitten, supra*, along with *United States v. Farmer*, 583 F.3d 131, 142, 143044 (2d Cir. 2009) and *United States v. Dhinsa,* 243 F.3d 635, 671 (2d Cir. 2001) (DCE 1196, p. 2).  During the lengthy jury instruction conference near the conclusion of the trial, the District Court expressed misgivings about the final sentence of the Government's proposed instruction, stating that it had "a little bit

161

of concern that it's basically arguing the case for the Government." (Tr. Vol. XXIII, p. 50). Ultimately, the District Court agreed to give the Government's proposed instruction in modified format, removing the final sentence. (Tr. Vol. XXIII, p. 52). In so doing, the District Court specifically stated, *"[T]he Government is not precluded from arguing that by any means because the evidence supports it and it's a correct statement*." (Tr. Vol. XXIII, p. 52).

Robinson's allegation that the Government "intentionally ignored the district court's ruling and argued a position [it] knew was contrary to the law" is specious at best. Clearly, Robinson did not consult the record prior to making this baseless claim. Contrary to Robinson's contention, the District Court had *specifically authorized* the Government to argue the final sentence of the Government's proposed "maintaining or increasing position" instruction, despite the District Court's having removed that sentence from the charge given the jury. The Government's closing argument was not "improper," it did not "diminish the government's burden of proof" and did not misstate the law. Most importantly, the Government's argument most certainly did not constitute a deliberate disregard of any ruling made by the District Court. Robinson's argument in that regard is without merit.

In point of fact, the numerous Courts of Appeals that have addressed the "maintaining or increasing position" element have held "the motive requirement is

Appellate Case: 13-1894     Page: 174     Date Filed: 02/06/2014 Entry ID: 4121608

satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994); *United States v. Robertson*, 736 F.3d 1317, 1331 (11th Cir. 2013) (same); *United States v. Gooch*, 665 F.3d 1318, 1337-38 (D.C. Cir. 2012) (same); *United States v. Heilman*, 377 Fed. Appx. 157, 204 (3d Cir. 2010).    In *Gooch*, the United States Court of Appeals for the District of Columbia Circuit recalled that:

> [S]uch a motive has been found where the defendant murdered individuals on suspicion that they were cooperating with police and thereby jeopardizing the enterprise, or murdered individuals to maintain or increase his own reputation as an enforcer in the enterprise, where the defendant frequently carried out violent crimes against those who threatened the organization.

*Id.* (internal citation and quotations omitted).  In the instant case, the jury heard evidence that Robinson carried out, was complicit in, or was present during the commission of, multiple acts of violence on behalf of the organization.   Moreover, the jury heard recorded conversations in which Robinson spoke about committing acts of violence, even against other members of the WOS.  After Pinkston was stripped of his "colors" in the wake of an August 15, 2009 shooting in St. Louis (FN 43, *supra*), Robinson was involved in a conversation with other WOS members.

Unbeknownst to Robinson, the conversation was surreptitiously recorded by M. Hunter. The recording was admitted into evidence as Government's Exhibit 141. (Appx., p. 175-76). During that conversation, Robinson spoke about Pinkston, stating "n***a don't have colors on anymore. You know what I'm sayin'?" (Govt. Exh. 141, Appx., p. 175) Robinson initially spoke fondly of Pinkston, stating "I love that n***a with all my heart." (Govt. Exh. 141, Appx., p. 176). Almost immediately thereafter, however, Robinson spoke of Pinkston's conduct on August 15, 2009, saying, "[H]e'd have did [sic] that s**t with me, I'd have killed him." (Govt. Exh. 141, Appx., 176). Shortly thereafter, Robinson elaborated, stating "them last two shots supposed [sic] to have been for him." (Govt. Exh. 141, Appx. 176). According to M. Hunter, who was a party to this conversation, when Robinson made this statement, he was referring to Pinkston. (Tr. Vol. III, p. 115). This recording, admitted as an exhibit at trial and played for the jury, reveals that Robinson was more than willing to engage in acts of violence – including murder – in order to protect the WOS and its members, even if it meant committing such acts against fellow (or former) members.

> Courts have found various types of evidence sufficient to meet the Government's burden. For instance, courts have considered testimony that violence is a common part of the culture, members are expected to retaliate, and members are pressured to live up to nicknames, as well as testimony that members are expected to violently respond to disrespect and to live up to their role within the organization. Courts have also relied on testimony

164

that there are clearly delineated rules regarding positions
and progression through the organization's hierarchy, that
members acted to enhance their reputation generally or in
the eyes of a specific faction or individual, about the
violent nature of the organization, customs and
expectations of members, and acknowledging the
importance of maintaining status.

*Heilman*, 377 Fed. Appx. at 205 (internal citations omitted).   The instances in

which the Appellants and/or other members of the WOS spoke about and/or

committed acts of violence are almost too numerous to include herein.  The

recorded evidence played at trial demonstrated irrefutably that "violence is a

common part" of the WOS culture, and that its members were "expected to

violently respond to disrespect."  This culture and environment was nurtured from

the WOS's highest levels; many of the calls to violence came directly from J.

Smith, the National Vice President.  In light of this voluminous evidence, the jury

could have quite reasonably concluded that Robinson committed the offenses of

which he was convicted in Counts X, XI, and XIV for the purpose of "maintaining

or increasing position" in the WOS enterprise.  As a result, the District Court did

not err in denying Robinson's motions for judgment of acquittal as to those counts.

165

<center>**ARGUMENT**</center>

**II.** **THE DISTRICT COURT DID NOT CLEARLY ABUSE ITS DISCRETION IN ADMITTING RECORDED EVIDENCE AT TRIAL**[62]

Appellants next suggest that the District Court erred in admitting evidence obtained by way of a judicially authorized wiretap on a cellular telephone belonging to A. Hunter.[63]

**A.** **Standard of Review**

This Court reviews the admission of recorded evidence for *clear* abuse of discretion. *United States v. Roach*, 28 F.3d 729, 732-33 (8th Cir. 1994) (emphasis added); *United States v. Pecina*, 956 F.2d 186, 189 (8th Cir. 1992); *United States v. Johnson*, 767 F.2d 1259, 1271 (8th Cir. 1985).

---

[62] Appellants' Joint Brief, Issue III and Issue IV.

[63] Although this issue appears in Appellants' Joint Brief at Issues III and IV, neither J. Peteet nor Fry filed a motion to suppress electronic surveillance evidence in the District Court. Indeed, Fry did not enjoy standing to file such a motion as to any Title III wiretap evidence, inasmuch as he was not intercepted over the course of that wiretap. He therefore does not meet the definition of an "aggrieved person" pursuant to Title 18, United States Code, Section 2518(10). Although J. Peteet was entitled to file a motion to suppress the wiretap evidence, he failed to do so in the District Court.

<center>166</center>

## B.    Argument

### i.    The Judicially Authorized Title III Wiretap Evidence was Properly Admitted Because the Authorizing Judge Had Jurisdiction to Authorize the Interceptions Based Upon the "Listening Post" Rule

Appellants claim that the authorizing United States District Judge for the Eastern District of Missouri lacked jurisdiction to enter the wiretap order at issue, inasmuch as the telephone for which the interceptions were authorized (Target Telephone #1) was not located within that judicial district.  The Government concedes that during the majority of the 90-day period during which interception was authorized, Target Telephone #1 was physically located in the Northern District of Illinois.  However, the physical location of the device notwithstanding, the District Court authorizing the wiretap enjoyed jurisdiction to do so.

Title 18, United States Code, Section 2518 provides the procedure by which a wiretap may be obtained.  Subsection (1) requires that "application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to *a judge of competent jurisdiction* and shall state the applicant's authority to make such an application."  Subsection (3) provides that

> [u]pon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving the interception of wire, oral, or electronic communications within the territorial jurisdiction of the

167

> court in which the judge is sitting (and outside that
> jurisdiction but within the United States in the case of a
> mobile interception device authorized by a Federal court
> within such jurisdiction).

Appellants claim, in the instant case, that the wiretap order failed to comply with the "jurisdictional requirement" contained in Subsection (3). It appears that the dispute centers around the proper interpretation of the phrase "territorial jurisdiction." Appellants contend that the statute requires that unless Target Telephone #1 was physically located in the Eastern District of Missouri, the "interception of wire, oral or electronic communications" did not occur "within the territorial jurisdiction of the court in which the judge is sitting." Appellants, however, are in error.

Although this issue appears to be one of first impression in this Circuit, many other federal circuits have examined the issue of whether a District Court may authorize a wiretap where the subject device is located outside its territorial jurisdiction. In 1992, the United States Court of Appeals for the Second Circuit decided *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992). Therein, the Court held,

> the language of §2510(4), the legislative history of that
> section, and the policy considerations of Title III all
> persuade us that for purposes of §2518(3)'s jurisdictional
> requirement, a communication is intercepted not only
> where the tapped telephone is located, but also where the

168

> contents of the redirected communications are first to be
> heard.

*Id*. at 136.[64]

Two years later, in 1994, the United States Court of Appeals for the Tenth Circuit was called upon to determine whether the Oklahoma wiretap statute permitted a district attorney in one judicial district to apply for a wiretap on a telephone physically located in a different judicial district.   In *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th Cir. 1994), the Court first noted that, "[a]lthough courts have not previously interpreted this provision of the Oklahoma Act, we note that our interpretation is in accordance with federal court interpretations of the similarly worded federal statute, 18 U.S.C. §2518(3).  The Tenth Circuit then cited to *Rodriguez* with approval, ultimately holding that "the location of an 'interception' for purposes of section 176.9(C) includes the place where the intercepted communication is heard." *Tavarez*, 40 F.3d at 1138.

Still other federal circuits followed suit.  In 1996, the Fifth Circuit decided *United States v. Denman*, 100 F.3d 399 (5th Cir. 1996), in which it first noted that

> [o]ur colleagues in the Second Circuit, in *United States v. Rodriguez*, interpreted interception as used in Title III to

---

[64]Title 18, United States Code, Section 2510(4) provides a specific definition of "intercept."  Specifically, "intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."

Appellate Case: 13-1894     Page: 181     Date Filed: 02/06/2014 Entry ID: 4121608

include *both* the place where the lines are tapped *and* the place where the communications are heard by law enforcement. They held that a wiretap order may be issued by a court in either jurisdiction. . . In a decision interpreting a similarly worded Oklahoma wiretap law, our colleagues in the Tenth Circuit adopted the *Rodriguez* holding that the location of an interception includes the place where law enforcement officers listened to the communication which they intercepted.

*Id.* at 402-03. The Fifth Circuit ultimately agreed, holding

that interception includes both the location of a tapped telephone and the original listening post, and that judges in either jurisdiction have authority under Title III to issue wiretap orders. As the *Rodriguez* court noted, this interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge to supervise an investigation that spans more than one judicial district.

*Id.* at 403.

This trend continues, with still more Courts of Appeals adopting the reasoning first advanced by the Second Circuit in *Rodriguez*. In 2001, the Seventh Circuit joined this growing list of Circuits. In *United States v. Wilson*, 237 F.3d 827, 831 (7th Cir. 2001), that Court held that "the order authorizing the wiretap of [] conversations at the Vienna Correctional Center (located in southern Illinois) was within the jurisdiction of the federal district court in the Northern District of Illinois because the conversations were first heard by human ears in Chicago."

Appellate Case: 13-1894    Page: 182    Date Filed: 02/06/2014 Entry ID: 4121608

In 2006, the Ninth Circuit wrote that "[t]he most reasonable interpretation of the statutory definition of interception is that an interception occurs where the tapped phone is located *and* where law enforcement officers first overhear the call." *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006). And, even more recently, the Sixth Circuit agreed. Although the Sixth Circuit examined the issue in the context of the Tennessee wiretap statute, it first noted that "[t]he Tennessee statute, like Title III, defines 'intercept' as 'the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.'" *United States v. Johnson*, No. 08-5911, 2010 WL 3736881, at * 2 (6th Cir. Sept. 17, 2010) (unpublished). The Court then observed that "[t]he post at which the investigators listened to the communications - aurally acquired the communications, to use the statutory language," was located in the judicial district in which the wiretap order had been issued. Citing to *Denman*, the Sixth Circuit agreed that "'Interception includes both the location of a tapped telephone and the original listening post.'" *Id*. at *2.[65]

---

[65] *See also*, *United States v. Kazarian*, No. 10 Cr. 895, 2012 WL 1810214 (S.D.N.Y., May 18, 2012) (citing *Rodriguez*); *United States v. Savoy*, 883 F. Supp. 2d 101 (D. D.C. 2012) (citing *Rodriguez*); *United States. v. Rodriguez*, No. 08 CR 1311 (RPP), 2009 WL 2569116 (S.D.N.Y., Aug. 20, 2009) (citing *Rodriguez*); *United States v. Bernardino*, No. 07 Cr. 151 (PKC),2007 WL 4462176 (S.D.N.Y., Dec. 17, 2007) (citing *Rodriguez*); *United States v. Giampa*, 904 F. Supp. 235 (D. N.J. 1995) (citing *Rodriguez*).

Appellate Case: 13-1894     Page: 183     Date Filed: 02/06/2014 Entry ID: 4121608

Clearly, all of the federal Circuits that have addressed the issue now before this Court have determined that a variety of reasons, including sound logic and statutory interpretation, dictate that territorial jurisdiction to authorize a wiretap should lie in both the jurisdiction in which the target device is located, *and* in the location in which the calls are intercepted by law enforcement.[66]

To hold otherwise would be to establish a significant impediment to law enforcement's legitimate use of electronic surveillance. Given the inherently mobile nature of both wireless telephones and modern society itself, to hold that jurisdiction lies only in the jurisdiction in which the device is located would create a practical hardship that would be difficult, if not impossible, for law enforcement to overcome. Based upon the analysis adopted by the Second Circuit and numerous others, it seems clear that Congress did not intend to restrict the use of this technology in this manner. Therefore, the Government urges this Court to adopt the reasoning and holdings announced in *Rodriguez* and followed in *Tavarez, Denman, Wilson, Luong, and Johnson* and to conclusively hold that the

---

[66]Although Appellants rely on the Fifth Circuit case of *United States v. North*, 728 F.3d 429 (5th Cir. 2013), this opinion was expressly withdrawn in *United States v. North*, No. 11-60763, 2013 WL 5761902 (5th Cir., Oct. 24, 2013). Therefore, not only does *North* fail to control this Court's resolution of the case at bar, it is not even binding authority in the Fifth Circuit. Appellant's reliance on *United States v. Jones*, 132 S. Ct. 945 (2012) is similarly unavailing. The Supreme Court's holding in *Jones* concerned a GPS tracking device where the government interfered with the defendant's possessory interest in an automobile, *See Id.* at 952, and did not relate in any way to a Title III wiretap.

172

United States District Court for the Eastern District of Missouri did have jurisdiction to enter a wiretap order for Target Telephone #1, where the calls were intercepted and monitored in that District. As a result, the District Court did not clearly err in admitting evidence gathered during the course of the judicially authorized wiretap on A. Hunter's cellular telephone.

## ii. The Consensual Recordings Were Properly Admitted Because They Were Properly Authenticated

Appellants jointly complain that the District Court erred in admitting various pieces of recorded evidence, asserting that the Government failed to establish that the recordings were sufficiently authentic. In order for evidence to be admitted at trial, it must be authentic. Fed. R. Evid. 901(a). "To satisfy the requirement of authenticating . . . an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Id.* This low threshold for admissibility requires only a "rational basis" to conclude that the evidence is authentic. *Kaplan v. Mayo Clinic*, 653 F.3d 720, 725-26 (8th Cir. 2011). "Once the threshold requirement is met . . . any question as to whether the evidence is authentic is for the jury." *Id.* at 726.

When determining the admissibility of audio recordings in particular, this Court has recognized several nonexclusive factors that should be considered. *See*

173

*United States v. McMillan*, 508 F.2d 101, 104 (8th Cir. 1974). These factors

include:

> (1) That the recording device was capable of taking the conversation now offered in evidence.
> (2) That the operator of the device was competent to operate the device.
> (3) That the recording is authentic and correct.
> (4) That changes, additions or deletions have not been made in the recording.
> (5) That the recording has been preserved in a manner that is shown to the court.
> (6) That the speakers are identified.
> (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id.* Despite the fact that the United States is "not required to meet every *McMillan*

factor,"[67] Appellants assert that they are entitled to reversal, alleging that the

Government failed to meet factors (3), (4), and (5). (Appellants Joint Brief, p. 47).

This baseless allegation ultimately fails because the District Court did not abuse its

discretion in concluding that the Government presented sufficient evidence to

satisfy the *McMillan* factors.

### a.    The Consensual Recordings Presented by the Government Were Authentic

The first category of recorded evidence the Government admitted at trial

could properly be characterized as "consensual recordings."  Each of the

---

[67] *United States v. Oslund*, 453 F.3d 1048, 1054 (8th Cir. 2006).

Appellate Case: 13-1894    Page: 186    Date Filed: 02/06/2014 Entry ID: 4121608

recordings in this category was made with the consent of one of the participants. In most cases, the consenting party was M. Hunter, the Government's informant, who not only consented to a wiretap of his cellular telephone, but who also agreed to attend and surreptitiously record WOS meetings and functions, and to conduct and record a variety of controlled purchases. Despite Appellants' suggestion to the contrary, the Government satisfied the third *McMillan* factor as to each of the "consensual recordings" admitted at trial.

Indeed, for each and every consensual recording presented at trial, a witness who participated in the recorded conversation testified that he had reviewed the recording in anticipation of his testimony, and that the recording was accurate. But for one instance, this testimony was based on each witness's recollection of the recorded conversation and on listening to the audio recordings before trial. The Appellants do not and cannot dispute the authenticity or accuracy of these recordings. *See United States v. Risken*, 788 F.2d 1361, 1370 (8th Cir. 1986) (holding that an individual can authenticate recordings of conversations in which they personally participated, based on his or her recollection of the conversation and on listening to the audio recordings). Therefore, the only genuine question as to the authenticity of any recording pertains to a limited portion of a recording involving witness Sean Jackson, who only recalled reviewing a transcript of the recording but not necessarily listening to the entire recording itself. (Tr. Vol. II, p.

Appellate Case: 13-1894    Page: 187    Date Filed: 02/06/2014    Entry ID: 4121608

247). Although the Appellants contend that these circumstances demonstrate that the Government failed to authenticate this one recording, this contention is without merit.

The Government undoubtedly provided a "rational basis" to conclude that the recording at issue is authentic under Rule 901 of the Federal Rules of Evidence. Indeed, the authenticity of this recording is demonstrated by Jackson's testimony that the transcripts accurately reported the conversation in which he participated, (Tr. Vol. II, p. 157), and the indisputable fact that these transcripts memorialized the recording verbatim.[68] Although Jackson did not recall listening to the entire recording before trial, having a witness review a transcript that memorializes a recording verbatim is no different for authentication purposes than having a witness listen to the recording itself—a process that unquestionably establishes authentication. *See Roach*, 28 F.3d at 733 (recordings are properly authenticated where participants in the recorded conversation affirm the recording's accuracy after listening to that recording); *see also United States v. Calderin-Rodriguez*, 244 F.3d 977, 986-87 (8th Cir. 2001) (consensual recording can be authenticated even when it is introduced by an agent who was not a participant to the

_____

[68] Appellants did not dispute the accuracy of the transcripts at trial, and they do not do so on appeal. But even if Appellants had raised an argument regarding the authenticity of these transcripts on appeal, this argument would be forfeited because the Appellants failed to comply with the District Court's order requiring that they raise any such issues prior to trial. (DCD 873).

conversation). Based on the established authenticity and accuracy of the audio recordings presented at trial, all of the Government's consensually recorded evidence clearly satisfied *McMillan's* third factor.

### b. The Consensual Recordings Presented by the Government Were Appropriately Preserved

Appellants' arguments regarding the fourth and fifth *McMillan* factors are similarly without merit. Indeed, the Appellants' unfounded allegation that the Government failed to prove chain of custody should be rejected as it ignores at least thirty years of this Court's precedent. This precedent holds that a "District Court is entitled, absent proof to the contrary, to assume that the investigators properly maintained the tape and did not tamper with it." *Roach*, 28 F.3d at 733 (citing *United States v. Panas,* 738 F.2d 278, 287 (8th Cir. 1984)); *United States v. Coohey*, 11 F.3d 97, 100 (8th Cir. 1993); *United States v. McCowan*, 706 F.2d 863, 865 (8th Cir. 1983).

Notably, this Court's decisions clearly require *proof* that such recorded evidence was not properly maintained, or *proof* of tampering – mere speculation, bald allegations, or conjecture cannot carry the day. Because the Appellants have yet to assert a single plausible allegation that the audio recordings played at trial were not true and accurate records, the District Court was well within its

Appellate Case: 13-1894    Page: 189    Date Filed: 02/06/2014 Entry ID: 4121608

considerable discretion when it accepted that the recordings were properly

maintained by the United States.

### iii. The District Court Properly Admitted the Authentic Judicially-Authorized Wiretap Recordings in Accordance with Title 18, United States Code, Section 2518

#### a. The Judicially-Authorized Wiretap Recordings Were Authentic and Accurate

Appellants next urge reversal claiming that the Government failed to

properly authenticate the judicially authorized wiretap communications introduced

into evidence.  Once again, this argument ignores over thirty years of this Court's

precedent. This Court has uniformly held that an audio recording is properly

authenticated when its accuracy is affirmed by a person who participated in the

recorded conversation. *See Roach*, 28 F.3d at 733;  *Risken*, 788 F.2d at 1370;

*Johnson*, 767 F.2d at 1271; *Panas*, 738 F.2d at 286. The Government fully adhered

to this precedent by admitting each court-authorized recording through A. Hunter,

whose cellular telephone was the subject of the judicially authorized wiretap, and

who participated in the recorded conversations, testifying that  these recordings

were accurate. (Tr. Vol. IX, p. 132). Based on the Government's complete

Appellate Case: 13-1894    Page: 190    Date Filed: 02/06/2014 Entry ID: 4121608

adherence to this Court's clear and consistent precedent, the court-authorized wiretap recordings were unquestionably authenticated.[69]

In addition to authenticating these court-authorized recordings, the Government also complied with the statutory provisions of Title 18, United States Code, Section 2518(8)(a), which requires that the recordings should be protected "from editing or other alterations." *See* 18 U.S.C. §2518(8)(a). The Government offered substantial evidence demonstrating that these recordings were protected and secure. This evidence included the testimony of TFO Van Mierlo as to security features on the server where the recordings were stored, and that those security features prevented any alteration of these recordings whatsoever. (Tr. Vol. XVII, p. 15). TFO Van Mierlo further testified that the recordings used at trial were downloaded directly from this tamper-proof server. (Tr. Vol. XVII, p. 15). This testimony demonstrates that the Government protected these recordings "from editing or other alterations" in compliance with 18 U.S.C.A. §2518(8)(a).

The only case cited by the Appellants that actually reversed a district court on chain-of-custody grounds is an obviously distinguishable case decided by the

---

[69] The Appellants' contention that the court-authorized recordings were not authenticated based on A. Hunter's ability to remember these recorded conversations misunderstands the requirements for authentication. (Appellants' Joint Brief, p. 61). Federal Rule of Evidence Rule 901 requires only a "rational basis" to conclude that the evidence is authentic. *Kaplan*, 653 F.3d at 725-26. "Once the threshold requirement is met . . . any question as to whether the evidence is authentic is for the jury." *Id.*

179

Third Circuit Court of Appeals almost forty years ago. *See United States v. Starks*, 515 F.2d 112 (3d Cir. 1975). Unlike the case at bar, the *Starks* defendant plausibly alleged that a recording had been tampered with—rebutting the general presumption that the Government preserves recordings properly. *Id.* at 121. Because the Appellants in the case at bar have put forth no such allegation, this case is plainly distinguishable.

Even assuming, *arguendo,* that the Government failed to present evidence that wiretap recordings were protected from tampering, the recordings would be nonetheless admissible because the Appellants have yet to allege plausibly that these recordings were not true and accurate. This Court has consistently held that, absent a colorable argument of tampering, district courts are "entitled to presume that the public officials in possession of the records acted with integrity and properly discharged their official duties." *Coohey*, 11 F.3d at 100; *McCowan*, 706 F.2d at 865. Because the Appellants failed to advance a single plausible allegation that these recordings were inauthentic or inaccurate, the District Court was well within its discretion in holding that these recordings were authentic and admissible.[70]

---

[70] Although there was a gap in one wiretap call, (Tr. Vol. XVII, p. 32), the Appellants' do not allege that this gap constituted evidence of tampering or that it rendered the recording wholly untrustworthy. Therefore, this gap has no bearing on the admissibility of the judicially-authorized recordings. *See Oslund*, 453 F.3d at

Appellate Case: 13-1894     Page: 192     Date Filed: 02/06/2014 Entry ID: 4121608

### b. Because the Appellants Failed to Raise the Sealing Issue in the District Court, This Issue is Reviewed for Plain Error

For the very first time on appeal, the Appellants raise a somewhat novel objection to the admission of the judicially-authorized wiretap recordings, claiming that the recordings were not sealed "immediately upon the expiration" of the wiretap order as required by 18 U.S.C. §2518(8)(a). (Appellants' Joint Brief, pp. 63-66).  Because the Appellants failed to raise this issue in the District Court below, this Court reviews this issue only for "plain error." *United States v. Manning,* 738 F.3d 937, 946 (8th Cir. 2013) ("To obtain relief under a plain error standard of review standard of review, the party seeking relief must show that there was an error, the error is clear or obvious under current law, the error affected the party's substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.")  Anticipating that Appellants may claim that this issue was raised before the District Court in Robinson's motion to

---

1056 (holding that gaps in an audiotape affect "the weight of the evidence, not its admissibility"); *United States v. Ray*, 250 F.3d 596, 602 (8th Cir. 2001) (dismissing defendant's argument that a recording lacked authenticity because of gaps in the recording where the defendant had an opportunity to argue the issue to the jury but didn't); *Calderin-Rodriguez*, 244 F.3d at 987 (recordings were sufficiently authentic despite a gap in the tape, where gap was denoted as "BREAK" on the transcript and officer who made the recordings testified about the recording and was available for cross examination).

Appellate Case: 13-1894     Page: 193     Date Filed: 02/06/2014 Entry ID: 4121608

exclude the judicially-authorized recordings, this argument fails for two primary reasons.

First, although Robinson did file a motion to exclude the judicially-authorized recordings, (DCD 1157), this motion failed to *specifically* raise the issue now raised on appeal: that the recordings were somehow fatally tainted as a result of a delay in sealing. In fact, Appellants never mentioned anything about the Government's compliance with the immediacy requirement under § 2518(8)(a) prior to filing their Joint Brief on appeal. Because the Appellants failed to state this objection with specificity in the District Court, which is required the Federal Rules of Evidence to preserve an issue for appeal,[71] the plain error standard applies. *See Dranow v. United States*, 307 F.2d 545, 568 (8th Cir. 1962) (holding that "[i]t is a fundamental rule that objections to the admissibility of evidence must be specific and that general objections such as those advanced here are insufficient, standing alone, to support a claim of error before this [C]ourt").

Second, even if Robinson's motion to exclude the court-authorized recordings is found to be sufficiently specific, the Appellants nonetheless failed to preserve their sealing argument for appeal because this motion, even if made, was untimely. Federal Rule of Evidence 103 provides that an objection must be "timely" in order to preserve an issue for appeal. Fed. R. Evid. 103(a)(1)(A).

---

[71] *See* Fed. R. Evid. 103(a)(1)(B).

Appellate Case: 13-1894    Page: 194    Date Filed: 02/06/2014 Entry ID: 4121608

Federal Rule of Criminal Procedure 12(b)(3)(C) requires that motions to suppress

evidence must be raised prior to trial. Fed.R.Crim.P. 12(b)(3)(C). Similarly, Title

18, United States Code, Section 2518(10)(a) requires that a motion to suppress a

judicially authorized wiretap "shall be made before the trial, hearing, or proceeding

unless there was no opportunity to make such motion or the person was not aware

of the grounds for such motion." [72]  Therefore, even assuming, *arguendo*, that this

Court considers Robinson's mid-trial motion to suppress the wiretap evidence as

having sufficiently preserved the sealing issue for appeal, such motion was

untimely, failing to comply with both Federal Rule of Evidence 12(b)(3)(C) and 18

U.S.C. §2518(10)(1).

---

[72] To the extent that Appellants now argue that they did not learn, until trial, of the date on which the wiretap was sealed, (Appellant's Brief, p. 64), this contention is belied by each Appellants signed acknowledgments of receipt of discovery.  At the time the Government provided discovery, a copy of the court-authorized wiretap records, which *included a copy of the Sealing Order* and all of the information necessary to lodge proper and timely objections was included in the discovery that counsel for each Appellant received. (*See*, Appellants' Discovery Acknowledgements, Appx, pp. 133-63).  As the Court should note – and Appellants should now concede – the discovery was provided to most Appellants in August of 2011.  Included in that discovery was a digital copy of "Electronic Surveillance Docs (T3, PLIs & Pen-Cells), specifically containing "Title III Docs – contains 25 .pdf files of Title III docs, including Index (706 pgs.)"  (Appx, p. 136, 141, 146, 151, 156, 161).  Perhaps more importantly, *the Sealing Order was admitted as evidence at the Motion to Suppress Electronic Surveillance held on April 5, 2012.* (Transcript of Hearing on Motion to Suppress Electronic Surveillance, April 5, 2012).  The suggestion that the Appellants did not have the opportunity to see the Sealing Order until trial is false.

Appellate Case: 13-1894     Page: 195     Date Filed: 02/06/2014 Entry ID: 4121608

### c. The Government Complied With the Sealing Requirements Contained in Title 18, United States Code, Section 2518

As outlined in the immediately preceding section, Appellants argue – for the first time on appeal – that the District Court erred in admitting evidence gathered by way of the judicially authorized wiretap, asserting that the Government failed to comply with the requirement that such evidence must be immediately sealed up on expiration of the order authorizing the interceptions. Title III of the Omnibus Crime Control and Safe Streets Act of 1968 establishes procedures that law enforcement officers must follow when conducting wiretap surveillance. *See* 18 U.S.C. §2518. Among other things, this Act requires that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." 18 U.S.C. §2518. When a recording is not immediately sealed, there must be a "satisfactory explanation" as to why a delay occurred and why it is excusable. *United States v. Maxwell*, 25 F.3d 1389, 1393 (8th Cir. 1994).

In the instant case, Appellants argue vociferously that "**no explanation was at all was given**" for what Appellants characterize as a delay in sealing. (Appellants' Joint Brief, p. 65) (emphasis in original). However, what Appellants fail to acknowledge is that they *wholly failed to raise this issue in the District Court.* Quite obviously, given the absence of any specific objection with regard to the sealing, the Government did not address an issue that did not exist. It is absurd

to suggest that the Government should have been expected to offer an explanation when none was requested.

Appellants are incorrect when they accuse the Government of having failed to offer an explanation as to the timing of the sealing. A review of the record reveals that the Government *did* explain the timing of the sealing. In point of fact, TFO Van Mierlo testified at trial that the final extension of the wiretap expired at 11:59 pm on April 8, 2011, a Friday. (Tr. Vol. XVII, p. 18). After explaining that she retrieved the magneto-optic discs from the server on Monday, April 11, 2011, TFO Van Mierlo testified that United States District Judge Hamilton instructed her to appear in chambers for the sealing on Thursday, April 14, 2011 – the fourth business day after the expiration of the wiretap order. (Tr. Vol. XVII, p. 19). It is abundantly clear from the record that it was Judge Hamilton who scheduled the date for the sealing, not the Government or any of its agents.

This Court has held that a delay in sealing is excusable where the issuing judge scheduled the sealing seven days after the termination of a wiretap authorization. *Maxwell,* 25 F.3d at 1394; *see also United States v. Pedroni,* 958 F.2d 262, 266 (9th Cir. 1992) (finding that an issuing judge's decision to sign a sealing order late constitutes a satisfactory explanation). The circumstances of the sealing in the instant case were virtually identical to the circumstances in *Maxwell,*

Appellate Case: 13-1894     Page: 197     Date Filed: 02/06/2014 Entry ID: 4121608

except that here, only four days elapsed between the expiration of the order and the sealing, as opposed to the seven days that elapsed in *Maxwell*.

Throughout their argument with regard to the Government's compliance with the sealing requirement contained in 18 U.S.C. §2518, Appellants make meritless claims that have no basis in fact whatsoever. Moreover, they wholly fail to acknowledge that this issue was never raised in the District Court. To the contrary, counsel for Robinson – the only Appellant who can even claim to have suggested any issue with regard to the sealing – *affirmatively advised the District Court that he was not making any objection to the timing or manner of the sealing.* During one of the many discussions with regard to the admissibility of the Title III wiretap evidence, counsel for the Government hypothesized that Robinson would make an argument with regard to the sealing of the wire. In response, counsel for Robinson stated, "I must talk with marbles in my mouth because that's not the issue. **The issue is not the sealing of the tapes in the suppression [sic], it's the admissibility of the tapes at trial.**" (Tr. Vol. XVI, p. 132)(emphasis added). Robinson *categorically denied* that he had any argument with the way in which the wire was sealed. Despite this affirmative waiver of any argument with regard to the sealing, Appellants incredibly now assert that their convictions must be

Appellate Case: 13-1894     Page: 198     Date Filed: 02/06/2014 Entry ID: 4121608

reversed because the Government failed to comply with the sealing requirement.[73]

This argument is factually and legally without merit.

---

[73] United States Magistrate Judge Frederick R. Buckles (Ret.), to whom the pre-trial matters in the instant case were assigned, held two separate hearings on Appellant's motions to suppress electronic surveillance. The first of these two hearings, which included Appellants J. Smith, Henley and Elkins, was held on April 5, 2012. (DCD 622; Transcript at DCD 648). The second hearing was held to accommodate counsel for Robinson, who was unavailable on April 5, 2012. The hearing on Robinson's motion to suppress electronic surveillance took place on May 24, 2012. (DCD 699; Transcript at DCD 1640). At the beginning of this second hearing, Magistrate Judge Buckles clarified that as grounds for their motions to suppress, Appellants raised the "territorial jurisdiction" issue and a "necessity" issue. (DCD 1640, pp. 5-6). Counsel for Robinson advised Judge Buckles, "[M]y colleagues I thought did a very thorough job on all the issues." (DCE 1640, p. 7). In addition to the two common issues, Robinson raised an additional issue regarding the use of GPS tracking devices. (DCD 1640, p. 5). None of the Appellants raised any issue with regard to the Government's compliance with the sealing requirement in any written pleading or at either of the two hearings on the motions to suppress electronic surveillance, despite having been provided with a copy of the Sealing Order in August of 2011.

Appellate Case: 13-1894      Page: 199      Date Filed: 02/06/2014 Entry ID: 4121608

<center>**ARGUMENT**</center>

## III.   THE DISTRICT COURT DID NOT CLEARLY ABUSE ITS DISCRETION WHEN IT REFUSED TO ADMIT BARRY ROGERS' HEARSAY AFFIDAVIT[74]

### A.   Standard of Review

This Court reviews the "district court's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affects the defendant's substantial rights or had more than a slight influence on the verdict." *United States v. Halk*, 634 F.3d 482, 488 (8th Cir. 2011) (quoting *United States v. Two Shields*, 497 F.3d 789, 792 (8th Cir. 2007)).

### B.   Argument

J. Peteet (and only J. Peteet) asserts that the District Court abused its discretion when it refused to admit an affidavit, purportedly written by Barry Rogers (hereinafter, B. Rogers), in which B. Rogers claimed that it was he, and not J. Peteet, who shot Taylor on May 28, 2009 in Bennigan's parking lot in Gary, Indiana. The affidavit was signed before a Notary Public on June 27, 2012. (Appx., p. 174). Only six days before, on June 21, 2012, J. Peteet had been named in the Superseding Indictment in the instant case. (DCD 744). J. Peteet was arrested in Northern Indiana on June 22, 2012 – five days before B. Rogers appeared before the Notary Public to sign the Rogers Affidavit. (DCD 776). More

---

[74] Appellant's Brief (J. Peteet), Issue III.

<center>188</center>

than three years elapsed between the events about which the Rogers Affidavit and the actual signing of the affidavit.

The Federal Rules of Evidence strongly disfavor attempts by criminal defendants to introduce uncorroborated hearsay confessions of unavailable third parties. *See e.g.*, *Williamson v. United States*, 512 U.S. 594, 605 (1994) (refusing to admit a third party confession despite the inculpatory nature of his statements). The hearsay confession of an unavailable third party, when offered to exculpate the defendant, is admissible only if it can satisfy at least two exacting criteria: (1) the statement must have "so far tended to subject the declarant to civil or criminal liability" that a reasonable person would not falsely make such an admission; *and* (2) there must exist "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement." Fed. R. Evid. 804(b)(3) (emphasis added).[75]

As the proponent of the evidence, J. Peteet bears the burden to prove the applicability of any exception to the general proscription against hearsay evidence. *Two Shields*, 497 F.3d at 793. Because B. Rogers' Affidavit does not satisfy either criterion under Rule 804(b)(3), the District Court did not clearly abuse its discretion in refusing to admit this evidence.

---

[75] The Government did not, and does not now, dispute that B. Rogers was "unavailable" within the meaning of Fed. R. Evid. 804(a), inasmuch as counsel for J. Peteet represented to the District Court that he had attempted to subpoena B. Rogers, only to be told that if called, B. Rogers would assert his Fifth Amendment privilege against self-incrimination.

189

### a. The Rogers Affidavit Does Not Qualify As A Statement Against Rogers' Penal Interest Because Rogers Claimed Self-Defense

In order for the Rogers Affidavit to be admissible as a "statement against interest" as J. Peteet urges, J. Peteet was first required to demonstrate that the statement would not have been made unless true because it "had so great a tendency" to "expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A).

J. Peteet claims that because the Rogers Affidavit amounts to a "confession" in which B. Rogers claims to have shot Taylor, the statement exposes B. Rogers to criminal liability. However, a closer examination of the Rogers Affidavit reveals otherwise. In point of fact, the Rogers Affidavit alleges that B. Rogers shot Taylor "[i]n self-defense of myself [*sic*] and others." (Appx., p. 173). More specifically, the Rogers Affidavit explains:

> Robert turned to his left and pointed his gun at me. In self-defense of myself [sic] and others, I fired a warning shot away from Robert Taylor and yell [sic] for him to 'drop the gun.' He continued to point the gun as he turned to walk away. I believed that he was going to fire at me due to the look on his face and I fired a second shot at his legs to cause him to drop the gun.

(Appx., p. 173). B. Rogers' assertion that he shot Taylor in self-defense does not "so far tend[] to subject [Rogers] to civil or criminal liability . . . that a reasonable

person in [Rogers'] position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3).

As the District Court correctly noted in excluding the Rogers Affidavit, "the statement itself is not against interest in the sense of he's not admitting committing this crime. He's saying he fired in self-defense." (Tr. Vol. XIX, p. 16). B. Rogers' self-defense claim, if believed, would *exculpate him entirely*. Thus, despite J. Peteet's conclusory statement to the contrary, (Appellant's Brief (J. Peteet), p. 24), B. Rogers' claim that he shot Taylor in self-defense fails to constitute a statement against penal interest.

This intuitive conclusion—that exculpatory statements are not contrary to the declarant's penal interests—formed the basis for the Ninth Circuit Court of Appeals' holding in *United States v. Shryrock*, 342 F.3d 948 (9th Cir. 2003). In *Shryrock*, the defendant (Shryrock) was charged with committing murder in furtherance of a RICO enterprise. At trial, Shryrock sought to admit the out-of-court statement of an unavailable third party named Hernandez, who claimed that "he shot the victims in self-defense." *Id.* at 981.

The Ninth Circuit first noted that it had previously instructed that any such third-party admission "must be examined in context, to see whether as a matter of common sense the portion at issue was against interest and would not have been made by a reasonable person unless he believed it to be true." *Id.* (internal citation

Appellate Case: 13-1894    Page: 203    Date Filed: 02/06/2014 Entry ID: 4121608

omitted).  Thereafter, the Ninth Circuit summarily announced, "[o]bviously, this test is not met here.  Hernandez could have made the statement to serve his own penal interest—self -defense would absolve him of criminal liability—and not because he believed the statement to be true." *Id.*  As a result, the Ninth Circuit characterized Hernandez's statement as "exculpatory, and not against his penal interest," therefore concluding that the district court had not abused its discretion in excluding the statement as hearsay.  *Id.*

*Shryrock* is indistinguishable from the instant case. As quoted above, the Rogers Affidavit tells a story that is not only exculpatory as to J. Peteet, but also exculpatory as to B. Rogers himself. Far from being so clearly self-condemning that one must presume the statement's truth, B. Rogers' tale is an expected fabrication from a criminal conspirator attempting to get his associate out of trouble *without* exposing himself to liability.[76] *Cf. Halk*, 634 F.3d at 489-90 (affirming the district court's exclusion of a third party's out-of-court statement that the declarant's son owned the charged firearm because the statement tended to

---

[76]Interestingly, Rogers also takes pains in his affidavit to assert that "this case was between myself and [the victim] concerning personal issues and not any motorcycle club issues."  (Appx., p. 174). This curious remark is not coincidental. The affidavit was executed five days *after* J. Peteet had been arrested on a federal racketeering case. It seems obvious that, in asserting that the shooting resulted from a personal dispute, Rogers was attempting to suggest that the offense was not committed "in aid of racketeering" as alleged in the Superseding Indictment. By attempting to distance himself from any racketeering activity, Rogers effectively establishes that his statement is not truly contrary to his penal interest.

inculpate the declarant's son, not the declarant). Because the Rogers Affidavit did

not "have so great a tendency" to "expose the declarant to civil or criminal

liability" that "a reasonable person in the declarant's position would have made [it]

only if the person believed it to be true," the statement does not meeting the first

criteria of Rule 804(b)(3) and the District Court did not abuse its discretion in

excluding it.

### b. The Rogers Affidavit Is Not Supported By Corroborating Circumstances That Clearly Indicate Its Trustworthiness

Even if the Rogers Affidavit were contrary to Rogers' penal interests, thus

satisfying the first requirement of Rule 804(b)(3) it is nevertheless inadmissible

because it is not supported by the requisite "corroborating circumstances clearly

indicat[ing] the trustworthiness of the statement." Fed. R. Evid. 804(b)(3). Once

again, J. Peteet bears the burden of persuasion. *Two Shields*, 497 F.3d at 789.

Thus, if J. Peteet cannot demonstrate the existence of corroborating circumstances,

the Rogers Affidavit is inadmissible under Rule 804(b)(3). *See, e.g.*, *United States

v. Cole*, 525 F.3d 656, 661 (8th Cir. 2008) (affirming the district court's exclusion

of the defendant's wife's out-of-court statement that the illegal sawed-off guns

belonged to her, not the defendant). More than mere corroboration, however, J.

Peteet must have put forth "clearly reliable corroboration," to justify the admission

of the statement. *United States v. Savage*, 863 F.2d 595, 600 (8th Cir. 1988)

Appellate Case: 13-1894    Page: 205    Date Filed: 02/06/2014 Entry ID: 4121608

This Court has identified "five factors that aid in determining the trustworthiness of a hearsay statement against the declarant's penal interest." *Halk*, 634 F.3d at 490. These factors include, but are not necessarily limited to, the following:

> (1) whether there is any apparent motive for the out-of-court declarant to misrepresent the matter, (2) the general character of the speaker, (3) whether other people heard the out-of-court statement, (4) whether the statement was made spontaneously, (5) the timing of the declaration and the relationship between the speaker and the witness.

*Id.* (quoting *United States v. Rasmussen*, 790 F.2d 55, 56 (8th Cir. 1986)). Because these factors demonstrate that the Rogers Affidavit is highly untrustworthy, this Court should affirm the district court's exclusion of this hearsay statement.[77]

### i. Rogers Had an Apparent Motive to Misrepresent

The first of the *Halk* factors requires this Court to consider whether the declarant—B. Rogers—had an apparent motive to misrepresent. In the instant case, the motive for misrepresentation could not be clearer. B. Rogers was, by all accounts, a member of the WOS, and bound by oath to be loyal to other members

---

[77] Outside of these factors, there are not any relevant facts that demonstrate the truthfulness of the Rogers Affidavit. Although Rogers brought the gun that was used in the murder to the authorities, this fact does not indicate the trustworthiness of his affidavit. After Rogers brought the gun to the authorities, he later lied about doing so to avoid being charged as a felon in possession. (Tr. Vol. XIX, p. 10). Thus, if anything, this further illustrates that Rogers was willing to say anything that he could to keep himself out of trouble.

unto death. (Tr. Vol. XXI, p. 180).   The record is replete with instances in which

members of the WOS were admonished and indeed threatened that they must "be

their brothers' keepers" and must not speak of WOS business among non-WOS.

As M. Hunter so aptly testified, cooperating with law enforcement against fellow

WOS members was considered "treason." (Tr. Vol. III, p. 45, 52).  Such conduct

was punishable by beatings.  (Tr. Vol. III, p. 46).  After J. Peteet was arrested –

initially on State charges – WOS member "Buckskin" assisted J. Peteet by

pressuring other WOS members to refuse to cooperate with law enforcement

officers investigating the Bennigan's shooting.  (Govt. Exh. 124A, Appx., pp. 177-

78).  When one member balked, "Buckskin" became enraged, threatening,

> This what I'm gonna do.  If, if y'all Wheels, and I'm a
> Wheel, if I put myself down for this s**t, and any one of
> you n*****s up in here hold out on me?  When I come
> up outta there, I'm coming' to see the n***er who who
> hold up – out on me.

(Govt. Exh. 124A, Appx., p. 178).  J. Smith had made similar threats in the

November 2009 national meeting over which he presided.  (Govt. Exh. 220, Appx.,

p. 5).  Against this backdrop, it seems abundantly clear that B. Rogers had ample

motive to misrepresent when he signed the affidavit in question.  The District

Court did not abuse its discretion in excluding the affidavit, even if its ruling was

entirely premised upon J. Peteet's failure to satisfy the first factor identified in

*Halk*.

Appellate Case: 13-1894     Page: 207     Date Filed: 02/06/2014 Entry ID: 4121608

### ii.   Rogers' General Character Does Not Support the Admission of His Affidavit

The second factor in *Halk* indicates that "the general character of the speaker" is a relevant consideration in assessing the reliability of the out-of-court confession. *Halk*, 634 F.3d at 490. B. Rogers has been convicted of a violent crime, for which he was sentenced to two years in prison. (Tr. Vol. 19, p. 12). This Court has repeatedly acknowledged the "common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath." *United States v. Chauncey*, 420 F.3d 864, 874 (8th Cir. 2005). Based on this acknowledgement, B. Rogers' status as a convicted felon renders him less credible. *See* Fed. R. Evid. 609(a)(1). Indeed, in *United States v. Bobo*, 994 F.2d 524, 528 (8th Cir. 1993), this Court affirmed the exclusion of a hearsay confession of the defendant's brother, reasoning that he "is not a reliable declarant" because he was "convicted of a cocaine felony in December 1990 and a stay of imposition of his sentence was revoked because he tested positive for cocaine in his October 1991 urinalysis." *Id.* at 528. This holding demonstrates that Rogers' general character does not support the trustworthiness of his affidavit.

Not only is B. Rogers a convicted felon, the evidence at trial demonstrated unequivocally that B. Rogers was an eyewitness to the events of May 28, 2009.

Appellate Case: 13-1894      Page: 208      Date Filed: 02/06/2014 Entry ID: 4121608

The evidence was equally clear that following those events, B. Rogers fled the scene, failing to report what he had seen to the police. For a period of over three years, B. Rogers remained completely silent. There is no evidence whatsoever that B. Rogers ever spoke to any member of the law enforcement community until *after* he signed the affidavit in question. B. Rogers' flight from the scene of a shooting and his conspicuous failure to contact law enforcement speaks volumes about his character (or lack thereof), and the District Court was well within its discretion to conclude that J. Peteet had failed to satisfy the second *Halk* factor.

### iii. The Only Witnesses Who Testified to Having Heard B. Rogers Claim that he Shot Taylor were Witnesses Closely Tied to J. Peteet

Pursuant to *Halk,* this Court should next consider whether J. Peteet presented any evidence that other people heard B. Rogers' out-of-court statement. In the instant case, J. Peteet testified that on the night of May 28, 2009, B. Rogers admitted to having shot Taylor. (Tr. Vol. XXI, p. 151). To state the obvious, this claim is quintessentially self-serving. The only other person who testified to having heard such a confession by B. Rogers was K. Peteet, J. Peteet's brother. (Tr. Vol. XXI, p. 27). Quite naturally, such testimony should be viewed with skepticism, particularly given K. Peteet's admission that he harbored the weapon with which Taylor was shot for more than three years before causing it to be surrendered to law enforcement. Clearly, K. Peteet was complicit in the crime

Appellate Case: 13-1894     Page: 209     Date Filed: 02/06/2014 Entry ID: 4121608

with which his brother was charged. K. Peteet admitted to having been an eyewitness to the offense, and like B. Rogers, K. Peteet had remained silent until he appeared at trial to testify on his brother's behalf. K. Peteet's testimony that he heard B. Rogers admit to shooting Taylor is as incredible as it is predictable.

The only other person who could perhaps have testified to having heard B. Rogers' out-of-court statement was his wife, Sherri Rogers. However, the District Court properly disallowed Sherri Rogers' testimony, concluding that it was hearsay. (See, Issue IV, *infra*).

Not only was there only one witness (besides J. Peteet) who testified to having heard B. Rogers claim to have shot Taylor, the District Court noted in its ruling excluding the affidavit that it "heard multiple witnesses testify exactly contrary to this. Other witnesses have been subjected to cross-examination." (Tr. Vol. XIX, p. 16). In addition, it is important to note that although the Rogers Affidavit asserts that Taylor pointed a gun at B. Rogers, J. Peteet testified that he never saw Taylor pull a gun on May 28, 2009. (Tr. Vol. XXI, p. 189). In that crucial respect, the Rogers Affidavit flies directly in the face of the testimony of J. Peteet himself. While certainly the District Court's ruling was not made solely upon that basis, it properly considered the fact that several eyewitnesses had contradicted the Rogers Affidavit in open court before declining to admit it.

Appellate Case: 13-1894     Page: 210     Date Filed: 02/06/2014 Entry ID: 4121608

Given that K. Peteet was the only witness (other than J. Peteet himself) to testify to having heard B. Rogers make an out-of-court statement that he shot Taylor, the District Court did not err in concluding that the Rogers Affidavit was inadmissible for failing to satisfy the factors identified in *Halk*.

### iv. The Rogers Affidavit's Lack of Spontaneity Illustrates Its Untrustworthy Nature

The fourth *Halk* factor calls for the Court to consider whether the statements contained in the Rogers Affidavit were made spontaneously. *Halk*, 634 F.3d at 490. Applied to this case, it is difficult to imagine a less spontaneous utterance than the Rogers Affidavit. J. Peteet's participation in approving this affidavit casts grave doubt on its reliability. [78] Indeed, Rogers' collaboration with Peteet in preparing the affidavit presents the very antithesis of what is contemplated by the fourth *Halk* factor, *i.e.* "whether the statement was made spontaneously." *Id.*; *see also Bobo*, 994 F.2d at 528 (affirming the exclusion of the statement where "the statement at issue not only was not spontaneous, but it was not uttered until the eve of trial").

In the instant case, counsel for J. Peteet informed the District Court that prior to drafting his affidavit, B. Rogers "consulted Mr. Peteet." (Tr. Vol. XIX, p. 15). Although counsel claimed that "Mr. Peteet did not tell him what to put in the affidavit," he did acknowledge that "Mr. Peteet did read the affidavit." (Tr. Vol.

---

[78] *See* (Tr. Vol. XIX, p. 8-9).

Appellate Case: 13-1894   Page: 211   Date Filed: 02/06/2014 Entry ID: 4121608

XIX, p. 15). Counsel further confirmed that someone at B. Rogers' aunt's house (or his uncle's house) had typed the affidavit on his behalf. (Tr. Vol. XIX, pp. 15-16). This scenario is as calculated and methodical a scenario as there is. Even assuming, *arguendo*, that the District Court accepted the notion that J. Peteet had not actually drafted the Rogers Affidavit, it is abundantly clear (and J. Peteet has admitted) that he approved the content of the affidavit before B. Rogers signed it. In short, the District Court did not err in concluding that "there is nothing in the affidavit or the surrounding circumstances that leads me or that I believe would lead any reasonable person to think that, okay, this is something that this wouldn't have happened if it hadn't been true." As a result, the District Court did not abuse its discretion in excluding the affidavit.

### v. The Affidavit is Inherently Untrustworthy

The last *Halk* factor would have this Court consider the timing of his affidavit. It is undisputed that the Rogers Affidavit was signed and notarized on June 27, 2012 – some three years after the events it purported to describe. (Appx., p. 174). In contrast, the witnesses who testified for the Government made statements to Gary Police on the very night the shooting occurred. Not only did B. Rogers fail to claim responsibility for the shooting for well over three years, he produced the affidavit only *after* Peteet was federally charged and arrested. (Appx., p. 174). In fact, the Rogers Affidavit was prepared in circumstances very similar

Appellate Case: 13-1894    Page: 212    Date Filed: 02/06/2014 Entry ID: 4121608

to those in *Halk* itself, in which the out-of-court statement was held inadmissible in part because "the statement at issue . . . was made over a year after Halk's arrest and during an interview conducted in anticipation of his trial." *Id.*

J. Peteet seems to tacitly acknowledge the difficulty presented by the three year delay between the May 28, 2009 shooting and the emergence of the Rogers Affidavit. In an attempt to overcome this obstacle, J. Peteet suggests that the Rogers Affidavit is corroborated by B. Rogers' having surrendered to Lake County (Indiana) Sheriff's Department Officers on June 29, 2012, and having turned over to them the gun that had been used to shoot Taylor. (Tr. Vol. XIX, pp. 7-8; Appellant's Brief – J. Peteet, p. 23). However, these circumstances are unavailing. First, and perhaps foremost, as J. Peteet acknowledges, B. Rogers himself denied having surrendered the gun to law enforcement. (Tr. Vol. XIX, p. 9). Moreover, *J. Peteet himself accompanied B. Rogers to the Lake County Sheriff's Department on June 29, 2012.* (Tr. Vol. XXI, p. 170).

J. Peteet's conduct in this regard was nothing short of astonishing. After having been complicit in the concealment of crucial evidence of a crime over a period of three years, J. Peteet then miraculously appears at the Lake County Sheriff's Office *along with the weapon and a person claiming responsibility for the shooting.* J. Peteet – an attorney and thus an officer of the Court who had kept silent for three years, participated in surrendering this weapon and the purported

Appellate Case: 13-1894     Page: 213     Date Filed: 02/06/2014 Entry ID: 4121608

"shooter" only *after* J. Peteet had been indicted on racketeering conspiracy charges in the instant case.  J. Peteet's involvement in the surrender of this weapon, and the "surrender" of B. Rogers does nothing to render the Rogers Affidavit trustworthy. To the contrary, it cements the notion that J. Peteet was willing to do anything, including suborning a perjured affidavit, in an attempt to extricate himself from the situation of his own making.  The District Court quite properly considered these circumstances prior to reaching its decision with regard to the Rogers Affidavit. And having done so, it did not abuse its discretion in excluding the affidavit as hearsay not within any exception.

Appellate Case: 13-1894     Page: 214     Date Filed: 02/06/2014 Entry ID: 4121608

<center>**ARGUMENT**</center>

**IV.    THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR WHEN IT REFUSED TO ADMIT BARRY ROGERS' HEARSAY STATEMENTS[79]**

**A.    Standard of Review**

When a party properly preserves an evidentiary issue for appeal, this Court "review[s] [a] district court's evidentiary ruling for abuse of discretion." *United States v. Kenyon*, 397 F.3d 1071, 1079 (8th Cir. 2005).

> 'In order to challenge a trial court's exclusion of evidence, . . . an attorney must preserve the issue for appeal by making an offer of proof. . . Even if an issue is raised pre-trial, . . . an attorney must make an offer of proof during the trial in order to preserve the issue for appeal.'

*United States v. Seibel*, 712 F.3d 1229, 1236 (8th Cir. 2013) (internal citation omitted).  When a party fails to preserve an evidentiary issue for appeal, this Court reviews a district court's evidentiary ruling for "plain error." *Harris v. Chand*, 506 F.3d 1135, 1141 (8th Cir. 2007).

**B.    Argument**

J. Peteet (and only J. Peteet) asserts that the District Court erred when it excluded from evidence certain testimony of defense witness Sherri Rogers. Specifically, J. Peteet alleges that Sherri Rogers should have been permitted to testify as to certain hearsay statements allegedly made by her husband, Barry

---

[79] Appellant's Brief (J. Peteet), Issue V.

<center>203</center>

Rogers.  At trial, J. Peteet called Sherri Rogers, wife of Barry Rogers, to testify.

After she introduced herself to the jury, the following exchange occurred:

    Q:    What is your husband's name?

    A:    Barry Rogers.

    Q:    Does he go by any other name?

    A:    Capone.

    Q:    I want to take you back to an event that happened in Bennigan's May
          28, 2009.  Okay?

    A:    Okay.

    Q:    Were you at Bennigan's that day?

    A:    No, I was not.

    Q:    Where were you the evening of May 28, 2009?

    A:    I was at home.

    Q:    At some point in the evening, did Barry come home?

    A:    Yes, he did.

    Q:    And what was his mood?

    A:    He was hyper.

    Q:    And what did he tell you?

(Tr. Vol. XXI, p. 107).  Thereafter, the Government objected and the District Court

invited the parties to the bench for a sidebar conference.  Counsel for J. Peteet

advised the District Court that he believed the statements he was attempting to

Appellate Case: 13-1894      Page: 216      Date Filed: 02/06/2014 Entry ID: 4121608

elicit to be "a declaration against interest, and second an excited utterance." (Tr. Vol. XXI, pp. 107-08). The District Court responded, "[T]he objection is sustained." (Tr. Vol. XXI, p. 108). Counsel asked, "[O]n both of these? I can't get it as excited utterance?" (Tr. Vol. XXI, p. 108). The District Court reiterated, "[T]he objection that it's hearsay is sustained." (Tr. Vol. XXI, p. 108). Counsel then stated, "I'm done with this witness then." (Tr. Vol. XXI, p. 108). At no point did counsel for J. Peteet even make, or attempt to make, an offer of proof as to what Sherri Rogers would have said had the objection not been sustained.

J. Peteet urges this Court to utilize an "abuse of discretion" standard in reviewing the District Court's refusal to permit Sherri Roger to testify as to her husband's hearsay statements. His argument with regard to the standard of review, however, is without merit. Although J. Peteet did notify the District Court that he believed the statements to qualify as a "declaration against interest" or an "excited utterance," "different standards apply to preserved alleged error for trial court decisions to admit evidence versus its decisions to exclude evidence." *United States v. Yarrington*, 634 F.3d 440, 447 (8th Cir. 2011). "To preserve an argument that evidence was improperly *excluded*, the party must have made a sufficient offer of proof." *Id.* (emphasis in original). J. Peteet wholly failed to make an offer of proof as to the excluded evidence. Therefore, this Court should review the District Court's exclusion of the evidence for plain error.

Appellate Case: 13-1894     Page: 217     Date Filed: 02/06/2014 Entry ID: 4121608

In determining whether a hearsay statement qualifies as an excited utterance, the Eighth Circuit Court of Appeals has explained that "the proponent must prove three elements: '(i) that the statement was in reaction to a truly startling event; (ii) that the statement was made under the stress of excitement caused by that event; and (iii) that the statement relates to the event.'" *Brunsting v. Lutsen Mountains Corp.,* 601 F.3d 813, 817–18 (8th Cir. 2010) (quoting Glen Weissenberger & James J. Duane, *Weissenberger's Federal Evidence* § 803.8 (5th ed. 2006)). As the party attempting to show that a hearsay exception applies, J. Peteet bore the burden of demonstrating that the statement to which Sherri Rogers would have presumably testified was an "excited utterance." *See Reed v. Thalacker*, 198 F.3d 1058, 1061 (8th Cir. 1999).

> To determine whether a declarant was still under the stress of excitement caused by an event when a statement was made, [this Court] consider[s] the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, the subject matter of the statement, [and] . . . whether the declarant's stress or excitement was continuous from the time of the event until the time of the statements.

*United States v. Wilcox,* 487 F.3d 1163, 1170 (8th Cir. 2007) (internal quotations omitted).

At trial, J. Peteet did not even *attempt* to lay the requisite evidentiary foundation for an "excited utterance." He elicited no testimony whatsoever as to

the circumstances of the statement; it's temporal proximity to a "startling event;" the age of the declarant (Barry Rogers); the physical or mental condition of the declarant; or any of the above-referenced factors the District Court would have considered in excluding the evidence. His complete failure to address any of these factors left the District Court with no choice but to conclude that Barry Rogers's out of court statements was inadmissible hearsay.[80]

J. Peteet wholly failed in his burden to establish the applicability of a hearsay exception that would have permitted the District Court to admit the out-of-court statements made by Barry Rogers, presumably to his wife, Sherri Rogers. Because J. Peteet wholly failed to make an offer of proof as to the specific substance of the excluded hearsay statement to which Sherri Rogers apparently intended to testify, the District Court could not have properly concluded that the statement(s) in question fell within any recognized exception to the hearsay rule. J. Peteet's failure to make an offer of proof also prevents this Court from reviewing the District Court's ruling, except for "plain error." Inasmuch as there is no

---

[80] To the extent that J. Peteet asserts that Barry Rogers's statements qualified as a "statement against interest" under Federal Rule of Evidence 804(b)(3), he failed to properly preserve that argument for appeal by failing to make an offer of proof at the time of trial. *Yarrington*, 634 F.3d at 447. J. Peteet's failure to make an offer of proof left the District Court wholly without any basis upon which it could have concluded that the statement was indeed a "statement against interest." For the same reason, this Court should summarily affirm the District Court's exclusion of this evidence.

Appellate Case: 13-1894     Page: 219     Date Filed: 02/06/2014 Entry ID: 4121608

evidence – by offer of proof or otherwise – tending to establish that the statements at issue could have qualified as an "excited utterance" or a "statement against interest," the District Court did not plainly err or abuse its discretion in excluding this evidence as hearsay not within any exception and this Court should summarily affirm.

Appellate Case: 13-1894    Page: 220    Date Filed: 02/06/2014 Entry ID: 4121608

<h1 style="text-align:center"><u>ARGUMENT</u></h1>

**V.**  **<u>THE DISTRICT COURT DID NOT ERR IN ADMITTING EVIDENCE OF A NOVEMBER 1, 2009 MURDER</u>**[81]

**A.**  **Standard of Review**

This Court reviews the "district court's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affects the defendant's substantial rights or had more than a slight influence on the verdict." *Halk*, 634 F.3d at 488.

**B.**  **Argument**

Robinson (and only Robinson) alleges that the District Court abused its discretion when it permitted the Government to admit evidence of the November 1, 2009 murder of Thomas Tatum.  This murder was not included among the approximately 70 "overt acts" listed in the Superseding Indictment.  (DCD 745).  However, the Government provided all discovery related to this event, and notified counsel for Robinson of its intent to present such evidence at trial.  Robinson then moved for an order *in limine* prohibiting the Government from introducing evidence of the November 1, 2009 incident.  (DCD 1085).  The District Court denied the motion in an order dated October 9, 2012.  (DCD 1087).

Although Robinson claims that the November 1, 2009 murder was improperly admitted because it was not separately charged in the indictment, (Individual Brief of Defendant-Appellant Anthony Robinson's, p. 29), this

---

[81] Individual Brief of Defendant-Appellant Anthony Robinson, Issue V.

Appellate Case: 13-1894    Page: 221    Date Filed: 02/06/2014 Entry ID: 4121608

contention is contrary to authority. It is well established that the Government may present evidence of an uncharged predicate act in support of a RICO conspiracy. Such predicate acts are "clearly relevant and admissible to proving RICO's . . . elements," such as "proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy." *United States v. Gonzales*, 921 F.2d 1530, 1546 (11th Cir. 1991) (citing several cases holding that evidence of uncharged predicate acts is relevant and admissible in RICO prosecutions); *see also United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (allowing the Government in a RICO prosecution to introduce evidence of sixteen uncharged crimes to prove the existence of a criminal enterprise); *United States v. Boyle*, No. S108CR523 (CM), 2009 WL 5178525 at *6 (S.D.N.Y., Dec. 23, 2009) ("[E]vidence of uncharged acts is routinely admitted in this Circuit.").

More specifically, uncharged predicate acts of murder are frequently admitted in RICO prosecutions. *See, e.g.*, *United States v. Finestone*, 816 F.2d 583, 586 (11th Cir. 1987) (holding that the uncharged acts of kidnapping and murder were admissible in a RICO prosecution to prove the elements of a RICO conspiracy); *United States v. Erwin*, 793 F.2d 656, 669 (5th Cir. 1986) (approving the admission of a murder as "one of several uncharged RICO predicate offenses"). These holdings demonstrate that Robinson's murder of Tatum was properly

210

admitted to prove the elements of the RICO conspiracy. Indeed, evidence of the

November 1, 2009 murder was properly admitted, not just against Robinson, but

against all of the Appellants to prove the existence of the enterprise, the

conspiracy to conduct the affairs of the enterprise through a pattern of racketeering,

and the existence of a pattern of racketeering act, among other purposes.[82]

While Robinson asserts that Tatum's murder was unjustly prejudicial under

Federal Rule of Evidence 403, (Individual Brief of Defendant-Appellant Anthony

Robinson Brief, p. 35), he fails to acknowledge numerous cases holding the

contrary. In *Finestone*, for example, the Eleventh Circuit rejected the defendant's

attempt to exclude evidence of an uncharged murder committed by other RICO

conspirators. *Finestone*, 816 F.2d 585-86. Holding that this evidence was

admissible as directly probative of the elements of the RICO charges, the court

rejected the defendant's claim that the evidence should be excluded under Rule

403. *Id.*

Other courts have similarly rejected attempts to exclude evidence of

uncharged RICO predicate acts under Rule 403. *See, e.g.*, *United States v.*

*Eufrasio*, 935 F.2d 553, 572-73 (3d Cir. 1991) (holding that Rule 403 did not

exclude evidence of "uncharged Mafia crimes" "even against a defendant without

---

[82] Because Robinson's murder goes directly to the elements of the RICO conspiracy, it is not extrinsic evidence as Robinson claims. Thus, Robinson's arguments under Federal Rule of Evidence 404(b) are inapposite to the Court's analysis.

Appellate Case: 13-1894    Page: 223    Date Filed: 02/06/2014 Entry ID: 4121608

knowledge of such crimes); *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994) (rejecting a defendant's claim that "somewhat graphic testimony . . . as to the bloodstains," relating to violent uncharged RICO predicates, should have been excluded under Rule 403). Based on these holdings, Robinson's uncharged murder, which is directly probative of the elements of his RICO offense, is not unfairly prejudicial under Rule 403.

To the extent that Robinson separately argues that his murder was improperly admitted because it was only testified to by A. Hunter, (Individual Brief of Defendant-Appellant Anthony Robinson Brief, pp. 29-31), this argument holds no weight. Indeed, the jury was entitled to base its conclusions on Hunter's testimony, even if it were uncorroborated. *See United States v. Jefferson*, 725 F.3d 829, 834 (2013) (noting that this Court has "repeatedly upheld jury verdicts based solely on the testimony of co-conspirators and cooperating witnesses," because "it is within the province of the jury to make credibility assessments and resolve conflicting testimony.")

Evidence of the November 1, 2009 murder was relevant and admissible to prove the existence of the charged enterprise, as well as the agreement to conduct the affairs of that enterprise through a pattern of racketeering. The evidence was not more prejudicial than probative, and was therefore properly admitted. The District Court did not abuse its discretion in permitting the Government to present

Appellate Case: 13-1894     Page: 224     Date Filed: 02/06/2014 Entry ID: 4121608

evidence of the November 1, 2009 murder, notwithstanding the fact that it was not listed as an "overt act" in the Superseding Indictment. This Court should affirm the District Court's ruling, and Robinson's conviction as to Count I.

Appellate Case: 13-1894    Page: 225    Date Filed: 02/06/2014 Entry ID: 4121608

## VI.   THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR WHEN IT DENIED J. SMITH'S MOTION TO SEVER[83]

### A.   Standard of Review

When a motion to sever has been properly preserved, this Court will reverse a district court's denial of a motion to sever only if "clear prejudice and an abuse of discretion are shown." *United States v. Mueller*, 661 F.3d 338, 347 (8th Cir. 2011) (quoting *United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003)). However, where a defendant fails to renew his "motion [to sever] at the end of the government's case or at the close of all of the evidence," this Court "review[s] the denial of the motion for plain error." *United States v. Frank*, 354 F.3d 910, 920 (8th Cir. 2004) (citing *United States v. Mathison*, 157 F.3d 541, 546 (8th Cir. 1998)).

Because J. Smith failed to renew his motion to sever at the end of the Government's case in chief and at the close of all of the evidence, this Court renews the denial of his pretrial motion for plain error. "To succeed on plain-error review of the denial of the motion to sever, [Appellant] must show an abuse of discretion by the trial court as well as prejudice affecting his substantial rights and an extraordinary reason to reverse." *Frank*, 354 F.3d at 920 (internal quotations omitted); *United States v. Sanchez-Garcia*, 685 F.3d 745, 754 (8th Cir. 2012) (same.)

---

[83] Individual Brief of James C. Smith, Issue II.

**B.    Argument**

Generally, defendants who are indicted together should also be tried together in the interests of judicial economy. *Buchanan v. Kentucky*, 483 U.S. 402, 218 (1987). Indeed, joint trials allow the jury to view a more complete picture of the crime, and avoid the duplication involved in presenting the same evidence to more than one jury. *United States v. Lewis*, 557 F.3d 601, 609 (8th Cir. 2009). In addition to these benefits to the jury, joint trials also contribute to consistent verdicts. *Richardson v. Marsh*, 481 U.S. 200, 210 (1987); *United States v. Lane*, 474 U.S. 438, 449 (1986).

Based on the demonstrative benefits of joint trials, this Court "has consistently held that persons charged with conspiracy should generally be tried together." *United States v. Kindle*, 925 F.2d 272, 277 (8th Cir. 1991); *see e.g.*, *United States v. Stephenson*, 924 F.2d 753, 761 (8th Cir. 1991) (holding that "[r]arely, if ever will it be improper for co-conspirators to be tried together"). Despite J. Smith's arguments to the contrary, "[i]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *Layton v. South Dakota*, 918 F.2d 739, 744 (8th Cir. 1990). Likewise, severance is also not required if the evidence against a co-defendant is more damaging,[84] or if

---

[84] *United States v. Pou*, 953 F.2d 363, 369 (8th Cir. 1992).

215

the defendant's role in the conspiracy is minor.[85] Additionally, where defendants are properly joined, "there is a strong presumption for their joint trial, as it gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." *Lewis*, 557 F.3d at 609 (internal quotations omitted).

To overcome this "strong presumption" in favor of the joint trial in the case at bar, J. Smith advances an unsupported claim that the jury was "unable to compartmentalize the evidence as it relates to the separate defendants." (J. Smith's Brief, p. 22 (citing *Mueller*, 661 F.3d at 347). While a jury's inability to compartmentalize evidence may require severance in limited situations, this Court's precedent demonstrates that the District Court did not commit a plain error in denying J. Smith's motion to sever.

In assessing the jury's ability to compartmentalize the evidence against joint defendants, this Court considers (1) the complexity of the case, (2) whether any of the defendants were acquitted, and (3) the adequacy of the jury instructions and admonitions to the jury. *Lewis*, 557 F.3d at 610 (citing *United States v. Ghant*, 339 F.3d 660, 666 (8th Cir. 2003)). Ignoring the second and third factors, J. Smith's argument is premised wholly on the complexity of this case. While this case is concededly complex to a certain degree, the mere complexity of a case does not

---

[85] *United States v. Pecina*, 956 F.2d 186, 188 (1992).

Appellate Case: 13-1894     Page: 228     Date Filed: 02/06/2014 Entry ID: 4121608

require severance in and of itself. *See e.g.*, *United States v. Darden*, 70 F.3d 1507, 1527-28 (8th Cir. 1995) (affirming the joinder of nine defendants in a multiple count RICO case); *United States v. Morales*, 655 F.3d 608, 625 (7th Cir. 2011) (affirming the denial of a motion to sever in a RICO conspiracy case involving eight defendants).

In *Frank*, *supra,* this Court held that the district court did not plainly err when it denied the defendant's pre-trial motion to suppress, which he had failed to renew at the close of the government's case or post-verdict. The *Frank* Court reached its conclusion after determining that the jury was able to compartmentalize the evidence against defendants in a trial involving 51 counts. *Frank,* 354 F.3d at 920-21. This Court noted in *Frank* that the district court had instructed the jury that it must consider the evidence as to each defendant separately. This Court further noted that neither of the defendants in *Frank* was convicted of all counts, and on one count, one of the defendants was convicted while the other was acquitted.

Here, as in *Frank¸* the district court instructed the jury that it must consider the evidence as to each defendant separately. (DCD 1206, p. 19). In addition, here, as in *Frank*, the jury did not convict all of the Appellants on each and every count. Such acquittals as to individual counts or individual defendants are "a good indication that the jury made efforts to compartmentalize the evidence against each defendant." *Frank,* 354 F.3d at 921. Based on the clear instruction given to the

217

jury and the evidence that the jury followed that instruction, J. Smith has failed

overcome the strong presumption in favor of joint trials.  The District Court did

not, therefore, plainly err in denying J. Smith's motion to sever.

# ARGUMENT

## VII. NEITHER THE GOVERNMENT NOR THE COURT "CONSTRUCTIVELY AMENDED" THE INDICTMENT AS TO COUNT XI AND THE DISTRICT COURT THEREFORE DID NOT COMMIT PLAIN ERROR WHEN IT DENIED ROBINSON'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO COUNT XI[86]

### A. Standard of Review

"In the absence of objection at trial, [this Court] need not precisely decide whether constructive amendment compels reversal in all cases. . . In the absence of any trial objection, [this Court] review[s] for plain error." *United States v. Gavin*, 583 F.3d 542, 547-48 (8th Cir. 2009).  Moreover, a party's failure to object to jury instructions at trial "precludes appellate review, except where plain error affects substantial rights." *Id.* at 545-46.  "'Plain error review permits reversal only if the error was so prejudicial as to have affected substantial rights resulting in a miscarriage of justice.'" *Id.* at 546.

### B. Argument

Appellant Robinson (and only Robinson) urges this Court to reverse his conviction as to Count XI – Violent Crime in Aid of Racketeering – Attempted Murder, alleging that the jury was improperly instructed as to the elements of the offense, resulting in a "constructive amendment" of the Superseding Indictment. "An indictment is constructively amended only by 'the admission of evidence that

---

[86] Individual Brief of Defendant-Appellant Anthony Robinson, Issue II.

219

proves the essential elements of an uncharged offense.'" *Jefferson*, 725 F.3d at

836.  Stated another way, a constructive amendment occurs

> when the essential elements of the offense set forth in the
> indictment are altered, either actually or in effect, by the
> prosecutor or the court after the grand jury has passed
> upon them, thereby creating a substantial likelihood that
> the petit jury convicted the defendant of an offense that
> the grand jury had not charged.

*United States v. Mariano*, 729 F.3d 874, 880 (8th Cir. 2013) (internal citations and

quotations omitted).

In the instant case, Robinson complains bitterly that Instruction 40, which

defined the offense set forth in Count XI of the Superseding Indictment, was

improper.  More specifically, Robinson asserts that "Instruction No. 40 does not

instruct the jury that they must find beyond a reasonable doubt that Defendant *took*

*a substantial* step toward committing the crime of first degree murder, *an essential*

*element* of attempted murder as alleged in the Superseding Indictment."

(Individual Brief of Defendant-Appellant Anthony Robinson, pp. 17-18) (emphasis

in original).  Interestingly, and importantly, Robinson did not object to Instruction

40 at the time of trial.  To the contrary, during the jury instruction conference held

on November 20, 2012, the parties discussed this same instruction, which outlined

Appellate Case: 13-1894     Page: 232     Date Filed: 02/06/2014 Entry ID: 4121608

the elements of Count XI.[87]  When asked for his thoughts, counsel for Robinson

stated,

> [t]he only thing I have with Instruction Number 38 [now
> Instruction 40] is that the committee notes to the first
> degree murder instruction has, '[w]hen the prosecution is
> for an inchoate offense, attempt first degree murder,
> solicitation to commit first degree murder, do not gives
> [sic] paragraphs 2, 3, or 4.'  You have included in here
> paragraph 3, the defendant intended to kill or do great
> bodily harm to Charles Erwin [sic] or another, or that he
> knew his acts would cause --- after the second sentence
> where it says 'or knew that such acts would create a
> strong probability,' I think that should be taken out
> pursuant to Illinois law.

(Tr. Vol. XXIII, p. 76).  In response, counsel for the Government stated, "I don't

disagree with that."  (Tr. Vol. XXIII, p. 77).  Thereafter, the District Court made

the very change requested by Robinson.  After the Government clarified,

> [w]hat we should do is at the end of Element Number 2,
> we should simply eliminate everything after 'another.'  In
> other words, it should say, 'did intended [sic] to kill or
> did great bodily injury to Charles Ervin or another,
> semicolon, 3, defendant did so for the purpose of
> maintaining or increasing….

(Tr. Vol. XXIII, p. 77).  Counsel for Robinson responded, "I agree."  (Tr. Vol.

XXIII, p. 77).   Seconds later, he reiterated, "[t]hat would be fine, that instruction is

fine that way."  (Tr. Vol. XXIII, p. 77).  On appeal, Robinson does not

---

[87] At the time of the jury instruction conference, the instruction defining the
elements of Count XI was Instruction 38.  The instructions were subsequently re-
numbered, and the previously numbered 38 was read to the jury as Instruction 40.
It is Instruction 40 about which Robinson now complains.

Appellate Case: 13-1894     Page: 233     Date Filed: 02/06/2014 Entry ID: 4121608

acknowledge that this exchange occurred, and to the extent his counsel endorsed the instruction at trial, he has waived any objection to it. *See Mariano*, 729 F.3d at 881 (citing *United States v. Jefferson*, 432 Fed. Appx. 387-88 (5th Cir. 2011) (request to "leave the instructions as they are" is waiver).

Not only does Robinson neglect to acknowledge his failure to object to Instruction 40, he neglects to conduct a thorough review or analysis of the other instructions given to the jury. As this Court is no doubt aware, it has previously held that it "will 'affirm if the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case.'" *United States v. Webster*, 442 F.3d 1065, 1067 (8th Cir. 2006); *United States v. Redzic*, 627 F.3d 683, 690 (8th Cir. 2010) (same); *United States v. Stegmeier*, 701 F.3d 574, 582 (8th Cir. 2012). Although Robinson complains that Instruction 40 did not advise the jury that in order to convict, it must find that Robinson committed a "substantial step" toward the commission of the offense, the jury was so advised. In Instruction 28, the jury was instructed that:

> A person commits crime of Attempt to Commit Murder
> in violation of Illinois law, when he intends to commit
> Murder in the First Degree in violation of Illinois law,
> and he voluntarily and intentionally carries out some act
> *which is a substantial step* toward that crime.

Appellate Case: 13-1894     Page: 234     Date Filed: 02/06/2014 Entry ID: 4121608

(DCD 1206, p. 36) (emphasis added). In addition, the jury was provided

definitions of both the term "attempt" and the phrase "substantial step."

Instruction 47 advised that:

> A person "attempts" to commit a crime when he intends
> to commit that crime and voluntarily and intentionally
> carries out some act *which is a substantial step* toward
> the commission of that crime.
>
> A "substantial step," as used in this instruction, must be
> something more than mere preparation, yet may be less
> than the last act necessary before the actual commission
> of the substantive crime. In order for behavior to be
> punishable as an attempt, it need not be incompatible
> with innocence, yet it must be necessary to the
> consummation of the crime and be of such a nature that a
> reasonable observer, viewing it in context, could
> conclude beyond a reasonable doubt that it was
> undertaken in accordance with the violation of the
> statute.

(DCD 1206, p. 60) (emphasis added). Robinson did not object to Instruction 47 at

trial, and does not even acknowledge its existence on appeal. Robinson's

suggestion that the District Court's instructions permitted the jury to convict

Robinson of Violent Crime in Aid of Racketeering – Attempt to Commit Murder

without first finding that he completed a "substantial step" toward the commission

of that offense is factually baseless and without merit.

Clearly, the jury was properly instructed as to all of the requisite elements of

the offense charged in Count XI. The charge to the jury, when read as a whole,

fairly and adequately contains the law applicable to that offense . More

223

particularly, the charge as a whole properly advised the jury that in order to be guilty of an "attempt to murder," Robinson must have committed a "substantial step" toward the commission of the offense of murder. The District Court did not plainly err in instructing the jury as to the elements of Violent Crime in Aid of Racketeering – Attempt to Commit Murder, and this Court should affirm Robinson's conviction as to that count. Inasmuch as the jury instructions correctly advised the jury as to the requisite elements of the offense charged in Count XI, the charge as contained in the Superseding Indictment was not "constructively amended," and the jury's verdict should therefore be affirmed.

Appellate Case: 13-1894    Page: 236    Date Filed: 02/06/2014 Entry ID: 4121608

<center>**ARGUMENT**</center>

**VIII.** **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO UTILIZE A SPECIAL VERDICT FORM**[88]

**A.** **Standard of Review**

This Court reviews a district court's denial "of a request for a special verdict form under an abuse of discretion standard." *United States v. Pierce*, 479 F.3d 546, 551 (8th Cir. 2007).

**B.** **Argument**

Appellants next assert that the District Court abused its discretion in refusing to submit a special verdict form that would have required the jury to identify the "types of predicate acts to which the jury unanimously agreed as to each defendant." (Appellants' Joint Brief, p. 72). Presumably, Appellants believe the District Court should have employed Robinson's Proposed Jury Instruction H (DCD 1198, p. 9), although Appellants fail to specify the form they believe the special verdict form should have taken.

Appellants acknowledge that, although permitted, special interrogatories or verdicts are "generally disfavored in criminal cases." *Stegmeier*, 701 F.3d at 581. They contend, however, argues that in "complex" criminal cases, special verdict forms are not disfavored and may even be preferred. They cite several cases-none from the Eighth Circuit-in which other courts of appeal found no error in the use of

---

[88] Appellants' Joint Brief, Issue V; Individual Brief of James C. Smith, Issue III.

<center>225</center>

special verdict forms. (Appellants' Joint Brief, p. 70). It is crucial to note, however, that none of these courts held that a district court abused its discretion by *not* using a special verdict form; rather, they held only that there was no prejudice to criminal defendants where such forms were used. For example, in *United States v. Applins*, 637 F.3d 59, 82 (2d Cir. 2011), the Second Circuit rejected appellants' argument that their convictions must be reversed because the jury was not required to answer special interrogatories identifying specific predicate acts that each of them agreed would be committed. The Second Circuit also reiterated that the "'ultimate decision whether to use special interrogatories in criminal RICO cases is left to the discretion of the trial judge' and that '[n]either the prosecutor nor the defendant has the right to insist on their use.'" *Id.* at 83.

Contrary to Appellants' position, there simply is no requirement that a district court use a special verdict form, even in complex cases. *See United States v. Sababu*, 891 F.2d 1308, 1325 (7th Cir. 1989) (rejecting the argument that special verdict forms were required to ensure juror unanimity as to the conduct constituting the conspiracy); *United States v. Smith*, 938 F.2d 69, 70 (7th Cir. 1991); *see also United States v. Ogando*, 968 F.2d 146, 149 (2d Cir. 1992) (noting the benefits of special interrogatories in "particularly complex criminal cases," but finding their use within the "broad discretion of the district court" and affirming the district court's decision not to use special interrogatories submitted by the

Appellate Case: 13-1894     Page: 238     Date Filed: 02/06/2014     Entry ID: 4121608

defendants); *United States v. Shenburg,* 89 F.3d 1461, 1472 (11th Cir. 1996) (district court did not abuse its discretion in declining defendants' request for a special verdict on a RICO conspiracy count; court properly gave a unanimity instruction in addition to a general verdict, but did not hold that such an instruction was required); *United States v. Smith,* 413 F.3d 1253, 1277 (10th Cir. 2005), *overruled on other grounds, United States v. Hutchinson,* 573 F.3d 1011 (10th Cir. 2009) (district court did not err in declining to give defendant's proffered special verdict form).

Appellants have failed to provide this Court with even one instance in which a Court of Appeals has held that a district court abused its discretion in failing to utilize a special verdict form in a RICO conspiracy case. It is nearly inconceivable that the District Court in the instant case could have abused its discretion in failing to do that which countless other district courts have done without correction. The Government respectfully request that this Court should find that no abuse of discretion occurred with the District Court refused to utilize Appellants' requested special verdict form.

Appellate Case: 13-1894    Page: 239    Date Filed: 02/06/2014 Entry ID: 4121608

# ARGUMENT

**IX.** **THE DISTRICT COURT DID NOT COMMIT CLEAR ERROR IN IMPOSING A TWO-LEVEL ENHANCEMENT AS TO J. PETEET PURSUANT TO UNITED STATES SENTENCING GUIDELINES SECTION 3B1.1(c), BECAUSE J. PETEET WAS AN ORGANIZER, LEADER, MANAGER, OR SUPERVISOR IN THE CRIMINAL ACTIVITY[89]**

## A.    Standard of Review

This Court "review[s] a district court's factual findings supporting a leadership enhancement for clear error and its legal conclusions de novo. *United States v. Adetiloye*, 716 F.3d 1030, 1037 (8th Cir. 2013).

## B.    Argument

Appellant J. Peteet (and only J. Peteet) asserts that the District Court erred at the time of his sentencing when it imposed a two-level enhancement for his having occupied a position as an "organizer, leader, manager, or supervisor" pursuant to United States Sentencing Guidelines Section 3B1.1(c).  Section 3B1.1(a) provides that if a defendant was an organizer or leader in any criminal activity that involved five or more persons, or if his participation was otherwise extensive, four levels should be added to his Base Offense Level.  Similarly, Section 3B1.1(c) provides that "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than that described in (a) or (b) above, increase by 2 levels."

---

[89] Appellant's Brief (J. Peteet), Issue IV.

Appellate Case: 13-1894    Page: 240    Date Filed: 02/06/2014 Entry ID: 4121608

The Government bears the burden of proving, by a preponderance of the evidence, that the two-level enhancement pursuant to Section 3B1.1(c) was warranted. *United States v. Ortiz-Rodriguez*, 461 Fed. Appx. 525, 537 (8th Cir. 2012).

"There are several factors that distinguish a leadership and organizational role from one of mere management or supervision." *United States v. Beaulieu*, 893 F.2d 1177, 1182 (8th Cir. 1990). However, Section 3B1.1(c), unlike Section 3B1.1(a), does not differentiate between an "organizer or leader" and a "manager or supervisor." "Therefore, when considering whether §3B1.1(c) applies, it is unnecessary to determine whether the defendant was a mere 'manager or supervisor' or instead was a more responsible 'organizer or leader.'" *United States v. Jackson*, 639 F.3d 479, 483 (8th Cir. 2011). "'Each of these four terms is construed broadly.'" *United States v. Frausto*, 636 F.3d 992, 996 (8th Cir. 2011) (citing *United States v. De Oliveira*, 623 F.3d 593, 599 (8th Cir 2010)).

In determining whether any enhancement under Section 3B1.1 is appropriate, the Court should consider a number of factors, including,

> "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Appellate Case: 13-1894    Page: 241    Date Filed: 02/06/2014 Entry ID: 4121608

*Id.*; *Adetiloye*, 716 F.3d at 1027. "Furthermore, the enhancement applies 'even if the defendant's leadership role did not encompass all the participants.'" *United States v. Pizano,* 421 F.3d 707, 733 (8th Cir. 2005), *citing United States v. Payne,* 119 F.3d 637, 646 (8th Cir. 1997). *See also United States v. Rodriguez-Ramos*, 663 F.3d 356, 365 (8th Cir. 2011) (defendant need lead only one other participant in order to qualify as an "organizer or leader").

In the instant case, J. Peteet does not dispute that evidence presented at trial established that he was the President of the Indiana Chapter of the Wheels of Soul. His "colors" bearing the "President" patch were admitted as Government's Exhibit 109. The jury also heard evidence about the role of the Chapter Presidents. Multiple witnesses testified that the Chapter Presidents were responsible for maintaining membership, ensuring payment of dues, calling and presiding over meetings, passing information from Regional and National leadership to rank-and-file members, and enforcing club rules. K. Peteet, J. Peteet's own brother, testified that J. Peteet was his President, and that each member of the WOS was obligated to protect and obey his President. The government also played wiretap calls at trial that established by a preponderance of the evidence, that J. Peteet acted as "manager" or "supervisor" over the members of the Indiana Chapter of the WOS.

The Government admitted evidence of J. Peteet's role in this offense at trial, in the form of Government's Exhibit 537, a recorded telephone conversation in

230

which J. Peteet spoke to A. Hunter regarding Wheel of Soul member "Capone," who had recently been released from prison.  J. Peteet advised A. Hunter that "Capone is out of jail.  I gave Ghost his set of colors and his girl's "Property of." So, he's out of jail, man." (Govt. Exh. 537; Appx., p. 171).  In response, A. Hunter informed J. Peteet that he did not know who had possession of "Capone's" "colors," stating, "Ghost left me out of the loop with that."  (Govt. Exh. 537, Appx., p. 171). He later explained that "[I]f somebody goes to jail or you get stationed somewhere, all of that, then the chapter keeps it for thirty days.  After that, then it gets sent to the Regional, and then the Regional gets it up the road."  (Govt. Exh. 537, p. 171). J. Peteet confirmed, "Right, that's what he told me.  To Mother."  (Govt. Exh. 537, Appx., p. 172).  Later, J. Peteet indicated "I know [Capone] is going to call me sooner or later wanting his s**t."  (Govt. Exh. 537, Appx., p. 172).

During a search of J. Peteet's residence on June 22, 2012, two "Property of Capone" patches were seized from his garage.  (Government's Exhibits 117 and 118).  This telephone call, and these exhibits, demonstrate that defendant J. Peteet was responsible for managing the business and affairs of the Indiana Chapter of the WOA, and for acting as a liaison between the Indiana members and the Regional President, be that Farris, a/k/a "Ghost," or A. Hunter.

J. Peteet's brother, K. Peteet, testified at trial.  On cross-examination, K. Peteet acknowledged that J. Peteet was the President of the WOS chapter in Gary,

Appellate Case: 13-1894     Page: 243     Date Filed: 02/06/2014 Entry ID: 4121608

Indiana. (Tr. Vol. XXI, p. 30). K. Peteet admitted that as a member of the WOS, he was expected to follow his chapter President's orders. (Tr. Vol. XXI, p. 31).

The District Court also heard evidence at trial that between May 28, 2009 and July 2012, J. Peteet was aware that his own brother, K. Peteet, was in possession of the gun that had been used to shoot R. Taylor in the parking lot of Bennigan's restaurant. (Transcript of Sentencing Hearing, April 23, 2013, p. 34; Tr. Vol. XXI, pp. 213-14). The weapon did not resurface until the summer of 2012 when Arthur Griffin and others – including J. Peteet himself - surrendered it to law enforcement. (Tr. Vol. XXI, p. 113). By that time, more than three years had elapsed since the shooting. During that three-year span, J. Peteet knew full well that K. Peteet had custody of that firearm and was concealing it from law enforcement. It was only after J. Peteet was named in the Superseding Indictment that the firearm miraculously resurfaced and was provided to the police. Given the totality of the evidence presented at trial, the District Court was entitled to conclude that J. Peteet had directed his fellow WOS to produce that gun and provide it to law enforcement in the hope that it would exonerate him. This evidence, when coupled with the other evidence presented as to the WOS members' obligations to adhere to the directives of their Presidents generally - and specifically with respect to J. Peteet – proved by a preponderance of the evidence that J. Peteet occupied a position as an "organizer, leader, manager, or supervisor,"

Appellate Case: 13-1894    Page: 244    Date Filed: 02/06/2014 Entry ID: 4121608

and the two level enhancement pursuant to Section 3B1.1(c) was therefore

appropriate and should be affirmed.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that Appellants' assignments of error by the District Court be rejected, that each and all of their convictions, as well as the sentence imposed as to J. Peteet, be affirmed.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

*s/ Sirena M. Wissler*
SIRENA M. WISSLER
Assistant United States Attorney
111 South Tenth Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200

February 6, 2014.

Appellate Case: 13-1894     Page: 246     Date Filed: 02/06/2014 Entry ID: 4121608

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies pursuant to Rule 32(a)(C)(7) that this Brief is in monospaced type and contains 58,546 words, and pursuant to Eighth Circuit Rule 28A(c) that this Brief was prepared using Microsoft Word 2010 software.

 s/ Sirena M. Wissler
SIRENA M. WISSLER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2014, the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeal for the Eighth Circuit and that the foregoing will be served by operation of the Court's electronic filing system upon the following:

Donnell Smith (Attorney for D. Henley)
Chris Pickett (Attorney for J. Smith)
Ron Jenkins (Attorney for J. Elkins)
John Lynch (Attorney for M. Fry)
Doug Roller (Attorney for A. Robinson)
David Woods (Attorney for J. Peteet)

 s/ Sirena M. Wissler
SIRENA M. WISSLER
Assistant United States Attorney

Appellate Case: 13-1894     Page: 247     Date Filed: 02/06/2014 Entry ID: 4121608